**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, *et al.*,<br><br>Defendants. | Civil Docket No. 20-cv-2295 (EGS) |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## <u>**TABLE OF CONTENTS**</u>

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

I.      The United States Postal Service ............................................................................ 3

II.     USPS's Handling of Election Mail .......................................................................... 4

        A.      State, Local, and Individual Responsibilities for Election Mail ............................ 6

        B.      USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail ...................... 8

                1.      USPS Outreach and Recommendations to Election Officials ................... 8

                2.      USPS's Longstanding Special Measures for Election Mail .................... 11

                3.      USPS's Increased Efforts in Support of the Election ............................. 13

III.    USPS's Years-Long Mandate to Improve Efficiency and Control Expenses................... 14

        A.      Periodic, Data-Based Reduction in Redundant Processing Equipment
                and Collection Boxes ...................................................................................... 15

        B.      USPS's Continued Focus on Adherence to Existing Transportation
                Schedules ...................................................................................................... 17

        C.      USPS Personnel Practices Related to Overtime Usage and Staffing
                Shortages Caused by the Covid-19 Pandemic ................................................ 19

                1.      Overtime ...................................................................................... 19

                2.      The Impact of the COVID-19 Pandemic .................................................. 20

        D.      Other Efforts Aimed at Improving Efficiency ................................................... 21

IV.     Procedural History ............................................................................................... 21

STANDARD OF REVIEW ................................................................................................ 22

ARGUMENT .................................................................................................................... 23

I.      PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS
        CLAIMS. ............................................................................................................. 24

        A.      Plaintiff Lacks Article III Standing.................................................................... 24

                1.      Plaintiff Lacks Article III Injury. ............................................................. 25

2.      Plaintiff Cannot Establish Causation or Redressability Because It Seeks to Enjoin Changes That Have Not Occurred. ................................ 29

B.      Plaintiff Is Not Likely to Succeed On Its 39 U.S.C. § 3661 Claim. ..................... 30

1.      District Courts Lack Subject-Matter Jurisdiction Over Complaints Regarding 39 U.S.C. § 3661, Which Are Channeled to the Postal Regulatory Commission and Then the D.C. Circuit. ............................... 30

2.      The *Ultra Vires* Doctrine Does Not Provide an Avenue for Judicial Review Here ....................................................................................... 34

C.      Plaintiff Cannot Bring an Arbitrary and Capricious Challenge to the Postal Services' Compliance with 39 U.S.C. § 101(e). ................................ 40

II.      PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM. ........................... 42

III.      THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF. ....................... 45

CONCLUSION .................................................................................................................... 45

## TABLE OF AUTHORITIES

### CASES

*Aid Ass'n for Lutherans v. USPS*,
    321 F.3d 1166 (D.C. Cir. 2003) ............................................... 35

*Ajilon Prof. Staffing, PLC v. Kubicki*,
    503 F. Supp. 2d 358 ............................................................... 23

*Am. Legal Found. v. FCC*,
    808 F.2d 84 (D.C. Cir. 1987) .................................................. 27

*Bank of Louisiana v. FDIC*,
    919 F.3d 916 (5th Cir. 2019) .................................................. 33

*\*Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ............................................................ 35, 36

*Bovard v. U.S. Post Office*,
    47 F.3d 1178 (10th Cir. 1995) ............................................... 31

*\*Buchanan v. U.S. Postal Serv.*,
    508 F.2d 259 (5th Cir. 1975) ............................................ 36, 40

*Buchanan v. USPS*,
    375 F. Supp. 1014 (N.D. Ga. 1974) ...................................... 28

*Carlin v. McKean*,
    823 F.2d 620 (D.C. Cir. 1987) ............................................... 41

*Chamber of Commerce of U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ............................................... 36

*City of L.A. v. Lyons*,
    461 U.S. 95 (1983) ................................................................ 25

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ................................................. 23

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .......................................................... 24, 26

*Cobell v. Norton*,
    391 F.3d 251 (D.C. Cir. 2004) ............................................... 23

*Columbia Hopsital for Women Found v. Bank of Tokyo-Mitsubishi, Ltd.*,
    15 F. Supp. 2d 1 (D.D.C. 1997) ............................................. 23

*Ctr. for Biological Diversity v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017) ............................................... 33

iii

*Ctr. for Law & Educ. v. Dep't of Educ.*,
  396 F.3d 1152 (D.C. Cir. 2005) ................................................................ 27

*Currier v. Potter*,
  379 F.3d 716 (9th Cir. 2004) .................................................................... 41

*Eagle Trust Fund v. USPS*,
  365 F. Supp. 3d 57 (D.D.C. 2019) ..................................................... 41, 42

*Elec. Privacy Info. Ctr. v. Dep't of Educ.*,
  48 F. Supp. 3d 1 (D.D.C. 2014) ............................................................... 28

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ................................................................. 27

*\*Foster v. Pitney Bowes Corp.*,
  549 F. App'x 982 (Fed. Cir. 2013) ........................................................... 31

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ........................................................................... 33, 34

*Gelman v. FEC*,
  631 F.2d 939 (D.C. Cir. 1980) ................................................................. 39

*Havens Realty Corp. v. Coleman*,
  466 U.S. 363 (1982) ................................................................................. 25

*Int'l Acad. of Oral Medicine & Toxicology v. FDA*,
  195 F. Supp. 3d 243 (D.D.C. 2016) ......................................................... 28

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
  933 F. Supp. 2d 58 (D.D.C. 2013) ..................................................... 22, 23

*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015) .................................................................... 34

*Key Medical Supply, Inc. v. Burwell*,
  764 F.3d 955 (8th Cir. 2014) .................................................................... 42

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .................................................................... 43

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ................................................................................. 35

*\*LeMay v. U.S. Postal Serv.*,
  450 F.3d 797 (8th Cir. 2006) .............................................................. 30, 31

*McDermott v. Potter*,
  No. C09-0776RSL, 2009 WL 2971585 (W.D. Wash. Sept. 11, 2009) ..................... 32

*McDermott v. Donahue,*
  408 F. App'x 51 (9th Cir. 2011) ............................................................. 32

*Media Access Project v. FCC,*
  884 F.2d 1063 (D.C. Cir. 1989) ............................................................. 33

*Mittleman v. Postal Regulatory Comm'n,*
  757 F.3d 300 (D.C. Cir. 2014) ............................................. 34, 35, 36, 41

*Murphy v. United States Postal Serv.,*
  No. C 14-02156 SI, 2014 WL 4437731 (N.D. Cal. Sept. 9, 2014) ........... 32

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Service Impasses Panel,*
  437 F.3d 1256 (D.C. Cir. 2006) ............................................................. 35

*Nat'l Ass'n of Home Builders v. EPA,*
  667 F.3d 6 (D.C. Cir. 2011) ................................................................... 27

*Nat'l Ass'n of Postal Supervisors v. USPS,*
  No. 18-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020) ........... 35

*Nat'l Consumers League v. Gen. Mills, Inc.,*
  680 F. Supp. 2d 132 (D.D.C. 2010) ....................................................... 28

*Nat'l Taxpayers Union, Inc. v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ............................................................... 27

*Nat'l Treasury Emps. Union v. United States,*
  101 F.3d 1423 (D.C. Cir. 1996) ....................................................... 25, 27

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................. 23

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ............................................................................... 45

*Nyunt v. Broadcasting Bd. of Govs.,*
  89 F.3d 445 (D.C. Cir. 2009) ................................................................ 35

*Open Communities All. v. Carson,*
  286 F. Supp. 3d 148 (D.D.C. 2017) ....................................................... 43

*Pep-Wku, LLC v. USPS,*
  No. 20-cv-0009-GNS, 2020 WL 2090514 (W.D. Ky. Apr. 30, 2020) ......... 32

*Pitney Bowes, Inc. v. USPS,*
  27 F. Supp. 2d 15 (D.D.C. 1998) ........................................................... 41

*Powell v. United States Postal Serv.,*
  No. CV 15-12913-FDS, 2016 WL 409672 (D. Mass. Feb. 2, 2016) ........... 32

v

*Power Mobility Coalition v. Leavett*,
    89 F.3d. 2d 190 (D.D.C. 2005)......................................................................... 43

*Public Util. Comm'r of Or. v. Bonneville Power Admin*,
    767 F.2d 622 (9th Cir. 1985)......................................................................... 33

*Reese Bros. v. U.S.P.S.*,
    905 F. Supp. 2d 223 (D.D.C. 2012) ............................................................... 41

*Rodriguez v. Hemit*,
    No. C16-778 RAJ, 2018 WL 3618260 (W.D. Wash. July 30, 2018)..................... 32

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
    134 F. Supp. 3d 365 (D.D.C. 2015) ............................................................... 32

Sears, Roebuck & Co. v. United States Postal Serv.,
    844 F.3d 260 (D.C. Cir. 2016) ..................................................................... 32

*Singh v. Carter*,
    185 F. Supp. 3d 11 (D.D.C. 2016) ........................................................... 23, 25

*Spann v. Colonial Vill., Inc.*,
    899 F.2d 24 (D.C. Cir. 1990) ..................................................................... 27

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ............................................................................... 24

*Striley v. United States Postal Serv.*,
    No. 16-CV-07233-HRL, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017) ................... 32

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................................... 28, 43

*Telecomms Res. & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ..................................................................... 33

*Turlock Irrigation Dist. v. FERC*,
    786 F.3d 18 (D.D.C. 2015)......................................................................... 27

*United Farm Workers of Am., AFL-CIO v. Chao*,
    227 F. Supp. 2d 102 (D.D.C. 2002) ............................................................. 38

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*,
    No. CV 20-1630 (JEB), 2020 WL 5232076 (D.D.C. Sept. 2, 2020) ................... 45

*Wilson v. USPS*,
    441 F. Supp. 803 (C.D. Cal. 1977)............................................................... 37

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 23

*Wisconsin Gas Co. v. F.E.R.C.*,
  758 F.2d (D.C. Cir. 1985) ................................................................. 43

*Working Grp. v. FDA*,
  301 F. Supp. 3d 165 (D.D.C. 2018), 301 F. Supp. 3d................... 27, 28

## **STATUTES**

5 U.S.C. § 706(2) ............................................................................... 41

39 U.S.C. § 39 .................................................................................... 35

39 U.S.C. § 101 .................................................................................... 3

39 U.S.C. § 101(e) ................................................................. 40, 41, 42

39 U.S.C. § 202 .................................................................................... 4

39 U.S.C. § 401(a) ............................................................................. 35

39 U.S.C. § 409(a) ............................................................................. 30

39 U.S.C. § 410(a) ....................................................................... 35, 41

39 U.S.C. § 3661 ........................................................................ *passim*

39 U.S.C. § 3662 ........................................................................ *passim*

## **POSTAL REGULATORY COMMISSION AUTHORITIES:**

Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket
  No. N2014-1 (Mar 26, 2014),
  https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-
  1_Advisory%20Opinion.pdf......................................................................39

Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No.
  N2012-1 (Sept. 28, 2012),
  https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf.........39

Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012)
  https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf

Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23,
  2011), at 1, https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf.......................39

Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011),
  https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf....................................40

Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket
  No. N2009-1 (Mar. 10, 2010),
  https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf....................................39

**<u>OTHER AUTHORITIES:</u>**

Congressional Briefing (Aug. 31, 2020),
  https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf .......... 19

USPS Service Performance Continues Upward Trend (Sept. 10, 2020),
  https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-
  continues-upward-trend.htm ..................................................................................................... 19

Service Performance Rebounds at Postal Service (Aug. 31, 2020),
  https://about.usps.com/newsroom/national-releases/2020/0831-service-
  performance-rebounds-at-postal-service.htm.......................................................................... 19

## INTRODUCTION

This case is not about whether the United States Postal Service ("USPS") will be able to meet the burdens imposed by individuals who intend to vote by mail in the November 2020 election (the "Election").  Just as it has in past elections, USPS has taken, and will continue to take, a number of efforts to ensure that ballots move quickly and efficiently through the mail. Such efforts include encouraging state officials to appropriately identify and mark ballots to facilitate proper treatment of Election Mail; asking voters to mail their ballots as soon as they are able; and then tracking (where possible), monitoring, and moving the ballots as expeditiously as possible. Nothing has changed in USPS's approach to Election Mail from past years, except that the Postal Service has put in place *even more* processes to monitor and move these ballots in response to the major increase in Election Mail volume caused by the COVID pandemic.  Indeed, to avoid any doubt about USPS's ability to meet its responsibilities, it has suspended a number of routine, long-standing operational activities—implemented *before* Postmaster General DeJoy's tenure—until after the Election.

In light of these publicly expressed commitments, this case is now about Plaintiff's attempts to have this court oversee the day-to-day operations of USPS, based on statutory claims that the D.C. Circuit has analogized to a "Hail Mary," to right wrongs that do not exist.  Plaintiff's legally deficient claims, arising from unsupported fears about the potential actions of USPS, do not warrant the extraordinary relief it seeks.

First, Plaintiff cannot show a likelihood of success because it lacks Article III standing.  Its purported associational standing is based on the alleged injuries of its members in the past (which is insufficient under the Supreme Court's decision in *Lyons*), and its speculation that its members' mail might be delayed in the future (which is insufficient under the Supreme Court's decision in

1

*Clapper*).  And Plaintiff's purported organizational standing fares no better, as it is based on the allegation that Plaintiff will elect to focus more on educating its members about voting by mail rather than voting more generally (which is insufficient under the Supreme Court's decision in *Havens Realty*), and the assertion that the Postal Service has failed to offer it an opportunity to comment on certain operational changes (which is a purely procedural harm that is insufficient under the Supreme Court's decision in *Summers*). Even if Plaintiff did show injury, it cannot show causation or redressability, because nearly all of the "changes" of which it complains did not occur.

Even if Plaintiff had standing, the Court still lacks jurisdiction over Plaintiff's statutory claims.  Its primary claim is that the Postal Service failed to comply with 39 U.S.C. § 3661's requirement that certain major changes first receive an advisory opinion by the Postal Regulatory Commission.  But Congress has explicitly channeled those claims away from the district court, and towards the Postal Regulatory Commission, an independent executive branch establishment responsible for regulating the Postal Service, with review in the D.C. Circuit.  Decades of precedent thus confirm that district courts have no jurisdiction over these claims.

Plaintiff turns to the last resort of *ultra vires* jurisdiction to overcome this clear statutory bar, such jurisdiction is unavailable here for two reasons.  First, the cases it cites from the D.C. Circuit do not involve the provisions at issue here, which channel (rather than entirely prohibit) judicial review to the D.C. Circuit.  *Ultra vires* review is unavailable where there is a path for judicial review, and because here here there clearly is, Plaintiff cannot invoke this doctrine. Second, relief under the *ultra vires* doctrine requires a clear error, implicating the agency's jurisdiction to take such action.  But the statute Plaintiff relies upon applies only to certain major changes, and here Plaintiff's challenge centers around a series of actions discussed only in mid-level managerial documents, that never culminated in a "change" of service at the national level.

The only national policy Plaintiff challenges is guidance on when extra truck trips are appropriate, which likewise does not constitute a "major change" requiring an advisory opinion by the Postal Regulatory Commission.

Nor can Plaintiff succeed on its second statutory claim, that the agency actions at issue are arbitrary and capricious in violation of 39 U.S.C. § 101. It again seeks to invoke this court's *ultra vires* jurisdiction to bring such a challenge. But Congress expressly precluded APA review of Postal Service decisions, and that type of review is exactly what Plaintiff is trying to obtain here, just by another name. *Ultra vires* claims are not available to challenge agency actions that are allegedly arbitrary and capricious.

Furthermore, Plaintiff cannot establish the other prerequisites for a preliminary injunction, including that any irreparable injury must be "certain and great." Plaintiff's injuries consist of speculative and unjustified concerns over future mail deliveries, and educational services activities about matters of policy that Plaintiff will continue to provide regardless of how this Court rules here. And finally, the balance of the equities and the public interest support allowing the Postal Service to manage its operations as efficiently and effectively as possible, so it can meet the many burdens placed upon it in advance of the upcoming election. Those equities do not support placing the Postal Service under judicial receivership, with that election only weeks away.

## BACKGROUND

### I.     The United States Postal Service

USPS is a self-supporting, independent establishment of the executive branch, responsible for providing postal services throughout the United States. USPS has the authority to, among other things, designate mail routes and construct or designate post offices with the authority to carry, deliver, and regulate mail for the entire country. It is one of the nation's largest and most complex business operations. The USPS employs more than 630,000 employees; operates more than 31,000

Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a *single* day.  *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

The Board of Governors of USPS, which is comparable to the board of directors for a publicly held corporation, directs the exercise of powers of the Postal Service, including, among other things, long-range planning, oversight of service standards, management of expenditures, and review of policy and practices.  The PRC, an independent agency, has regulatory oversight over USPS.

Louis DeJoy is the 75th Postmaster General and Chief Executive Officer of USPS.  The Board appointed Postmaster General DeJoy on May 6, 2020.  He assumed office on June 16, 2020.

## II.   USPS's Handling of Election Mail

"Election Mail" is defined by USPS as any item mailed to or from authorized election officials that enables citizens to participate in the voting process. *See* Declaration of Robert Glass ("Glass Dec.") ¶ 3. This includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications).[1]  *Id.*  USPS regards Election Mail as having special importance.

The USPS has determined that it is fully capable—both financially and operationally—of handling a surge of Election Mail in connection with the Election. By its analysis, even if every registered voter in the United States[2] used a mail-in ballot to cast a vote in the Election, the

---

[1] Election Mail is distinct from "Political Mail" sent by political candidates, political action committees, and similar organizations in order to engage in advocacy.  Glass Dec. ¶ 3.

[2] Publicly available data generally indicate that there are approximately 150 million registered voters in the United States. *See, e.g.*, *Number of Voters and Voter Registration as a Share of the*

4

associated mail volume would represent only a small fraction of the total mailpieces that the USPS processes each day, on average, *id.* ¶ 42, and would pale in comparison to spikes in mail volume that the USPS handles every winter holiday season. *Id.* ¶ 43; Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 23. Indeed, USPS projects (even accounting for an increased use of mail-in ballots to compensate for COVID-19-related mitigation efforts) that only two to five percent of the total mail volume in October and November 2020 will be Election Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23. As detailed below and in USPS's declarations and public statements, USPS has been planning for the Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered. Glass Dec. ¶¶ 42-44.[3]

Beyond these financial and operational resources, USPS will continue to employ longstanding practices to facilitate the use of Election Mail by states, and to enhance the Postal Service's handling of Election Mail. These include extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots; publishing and distributing the official Election Mail kit (which provides a comprehensive guide to services, resources, and recommendations for Election Mail) to approximately 11,400 state and local election officials; offering official Election Mail markings to improve the visibility and ensure proper handling of Election Mail; and, as the attached declarations further detail, taking

---

*Voter Population*, https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-voter-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Sept. 10, 2020).

[3] *See also* Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Meeting (Aug. 7, 2020) (Ex. 3) at 4 ("[T]he Postal Service has ample capacity to deliver all election mail securely and on-time in accordance with our delivery standards, and we will do so."); Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections (Ex. 5) at 54 ("[W]e have plenty of cash to operate for the election.").

extraordinary steps to ensure the timely delivery of Election Mail for the upcoming election. *See* Glass Dec. ¶¶ 3-41.  Further, due to the unprecedented demands of the election, the Board of Governors has established a bipartisan Election Mail Committee to actively oversee USPS's support of Election Mail for the Election. *Id.* at ¶ 10.  USPS has demonstrated, both in its public representations and in practice, its commitment to continuing its longstanding practice to facilitate and expedite the timely delivery of Election Mail this year.

### A.      State, Local, and Individual Responsibilities for Election Mail

Notwithstanding USPS's longstanding commitment to the timely delivery of Election Mail, election officials and voters bear significant responsibility in the successful utilization of postal services for the Election.  USPS lacks authority over the critical decisions committed by law to states and local election officials regarding their Election Mail policies and procedures. *Id.* ¶ 4. Generally, each state determines whether, and to what extent, mail-in voting of any kind is allowed.  If mail-in voting is allowed, either the legislature or state and local election officials, if so authorized,  and must choose whether to send Election Mail to voters via either First-Class Mail, which  is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days. *Id.* ¶ 4; *see also* Ex. 4 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections*"* (Aug. 31, 2020)).  Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a Priority Mail class with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 4 at 1; Glass Dec. ¶ 4. USPS has not altered, nor will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election. . *See, e.g.*, Ex. 5 (Transcript of Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the

Elections (Aug. 21, 2020)) at 18 ("[W]e are not going to change any rates."); Ex. 3 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 4 ("We have delivery standards that have been in place for many years. These standards have not changed").

State legislatures, or election officials, if delegated such authority, also have the responsibility for making key decisions that directly impact mail-in voting.  Within the constraints of state and federal law, state and local election officials determine, among other things: (1) the design of Election Mail (its dimensions and the graphic and textual elements that will be displayed); (2) whether they will sufficiently mark Election Mail to enable USPS to identify and expeditiously process Election Mail for handling and delivery; (3) deadlines for voters to request and return mail-in ballots (4) when Election Mail will be sent to voters; (5) whether Election Mail will be trackable (for example, using USPS's Intelligent Mail barcode system); and (6) whether to pre-pay postage for returned ballots (versus requiring voters to affix their own postage).  Glass Dec. ¶ 4.  Individual voters are responsible for, among other things, providing current addresses to election officials; understanding mail-in voting procedures in their state and locality; and timely requesting ballots from, and returning those ballots to, election officials.

