# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE and LOUIS DEJOY, in his official capacity as Postmaster General of the United States Postal Service,<br><br>*Defendants*. | No. 1:20-cv-2295-EGS |

## BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Dayna J. Zolle (DC Bar No. 1672633)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org
dayna@theusconstitution.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTEREST OF *AMICI CURIAE* ........................................................................................ 1

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 4

    I.    Since the Nation's Founding, The Post Office Has Played a Critically
Important Role in American Society ................................................................... 4

    II.   Reflecting the Importance of the Postal System's Role, Congress Has Required
the Postal Service to Follow Certain Procedures Whenever It Seeks to Change
the Nature of Postal Services in a Way That Will Generally Affect Service on a
Substantially Nationwide Basis .......................................................................... 7

    III.   By Failing to Request an Opinion from the Postal Regulatory Commission
Before Making Its Recent Changes, the Postal Service Has Violated Federal
Law ..................................................................................................................... 12

CONCLUSION ................................................................................................................. 16

APPENDIX: LIST OF *AMICI* .......................................................................................... 1A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Buchanan v. U.S. Postal Serv.*,
   508 F.2d 259 (5th Cir. 1975) ................................................................... 11, 14

*Carlson v. Postal Regulatory Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019) ................................................................. 9, 14

*GameFly, Inc. v. Postal Regulatory Comm'n*,
   704 F.3d 145 (D.C. Cir. 2013) ................................................................. 9

*Govs. of U.S. Postal Serv. v. U.S. Postal Rate Comm'n*,
   654 F.2d 108 (D.C. Cir. 1981) ................................................................. 8, 9

*United Parcel Serv., Inc. v. U.S. Postal Serv.*,
   604 F.2d 1370 (3d Cir. 1979) .................................................................. 8, 11, 14

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*,
   540 U.S. 736 (2004) ................................................................................. 10


<u>CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS</u>

Conf. Rep. No. 91-1363, 91st Cong., 2d Sess. (Aug. 3, 1970) ..................................... 12

H.R. Rep. No. 91-1104 (1970) ........................................................................................... *passim*

Postal Accountability and Enhancement Act of 2006, Pub. L. No. 109-435, 120 Stat. 3198
   (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 *et seq.*) ............................................. 1, 12

Postal Reorganization Act of 1970, Pub. L. No. 91-375, 84 Stat. 719
   (Aug. 12, 1970) (codified at 39 U.S.C. § 101 *et seq.*) .............................................. 1, 8, 9

Postal Service Act of 1792, ch. 7, 1 Stat. 232 ............................................................... 2, 5

39 U.S.C. § 202(a) ............................................................................................................ 8

39 U.S.C. § 202(c) ............................................................................................................ 8

39 U.S.C. § 202(d) ............................................................................................................ 8

39 U.S.C. § 402 ................................................................................................................. 11

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

39 U.S.C. § 3601 ........................................................... 9

39 U.S.C. § 3621 ........................................................... 11

39 U.S.C. § 3622 ........................................................... 9

39 U.S.C. § 3623 ........................................................... 9

39 U.S.C. § 3624 ........................................................... 9

39 U.S.C. § 3661(b) ........................................................ *passim*

39 U.S.C. § 3661(c) ........................................................ 3, 7

39 U.S.C. § 3663 ........................................................... 9

U.S. Const. art. 1, § 8 ...................................................... 2, 4

OTHER AUTHORITIES

Compl., *NAACP v. U.S. Postal Serv.*, No. 1:20-cv-2295 (D.D.C. Aug. 20, 2020) ....... 2, 6, 12, 13

Compl., *New York v. Trump*, No. 1:20-cv-2340 (D.D.C. Aug. 25, 2020) ................... 2, 12, 13, 15

Compl., *Washington v. Trump*, No. 1:20-3127 (E.D. Wash. Aug. 18, 2020) .............. 9, 12