USPS's most significant operational concerns with respect to the Election are those elements controlled by the states themselves, either through legislation or state and local election officials and voters, not USPS.  *Id.* ¶ 45.  Indeed, when reviewing an audit of the special and primary elections in May and June 2020, the USPS Office of Inspector General ("OIG") concluded that USPS had improved several of its practices and procedures since prior OIG audits and had appropriately adjusted its processes to accommodate for the timely processing of Election Mail to meet the needs of the elections. Ex. 4 at 3, 12.  OIG identified, however, several "potential

concerns" that may affect the USPS servicing capacity for the Election (*i.e.* ballots mailed without tracking technology, ballot mailpiece design, Election Mail sent to voters too close to the election, varying state postmark requirements for ballots, and out-of-date voter addresses)—none of which are controlled by USPS.

**B.**     **USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail**

In preparation for the Election, USPS has undertaken extensive, expanded efforts to help election officials and voters in the planning and preparation of Election Mail, strongly encourage election officials, voters, and Postal Service employees to implement best practices, reinforce existing policies and procedures for handling Election Mail with Postal Service employees, and prepare to process and deliver a high volume of Election Mail.

**1.**     **USPS Outreach and Recommendations to Election Officials**

USPS has demonstrated its commitment to provide election officials with the tools necessary to use the U.S. Mail as a secure, efficient, and effective way to facilitate the election process. In support of the Election, USPS has already had approximately 42,000 contacts to confer and advise state and local election officials regarding Election Mail best practices and recommendations, and this outreach is ongoing.  Glass Dec. ¶¶ 5-9.  Additionally, since February 2020, the outreach strategy has included distributing approximately 11,500 copies of "Kit 600," an official Election Mail guide; offering mailpiece design services; designating Election Mail Coordinators to serve each locality; and publishing extensive election-related information and guidance online. *Id.* ¶ 6; *see also* Ex. 6 (USPS 2020 Election Mail – Kit 600). This outreach strategy in the run-up to the 2020 Election is consistent with USPS's outreach efforts in past election years.  The principal distinction between this year's effort and those of previous election years is that the volume and frequency of USPS's communications have *increased* to address challenges stemming from the COVID-19 pandemic.  Glass Dec. ¶ 32.

8

In May and July 2020, following dissemination of Kit 600, the USPS General Counsel's office sent letters to election officials to follow up and emphasize key aspects of the USPS's process and recommendations so that they may be taken into account when educating the public on voting by mail. Glass Dec. ¶ 7 & Glass Dec. Ex. 1.  USPS tailored the July 2020 letters to each state, identifying key provisions of each state's election laws and procedures and relevant considerations for the timely, effective use of U.S. Mail to facilitate the voting process.  *See generally* Ex. 15 (July 29, 2020 USPS Letter).  For example, in its letter to Arkansas election officials, USPS cited provisions of state election law that "are incongruous with [USPS] delivery standards" and "create[] a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted."  *Id.* at 1.  USPS implored Arkansas election officials, as it did all other state and local election officials, to "keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election" by mail.  *Id.* at 2.

None of the letters sent to state and local election officials by the Postal Service stated that the Postal Service intended to slow or delay delivery of Election Mail, or that USPS was otherwise altering its service standards for Election Mail.  Rather, these letters aimed to ensure that election officials are fully informed, well in advance of the Election, of USPS's delivery standards, the extensive resources that USPS offers to assist election officials, and the potential risks that local ballot request deadlines may pose to voters' full participation by mail in the Election. *See* Ex. 1; *see generally* Ex. 15. Moreover, these letters were consistent with USPS's outreach to election officials during past election cycles. *See, e.g.*, Glass Dec. ¶ 8 & Glass Dec. Ex. Ex. 2 (Sept. 23, 2016 letter to state election officials advising them, for example, to consult with USPS Election

Mail Coordinators, urge voters to return ballots one week early in order to ensure timely delivery, use the official USPS Election Mail markings, and send Election Mail by First-Class Mail).

In all of its communications regarding 2020 Election Mail, USPS has strongly, and repeatedly, recommended that election officials adopt USPS best practices, including the following[4]:

- Consult with USPS Election Mail Coordinators to better understand the Postal Service's services, resources, recommendations and to help resolve issues should they arise, as well as mailpiece design analysts on how to ensure quality mailpiece design for Election Mail envelopes, including ballot envelopes. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 2; Ex. 6 at 5; *see also* Glass Dec. ¶ 6.

- Identify Election Mail using USPS's official Election Mail logo, Green Tag 191 (which can be applied only to containers of mail enclosing ballots being sent out to voters), or by other means. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 4, 5, 13, 23; Ex. 8 (USPS Election Mail – Graphic Guidelines and Logos (Pub. 631)); *see also* Glass Dec. ¶¶ 11-14.



Official USPS Election Mail Logo



Green Tag 191

- Use tracking technology, for example USPS's Intelligent Mail Barcode, for Election Mail. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 7.

---

[4] *See* Glass Dec. ¶ 32; *see also* Ex. 4 at 2 ("[t]he Postal Service has frequently communicated to state election officials the importance of" following best practices).

- Use First-Class Mail to transmit Election Mail (including blank ballots) to voters, and allow sufficient time for delivery to and from voters. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1; Ex. 7 at 10 (USPS Publication 632, explaining the USPS's different delivery standards and "recommend[ing] the use of First-Class Mail service to obtain timely delivery"); *see also* Glass Dec. ¶ 18.

- Keep USPS delivery standards in mind when informing voters how to vote by mail. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1.

Lastly, the USPS has consistently urged voters to return their completed ballots early. *See, e.g.*, Ex. 1 at 2; Glass Dec. ¶ 42 ("[T]o mitigate the impacts of any surges in Election Mail sent in the days immediately before Election Day, the Postal Service is actively encouraging voters and election officials to act early"); Ex. 9 at 1 (Statement of Postmaster General Louis DeJoy Before the House Committee on Oversight and Reform (Aug. 24, 2020) "encourag[ing] all Americans who choose to vote by mail to request their ballots early and to vote early, as a common sense best practice.").

### 2.    USPS's Longstanding Special Measures for Election Mail

For many years, USPS has taken special measures for handling Election Mail. In anticipation of the Election's increased reliance upon USPS, USPS has ramped up its efforts to ensure Election Mail is timely delivered.

First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery. This effort is significantly aided when election officials use the official USPS Election Mail logo for all Election Mail mailpieces, affix Green Tag 191 to mail bins containing ballots being sent to voters, and check the "Election Mail" box on the postage statement form that is filled out when bulk Election Mail is entered into the USPS system. *See* Glass. Dec. ¶¶ 11-14. When a mail bin identifiable as Election Mail enters the system, USPS personnel log that container at every step of processing, so that it can be easily located if necessary.

*Id.* ¶ 19. USPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day).  *Id.*

USPS also has several longstanding practices to expeditiously process and deliver of Election Mail, particularly ballots (whether election officials have chosen to send ballots to voters using Marketing Mail or First-Class Mail).  *Id.* ¶ 20.  USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail.  *Id.* ¶ 21.  As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail.  *Id.* And, when identifiable,, USPS prioritizes placing ballots on outgoing truck, whether sent using First-Class Mail or Marketing Mails.  *Id.* ¶ 22.

Furthermore, USPS has a longstanding practice of postmarking (also referred to as "cancelling") all completed ballots returned by mail that are readily identifiable as ballots.  *Id.* ¶ 34.  A postmark is a USPS imprint applied to a mailpiece, usually by an Advanced Facer Cancellation System (AFCS) machine at a processing plant, indicating the location and date that the USPS accepted custody of the mailpiece, and the location the cancellation mark was applied, in order to cancel affixed postage so that it may not be reused.  *Id.* ¶ 33, 35.  Many mailpieces do not need to be cancelled, because they bear indicia of postage that is not at risk of being reused (*e.g.*, metered or permitted mail, or mail bearing a pre-cancelled stamp). *Id.* USPS, however, still takes measures to strive to postmark all returned ballots given the emphasis placed on postmarks by some state laws in validating the timely return of ballots.  *Id.*  USPS even goes so far as to cancel return ballot envelops by hand, if necessary, to facilitate postmarking.  *Id.* ¶ 34.

12

Based upon USPS's analysis of contemporaneous data regarding current AFCS machine capacity throughout the country, USPS ample capacity to postmark all mailpieces readily identifiable ballots. *Id.* USPS also plans to take extra steps for this election to identify and hand-cancel ballots thatare rejected by an AFCS machine. *Id.* ¶¶ 39, 41. Further, and for the first time, USPS will use Ballot Monitors during the week preceding and through Election Day to ensure that all USPS personnel follow proper protocol for identifying and postmarking ballots. *Id.* ¶ 39.

USPS will continue these longstanding practices in support of mail-in voting for the Election. Glass Dec. ¶ 28. USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots.  Glass Dec. ¶¶ 1, 27.

### 3.      USPS's Increased Efforts in Support of the Election

In anticipation of the additional mail volume associated with the Election, USPS has remains committed to and has increased its efforts to process and deliver Election Mail.  For example, Postmaster General DeJoy publicly committed that, starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election. *Id.* ¶ 29; Ex. 10 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1-2.  These standby resources will include, among other things, availability of additional staffing, transportation, and mail processing capacity (through the use of idle windows). Glass Dec. ¶ 29.  USPS has also expanded its Election Mail Task Force this year to include leaders of the postal unions and management associations, to ensure strong coordination throughout USPS and with state and local election officials, and to make sure any concerns can be raised and timely resolved at the highest levels of the organization.  *Id.* ¶ 10.  As discussed above, USPS has also increased the volume and frequency of its communications with election officials and will, for the first time, utilize Ballot Monitors.  *Id.* ¶¶ 32, 39.