*The Federalist No. 42* (James Madison) (Clinton Rossiter ed., 1961) .......................... 5

Wendell Phillips Garrison, 1 *William Lloyd Garrison, 1805-1879: The Story of His Life Told by His Children* (1885) ...................................................... 6

Richard R. John, *Spreading the News: The American Postal System from Franklin to Morse* (1995) ...................................................... 5

Pres. Richard Nixon, Remarks upon Signing the Postal Reorganization Act (Aug. 12, 1970) ...................................................... 11

President's Commission on Postal Organization, *Towards Postal Excellence* (1968) . 3, 4, 8, 10

*Rural and Urban Origins of the U.S. Postal Service*, RISC Report WP-19-007 (Aug. 26, 2019) ...................................................... 6

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

W. Sherman Savage, *Abolitionist Literature in the Mails. 1835-1836*,
    13 J. Afr. Am. Hist. 150 (1928) .................................................................     6

Alex Seitz-Wald, *How Do You Know Voting by Mail Works? The U.S. Military's Done It
    Since the Civil War*, NBC News (Apr. 19, 2020),
    https://www.nbcnews.com/politics/2020-election/how-do-you-know-voting-mail-
    works-u-s-military-n1186926 ...................................................................    13

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are members of the U.S. Senate, many of whom served when key components of the nation's laws governing the U.S. Postal Service, including provisions pertinent to this case, were drafted, debated, and passed.  Based on their experience serving in Congress, *amici* understand that the Postal Reorganization Act of 1970, Pub. L. No. 91-375, 84 Stat. 719 (Aug. 12, 1970) (codified at 39 U.S.C. § 101 *et seq.*), as amended by the Postal Accountability and Enhancement Act of 2006, Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 *et seq.*), was passed to ensure that management of the Postal Service remains free from partisan politics and accountable to the American public, particularly when the Postal Service seeks to make nationwide changes in the nature of postal services.  *Amici* therefore have a substantial interest in ensuring that this Court recognizes that when the Postal Service and Postmaster General failed to follow the procedures set forth in 39 U.S.C. § 3661—which requires that the Postal Regulatory Commission and members of the public have the opportunity to weigh in before the Postal Service implements certain changes—they not only violated the plain text of § 3661 but also acted counter to Congress's plan in enacting that legislation.

A full listing of *amici* appears in the Appendix.

## INTRODUCTION

In June and July 2020, Postmaster General Louis DeJoy instituted several major changes that have had a significant effect on the nature of postal services nationwide.  According to Plaintiffs in this lawsuit and others, the U.S. Postal Service has, under DeJoy's instruction, "removed hundreds of collection boxes and high-speed sorting machines; cut or curtailed

---

[1] *Amici* state that no counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution to the brief's preparation or submission.

overtime; prohibited needed late trips and extra trips; and [begun] a pilot program in almost 400 localities that turned how the agency processes mail on its head."  Compl. 2, *New York v. Trump*, No. 1:20-cv-2340 (D.D.C. Aug. 25, 2020).  These changes have allegedly "produced serious delays across the country despite the fact that letter mail volume had decreased during the [COVID-19] pandemic."  *Id.* at 3; *see* Compl. 2, *NAACP v. U.S. Postal Serv.*, No. 1:20-cv-2295 (D.D.C. Aug. 20, 2020) ("[T]he Postal Service has made significant changes that have resulted in unreliable service and widespread delays.").  Particularly troubling, these changes "will hinder the delivery of mail ballots and ballot applications" across the country, Compl. 61, *New York*, No. 1:20-cv-2340, just as many states are "expect[ing] a record-breaking volume of mail-in voting for the November 2020 election," Compl. 16, *NAACP*, No. 1:20-cv-2295.  The Postal Service has imposed these changes in violation of federal laws that Congress passed to protect the Postal Service from partisan influence and ensure its accountability to the public.