### III.      USPS's Years-Long Mandate to Improve Efficiency and Control Expenses

USPS's systematic efforts to facilitate the use of U.S Mail for elections, particularly the 2020 Election, have not been diminished by USPS's mandate to improve performance, adhere to service standards, and help address the Postal Service's precarious financial condition—a mandate that long predates Postmaster General DeJoy's tenure. Per USPS's Fiscal Year 2019 Annual Report to Congress, the USPS's financial condition results, in part, from the steady declines in First-Class and Marketing Mail volumes.  *See* Ex. 1 at 28-29; *see also, e.g.*, Ex. 11 (First-Class Mail Volume Since 1926 Report, showing that the volume of First-Class Mail in 2019 was at its lowest point since 1977); Ex. 12 (Statement of Postmaster General and Chief Executive Officer Megan J. Brennan Before the House Committee on Oversight and Reform (Apr. 30, 2019)) at 1 (2019 statement of the former Postmaster noting the steep decline in First-Class Mail, the USPS's "most profitable product").  Pursuant to this mandate, the Postal Service routinely analyzes operations and performance metrics to determine whether and where improvements can be made to further efficient service.  To that end, USPS regularly reviews, among other things, collection box and equipment utilization, overtime usage, retail and facility operations, and transportation and delivery initiatives.  As a part of that process, the USPS makes determinations as to collection box and equipment removal, implementation of programs to improve efficiency, changing retail hours, consolidation or closing of facilities, and amendments to policies and practices.

In light of the increased scrutiny of these activities recently, and in an effort to bolster public confidence in the Postal Service's ability to handle Election Mail, Postmaster General DeJoy has publicly committed to suspending the aforementioned activities, including equipment and collection box removal, changes to retail hours, plans to consolidate or close any facilities, and implementation of a limited pilot program for mail carriers.  *See, e.g.*, Ex. 10.  He also clarified that overtime was never banned and that it would continue to be permitted.  *Id.*  The only exception

to Postmaster General's DeJoy's directive to maintain the status quo through Election Day pertains to the ongoing effort to improve compliance with existing schedules throughout USPS's transportation and processing networks—which, as discussed below, has not had any lasting negative impact on USPS's service performance.

### A.      Periodic, Data-Based Reduction in Redundant Processing Equipment and Collection Boxes

For years, and largely the result of changing operational needs due to the decline in letter and flat mail[5] volume, USPS has periodically gathered and analyzed data relating to the utilization of blue collection boxes and mail processing machines.  Based upon these analyses, USPS makes determinations regarding the reduction or reallocation of redundant collection boxes and processing equipment based upon its analyses.

USPS has over 140,000 collection boxes.  *See* Declaration of Jennifer Vo ("Vo Dec.") ¶ 4. USPS regularly reviews the need for and location of collection boxes in accordance with procedures set out in the Postal Operations Manual ("POM").  *Id.* ¶ 5.  Generally, a collection box is targeted for removal if it averages fewer than 25 mailpieces daily during a two week observation period.  With some exceptions, USPS posts a 30-day public notice on collection boxes identified for relocation or removal before final action.  *Id.* ¶¶ 5, 8.  For the last seven years, USPS has removed an average of 3,100 collection boxes each year, many of which were relocated to more heavily trafficked areas. *Id.* ¶¶ 8, 10.  Local USPS officials are primarily responsible for testing, assessing, and identifying collection boxes for removal.  *Id.* ¶ 6.  USPS has removed approximately 1,500 boxes in 2020 pursuant to this routine process, consistent with removal rates of previous years. Postmaster General DeJoy was not involved in any decisions relating to the removal of these

---

[5] "Flat mail" refers to periodicals and larger envelopes (for example, newsletters and advertising material).  *See, e.g.*, DeChambeau Dec. ¶ 5.

boxes.  *Id.* ¶¶ 10, 19.  Rather, the removal and relocation of collection boxes (other than damaged boxes or unsecured boxes) has been suspended at least through the Election at Postmaster General DeJoy's direction.  *Id.* ¶¶ 18-19.

Similarly, USPS regularly identifies mail processing and sorting equipment in approximately 289 mail processing facilities for removal and/or replacement.  *See* DeChambeau Dec. ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Declaration of Robert Cintron ("Cintron Dec.") ¶ 5.  Based on its data analyses, USPS has been steadily reducing its letter and flat mail processing equipment for several years, to align with volume reductions in those types of mail.  DeChambeau Dec. ¶ 13. The number of machines reduced varies from year to year, based on utilization data.  *Id.*  For example, in Fiscal Year 2016, the USPS reduced 1,120 letter and flat sorting machines, while the following year it reduced only 197 machines.  *Id.*  In 2017, the USPS began a more structured, phased equipment reduction initiative. *Id.* ¶ 14. The first phase focused on reducing unnecessary Delivery Barcode Sorters (DCBS) and Automated Flat Sorting Machines (AFSM), which process letter and flat mail, respectively. *Id.* Later phases included reducing unnecessary AFCS equipment.  *Id.* ¶¶ 6, 16.  In 2020, the USPS reduced approximately 700 letter and flat sorting machines. *Id.* ¶¶ 19-21. These reductions were planned and scheduled before Postmaster General DeJoy took office, and he had no role in their implementation, *id.* ¶ 22, Couch Dec. ¶¶ 5, 9, Declaration of Michael L. Barber ("Barber Dec.")  ¶ 5.  Regarding the timing of the removals, as in prior years, the removals were scheduled for summer, when mail volumes are historically lower. DeChambeau Dec. ¶ 19; Couch Dec. ¶ 4.

Mail processing machines that are taken out of service are generally removed from a facility floor and disassembled for their usable parts.  Couch Dec. ¶¶ 10-11.  Other machines may be offered for sale to the general public through the USPS's Corporate Asset Accountability

Office. *Id.* ¶¶ 10, 12. Indeed, factoring in the mail processing machines that were removed or disconnected this year, USPS's mail processing utilization at the national level ranges from 35 percent (when mail is low) to 65 percent (when mail is high); which means that machines have ample extra capacity.  Barber Dec. ¶ 6.

USPS is confident that its processing facilities have ample capacity to process all anticipated Election Mail based on its ongoing monitoring of processing capacity data, taking into account machines that have been removed from service.  DeChambeau Dec. ¶ 23; Barber Dec. ¶ 6. USPS tracks mail processing data for machines nationwide in order to evaluate whether machine utilization comports with the volume and types of mail handled in each facility, removing and/or replacing machines accordingly.  DeChambeau Dec. ¶ 8; Couch Dec. ¶ 4; Barber Dec. ¶ 4.  USPS may also remove machines because they are obsolete, to free up floor space for other use (*e.g.*, sorting operations or package handling equipment), or as a result of facility consolidations, though no mail processing facility closings or consolidations are scheduled for Fiscal Year 2020 or the first quarter of Fiscal Year 2021.  DeChambeau Dec. ¶¶ 7-12, 18; Couch Dec. ¶ 3; *see* Barber Dec. ¶ 11; *see also* Ex. 10 at 1 ("No mail processing facilities will be closed.").

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election.  *See* Ex. 10 at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15.

### B.    USPS's Continued Focus on Adherence to Existing Transportation Schedules

Approximately two years ago, Robert Cintron, Vice President of Logistics at USPS Headquarters, began an initiative to improve compliance with USPS's long-established delivery schedules.  Cintron Dec. ¶¶ 1, 11-13, 21.  When Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed the initiative with the Postmaster General and other Postal executives. *Id.* ¶¶ 22-23. Concurrent with these discussions, the OIG published a report addressing "late

deliveries . . . late dispatch, extra trips, and all the time and costs" that those issues caused. Ex. 5 at 10. In that report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency." Ex. 13 (USPS OIG Audit Report No. 19XG013NO00O-R20, "US. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." *Id.* at 2. Among interrelated problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.*

Soon after joining the Postal Service, Postmaster General DeJoy reemphasized the need to adhere to USPS's operational plans, including transportation schedules. Cintron Dec. ¶ 23. Mr. Cintron and his team then developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. Cintron Dec. ¶ 24 & Ex. 2. On July 14, 2020, the guidelines were distributed to area executives, advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips. *Id.* ¶ 25.[6]

During the following week, compliance with transportation schedules improved, but USPS experienced a temporary decline in its service performance. *Id.* ¶ 26. However, after USPS

---

[6] USPS is aware of a memorandum dated July 10, 2020, titled "Mandatory Stand-Up Talk: All Employees," which discusses some issues relating to late and extra trips. *See* Cintron Dec. ¶ 24 n.1. USPS, upon investigation, learned that this memo was locally prepared; it was not created, reviewed, or approved by USPS Headquarters. *Id.* The memo does not represent official USPS policy, either in July or now; in fact, it mischaracterizes USPS policy and the USPS's initiative to encourage compliance with transportation schedules. *Id.* It has never been USPS policy or guidance to "ban" extra trips, nor was it ever USPS's goal or desire to leave mail behind in processing facilities. *Id.* ¶¶ 24 n.1 & 28; Curtis Dec. ¶ 24 n.1.

addressed the decline, it observed steady improvements in service performance. *Id.* ¶ 27; *See* Declaration of Angela Curtis ("Curtis Dec.") ¶ 30.  On August 31, 2020, Postmaster General DeJoy provided updated information to Congress showing "the expected improvements in service. . . . across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early July levels. . . . while still adhering to our existing transportation schedules. In other words, we are improving service performance while more consistently running our trucks on time." *See* Service Performance Rebounds at Postal Service (Aug. 31, 2020) at 1, https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-at-postal-service.htm; *id.* Congressional Briefing (Aug. 31, 220) at 8 (data showing that USPS service performance has rebounded to early-July 2020 levels), https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf ("Congressional Briefing") ; Cintron Dec. ¶ 27. Furthermore, in the last two months, there has been a sharp decrease in late and extra trips. *See* Congressional Briefing at 4-6 (data showing a steep decline since early July in late and extra trips); Cintron Dec. ¶ 27. USPS's performance continues to improve.  *See* USPS Service Performance Continues Upward Trend (Sept. 10, 2020), https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-continues-upward-trend.htm.

### C.   USPS Personnel Practices Related to Overtime Usage and Staffing Shortages Caused by the Covid-19 Pandemic

#### 1.   Overtime

Defendants have not attempted to curtail USPS's ability to handle Election Mail by banning or unreasonably restricting employee overtime. The Postal Service's customary overtime practices, pursuant to which overtime is generally evaluated and approved by local field managers (not Headquarters personnel), have remained unchanged since Postmaster General DeJoy took

office, and the rate at which USPS has incurred overtime has remained constant. *See* Curtis Dec. ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4. To the extent USPS has made past efforts to monitor or address certain issues regarding overtime usage, such efforts are unrelated to the Election.  Instead, these efforts consist of ongoing, routine measures to improve efficiency and reduce unnecessary costs. *See* Curtis Dec. ¶¶ 12-13; Colin Dec. ¶¶ 3-6.

In maintaining the status quo leading up to the Election, Postmaster General DeJoy clarified that he never banned overtime, and continues to approve of its appropriate use.  *See, e.g.*, Ex. 14 14 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020)) 14 ("I did not direct the elimination or any cutback in overtime."); Ex. 10 at 1 ("[W]e reassert that overtime has, and will continue to be, approved as needed").