The U.S. Constitution vests Congress with the power to "establish Post Offices and post Roads," U.S. Const. art. 1, § 8, and Congress created the U.S. Post Office Department just a few years after the Constitution's ratification, Postal Service Act of 1792, ch. 7, § 1, 1 Stat. 232.  The postal system quickly became fundamental to the functioning of American democracy and American society more broadly.  As the United States developed and grew, the Post Office Department made changes to the postal system to ensure that it was accessible to everyone, no matter where they lived or how much money they had.

Reflecting the critically important role the Postal Service has played in American society since the nation's founding, Congress has acted over time to protect the integrity and effectiveness of the postal system.  As relevant here, Congress enacted the Postal Reorganization Act of 1970, as amended by the Postal Accountability and Enhancement Act of 2006, which

requires the Postal Service to follow certain procedures that allow the public to weigh in "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). Specifically, when the Postal Service seeks to make such a change, it "shall submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* The Act also states that "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record . . . has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public." *Id.* § 3661(c).

The history of the Postal Reorganization Act makes clear that Congress passed that law to "[i]nsulate" management of the Postal Service "from partisan politics . . . by having the Postmaster General responsible to the [Postal Regulatory] Commission, which represents the public interest only, for his conduct of the affairs of the Postal Service." H.R. Rep. No. 91-1104, 3660-61 (1970). The Act was based on the recommendations of the Kappel Commission, which President Johnson assembled to determine whether the postal system needed to be reorganized in light of the nation's growing economy and population. President's Commission on Postal Organization, *Towards Postal Excellence* v (1968). The Commission recommended a major reorganization of the Postal Service, explaining, among other things, that "[b]ecause postal patronage was once a source of party power, the Post Office is still burdened with an anachronistic postmaster selection system," and that "[b]ecause [the Postmaster General] presides over what was once a major policy arm of Government, [he] is still a member of the President's Cabinet." *Id.* at 47. It concluded that "[p]ostmaster patronage suggests to many that

partisan politics plays a part in the operation of a post office," a notion that "undermines public confidence and employee morale."  *Id.* at 42.

Thus, a key committee report on the Postal Reorganization Act declared that "[i]f the American public is to have the Postal Service that it expects and deserves, the post office must be taken out of politics and politics out of the post office.  Nineteenth Century customs of political patronage have no place in a late 20th Century Postal System."  H.R. Rep. No. 91-1104, *supra*, at 3654.  That goal prompted Congress to create the procedures set forth in § 3661.  To shield management of the Postal Service from partisan influence and to ensure that the Postal Service is responsive to the public interest, Congress required that the public be allowed to weigh in before the Postal Service implements changes to the nature of postal services on a substantially nationwide basis.

In this case, the Postal Service failed to notify the Postal Regulatory Commission of *any* of its recent changes in the nature of postal services before their implementation, and it therefore failed to allow the Commission or the public the opportunity to comment in any meaningful way on these reforms.  The Postal Service's decision to bypass the presribed procedures of § 3661 flies in the face of Congress's plan in passing the Postal Reorganization Act, which was to buffer Postal Service management from partisan influence and to ensure its accountability to the public. Accordingly, this Court should conclude that the Postal Service's actions are unlawful.

**ARGUMENT**

I.   **Since the Nation's Founding, The Post Office Has Played a Critically Important Role in American Society.**

The U.S. Constitution vests Congress with the power to "establish Post Offices and post Roads."  U.S. Const. art. 1, § 8.  In *The Federalist No. 42*, James Madison explained, "The power of establishing post roads must, in every view, be a harmless power and may, perhaps, by

judicious management become productive of great public conveniency.  Nothing which tends to facilitate the intercourse between the States can be deemed unworthy of the public care."  *The Federalist No. 42*, at 271 (James Madison) (Clinton Rossiter ed., 1961).