## 2.      The Impact of the COVID-19 Pandemic

Since March 2020, USPS has faced significant staffing issues caused by the COVID-19 pandemic. *See* Declaration of John Prokity ("Prokity Dec.") ¶ 4; Curtis Dec. ¶ 18. Prior to the pandemic, USPS experienced, on average, a weekly equivalent of 55,000 employees using full-day leave. Prokity Dec. ¶ 5. In early March, this figure began to increase until it peaked in mid-April at 81,000, or the equivalent of nearly 26,000 additional employees using full-day leave in a week. *Id.* Thereafter, the situation improved somewhat until July, when personnel availability again began to decrease (hitting its lowest levels in the week of July 11, 2020). *Id.*

To mitigate these staffing shortages, which negatively USPS's ability to timely deliver mail, *see id.* ¶¶ 20-21, Prokity Dec. ¶¶ 6, 10, USPS has taken extraordinary steps to hire additional

employees.[7] *See* Prokity Dec. ¶ 6. For instance, USPS has implemented a number of changes to its normal hiring processes to be able to hire employees more quickly, and has negotiated agreements with the postal workers' unions to allow the hiring of non-career employees above the historical contractual limits. *See id.* ¶¶ 7-8. As a result of these and other efforts, USPS has hired an average of 2,000 to 3,000 employees per week, with a total of 88,627 new employees hired between March 1 and August 27, 2020. *Id.* ¶ 9.

### D.      Other Efforts Aimed at Improving Efficiency

There are two other practices that have prompted election-related criticism of USPS: setting park points (*i.e.*, locations where a driver parks and exits a postal vehicle to deliver mail on foot) and "Expedited to Street/Afternoon Sortation" ("ESAS"), a limited pilot program aimed at reducing morning activities to allow carriers to begin their routes earlier. There is no nationwide USPS policy setting a fixed cap on the number of park points that may be used on a route, nor has Postmaster General DeJoy made any changes to USPS practices regarding park points. Colin Dec. ¶¶ 12-14. Furthermore, the ESAS was planned before Postmaster General DeJoy took office, and it was suspended at the Postmaster General's direction. Colin Dec. ¶ 11.

### IV.      Procedural History

Plaintiff filed this Complaint on August 20, 2020, Compl, ECF No.1, and its motion for Preliminary Injunction, ECF No. 8, on September 1, 2020. It complains about two sets of alleged changes, which are purportedly identified in two informal documents. The first purported set of changes are summarized in a document entitled "New PMG's expectations and plan," which purportedly identifies "significant nationwide changes Postmaster DeJoy was implementing,"

---

[7] On August 7, 2020, in connection with a high-level organizational restructuring, USPS implemented a hiring freeze for managerial positions. Prokity Dec. ¶ 6 n.1. This action has had no effect on the hiring of non-management employees, including mail carriers, mail handlers, and clerks. *Id.*; *see also* Curtis Dec. ¶ 25.

including "that overtime would be eliminated, that letter carriers would have to make changes limiting the timeline and affecting the scope of their delivery routes, and that certain customer service windows would be closed during lunchtime . . . .[while] direct[ing] employees to leave mail behind at distribution centers if it delayed letter carriers from their routes."  PI Mem. at 11 (hereinafter "PMG Plan").  The second set of changes is detailed in a document entitled "Pivoting for our Future," which describes certain "transportation changes being implemented (today)."  *Id.* at 12 (hereinafter "Pivot").  As will be discussed later, neither of these documents describes actual changes on behalf of the organization; rather, each is a mid-level, local document that does not accurately represent USPS policy.  *See* Curtis Decl. ¶ 24 n.1.  Plaintiff seeks to enjoin the "PMG Plan" and "Pivot."  *See* Proposed Order, ECF No. 8-4.

Eleven lawsuits, including this one, have been filed recently across the country concerning purported changes made by USPS. Generally, the plaintiffs in these cases allege that the purported changes were intended to obstruct voting by mail for the Election, asserting overlapping constitutional and statutory claims. Despite the fact that the USPS suspended almost all of the activities at issue until after Election, these plaintiffs continue to pursue litigation.[8]

## STANDARD OF REVIEW

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted).  An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden

---

[8] Because the issues here are largely the same, and in the interest of efficiency, Defendants also rely here on the declarations filed in support of Defendants' preliminary injunction briefing in *Jones, et al. v. United States Postal Service, et al.*, No. 1:20-cv-06516 (S.D.N.Y.).

of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).   A party moving for a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).   When, as here, the government is opposing a motion for a preliminary injunction, the third and fourth factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[9]

Moreover, Plaintiff seeks to revoke certain USPS policies that have purportedly gone into effect, rather than to prevent their implementation.  Where "a party seeks a mandatory injunction, i.e., to change the status quo rather than to preserve it, the moving party 'must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction.'" *Ajilon Prof. Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, (quoting *Columbia Hopsital for Women Found v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997)).

## **ARGUMENT**

Plaintiff has not established the requirements for the extraordinary relief it seeks in this motion.  First, it is not likely to succeed on the merits of its claim.  It cannot show Article III

---

[9] "The D.C. Circuit has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions . . . . The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter v. National Resources Defense Council*, 555 U.S. 7, 22 (2008)." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted).  In any event, regardless of which standard is applied, preliminary injunctive relief is inappropriate here.

standing based on the injuries alleged in the Complaint, nor can it litigate a claim that Congress has expressly mandated must be directed to the PRC and then, if necessary, to the D.C. Circuit.  If this Court were to decide, contrary to the overwhelming majority of precedent, that the claim is nonetheless reviewable here, Plaintiff's claim would still fail to meet the high standard required for an *ultra vires* claim in this Circuit.  Plaintiff similarly cannot bring a challenge to the Postal Service's "arbitrary and capricious" decisionmaking, because, as Plaintiff concedes, the APA does not apply, this challenge is simply an APA challenge by another name.  And relief is still not appropriate, because Plaintiff is seeking to enjoin changes that have not occurred, while asking this Court to involve itself in monitoring the day-to-day activities of the Postal Service.

## I.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

### A.   Plaintiff Lacks Article III Standing

At the outset, Plaintiff cannot succeed on its claims because it cannot show that it has Article III standing.  To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). When a plaintiff seeks prospective relief, the "threatened injury must be certainly impending to constitute injury in fact;" "[a]llegations of possible future injury are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  A "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy" this requirement. *Id.* at 410. "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547 (citation omitted).  An organization can sue either on its own behalf (organizational standing) or

24

on behalf of its members (associational, sometimes called representational, standing).  *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996).

### 1.  **Plaintiff Lacks Article III Injury**.

In its Complaint and preliminary injunction motion, Plaintiff alleges that it is injured in four ways.  The first two allegations concern purported injuries to its members, the latter two to Plaintiff itself as an organization.  These allegations include that: (1) its members "have been adversely impacted by recent delays in mail delivery," Compl. ¶ 10, and may be hurt again in the future, Pl.'s Mot for a Prelim. Inj. at 28, ECF No. 8 ("PI Mem."), (2) it "has many members who intend to vote by mail in the November 2020 election," who are presumably concerned that their ballots might be delayed, Compl. ¶ 10, (3) it is "engaged in educational initiatives targeted at its members," including providing education about mail-in voting, Compl. ¶ 11, and given recent postal slowdowns, it must now devote organizational resources to providing extra information about mail-in voting, PI Mem. at 28-29 (citing *Havens Realty Corp. v. Coleman*, 466 U.S. 363, 379 (1982)), and (4) "Defendants have violated Plaintiff's right to notice and opportunity to comment" pursuant to 39 U.S.C. § 3661, and thus they are *per se* injured, *id.* at 26-27.  Plaintiff is not likely to succeed on any of these theories.

*First*, the fact that one of Plaintiff's members allegedly has been harmed by the delayed delivery of mail in the past does not entitle Plaintiff to standing *now*, at least when it is seeking forward-looking injunctive relief.  *See City of L.A. v. Lyons*, 461 U.S. 95, 107-08 (1983).  Past injury is all Plaintiff pleads: it identifies one member, Mr. Earl Graham, who alleges that he has had medication delayed when sent via the mail, and even there, he only identifies *past* late deliveries, with the last notification being in mid-August, before the Complaint was even filed.  *See* Decl. of Earl Graham ¶ 6, ECF No. 8-3 ("Graham Decl").  In light of the reversion or cessation

by USPS of certain changes, as well as the evidence that mail delays have been mitigated, *see* Cintron Dec. ¶ 27, there is no basis to conclude that this purported injury is likely to recur. This conclusion is underlined by the fact that the Complaint does not, and cannot, allege what exactly caused the delays of Mr. Graham's medications, as the Complaint only notes that his doctor's office informed him it was caused by delays in the mail (and even then does not allege what caused those delays – for example, COVID-19 related staffing issues, which occurred at the same time that Mr. Graham says his mail was delayed – and which Plaintiff does not challenge – versus the aftereffects of the extra trip guidance). *See e.g.*, Prokity Dec. ¶¶ 4-5.

*Second*, the fact that Plaintiff's members may be concerned about the *future* delay in mail delivery as it may impact their ability to is insufficient to establish standing. In order for future injury to be cognizable, it must be "certainly impending," *see Clapper*, 568 U.S. at 409. But here, the Postal Service has numerous policies and practices designed to ensure that ballots will be timely delivered before the election. *See generally* Glass Decl. Any concern that, notwithstanding these practices (and the fact that Plaintiff's members control the timing of their ballots and can mail their ballots back as soon as they receive them), the mail will delay their ballot in a way that frustrates the vote – as opposed to, for example, an error caused by their State – is too speculative to be legally cognizable.

*Third*, Plaintiff complains that it will now need to spend more time educating its members about voting by mail. *See* PI Mem. at 28-29. An organization asserting standing on its own behalf, as Plaintiff attempts to do with regard to this claim, must demonstrate that it has suffered a "concrete and demonstrable injury to [its] activities – with [a] consequent drain on [its] resources – constitute[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers*

*Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).  Indeed, it has long been clear that "pure issue-advocacy[,]" *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005), provides no more basis for an organization's standing than "generalized grievances about the conduct of Government" do for individual standing, *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (citation omitted).  Thus, "conflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing."  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (finding that "frustrat[ion]" of an organization's objectives "is the type of abstract concern that does not impart standing").  Instead, "'[t]he organization must allege that discrete programmatic concerns are being directly and adversely affected' by the challenged action."  *Id.* (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)).