This important constitutional power did not lie dormant for long.  Just a few years after the Constitution's ratification, Congress enacted the first substantive federal postal law, creating the U.S. Post Office Department led by "one Postmaster General, who . . . shall provide for carrying the mail of the United States" and who served under the direction of the President.  Postal Service Act of 1792, ch. 7, § 3, 1 Stat. 232, 234.  The law also established post roads, *id.* § 1; allowed the Postmaster General to enter into contracts, *id.* § 2; determined postage rates, *id*. § 9; and set penalties for "neglecting, detaining, delaying, or secreting letters," *id.* § 16.  Finally, the law subsidized newspaper circulation, allowing for the distribution of newspapers across the country.  *Id.* §§ 21-22.

Scholars have explained that the development of the postal system "spurred a communications revolution that was as profound in its consequences for American public life as the subsequent revolutions that have come to be associated with the telegraph, the telephone, and the computer."  Richard R. John, *Spreading the News: The American Postal System from Franklin to Morse* vii (1995).  Indeed, the Post Office Department created a central communications system that allowed for a robust exchange of ideas—a system that is core to our democracy.  As Alexis de Tocqueville aptly commented in his famous study of American democracy, the post office was a "great link between minds."  *Id.* at 3.

As the United States continued to develop, the Post Office Department made changes to the postal system to ensure that the post was accessible to everyone, no matter where they lived or how much money they had.  For example, in the 1840s, after a study from a congressionally

appointed Postal Commission found that mail was an essential tool for democracy, Congress altered the postage scale to be based on weight, which greatly reduced the cost of postage stamps and made the post more affordable and accessible. *Rural and Urban Origins of the U.S. Postal Service*, RISC Report WP-19-007 (Aug. 26, 2019).

The U.S. postal system has also provided an essential forum for some of the nation's most important debates. During the nineteenth century, abolitionists used the mail to circulate newspapers, books, and pamphlets in an effort "to show the horrors of the institution [of slavery,] . . . to develop sentiment against it . . . [and] to arouse the people to a realization of the evils of the institution." W. Sherman Savage, *Abolitionist Literature in the Mails. 1835-1836*, 13 J. Afr. Am. Hist. 150, 150 (1928). The American Anti-Slavery Society specifically stated that it would "circulate unsparingly and extensively Anti-Slavery tracts and periodicals," and William Lloyd Garrison, editor of the abolitionist paper *The Liberator*, raised money to "provide for the gratuitous distribution of anti-slavery publications" through the postal system. Wendell Phillips Garrison, 1 *William Lloyd Garrison, 1805-1879: The Story of His Life Told by His Children* 412, 483 (1885). As the nation had little to no communications technology at the time, it was the postal system that made an extensive debate over slavery possible.

Today, the postal service is as important as ever in maintaining our democracy. In light of COVID-19, millions of Americans hope to vote by mail in the upcoming election, but they need a functioning post office to exercise their fundamental right to vote without endangering their health and the health of others. *See* Compl. 16, *NAACP*, No. 1:20-cv-2295 ("States witnessed surges in applications for vote-by-mail ballots for 2020 primary elections, and historical levels of mail-in voting during primaries in 2020. . . . Many states likewise expect a record breaking volume of mail-in voting for the November 2020 election." (footnotes omitted)).

In sum, ever since Congress created the Post Office in the early years of the Republic, the postal system has played an important role in maintaining our society and our democracy. To help ensure that it is always able to play that role effectively, Congress has over time put in place important procedural requirements that must be followed before changes can be made to the nature of postal services, as the next Section discusses.