But issue advocacy is exactly the type of injury of which Plaintiff complains: it notes that it focuses on civic engagement, and conducts that engagement through a specific educational and advocacy activity (educating its members and others about the election, with a new focus on mail-in voting).  This is the very type of issue advocacy harm that *Havens* precludes as a basis for standing.  For these educational activities to constitute an "injury to its interests," the organization must "allege that the defendants' conduct *perceptibly impaired* the organization's *ability* to provide services," i.e. where "the challenged conduct causes an actual inhibition of [the organization's] daily operations."  *Evt'l Working Grp. v. FDA*, 301 F. Supp. 3d 165, 171 (D.D.C. 2018), 301 F. Supp. 3d. at 172 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)) (emphasis added); *see also Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.D.C. 2015) (plaintiff must allege "impairment of its ability to provide services").  An

organization's perceived need to provide additional education to its members or the public does not demonstrate that its ability to provide such education has been impaired

Plaintiff alleges that it has had to re-orient its advocacy and educational purposes within the general sphere of civic and voter engagement.  This does not impair its ability to provide educational services, but merely demonstrates that Plaintiff has chosen to engage in somewhat different types of advocacy activities.  These activities are, accordingly, "not a 'diversion' from, but rather a continuation of [plaintiff's] ordinary educational, advocacy, and training activities." *Int'l Acad. of Oral Medicine & Toxicology v. FDA*, 195 F. Supp. 3d 243, 259 (D.D.C. 2016) (citation omitted).  Thus, courts have routinely rejected organizational plaintiffs' efforts to claim that their choices about which educational efforts to focus on constitute a cognizable injury in fact. *See, e.g.*, *Envt'l Research Grp.*, 301 F. Supp. 3d at 172 ("Neither do the Plaintiffs' educational efforts suffice, because this type of work is exactly what these organizations always do."); *Elec. Privacy Info. Ctr. v. Dep't of Educ.*, 48 F. Supp. 3d 1, 23 (D.D.C. 2014) ("Here, the Final Rule has not impeded EPIC'S programmatic concerns and activities, but fueled them. And the expenditures that EPIC has made in response to the Final Rule have not kept it from pursuing its true purpose as an organization but have contributed to its pursuit of its purpose."); *Nat'l Consumers League v. Gen. Mills, Inc.*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) (similar).

*Finally*, Plaintiff alleges that it is injured solely because it has been denied (purportedly) the opportunity to comment on the Postal Services supposed changes pursuant to 39 U.S.C. § 3661. "But deprivation of a procedural right" – specifically, the right to comment on a government proposal – without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Plaintiff cites to a district court decision, *Buchanan v. USPS*, 375 F. Supp. 1014,

1022 (N.D. Ga. 1974), that held that the failure to comply with section 3661 is itself sufficient for standing; but this decision predates *Summer*'s contrary, on-point holding by thirty-five years. Plaintiff cannot invoke this Court's jurisdiction based solely on a procedural injury.

> ### 2.   Plaintiff Cannot Establish Causation or Redressability Because It Seeks to Enjoin Changes That Have Not Occurred.

Plaintiff also cannot establish Article III standing because the specific USPS "changes" it challenges did not actually occur; and therefore any injury would not have been caused by these non-existent changes nor be redressed by order of this Court, since there is nothing to redress.

Plaintiff complains about two sets of changes, which are purportedly identified in two informal documents: the PMG Plan, and the Pivot.  *See* PI Mem. at 10-11.  The problem for Plaintiff is that neither of these documents constitute official USPS policy.  Rather, "[t]hese documents were prepared by local managers and were not reviewed or approved by Headquarters. They were distributed locally, not nationally.  They do not represent official Postal Service guidance or directions."  Curtis Dec. ¶ 24 n.1.  More importantly, they are not accurate: overtime is not being eliminated, there is no direction to change delivery routes, there are no closures of USPS mail-processing facilities, and there is no direction to leave behind mail that was scheduled for delivery.  *See, e.g.*, Curtis Dec. ¶¶ 22, 24-26.  Moreover, while Plaintiff characterizes the "Pivot" as a set of major and continued transportation changes, the only specific change that was actually implemented was additional guidance on complying with long-established transportation schedules by departing on time and thus mitigating extra trips.  *See, e.g.*, Curtis Dec. ¶ 28; Cintron Dec. ¶¶ 25-26.  The vast majority of the "changes" Plaintiff challenges did not actually occur, and thus could not have caused any of its purported injuries, nor would any relief redress such harm.

**B.  Plaintiff Is Not Likely to Succeed On Its 39 U.S.C. § 3661 Claim.**

Plaintiff's central claim in this lawsuit is that the Postal Service has failed to comply with the requirement to seek an advisory opinion from the PRC pursuant to 39 U.S.C. § 3661(b) before enacting certain purported operational "changes," *i.e.*, the PMG Plan and the Pivot.   Section 3661(b) requires that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it must first submit a proposal to the PRC requesting an advisory opinion. 39 U.S.C. § 3661(b).  The PRC shall issue its written opinion only after an opportunity for a hearing on the record.  39 U.S.C. § 3661(c).

As a threshold matter, clear statutory text and decades of precedent make clear that it is the *PRC* that has exclusive jurisdiction over complaints relating to service issues, including the failure of the Postal Service to first seek an advisory opinion from that body for a nationwide change in service, with the right to appeal to the D.C. Circuit if the complainant is dissatisfied.  District courts play no role in adjudicating such disputes.  But even if Plaintiff could somehow overcome this hurdle, the Postal Service was not required to seek an advisory opinion relating to any of the purported actions challenged in this suit.

**1.  District Courts Lack Subject-Matter Jurisdiction Over Complaints Regarding 39 U.S.C. § 3661, Which Are Channeled to the Postal Regulatory Commission and Then the D.C. Circuit.**

Congress has expressly precluded district court jurisdiction over Plaintiff's section 3661 claim.  Title 39 of the U.S. Code provides that the district courts have jurisdiction over cases against the Postal Service, "*except* as otherwise provided in this title."   39 U.S.C. § 409(a) (emphasis added); *see also LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (district court jurisdiction over Postal Service can be preempted by other provisions, including section

3662).   This case involves one of those exceptions: 39 U.S.C. § 3662, which vests exclusive jurisdiction over complaints regarding the Postal Service's compliance with certain statutory requirements – including section 3661 – in the  PRC.

In section 3662, Congress specified that any person "who believes the Postal Service is not operating in conformance with the requirements of various provisions, including "*this chapter* [i.e., Chapter 36 of Title 39, which includes 39 U.S.C. § 3661] (or any regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission."  39 U.S.C. § 3662(a) (emphasis added). "If the Postal Regulatory Commission finds the complaint to be justified, it shall order that the Postal Service take such action as the Commission considers appropriate in order to achieve compliance with the applicable requirements and to remedy the effects of any noncompliance."  *Id.* § 3662(c).  If that person is dissatisfied with the PRC's ruling, she may petition for review in the D.C. Circuit.  *Id.* § 3663.  If she is satisfied with the PRC's order, the district courts have jurisdiction to enforce any PRC orders against USPS.  *Id.* § 3664.

Courts have repeatedly held that 39 U.S.C. §§ 3662 and 3663 constitute the exclusive jurisdictional remedy for complaints about postal services that fall within the statutory provisions specifically identified in section 3662 – and as discussed above, that includes a claim that the Postal Service is not complying with section 3661.  Numerous courts of appeals have so held.  *See, e.g.*, *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013) (PRC has "exclusive jurisdiction . . . over claims enumerated in § 3662"); *LeMay*, 450 F.3d at 799-800 ("In this case, Congress removed the district courts' jurisdiction over claims regarding postal rates and services. It did so by enacting 39 U.S.C. § 3662."); *Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir. 1995) (earlier version of 39 U.S.C. § 3662 "makes clear that a postal customer's remedy for

31

unsatisfactory service [which was identified in section 3662] lies with the Postal Rate Commission. . . . Accordingly, the district court was without jurisdiction to review this claim.").

And these courts of appeals have been joined by the "countless decisions" of lower courts. *Pep-Wku, LLC v. USPS*, No. 20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky. Apr. 30, 2020); *see, e.g.*, *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009), *aff'd sub nom. McDermott v. Donahue*, 408 F. App'x 51 (9th Cir. 2011) ("Read together, [39 U.S.C. §§ 3662, 3663, and 3664] demonstrate that this Court lacks jurisdiction to consider service-related complaints in the first instance" and holding that "the PRC has exclusive jurisdiction" over such claims); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018) (same); *Striley v. United States Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017) ("Under 39 U.S.C. Section 3662, the Postal Regulatory Commission has exclusive jurisdiction over such complaints"); *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 134 F. Supp. 3d 365, 382 (D.D.C. 2015), *aff'd in part on other grounds, vacated in part on other grounds, rev'd in part sub nom. Sears, Roebuck & Co. v. United States Postal Serv.*, 844 F.3d 260 (D.C. Cir. 2016) ("Particularly exempted [from district court jurisdiction] are claims concerning postal rates and service standards; such claims must first be presented to the Postal Regulatory Commission"); *Murphy v. United States Postal Serv.*, No. C 14-02156 SI, 2014 WL 4437731, at *3 (N.D. Cal. Sept. 9, 2014) ("The PRC has exclusive jurisdiction over service-related complaints with the Postal Service covered by section 3662."); *Powell v. United States Postal Serv.*, No. CV 15-12913-FDS, 2016 WL 409672, at *1 –2 (D. Mass. Feb. 2, 2016) (district courts lack jurisdiction over claims brought under 39 U.S.C. § 3661(a)).

This overwhelming line of precedent has developed for good reason. "Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on

particular problems' those procedures 'are to be exclusive.'" *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 589 (2010) (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S.411, 420 (1995)).  "It is well settled that even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomms Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 186 (D.C. Cir. 2017) ("[W]here 'a special statutory review procedure [exists], it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases to which it applies.'") (quoting *Media Access Project v. FCC*, 884 F.2d 1063, 1077 (D.C. Cir. 1989)); *Public Util. Comm'r of Or. v. Bonneville Power Admin*, 767 F.2d 622, 627 (9th Cir. 1985) ("[J]urisdiction over a specific class of claims which Congress has committed to the court of appeals generally is exclusive, even in the absence of an express statutory command of exclusiveness.").  This principle applies particularly in situations where there are multiple layers of review, *i.e.*, review first to an agency, and then to the federal courts of appeals.  *See, In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) ("The multiple layers of review evince Congress's intent to direct challenges . . . to the avenues Congress created."); *see also Bank of Louisiana v. FDIC*, 919 F.3d 916, 922 (5th Cir. 2019) ("[S]ometimes Congress leapfrogs district courts by channeling claims through administrative review and directly to federal appellate courts").  Here, Congress has created just such a channeling scheme: complaints within the ambit of section 3662 (including complaints that the Postal Service has not complied with section 3661) go first to the Commission, an agency with deep expertise in postal matters, and then to the D.C.