**II.    Reflecting the Importance of the Postal System's Role, Congress Has Required the Postal Service to Follow Certain Procedures Whenever It Seeks to Change the Nature of Postal Services in a Way That Will Generally Affect Service on a Substantially Nationwide Basis.**

Reflecting the important role the postal system plays, Congress has long sought to ensure that the Postal Service is properly managed, free from partisan influence, and accountable to the public. Most significantly, under the Postal Reorganization Act of 1970, as amended by the Postal Accountability and Enhancement Act of 2006 (PAEA), Congress has required the Postal Service to follow certain procedures that allow the public to weigh in "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). Specifically, when the Postal Service seeks to make such a change, it "shall submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion on the change" within "a reasonable time prior to the effective date of such proposal," *id.*, and the Commission must issue a written opinion after providing "an opportunity for hearing on the record under [the Administrative Procedure Act, 5 U.S.C. §§ 556-57] . . . to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public," 39 U.S.C. § 3661(c). Congress viewed these requirements as critical to the proper provision of postal services, as this Section describes.

**A.**  By the 1960s, the Post Office Department was suffering from inefficiency because of "inadequate or diffused management authority."  *Govs. of U.S. Postal Serv. v. U.S. Postal Rate Comm'n*, 654 F.2d 108, 109 (D.C. Cir. 1981).  President Johnson assembled the Kappel Commission in 1967 to investigate whether to reorganize the postal system in light of the nation's growing economy and population, *Towards Postal Excellence*, *supra*, at v, and Congress itself devoted significant time and resources to determine how best to address the situation. Indeed, the House Committee on Post Office and Civil Service remarked in 1970 that "rarely has any subject received as much careful and intensive consideration by a committee of the Congress as this committee has given to the very complex and important subject of postal reform."  H.R. Rep. No. 91-1104, *supra*, at 3651.

Based on these careful deliberations, Congress passed the Postal Reorganization Act of 1970, 39 U.S.C. § 101 *et seq.*, which abolished the Post Office Department and established in its place the U.S. Postal Service and the Postal Rate Commission.  *Id.*; *see United Parcel Serv., Inc. v. U.S. Postal Serv.*, 604 F.2d 1370, 1371 (3d Cir. 1979).  The Postal Service is managed by an eleven-member Board of Governors, nine of whom are appointed by the President.  The Postmaster General is appointed by those nine governors, and the Deputy Postmaster General is appointed by the nine governors and the Postmaster General.  *Govs. of USPS*, 654 F.2d at 109 (citing 39 U.S.C. § 202(a), 202(c)-(d)).

The Postal Reorganization Act, as intially enacted, created the Postal Rate Commission "as an independent establishment," *id.* at 110, to serve as a "partner" to the Postal Service's Board of Governors, *id.* at 114.  To that end, the Act provided that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within

8

a reasonable time prior to the effective date of such proposal, to the Postal Rate Commission requesting an advisory opinion on the change."  Postal Reorganization Act of 1970, Pub. L. No. 91-375, 84 Stat. 719, 764 (Aug. 12, 1970) (codified at 39 U.S.C. § 3661(b)).

Congress similarly charged the Postal Rate Commission "with the duty of making recommendations to the Governors of the Postal Service with respect to rate, fee and classification matters."  *Govs. of USPS*, 654 F.2d at 110 (citing 39 U.S.C. §§ 3601, 3622-24). "In considering Postal Service requests for recommended decisions on rates, fees, and classifications . . . [,] the Commission [was] required to accord to the Postal Service, users of the mails, and an officer of the Commission representing the public, an opportunity for a hearing," and the Commission would then provide a written recommendation for the Postal Service.  *Id.*

In 2006, Congress enacted the PAEA.  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 340 (D.C. Cir. 2019); *see* Compl. 14, *Washington v. Trump*, No. 1:20-3127 (E.D. Wash. Aug. 18, 2020).  The PAEA "reconstituted the Postal Rate Commission as the Postal *Regulatory* Commission" and "strengthened the role of the Commission."  *Carlson*, 938 F.3d at 340 (emphasis added).  As amended by the PAEA, the Postal Reorganization Act requires the Postal Service to follow the same procedures it initially required for nationwide changes in the nature of postal services, except that the Postal Service must now seek a written opinion from the Postal *Regulatory* Commission, rather than the Postal Rate Commission.  39 U.S.C. § 3661(b); *see id.* ("[The Postal Service] shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.").  The PAEA "incorporates the APA as the framework for review" of proposed rate changes as well.  *Carlson*, 938 F.3d at 343 (citing 39 U.S.C. § 3663, and *GameFly, Inc. v. Postal Regulatory Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013)).