Circuit.  *See* 39 U.S.C. §§ 3661, 3662.  Under such circumstances, this court lacks subject matter jurisdiction over this claim[10]

### 2.   The *Ultra Vires* Doctrine Does Not Provide an Avenue for Judicial Review Here

Plaintiff fails to acknowledge section 3662's channeling of review to the PRC and then to the D.C. Circuit.  Instead, Plaintiff seeks review under this Court's very limited *ultra vires* review doctrine.  But Plaintiff cannot satisfy *ultra vires* review, for two reasons – first, *ultra vires* review is *only* available where there is no other potential remedy, and here the statue provides for the filing of a complaint to the PRC and then the D.C. Circuit.  And second, *ultra vires* review is only available if the agency has failed to comply with such a clear and unequivocal statutory command that the agency has acted without any authority.  There is no such error here – indeed, the vast majority of the "changes" of which Plaintiff complains did not exist, and USPS has made clear its intent not to pursue them.

"[T]he Postal Service is exempt from review under the [APA]."  *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) (internal quotation marks and citations omitted); 39 U.S.C. § 401(a).  For claims—unlike here—where there is no other remedy, some

---

[10] The Supreme Court has recognized that district court jurisdiction may not be implicitly precluded if three factors are met: (1) "a finding of preclusion could foreclose all meaningful judicial review," (2) if the suit is "wholly collateral to a statute's review provisions," and (3) "if the claims are 'outside the agency's expertise." *Jarkesy v. SEC*, 803 F.3d 9, 17 (D.C. Cir. 2015) (quoting *Free Enterprise*, 561 U.S. at 489-90.  None of these factors is met here.

There is meaningful judicial review of a final PRC order in the D.C. Circuit.  Nor does it matter that the PRC cannot provide "immediate relief," as the fact that there may *eventually* be relief is sufficient as a matter of law.  *See Am. Fed'n of Gov't Employees*, 929 F.3d at 755-56 ("Here, [the Supreme Court] instructs that the [plaintiffs] are not necessarily entitled to raise a pre-implementation challenge in the district court, and that Congress may require them to litigate their claims solely through the statutory scheme, so long as they can *eventually* obtain review and relief.") (emphasis added)  Moreover, the suit is not collateral to the statute's review provisions, but falls within their explicit text, and involves a function committed to the agency's expertise.

courts have, however, found "non-statutory review' available for certain Postal Service decisions, notwithstanding the preclusion of APA review under 39 U.S.C. § 39 U.S.C. § 410(a)."  *Mittleman*, 757 F.3d. at 307; *see also Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (Postal Service can be reviewed under *ultra vires* doctrine pursuant to "the leading case, *Leedom v. Kyne*, 358 U.S. 184 (1958)").  Such review, however, "is quite narrow," *id.*, and "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds."  *Nyunt v. Broadcasting Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009).  In order to justify relief under the *ultra vires* doctrine "a plaintiff must show, *first* that the agency has acted 'in excess of its delegated powers and contrary to a specific prohibition,' and, *second*, that barring review by the district court 'would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights."  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Service Impasses Panel*, 437 F.3d 1256, 1258 (D.C. Cir. 2006) (quoting, first, *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), and, second, *Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)).  With respect to the first prong, "[a]n agency acts *ultra vires* when it violates a 'clear and mandatory' statutory provision.  A statutory provision is 'clear and mandatory' when it has only one unambiguous interpretation."  *Nat'l Ass'n of Postal Supervisors v. USPS*, No. 18-cv-2236-RCL, 2020 WL 4039177, at 3 (D.D.C. July 17, 2020).

Plaintiff's claim fails each requirement.  Most obviously, Plaintiff fails at the second condition: it has a "meaningful and adequate means of vindicating [its] statutory rights," *MCorp*, 502 U.S. at 43 – it can file a complaint to the Postal Regulatory Commission, with judicial review if it remains unsatisfied in the D.C. Circuit.  Its failure to even attempt to do so is fatal to their claim.  *See id.* (appeal to agency, followed by review in the courts of appeals, constitutes a meaningful and adequate means of vindicating statutory rights).

Plaintiff cannot avoid this conclusion by citing cases in the D.C. Circuit where *ultra vires* review was permitted.  *See* PI Mem. at 14 (citing *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d at 305).  In cases such as *Mittleman*, a mandatory statutory bar prohibited review altogether. Section 3662 merely channels judicial review to the D.C. Circuit.  Thus, as opposed to *Mittleman*, where the consequence of the bar on APA review would preclude judicial review altogether, such review is still available here.  *See, e.g.*, *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (*ultra vires* review is available when the APA was unavailable and the alternative is "insulat[ing] the entire executive branch from judicial review"); *MCorp*, 502 U.S. at 43 (*ultra vires* review is only available when the alternative is no judicial review at all).  The path for such review may not be the one that Plaintiffs would prefer, but that fact is insufficient to establish *ultra vires* jurisdiction.

Although this Court need not reach it in light of the express channeling of judicial review to the D.C. Circuit, Plaintiff's claim also fails under the first prong of the *ultra vires* analysis, because it cannot show that the Postal Service has violated section 3661(b).  That provision requires the Postal Service to request an advisory opinion whenever it "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis. 39 U.S.C. § 3661(b).  The leading case interpreting this statute is *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1975).  There, the Fifth Circuit recognized that "Congress intended 3661 to apply to only a specified class of decisions," and that "Postal management was left with broad decision-making power, subject to 3661's requirements for specified decisions."  *Id.* at 262; *see also id.* ("The language of 3661 indicates the limited scope of application."); *see also id.* at 263-64 (recognizing "a policy of broad management power and an

unexpansive interpretation of 3661").  Accordingly, three factors that must be satisfied before section 3661(b) comes into play.

"First, there must be a 'change.'  This implies that a quantitative determination is necessary."  *Id.* at 262.  In other words, "[t]here must be some meaningful impact on service.  Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661."  *Id.*  "Second, the change must be 'in the nature of postal services.'  This involves a qualitative examination of the manner in which postal services available to the user will be altered."  *Id.* at 262-63.  "Third, the change must affect service 'on a nationwide or substantially nationwide basis.'  A broad geographical area must be involved."  *Id.* at 263.  In drawing these lines, courts have made a "distinction between Postal Service managerial decisions and Postal Service decisions which affect the public and give rise to an opportunity to be heard," with decisions like transferring mail processing facilities and maintaining mail trucks falling into the former category.  *See, e.g.*, *Wilson v. USPS*, 441 F. Supp. 803, 806 (C.D. Cal. 1977).

None of the supposed "changes" that Plaintiff identifies meets these standards.  Indeed, Plaintiff challenges the "PMG Plan" and the "PIVOT," but as discussed earlier, the unofficial documents that Plaintiff relies upon to capture these "changes" do not constitute official agency policy, and the supposed "changes" they identify did not actually occur.

USPS has made no changes to its overtime policy (including banning overtime) or to its retail operating hours, nor has it closed or consolidated any mail processing facilities.  *See* Curtis Dec. ¶¶ 12, 22-23, 32-35; Colin Dec. ¶ 3.  It has not prohibited extra or late trips.  *See* Cintron Dec. ¶¶ 23-24.  The only notable change USPS has made has been to renew its emphasis on adhering to its published schedule, including developing written guidance clarifying the circumstances under which extra truck trips were acceptable, in order to mitigate the number of unplanned and

unnecessary trips, *see* Cintron Dec. ¶¶ 23-24, and that is not a "change" as that term is used in section 3661.  It is not a new policy but rather a renewed focus on ensuring the Postal Service complies with its *existing policies*, and that it operates as efficiently as possible.  This is precisely the type of management direction to which section 3661 does not apply.  In its brief, Plaintiff focuses on the fact that there was a delay in the mail, *see* PI Mot at 17-18, a delay which has now largely been corrected.  But that, by itself, cannot be enough to trigger section 3661 because *any* managerial change can be said to have the effect of changing the Postal Service's operations (i.e., changing how the mail is delivered).  If that is true, then nearly any managerial initiative, be that one which would make the Service either more efficient or less efficient, would first need to go through an on-the-record, trial-type proceeding.  It cannot be true, for example, that the Postal Service would be required to seek an advisory opinion from a separate agency if it wanted to upgrade its IT or truck routing systems, even if those upgrades might have a temporary effect on its services.  Indeed, Plaintiff never claims that USPS's operational plan needed to undergo PRC review; if so, a decision to enforce *compliance* with that plan could not trigger review.

Plaintiff also makes much of the fact that Postmaster General DeJoy described these changes as "fundamental."  PI Br. at 17. But the Postmaster General was not making a legal determination about the applicability of section 3661, nor is his labeling legally determinative. What matters is the nature of the changes - here the "changes" were simply directions to comply with a long-existing transportation schedule.  *See* Cintron Dec.

Moreover, both the Postal Service and the Commission's past practices confirm that these activities do not fall within section 3661's ambit.  "[P]ast practice . . . should be given the deference ordinarily accorded any interpretation of a statute by the agency charged with its enforcement." *United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102,107 n.11 (D.D.C. 2002)

(quoting *Gelman v. FEC*, 631 F.2d 939, 943 (D.C. Cir. 1980)).  The Commission has noted that a "change in the nature of postal services broadly can be defined as changes to a customer's ability to access essential postal services that require a visit to a postal retail facility."[11]  Its past practice illustrates that nationwide changes that trigger 3661's review are general changes to postal facility hours or service standards for mail delivery.  The Postal Service requires an advisory opinion before, for example, formally changing the service standards for certain pieces of mail (i.e., eliminating overnight delivery for single-piece First-Class Mail or adding an extra day to Standard Mail),[12] changing the hours of operations at tens of thousands of post offices or retail operations,[13]

---

[11] Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), at 1, https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf.

[12] Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket No. N2014-1 (Mar 26, 2014), at 1, 10, https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20Opinion.pdf ("This proposal entails a change to the delivery expectation or delivery service standard for . . . [certain] Standard Mail. . . . Under the Postal Service's proposal, the service standard would change [from 3 days] to 4 days"); Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1 (Sept. 28, 2012), at 1 https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf ("The [Postal Service's proposed] changes to service standards would ultimately eliminate all overnight delivery service for single-piece First-Class Mail, and delay much of current First-Class Mail 2-day delivery to 3-day delivery.  Presorted First-Class Mail and Periodicals would have to meet new mailing requirements, including new accelerated entry times, to maintain eligibility for overnight service.  Standard Mail and Package Services would be affected to a lesser extent."); Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, , at 7 Docket No. 2006-1 (Dec. 12, 2006) (proposing "changes in the application of current service standards to numerous 3-digit ZIP Code service area origin-destination pairs for different classes of mail.").