**B.**   According to the House Committee on Post Office and Civil Service, which drafted

the Postal Reorgnization Act, Congress's plan in making these changes was to "convert the Post

Office Department into an independent establishment in the executive branch of the government

freed from direct political pressures."  H.R. Rep. No. 91-1104, *supra*, at 3650.  Indeed, the

Supreme Court has recognized that the Act "was adopted to increase the efficiency of the Postal

Service and reduce political influences on its operations."  *U.S. Postal Serv. v. Flamingo Indus.*

*(USA) Ltd.*, 540 U.S. 736, 740 (2004).

The House Committee drafted the Postal Reorganization Act based on the findings of the

Kappel Commission, H.R. Rep. No. 91-1104, *supra*, at 3654, which noted, among other things,

that "[b]ecause postal patronage was once a source of party power, the Post Office is still

burdened with an anachronistic postmaster selection system," *Towards Postal Excellence*, *supra*,

at 47.  The Commission explained that "[b]ecause he presides over what was once a major policy

arm of Government, the Postmaster General is still a member of the President's Cabinet."  *Id*.

According to the Commission, "[p]ostmaster patronage suggests to many that partisan politics

plays a part in the operation of a post office.  Warranted or not, the suspicion undermines public

confidence and employee morale."  *Id.* at 42.

Thus, Congress passed the Postal Reorganization Act to "[i]nsulate" management of the

Postal Service "from partisan politics . . . by having the Postmaster General responsible to the

[Postal Regulatory] Commission, which represents the public interest only, for his conduct of the

affairs of the Postal Service."  H.R. Rep. No. 91-1104, *supra*, at 3660-61.  The House Committee

Report explained that the Postal Regulatory Commission in particular "provides an invaluable

buffer between the management of the Postal Service and the possible influence of partisan

politics."  *Id.* at 3660.  Indeed, the Report emphasized that "[i]f the American public is to have

the Postal Service that it expects and deserves, the post office must be taken out of politics and politics out of the post office.  Nineteenth Century customs of political patronage have no place in a late 20th Century Postal System."  *Id.* at 3654; *see* Pres. Richard Nixon, Remarks upon Signing the Postal Reorganization Act (Aug. 12, 1970) ("There is no Republican way or Democratic way to deliver the mail.  There is only the right way and that is what this occasion is all about.").

In describing the portion of the Act establishing "procedures for changes in postal services" in particular, the Committee Report emphasized that "[t]he Postal Service is—first, last and always—a public service."  H.R. Rep. No. 91-1104, *supra*, at 3668.  The Report stated that under the Act, therefore, the Postal Service must "seek out the needs and desires of its present and potential customers—the American public," and that the Act "provides significant assurance that the postal management will in fact be responsive to the people to a greater degree than has heretofore been known."  *Id.*  The Report described how the Act "contains specific provisions requiring justification and review of changes in service," and that those provisions compel the Postal Service, when seeking to make those changes in service, to "follow[] procedures comparable to those for proposed rate changes."  *Id.*; *cf. UPS*, 604 F.2d at 1377 ("The Act grants the Governors [of the Postal Service] the exclusive and nondelegable authority to establish 'classes of mail' and 'rates of postage', but only after the Governors have received a recommended decision from the Postal Rate Commission." (citing 39 U.S.C. §§ 402, 3621)).

The Report concluded that those procedures requiring notice and a public hearing "represent significant innovations that should materially enhance the responsiveness of the Postal Service to the American public."  *Id.*; *see Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 263 n.6 (5th Cir. 1975) ("[T]he procedures mandated by 3661 are sufficiently elaborate to amount to a

11

significant impediment in the path of the decision making process of the Postal Service.").