[13] Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012), at 1, 3, https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf (proposing to reduce the hours of operations "at more than 13,0000 post offices nationwide); Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23, 2011), at 1, https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf (proposing to identify "more than 3,650 post offices, retail annexes, stations and branches for possible closing").; Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010),  https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf  (proposing a broad station and branch discontinuation plan).

or eliminating an entire day of mail delivery.[14]  All of these proposals constitute formal changes in published service standards or which customer-facing operations are open.  None of them concern basic, managerial operational changes of the type at issue here.

If there were any doubt as to whether these "changes" are covered by section 3661, that doubt would be an insufficient basis for Plaintiff's *ultra vires* claim.  Plaintiff's claim emerges at the intersection of two lines of doctrine: the requirement that section 3661 be narrowly interpreted, in order to preserve USPS's "broad management power," *see Buchanan*, 508 F.2d at 263-64, and the *ultra vires* doctrine, which requires that any error be clear and unambiguous.  The basic, operational activities that Plaintiff seeks to challenge here cannot meet this set of unequivocal requirements.  Indeed, were it otherwise, the *ultra vires* doctrine would swallow Congress's express preclusion of judicial review of these types of claims in district court.  Almost any sort of operational or management initiatives that could have an impact on Postal Service operations would fall within the ambit of section 3661 – and require extensive hearings---exactly the sort of ossification Congress intended to avoid.  *See id.*

### C.  Plaintiff Cannot Bring an Arbitrary and Capricious Challenge to the Postal Services' Compliance with 39 U.S.C. § 101(e).

Plaintiff also alleges that the Postal Service's supposed changes were arbitrary and capricious actions that failed to consider the requirements of 39 U.S.C. § 101(e).  *See* PI Mem. at 24-26. That provision embodies the postal policy that "[i]n determining all policies for postal service, the Postal Service shall give the highest consideration to the requirement for the most

---

[14] Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011), at 1, available at https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf ("The Postal Service requests a Commission advisory opinion on a plan to end Saturday delivery, Saturday outgoing mail processing, and other related service changes.").

expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e). But, as Plaintiff concedes in its brief in support of their motion, it cannot succeed on such a claim, because this Court lacks jurisdiction over an arbitrary or capricious challenge against the Postal Service. *See* PI Mem. at 14 ( "judicial review of USPS action is not available under the APA").

As discussed above, pursuant to 39 U.S.C. § 410(a), "the Postal Service is exempt from review under the Administrative Procedure Act," *Mittleman*, 757 F.3d at 305, the statutory review provision which embodies arbitrary or capricious review, *see* 5 U.S.C. § 706(2). "[W]here Congress has . . . acted to preclude even APA review, it is well established that no cause of action remains, much less some undefined 'traditional' equitable remedy." *Eagle Trust Fund v. USPS*, 365 F. Supp. 3d 57, 66 (D.D.C. 2019) (citing *Carlin v. McKean*, 823 F.2d 620, 623 (D.C. Cir. 1987)), *aff'd* 811 F. App'x 669 (D.C. Cir. 2020). This principle therefore applies to any challenge that the agency has "failed to engage in 'reasoned decisionmaking,'" regardless of whether the plaintiff pleads the magic words "APA" or brings an APA claim in substance, as Plaintiff does here. *Id.* at 65*; see also Reese Bros. v. U.S.P.S.*, 905 F. Supp. 2d 223, 253 (D.D.C. 2012) ("[T]he Court agrees with the other courts that have concluded that Congress clearly intended to preclude arbitrary and capricious judicial review of the substance of Postal Service regulations, policies and procedures."); *see also, e.g.*, *Pitney Bowes, Inc. v. USPS*, 27 F. Supp. 2d 15 (D.D.C. 1998); *Currier v. Potter*, 379 F.3d 716, 725 (9th Cir. 2004) (holding that section 410(a) "evinces Congress's general intent to withdraw judicial scrutiny of postal regulations," and "declin[ing] to override [section 410(a)'s] express removal of APA review of the Service's actions by imputing an implicit Congressional intent to preserve common-law principles of judicial review.").

Nor can Plaintiff style such their arbitrary and capricious challenge as an *ultra vires* claim. As previously addressed, such a challenge is highly constrained, and does not encompass arbitrary

and capricious review.  "[A] claim that an agency acted *ultra vires* is a claim that the agency acted 'in excess of its delegated powers and contrary to a specific prohibition in [an] Act,[] not that an agency's authorized action was imprudent or that in validity exercising its judgment, the agency reached the wrong result."  *Eagle Tr. Fund*, 365 F. Supp. 3d at 67.  But it is the latter error that Plaintiff complains of here.  Plaintiff is not questioning the Postal Service's general authority to make policy changes. Instead, Plaintiff is claiming that in making those policy changes, the Postal Service did not give "highest consideration" to the enumerated factors.

Further, section 101(e) is not even susceptible to *ultra vires* review.  By its terms, it generally identifies certain factors that must play into the Postal Service's *decision-making process*; it imposes no restriction on the content of any policy that is implements.  It is neither a grant of, nor a limitation on, the Postal Service's authority but rather emphasizes the agency's wide discretion in setting policy.  *See* 39 U.S.C. § 101(e). Such discretion cannot be squared with *ultra vires* review, which depends on a claim that there is no such doubt over the proper interpretation of a statute.  *See, e.g.*, *Key Medical Supply, Inc. v. Burwell*, 764 F.3d 955, 963-64 (8th Cir. 2014) (noting, in the context of a "broad statutory authority," that plaintiff "attempts to identify clear violations of statutory authority," but has only "identified mere issues of statutory interpretation" insufficient for *ultra vires* review).

## II.    PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM.

In order to justify injunctive relief, "the injury must be both certain and great; it must be actual and not theoretical."  *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d at 669, 674 (D.C. Cir. 1985); *see also Power Mobility Coalition v. Leavett*, 404 F. Supp. 2d 190, 203 (D.D.C. 2005) (plaintiff must show that injury is "imminent, certain and irreparable").  Plaintiff's claimed injuries do not suffice.

First, there is no procedural injury.  PI Mot. at 26-27. As discussed *supra*, Plaintiff cannot state a claim under section 3661, and thus cannot have suffered any procedural injury as a result of any violation of that statute.  And even if there was a technical violation, the mere failure to comply with a procedural rule, absent any independent harm, is insufficient to show Article III injury (and thus cannot show "certain and great" injury).  *See Summers*, 555 U.S. at 496.

Next, Plaintiff has not identified that its members are likely to suffer any injuries in terms of the potential future delay of their ballots.  The only member Plaintiff specifically identifies, Mr. Graham, has not in fact established a "well-founded fear that his ballot will not arrive in time to be counted." PI Mot.. at 28.  Indeed, in light of the service improvements and ongoing efforts to timely delivery Election Mail described *supra*, he has failed to show that, if he mailed his ballot a reasonable time before the election (which is approximately two months away), it would not be received in time to be counted.

Second, Plaintiff's claimed injury to its resources falls well short of establishing a "certain and great" harm.  *Wisc. Gas Co.*, 758 F.2d at 674.  "An organization, to show irreparable harm, must show first that "the 'actions taken by the defendant have perceptibly impaired the organization's programs . . . If so, the organization must then also show that the defendant's actions 'directly conflict with the organization's mission.'" *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016)).  Plaintiff claims that it has had "to divert resources that it would have otherwise expended on other aspects of its civic engagement program" as a result of "widespread mail delays this summer." PI Mot. at 28-29  But that theory cannot bear the weight of Plaintiff's claim of irreparable harm for at least two reasons. First, Plaintiff has not established that mail delays were necessarily result of the challenged policies, or that any future delays, if there are any,

would be the result of these Postal Service operational changes.  Indeed, the transportation initiative (the only "change" that occurred) happened at the same time as the COVID-19 pandemic. "The COVID-19 pandemic led to significant staffing shortages beginning in March 2020."  Prokity Dec. ¶ 4.  And though the staffing shortage indicators recovered somewhat in June, "the availability for July again began to decrease, with availability falling to its lowest levels in the week of July 11, 2020."  *Id.* ¶ 5.  This is the same time that the delays of which Plaintiff complains began.  Indeed, while "localized staffing shortages resulted in additional service disruptions in July," [s]taffing availability in some of those localities has steadily improved as additional employees have been hired, and others have returned to work following illness or quarantine."  *Id.* ¶ 10.  That is the same time that the Postal Service's performance numbers have improved.  Given the simultaneous impact of this generational pandemic, Plaintiff cannot show that the specific operational changes they challenge here were the cause of their injury, as opposed to COVID.

Moreover, assuming that the prior mail delays caused Plaintiff to divert resources, Plaintiff cannot establish that any future harm is imminent or likely to recur.  As set forth *supra*, USPS has taken a number of steps that have resulted in service performance improving.  And while Plaintiff has gestured toward certain operational costs it is incurring as it educates its members about mail-in voting, it has not seriously attempted to show that such changes are "great," as this Circuit requires.  *Cf.* W*hitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. CV 20-1630 (JEB), 2020 WL 5232076, at *38 (D.D.C. Sept. 2, 2020) (finding irreparable harm where an organization demonstrated it will likely experience an array of financial and operational burdens as a result of the two regulatory actions) (citing cases).

Given the speculative nature of any future injury, Plaintiff has not shown that injury is "certain and great," and thus cannot show that it would be irreparable.

44

### III.    THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF.

A preliminary injunction is also not appropriate because the balance of the equities and public interest weigh in Defendants' favor. As explained *supra*, USPS is currently undertaking extensive efforts to facilitate the timely delivery of Election Mail. There is no dispute that USPS has the capacity, including in terms of financing and machinery, to handle the anticipated surge in Election Mail. And Plaintiff's member voters have an opportunity to avoid any harm by mailing in their ballots without delay. The equities therefore weigh against an injunction here.

Moreover, an injunction in this context would be particularly inappropriate.  In effect, Plaintiff seeks to enjoin informal documents, prepared by local officials without the review or approval of the agency itself, that do not accurately describe USPS's policies and do not constitute the agency's actual policy. *See* Curtis Dec. ¶ 24 n.1.  Moreover, precisely because these documents were not intended to have legal effect or to reflect a clear policy, they were not drafted with legal precision, leading to the potential for ambiguity and confusion about what types of activities would fall within their scope.  Moreover, full compliance could require the Court to act as an overseer of the agency's day-to-day activities (including whether extra trips carrying mail are permitted); something that is inappropriate even in APA cases, and for good reason.  *See, e.g.*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (noting the importance of "protect[ing] agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.").

### CONCLUSION

For the aforementioned reasons, this Court should deny Plaintiff's motion for a preliminary injunction.

Dated:  September 11, 2020      Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Director, Federal Programs Branch

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va. Bar No. 85519)
KUNTAL CHOLERA
ALEXIS ECHOLS
DENA M. ROTH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1944
Joseph.Borson@usdoj.gov

*Attorneys for Defendants*