Ultimately, Congress largely adopted the House Committee's version of what became § 3661,

*see* Conf. Rep. No. 91-1363, 91st Cong., 2d Sess., at 3719 (Aug. 3, 1970), and, as explained

above, Congress did not alter the required procedures in § 3661 when it passed the PAEA in

2006, except to replace the term "Postal Rate Commission" with "Postal Regulatory

Commission."  Postal Accountability and Enhancement Act, Pub. L. No. 109-435, 120 Stat.

3198, § 604(e)-(f).

### III.   By Failing to Request an Opinion from the Postal Regulatory Commission Before Making Its Recent Changes, the Postal Service Has Violated Federal Law.

The Postal Service's recent changes are unlawful because they were made without

complying with these important requirements that Congress put in place to ensure proper

management of the nation's mail delivery.  For example, without seeking input on the matter, the

Postal Service "prohibited postal workers from making the extra trips necessary to ensure that no

mail is left sitting in postal facilities at the end of the day."  Compl. 23, *New York*, No. 1:20-cv-

2340.  Likewise, the Postal Service "prohibited network, plant, and delivery workers from

making late trips—i.e., from embarking on their trip any later than the scheduled time."  *Id.*  In

addition, "671 machines used by the Postal Service to organize and sort letters or other pieces of

mail have been or will be removed from dozens of cities across America[,] . . . effectively

decommission[ing] 10 percent of the Postal Service's sorting machines."  Compl. 18-19,

*Washington*, No. 1:20-cv-3127.  These changes and others to the Postal Service's central

operations have allegedly "resulted in unreliable service and widespread delays," Compl. 2,

*NAACP*, No. 1:20-cv-2295, and "there have been widespread reports of mail piling up in

regional distribution centers and post offices around the country, and of customers experiencing substantial delays and disruptions in mail service," *id.* at 19.

If these changes continue to cause widespread delays, they could threaten the reliability of mail-in voting, Compl. 61, *New York*, No. 1:20-cv-2340—an option that at least some Americans have used to cast their ballots since the American Revolution, *see* Alex Seitz-Wald, *How Do You Know Voting by Mail Works? The U.S. Military's Done It Since the Civil War*, NBC News (Apr. 19, 2020), https://www.nbcnews.com/politics/2020-election/how-do-you-know-voting-mail-works-u-s-military-n1186926—with enormous implications for our country and our democracy.

These changes thus have already affected and will continue to "generally affect service on a nationwide or substantially nationwide basis," 39 U.S.C. § 3661(b), and the Postal Service made them without so much as notifying the Postal Regulatory Commission, much less having received a written opinion from the Commission following the completion of a public hearing.

The government may argue that these changes are not sufficiently significant to require public comment, but that is plainly wrong. Because Congress was seeking to ensure that there would be public accountability with regard to management of the Postal Service, it required that these procedures be followed with respect to any changes that "generally affect service on a nationwide or substantially nationwide basis," as these changes plainly do.

Significantly, Congress required the Postal Service to follow comparable procedures for even seemingly minor changes in postal rates or mailing classifications, *see* H.R. Rep. No. 91-1104, *supra*, at 3668 (under the Postal Reorganization Act, "[f]ollowing procedures *comparable to* those for proposed rate changes, operating management would submit proposals relating to changes in service to the rate board with public notice and opportunity for public comment"

(emphasis added)), and multiple courts have determined that the procedures governing those changes apply broadly, *see, e.g.*, *Carlson*, 938 F.3d at 343; *UPS*, 604 F.2d at 1380.  Indeed, the D.C. Circuit has held that the Postal Service needed to submit a proposed 5-cent increase for the price of stamps to the Postal Regulatory Commission before it could lawfully implement that change, recognizing that "Congress directed the Commission to serve as more than just a rubber stamp of the Postal Service's proposed rate increases."  *Carlson*, 938 F.3d at 351; *see id.* ("The PAEA establishes a robust rulemaking process for the Commission, subjecting rate-change proposals to the deliberative and participatory process of notice-and-comment rulemaking under the APA.").  Likewise, the Third Circuit has emphasized that "any proposal which would effect a change in mail classification or a rate, including a test or experiment embodying those features, must be submitted to the Rate Commission, *no matter how experimental, temporary, or limited in scope the change*."  *UPS*, 604 F.2d at 1380 (emphasis added).

To be sure, the Fifth Circuit has suggested that § 3661 applies only when the Postal Service seeks to make "changes of significance" that will have a "meaningful impact" on postal services.  *See Buchanan*, 508 F.2d at 262-63.  But that notion is contrary to § 3661's plain text, which states that the statute applies any time "the Postal Service determines that there should be a change in the nature of postal services which will *generally* affect service on a nationwide *or substantially nationwide basis*."  39 U.S.C. § 3661(b) (emphasis added).  This statutory language is broad, reflecting Congress's plan to ensure that the Postal Regulatory Commission and the public could meaningfully weigh in on any prospective changes to postal services that would have a substantially nationwide impact.

In any event, the postal changes at issue in this case would satisfy even the Fifth Circuit's heightened standard because they are significant, and they have had, and will continue to have, a

meaningful impact on postal services on a nationwide or substantially nationwide basis.  As discussed above, the Postal Service's changes have already had a major impact on the delivery of the mail with attendant consequences for people throughout the country.  Moreover, the changes allegedly "will hinder the delivery of mail ballots and ballot applications" for the November election.  Compl. 61, *New York*, No. 1:20-cv-2340.  Changes of this magnitude plainly cannot be made without input from the public and without following the requirements set out in federal law.

* * *

In sum, the Postal Service's recent changes not only violated the plain terms of § 3661 but also cannot be reconciled with Congress's plan in passing the Postal Reorganization Act.  Congress passed that legislation not to impose modest requirements on the Postal Service but to provide a substantial buffer between management of the Postal Service and partisan politics, as well as to ensure accountability to the public.  Here, the Postal Service has implemented significant institutional changes that have already affected service nationwide without seeking the requisite input from the independent Postal Regulatory Commission or the American public.  These changes exemplify the kind of partisan decisionmaking and lack of public accountability that Congress designed the Postal Reorganization Act, as amended by the PAEA, and the Postal Regulatory Commission to prevent.  This Court should therefore hold that the Postal Service and Postmaster General violated § 3661.

**CONCLUSION**

For the foregoing reasons, this Court should grant plaintiff's motion for a preliminary injunction.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Dayna J. Zolle (DC Bar No. 1672633)
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org
dayna@theusconstitution.org

*Counsel for Amici Curiae*

Dated: September 8, 2020

**APPENDIX**

LIST OF *AMICI*

Blumenthal, Richard
   Senator of Connecticut

Booker, Cory A.
   Senator of New Jersey

Brown, Sherrod
   Senator of Ohio

Carper, Tom
   Senator of Delaware

Hirono, Mazie K.
   Senator of Hawaii

Klobuchar, Amy
   Senator of Minnesota

Markey, Edward J.
   Senator of Massachusetts

Merkley, Jeffrey A.
   Senator of Oregon

Reed, Jack
   Senator of Rhode Island

Sanders, Bernard
   Senator of Vermont

Shaheen, Jeanne
   Senator of New Hampshire

Warren, Elizabeth
   Senator of Massachusetts

Whitehouse, Sheldon
   Senator of Rhode Island

Wyden, Ron
   Senator of Oregon

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2020, the foregoing document was filed with the Clerk

of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated:  September 8, 2020

/s/ Brianne J. Gorod
Brianne J. Gorod
