**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 20-cv-2295 (EGS) |
| UNITED STATES POSTAL SERVICE, et al., | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY
IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff National Association for the Advancement of Colored People (NAACP) submits this notice to advise the Court of a decision granting a motion for a preliminary injunction in *Commonwealth of Pennsylvania v. DeJoy*, 20-4096 (E.D. Pa. Sept. 28, 2020). The decision is pertinent to the NAACP's pending motion for a preliminary injunction, ECF 8.

Like the NAACP here, the plaintiffs in *Commonwealth of Pennsylvania* argued that the United States Postal Service and Postmaster General DeJoy violated 39 U.S.C. § 3661(b) by making changes to postal service with a nationwide or substantially nationwide effect. The court held that the plaintiffs established a likelihood of success on the merits of that claim and rejected the defendants' argument that 39 U.S.C. § 3662 deprived the court of jurisdiction. The decision, like this Court's decision in *State of New York v. Trump*, 20-cv-2340, ECF 52 (Sept. 27, 2020), supports NAACP's motion for a preliminary injunction on its section 3661 claim.

In addition, the plaintiffs in *Commonwealth of Pennsylvania* alleged a claim that the defendants violated 39 U.S.C. § 101(e), although the plaintiffs did not seek an injunction on that

basis. As to that claim, which overlaps with the NAACP's claim that the Postal Service acted in an arbitrary and capricious manner and counter to its statutory obligations by implementing changes to postal service during a pandemic and during an election year, the court stated (at 81 n.43) that "[m]uch of the same evidence advanced in support of [the section 3661 claim] would appear to establish a probability of success on the merits" of this claim as well.

A copy of the *Commonwealth of Pennsylvania* decision is attached.

Dated: September 30, 2020                          Respectfully submitted,

                                                   /s/ Allison M. Zieve
                                                   Allison M. Zieve (DC Bar No. 424786)
Samuel Spital (D.D.C. Bar No. SS4839)              Matthew A. Seligman (DC Bar No. 1018889)
Rachel Kleinman (NY Bar No. 4417903)              PUBLIC CITIZEN LITIGATION GROUP
Monique Lin-Luse (NY Bar No. 5671920)             1600 20th Street NW
J. Zachery Morris (NY Bar No. 5392196)            Washington, DC 20009
John S. Cusick (NY Bar No. 5585245)               (202) 588-1000
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

                          Counsel for Plaintiff NAACP

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,** | : | |
| **ET AL.** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 20-4096** |
| | : | |
| **LOUIS DeJOY** | : | |
| *IN HIS OFFICIAL CAPACITY AS* | : | |
| *UNITED STATES POSTMASTER GENERAL,* | : | |
| **ET AL.** | : | |

## MEMORANDUM

**Gerald Austin McHugh, J.**                                    **September 28, 2020**


This is an action brought by six states and the District of Columbia to enjoin certain changes made by the United States Postal Service in the leadup to the November 3, 2020 election. As an initial matter, it is useful to highlight that as a public agency, the Postal Service must abide by the procedures enacted by Congress when it created the modern Postal Service via the Postal Reorganization Act ("PRA") in 1970, and again when it amended the PRA by passing the Postal Enhancement and Accountability Act ("PAEA") in 2006. Congress required that the Postal Service seek an advisory opinion from the Postal Regulatory Commission (hereafter, "the Commission") and that a public hearing be held prior to making significant, nationwide changes. 39 U.S.C. § 3661. This structure formally balances the Postal Service's need to make "businesslike" decisions with its role as an agency that provides an indispensable service to the American public. *See* H.R. Rep. No. 109-66, at 42 (2005).

The Postal Service must also meet substantive requirements, including that it provide "adequate and efficient postal services," 39 U.S.C § 403(a), and that it "give the highest

consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

At issue in this case is whether the Postal Service violated the law and acted beyond its authority when it restricted extra and late trips by trucks and letter carriers and instituted overtime restrictions. Such changes could have profound consequences for the administration of state agencies in ordinary times. In a pandemic, states are even more reliant on the mail, especially when it comes to administering elections. This Court has been called upon to exercise jurisdiction and provide redress—namely, that the Postal Service reverse the changes it has made and abide by the statutorily-required process, which includes review and input from both the Commission and the public.

Plaintiffs and the Postal Service agree that the Postal Service undertook a major new initiative following Louis DeJoy's installation as Postmaster General. Both sides also agree that the Postal Service did not seek an advisory opinion and that no public hearing occurred before the Postal Service implemented these changes in July 2020. Against that background, Plaintiffs have produced compelling evidence from Defendants themselves, indicating that there has been a pronounced increase in mail delays across the country since the implementation of these changes. And the Postal Service insists that it is rolling back the changes and improving performance.

Nonetheless, the Postal Service raises several procedural arguments as to why this Court may not hear this case in the first place. It further contends that even if this Court has jurisdiction, the changes do not rise to a level that requires the input of the Commission or the public.

Having examined the facts, along with the text, structure, and legislative history of the PRA and the PAEA, and having also accorded some level of deference to the Postal Service's interpretation of the statute, I conclude that jurisdiction exists. Furthermore, as users of the mail

who rely on the Postal Service's historic commitment to a policy of "every piece, every day,"[1] Plaintiffs have been harmed in various and meaningful ways by these changes, as discussed below.

The Postal Service is a critical agency that preceded the birth of the nation itself, one of a few agencies that the Constitution explicitly authorized. U.S. Const. art. I, § 8. Congress has described it as "a basic and fundamental service provided to the people by the Government of the United States. . . ." 39 U.S.C. § 101(a). Its ability to fulfill its mission during a presidential election taking place in the midst of a public health crisis is vital. The record in this case strongly supports the conclusion that irreparable harm will result unless its ability to operate is assured. I will therefore grant injunctive relief.

## I.    The Relevant Factual Background and Procedural History

In response to the COVID-19 pandemic, states have sought to facilitate mail-in voting, and a record number of voters are expected to cast mail-in ballots. In twenty-eight states, plaintiffs may apply for and cast a mail-in ballot for any reason. *See* Compl. ¶ 6, ECF No. 1. Nine states will send mail-in ballots to all eligible voters. *Id.* Voters in six other states may also request a mail-in ballot for reasons related to COVID-19. *Id.* As a result of these efforts and voters' fears about contracting COVID-19 while voting in person, states are already seeing record numbers of requests for mail-in ballots.[2]

The ability of the Postal Service to deliver the Election Mail and other essential post in a timely fashion has recently been called into question. On June 15, 2020, Louis DeJoy began his tenure as the 75th Postmaster General and Chief Executive Officer. Compl. ¶ 155. Prior to his

---

[1] Mr. Robert Cintron, Vice President of Logistics for the Postal Service, acknowledged that for 35 years, he has heard the policy stated in various contexts: "It's about making sure that we get every piece delivered every day, every piece on the truck every day." Cintron Dep. Courtroom Exhibit 54 at 106: 12-16.  Plaintiffs introduced Supplemental Exhibits on September 24, 2020. These exhibits have not been filed electronically.

[2] In North Carolina, for instance, the elections authority has received over 10.8 times the number of absentee ballot requests than it had at the same time in 2016. Compl. ¶ 7.

term, DeJoy had no experience working at the Postal Service. *Id.* Before the COVID-19 pandemic began, the Postal Service met its service standards for First-Class Mail roughly 92 percent of the time. *See* Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit Ex. 54-16. In April, service performance declined to 90 percent, before climbing again in May to 92 percent. *Id.* Approximately one month after Postmaster DeJoy began his tenure, service dropped precipitously and fell to 85 percent on July 11, 2020. *Id.* By August 8, 2020 service performance fell to 81.47 percent, far lower than at any other time during the pandemic.  *Id.*

### A.  Procedural History

Prompted by fears of Postal Service delays and the administration of elections, the Commonwealth of Pennsylvania, the State of California, the State of Delaware, the District of Columbia, the State of Maine, the Commonwealth of Massachusetts, and the State of North Carolina filed a complaint for declaratory and injunctive relief on August 21, 2020 against Postmaster DeJoy, Robert Duncan, who serves as Chairman of the Postal Service Board of Governors,[3] and the United States Postal Service.

Plaintiffs claim that the Postal Service has unlawfully implemented policy changes regarding transportation schedules, letter carriers, and the use of overtime. Compl. ¶ 2. Specifically, they allege that the Postal Service has been "prohibiting late or extra trips by postal workers that are often necessary to keep the mail moving forward in the mail stream; requiring carriers to adhere rigidly to start and stop times regardless of whether all mail for their route has arrived or been delivered; and limiting the use of overtime." *Id.* at ¶ 3. Plaintiffs further argue

---

[3] Postmaster DeJoy and Chairman Duncan are named in their official capacities.

that these policy changes caused a significant drop in service and continue to contribute to delays.

The states have further claimed that Postal Service officials "also intend to change the Postal Service's longstanding practice of prioritizing Election Mail ahead of the November 2020 election." Pls. Mot. Prelim. Inj. ¶ 1, ECF No. 18.

Plaintiffs include four causes of action within their Complaint:

Count I:  The states contend that Defendants acted beyond their statutory authority, and in violation of section 3661 of the PRA, 39 U.S.C. § 3661, when they made national changes to postal services without submitting a proposal to the Postal Regulatory Commission. *See* Compl. ¶ 222-227. In Plaintiffs' Motion for a Preliminary Injunction, the states also allege that Defendants' "contemplated changes to the processing of Election Mail . . . are subject to section 3661's procedural requirements" and that the Postal Service must issue a proposal to the Commission before making these changes. Mem. Law. Supp. Pls. Mot. Prelim. Inj. 34-35, ECF No. 18-1.

Count II:  Plaintiffs also claim that Defendants' July 2020 policy changes and their intention to abandon the practice of giving Election Mail the highest priority exceed Defendants' authority under sections 101 and 403 of the PRA. Compl. ¶ 228-236. The Postal Service must "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C § 403(a). The Postal Service must also "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

Count III:  The states allege that the Defendants' changes have "abruptly and unlawfully impaired the operation of the postal services and have acted to cast doubt on the Postal Service's

ability to facilitate mail-in voting." Compl. ¶ 244. As a consequence, Defendants have violated

Plaintiffs' rights under the Elections Clause and the Electors Clause. *Id.* at ¶ 244-246.

Count IV:  Plaintiffs assert that Defendants' actions have disenfranchised voters based on

age, in violation of the 26th Amendment. *Id.* at ¶ 247-253.

On September 2, Plaintiffs filed a motion for a preliminary injunction. *See* P's Mot.

Prelim. Inj. ¶ 1.  On September 4, I ordered expedited discovery. *See* Order Granting Pls. Mot.

Expedite Disc., ECF No. 22. The Court was prepared to proceed with a hearing on September

22, the date proposed by the parties, but deferred the hearing to allow review of the documents

produced and the deposition of two Postal Service witnesses. Testimony from the Southern

District of New York was incorporated into the record here, and the parties agreed that the

pending motion could be decided without live testimony. *See* ECF No. 57. I held a hearing on

September 24, 2020, at which Plaintiffs introduced Supplemental Exhibits (Ex. 54–Ex. 75) and

the parties presented argument. During the hearing, Plaintiffs clarified that their motion for a

Preliminary Injunction is currently limited to Counts I and III.

**B. Determinations of Fact**[4]

By way of initial summary, the record shows that the Postal Service has implemented

new initiatives to slash the number of extra and late truck trips and restrict work hours. It has

also required letter carriers to abide by rigid start and stop times. Defendants strive to frame

these changes as merely the further implementation of existing operating plans. *See Examining*

*the Finances and Operations of the United States Postal Service During COVID-19 and*

*Upcoming Elections Before the S. Committee on Homeland Security and Governmental Affairs*,

116th Cong. 10 (2020) (statement of Postmaster General and Chief Executive Office Louis

---

[4] "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

DeJoy), Courtroom Ex. 58. But the record makes clear that the agency's sudden and rigid pivot to operating goals in the areas of truck transportation, overtime, and start and stop times for letter carriers constituted a significant change in agency practice. The evidence further establishes that these policy changes resulted in mail being left behind – until that point a "cardinal sin" among the 600,000 employees of the Postal Service. *See* Chester Cassel Decl. Ex. 47 ¶ 9, ECF No. 47-1. The declines in service that resulted from the initiatives have not been fully remedied and pose a threat to the operation of the November 2020 elections.

### 1.  Late/Extra Truck Trips and Carrier Start/Stop Times

New Postal Service policies that were set by leadership highly discourage late or extra truck trips to move the mail, even when those trips are needed to prevent delays in delivery. After weighing the evidence, I also conclude for the purposes of this motion that USPS has also changed its policies to require letter carriers to adhere to rigid stop and start times, with few exceptions. These changes appear to have occurred on a national basis and have caused delays in the mail service.

In an August 13, 2020 internal memo, Postmaster DeJoy summarized his view that the Postal Service "must make a number of significant changes," including "re-establish[ing] fundamental operating principles and then adher[ing] to them and run[ning] on time." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G, ECF No. 1-1. Postmaster DeJoy confirmed that he "began those efforts right away" and that, as a result, the Postal Service had an "ontime dispatch schedule" of "97.3 percent, up from 89.8 percent" and had "reduced extra trips by 71 percent." *Id.* These statements were corroborated in an August 6th letter drafted by Postal Service Chief Operating Officer David Williams, where Williams declared that the Postal Service had taken "immediate steps" focused on "improving our

transportation efficiency," including "working to eliminate extra and late trips." Letter to Members of Congress from Chief Operating Officer David Williams (Aug. 6, 2020) Ex. D., ECF No. 1-1.

The initiatives regarding trucks and letter carriers were planned during a series of conference calls between Headquarters and the Area Vice Presidents ("AVPs") who are charged with overseeing mail processing and delivery in their respective regions. With respect to the trucking initiative, Postmaster DeJoy was aware of efforts to "improve adherence to transportation schedules" and expressed support for them. *See* Cintron Dep. Courtroom Ex. 54, at 45-48.[5]

Headquarters repeatedly communicated rigid guidelines for letter carriers. On June 26, 2020, Chief Operating Officer David Williams, who reports directly to Postmaster DeJoy, presided over a conference call and PowerPoint presentation that included the AVPs. The PowerPoint declared that the Postal Service would be instituting actions to ensure that letter carriers adhere to start times and "leave on time." *See* PowerPoint – AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13. The Service estimated that the new "leave on time" requirement would save 7.1 million work hours. *Id.* On July 7, 2020, David Williams led another call with the AVPs that reiterated these messages. *See* PowerPoint – AVP Meeting (July 7, 2020), Courtroom Ex. 54-14.[6] There, presenters again stated that letter carriers should "leave on time" and that management should "set expectations for return times" for rural letter carriers. *Id.*

---

[5] On July 9, 2020, Otis Smith emailed Robert Cintron to notify him that Postmaster DeJoy "was requesting a draft of the business plan for review." Smith directed Cintron to provide preliminary financial estimates for "elimination of extra trips and change service standards to enable use of the most efficient transportation." Email from Robert Cintron to Otis Smith re: Preliminary Financial for Transportation Initiatives – PMG Draft report due Friday (July 20, 2020), Courtroom Ex. 54-8.

[6] This meeting was held on a monthly basis. *See* Cintron Dep. 121. Postmaster DeJoy was certainly aware of this initiative, as he attended the July 7, 2020 call to deliver "general remarks" for 15 minutes. *See* PowerPoint – AVP Meeting (July 7, 2020), Courtroom Ex. 54-14.

Achieving these goals would require "message saturation" and for employees to have "clarity on roles, responsibilities [and] expectations." *Id.*[7]

Williams also used the conference calls with the AVPs to push changes to trucking policies. During a July 10, 2020 conference call with the AVPs, the accompanying PowerPoint called for drastic changes to trucking transportation schedules. *See* PowerPoint – AVP Telepresence (July 10, 2020) Courtroom Ex. 54-9; Cintron Dep. 66 (establishing Williams participation). To meet "our first test," the PowerPoint declared, the Postal Service must shift to "no extra transportation" and "no late transportation." PowerPoint – AVP Telepresence (July 10, 2020) Courtroom Ex. 54-9. As of July 13, 2020, "all extra trips and Postal caused late trips are unauthorized contractual commitments." *Id.* For late trips and extra trips, Area Vice Presidents would serve as the "ratifying official" and must "ratify and submit to the COO." *Id.* If extra trips or late trips occurred the prior day, AVPs were to call the COO (Williams) "daily" to discuss next steps. *Id.* This PowerPoint would have been drafted by Williams or his staff. *See* Cintron Dep. 69.

Defendants claim that these messages represent a mere "aspiration for trying to achieve no unnecessary late trips and no unnecessary extra trips." Cintron Dep. 143. This framing of the evidence is unconvincing. Although the July 10, 2020 PowerPoint suggests that late trips and extra trips will be permitted in rare circumstances, the specificity of its content belies Defendants' assertions that the mandates are merely aspirational. Indeed, the PowerPoint encouraged AVPs to assume that extra trips and late trips are unauthorized absent action from the AVP as a ratifying official. The PowerPoint also suggested that AVPs who did authorize late

---

[7] This document, among others produced in discovery, was marked confidential. I will not post such documents on the docket absent further consultation with counsel but will cite to them as required because of the public interest in the transparency of judicial proceedings. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 784 (3d Cir. 1994). The Court's inherent power to do so in set forth in my published Guidelines for Counsel.

and extra trips would be held to account by the COO. The presentation appears authoritative, as it was drafted by the COO.

Given the specificity and intensity of the messages from Headquarters, it is unsurprising that some AVPs immediately undertook the rigid implementation of Headquarters' restrictions on letter carriers and truck transportation. One such effort was a July 10 "Mandatory Stand Up [sic] Talk" for "All Employees." Ex. A., ECF No. 1-1. The Stand-Up Talk ("SUT") was drafted by an AVP for the Southern Area. *See* Cintron Dep. 82.

The July 10 Stand-Up Talk was clearly influenced by the June 26, July 7, and July 10 presentations from Headquarters. The document offered "specific examples of transportation changes being implemented immediately (today)" and stated that "late trips are no longer authorized or accepted"; "all trips must depart on time"; "extra trips are no longer authorized or accepted"; "all PVS/HCR drivers must be notified that trips depart on time"; "carriers must begin on time, leave for the street on time, and return on time";  and "no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch." Stand-Up Talk, Ex A. The AVP also noted that "one aspect of these changes that may be difficult for employees is that – temporarily – we may see mail left behind . . .  which is not typical." *Id.* Employees were directed to report any mail left behind. *Id.*

Similarly, a PowerPoint entitled "PMGs expectations and plan" offered some of "[DeJoy's] expectations [that] will be implemented in short order." Ex. B, ECF No. 1-1. The author noted that "[i]f the plants run late they will keep the mail for the next day. If you get mail late and your carriers are gone and you cannot get the mail out without OT it will remain for the next day." *Id.* This document was drafted by an official out of the Northern Ohio District. *See* Tr. Prelim. Inj. Teleconference at 73, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020).

Defendants hotly dispute the reach and authority of the SUT and the PMG Expectations PowerPoint, particularly with respect to the trucking changes. Robert Cintron declared initially, under penalty of perjury, that the Stand-Up Talk "was not prepared, reviewed, or approved by Headquarters and does not represent official Postal Service guidance or direction." Cintron Decl. 19 n. 1, ECF No. 37-1. Cintron also stated that "Headquarters did not ban all . . . extra or late trips." *Id.* In his deposition, Cintron reiterated that extra and late trips are not banned and that the Service runs "late trips every day in the network." Cintron Dep. 40. He maintains that the Stand-Up Talk statement that "[e]xtra trips are no longer authorized or accepted" is inaccurate. *Id.* at 83.

Angela Curtis, who serves as Vice President for Retail and Post Office Operations at Headquarters, also testified that the Stand-Up Talk and the PMGs Expectations PowerPoint were "not reviewed or approved by Headquarters" and were "distributed locally, not nationally." Curtis Decl. 37-38 n.1, ECF No. 37-1. Moreover, she claims that "contrary to some information in these documents, Headquarters did not ban . . .  all extra or late trips and did not instruct local facilities to leave . . . mail." *Id.* at ¶ 8.

Defendants have since conceded that there is a clear connection between Headquarters and the Stand-Up Talk. In view of the involvement of Mr. Williams, the COO, it can hardly claim otherwise. In a supplemental declaration, Cintron admitted that the content of the July 10th Stand-Up Talk "draws from a July 10, 2020 teleconference, conducted with AVPs and members of Headquarters." Cintron Supp. Decl. ¶ 3, ECF No. 46-1.[8] It appears from the record that the

---

[8] Cintron adds that, "[d]uring that teleconference, members of Headquarters made statements reflected, in part, in the July 10, 2020 SUT." *Id.* Curtis, in another supplemental declaration, also noted that she participated in a July 10, 2020 teleconference where Headquarters members made statements that reflect the SUT in part. *See* Curtis Supp. Decl. ¶ 3, ECF No. 46-2.

11

Vice President for the Southern Area took Headquarters' demand for "message saturation" seriously and immediately set to work to educate employees under his purview about the changes. Furthermore, the AVP's belief that the July 10th PowerPoint's edict that "all extra trips and Postal caused late trips are unauthorized contractual commitments" meant a ban on late and extra trips is hardly unreasonable.

The messages contained within Stand-Up Talk and the PMGs Expectations PowerPoint were broadly disseminated.[9] On July 13, 2020, Thelma Griffin, the administrative assistant to Scott Tosch, the District Manager in Louisiana, forwarded an email that stressed the Stand-Up Talk should be shared with "all employees." Email from Thelma Griffin to Louisiana ACE Users re: SUT: Pivoting for Our Future (July 14, 2020), Courtroom Ex. 54-3. She urges all of the employees within the district to "[p]rint and post on all employee bulletin boards. Keep something on file in each office to indicate completion and compliance." *Id.* On July 14, 2020, Griffin emailed again to remind employees to "continue sharing the attached SUT, until it has been shared with all employees." *Id.* On July 13, an Arizona-based representative of the National Rural Letter Carriers' Association noted that she had received a copy of the Stand-Up Talk and had questions. *See* Email from Robert Cintron to Shaun Mossman re Pivoting (July 13, 2020), Courtroom Ex. 59.[10] It appears that these messages are still present in the field: on September 6, 2020, a journalist tweeted a sign that had "just went up" in a Portland, Oregon facility. *See* Tr. Prelim. Inj. Teleconference at 66, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020). The

---

[9] Vance Zimmerman, the Director of Industrial Relations for the American Postal Workers Union testified that, in his experience, "stand-up talks that are entitled "Mandatory Stand-up Talk" are from National Headquarters" and are "delivered to all employees nationwide." Vance Zimmerman Decl. Ex. 46 ¶¶ 7, 8, ECF No. 18-4.

[10] Management did not initially know where the Stand-Up Talk emanated from. Cintron emailed Shaun Mossman, who was revealed to have drafted the SUT to ask, "is this from the SA [Southern Area]." Email from Robert Cintron to Shaun Mossman re Pivoting (July 13, 2020), Courtroom Ex. 59.

sign stated that "All HCR and PBS trips will depart on time, no exception" and "Do not hold the truck. No more holding trucks." *Id.*

In addition to the impact of the Stand-Up Talk and the PowerPoint presentation, there is also guidance on Postal Service trucking policy preliminarily released by Robert Cintron on July 11, 2020 (hereinafter "Cintron Guidelines"). *See* Cintron Dep. 130. Cintron has claimed that he began work on the Guidelines on July 11, 2020 in order to clarify for the AVPs that there was no ban on late or extra trips. *Id.* at 65-66. The Cintron Guidelines do not explicitly ban late or extra trips but nonetheless mirror Headquarters' emphasis on sharply restricting approval for these trips. In the email distributing the Guidelines to the AVPs, Cintron wrote that "our focus is to eliminate unplanned extra transportation . . .  we should not impact the customers we have been providing pick ups for." Email from Robert Cintron to Area Vice Presidents re: Extra Guidance (July 14, 2020) Courtroom Ex. 54-11. He reiterated that "trips must depart on time." *Id*. Notably, Cintron's analytics team did not model the impact of the guidelines on the service prior to releasing them. *See* Cintron Dep. 54. Nor did they estimate what the impact of the guidance could be on the November elections. *Id.* at 62.

The combination of the Cintron Guidelines, the SUT, and the PMGs Expectations PowerPoint sharply curbed the number of late and extra trips. As Postmaster DeJoy emphasized in an August internal memo, the Postal Service on-time rates are now "97.3 percent, up from 89.8 percent" and extra trips have been reduced by "71 percent." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G. In numerous instances, these efficiencies came at the cost of timely delivery of mail.[11]

---

[11] Union officials have attested to this effect. *See* John Gibson Decl. Ex. 26 ¶ 15, ECF No. 18-4 ("Rigidly requiring trucks to leave at their scheduled time means that trucks leave without all of their mail, which exacerbates delays because a piece of mail that may have been an hour late becomes a day late or more."); Joseph Cogan Decl. Ex. 48 ¶

Defendants' policy with respect to rigid stop and start times for individual letter carriers is less clear. In arguing that the Stand-Up Talk and the PMGs Expectations PowerPoint do not represent actual policy, Defendants have focused primarily on the limitations upon extra or late trips for trucks. However, the SUT and the PMGs Expectations presentation both mirror Headquarters' talking points that carriers must start on time and leave on time.

The existence of a policy constraining letter carriers is also supported by other evidence from the field. In Philadelphia, for example, "mail handlers and other postal employees were instructed that all trips, including trucks and carriers, were to leave as scheduled." Gibson Decl. ¶ 14. National officials have also testified that they have "received reports from current U.S. Postal Service employees that they are prohibited from making late trips and extra trips even if waiting just a few minutes would ensure timely delivery to entire communities." Coradi Decl. Ex. 49 ¶ 8, ECF No. 47-1. Postal workers have also "been instructed to leave behind mail that is ready for delivery. *Id.* Given this evidence, and no effective rebuttal from Defendants, I conclude for purposes of this motion that the Defendants at some point effectively implemented strict start and stop requirements for letter carriers.

### 2. Overtime Changes

The Postal Service has also set new work hour reduction targets and sought to aggressively reduce the use of overtime on a nationwide basis. Postal Service leadership has engaged in a coordinated national effort to reduce overtime usage. On August 7, 2020, Postmaster DeJoy stated that he was focused on taking "immediate steps to better adhere to our existing operating plans," which included "not incurring unnecessary overtime or other costs." Opening Remarks of Postmaster General Louis DeJoy at Bd. of Governor's Meeting (Aug. 7,

---

13, ECF No. 47-1 (testifying that as a result of the changes, "mail that was nearly done being processed may miss the truck entirely and could sit at the facility for at least another day").

2020) Ex. E, ECF No. 1-1. This message was also reflected in an August 6th letter to Congress, where David Williams noted that, while the Postal Service has not eliminated overtime, leadership is "reemphasizing that operational managers must ensure that overtime is earned as the result of unexpected volume or other factors pursuant to our normal overtime analysis before it is approved." Letter to Members of Congress from Chief Operating Officer David Williams (Aug. 6, 2020) Ex. D.

Overtime was heavily discussed during the June 26, 2020 conference call between David Williams and the AVPs. *See* PowerPoint – AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13. At several points, the presentation focused on a "Work Hour Reduction Target, Do It Now" initiative. *Id.* The new initiative applied to processing, delivery, and retail services. *Id.* Letter carrier supervisors would be unable to exceed 8 hours a day or forty hours a week without higher approval. *Id.* Carrier work hours would be further reduced by eliminating standby and pre-tour overtime and enforcing rigid start times. *Id.* And with respect to mail processing, leadership sought to "zero out penalty overtime"[12] and "minimize use of pre-tour OT" for employees involved in mail processing of letters and flats. *Id.* Going forward, penalty overtime would be "approved by Plant Manager only." *Id.* The presentation also reported that changes with respect to penalty overtime would be implemented as of July 4, 2020. *Id.* Control of overtime for mail processing supervisors would be implemented in the period from July 11, 2020 to July 17, 2020. *Id.*

---

[12] Penalty overtime is when the Postal Service compensates a worker at twice their base rate. Employees receive time and a half for working 9 and 10 hours. After 10 hours, employees receive penalty overtime. *See* Cintron Dep. 86. The PMGs Expectations PowerPoint likely makes reference to penalty overtime when it declares that "POT will be eliminated. This is not cost effective and it will be taken away." Ex. B, ECF No. 1-1.

These messages were repeated on the July 7, 2020 call that was also led by David Williams and included the AVPs. *See* PowerPoint – AVP Meeting (July 7, 2020), Courtroom Ex. 54-14. Leadership reiterated its call to slash work hours and included a topline message of "64 Million Work Hours" "T-86. Days" (October 1, 2020).[13] *Id.* The accompanying PowerPoint also included directives to limit work hours for carrier and mail processing supervisors, as well as non-supervisory letter carrier personnel. *Id.* Angela Curtis, who then served as Acting Vice President for Eastern Area Operations, presented on new, reduced overtime targets regarding the manual distribution of mail to carrier routes. *Id.* Curtis also noted that overtime would be limited with respect to retail and customer service. *Id.* The overtime utilization rate for clerks would be cut from 16 percent to 12 percent and pre-tour overtime would be eliminated. *Id.* The July 10, 2020 call with the AVPs and Williams also incorporated the "64M Work Hours" and "T-83 Days" message. *See* PowerPoint – AVP Telepresence (July 10, 2020) Courtroom Ex. 54-9.

Postal Service leadership strongly disputes the existence of a new national overtime policy. Angela Curtis has testified that the current policy allows management to utilize overtime hours as needed to deliver the mail on time. Curtis Decl. ¶¶ 13, 14. She insists  that this practice has not changed since Postmaster DeJoy took office. *Id.* Supervision of overtime, she contends, is handled by front-line workers in the field who may freely approve or deny overtime requests. *Id*. at ¶ 14. Curtis also stresses that Headquarters has never issued an instruction that bans or formally caps overtime. *Id.* at ¶ 22; *see also* Colin Decl. ¶ 3, Ex. 37-2.

Curtis' assertion that there is no change on overtime policy conflicts with Plaintiffs' declarations. Union officials have testified that "overtime was significantly restricted at certain facilities" in Philadelphia that are represented by Local 308. Gibson Decl. ¶ 14. Although

---

[13] October 1, 2020 is the end of the fiscal year for USPS. *See* Cintron Dep. 105.

overtime allowances have increased in Philadelphia since the dramatic reductions in late July and early August, restrictions remain in place. *Id.* at ¶ 16. One Philadelphia branch manager further reported that the overtime restrictions came from the Postmaster General. *Id.* And in Pittsburgh, management instituted a blanket one-week ban on overtime. *See* Kelly Dickey Decl. Ex. 50 ¶ 22, ECF No. 47-1. Management has since lifted its ban but overtime continues to be limited at the facilities represented by Local 322 of the National Postal Mail Handlers Union. *Id.* at ¶ 23. Employees in San Antonio have also alleged that overtime restrictions are in place. *See* Tr. Prelim. Inj. Teleconference at 23, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020).

The PMGs Expectations PowerPoint, which came out of the Northern Ohio district[14] also discusses overtime restrictions. The document states that "[o]vertime will be eliminated . . . we are paying too much in OT and it is not cost effective and will soon be taken off the table." Ex. B, ECF No. 1-1. The presentation also declares that "[i]f . . . you cannot get the mail out without OT it will remain for the next day." *Id.* As with the transportation schedules, Postal Service leadership has denied that this PowerPoint represents agency policy. Cintron Decl. ¶ 25.

Ms. Curtis, in support of her claim that there are no overtime restrictions, notes that "prior to June 15, 2020, the Postal Service was incurring overtime at a rate of approximately 13 percent of total work hours nationwide, and since that time the rate has remained approximately 13 percent." Curtis Decl. ¶ 23 The Service has also claimed that the "[l]owest levels of availability were in July 11 due to localized COVID impact and increased usage of annual leave." Prokity Decl. ¶ 5, ECF No. 37-2. The testimony regarding the impacts of COVID-19 is supported by the reports of union officials in the field. *See* Dickey Decl ¶ 17 (noting that

---

[14] *See* Tr. Prelim. Inj. Teleconference at 73, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020).

COVID-19 has exacerbated the need for overtime); Gibson Decl. ¶ 16 (stating that more overtime has been needed for COVID).

There are some obvious inconsistencies in Defendants' account. It is clear that there have been repeated messages from Headquarters regarding its "Work Hour Reduction" initiative. The agency blames its decline in service on the large number of COVID-absences but acknowledges that the overtime rates have remained the same. Logically, however, one would expect overtime to increase with a greater number of absences because a smaller number of employees must perform more work.

The comments regarding overtime from Postmaster DeJoy and Mr. Williams, when viewed in combination with Headquarters' presentation of "Work Hour Reduction Targets" to AVPs and the actions at the facility level in Ohio (as represented by the PMGs Expectations document) and Pennsylvania, strongly suggest that however Defendants seek to characterize official policy, for practical purposes, leadership has encouraged restrictions on overtime in a way that has affected timely delivery of mail.

### 3. Status of the Transportation and Overtime Policies

The contested policies remain in place. Postmaster DeJoy's August 18, 2020 statement did not suspend transportation changes, and the Cintron Guidelines are still in effect. Cintron Dep. 144. DeJoy has stated that, "effective Oct. 1, we will engage standby resources in all areas of our operations, including transportation, to satisfy any unforeseen demand." Statement of Postmaster General Louis DeJoy (August 18, 2020) Ex. H, ECF No. 1-1. However, it is unclear if Postmaster DeJoy's statement on standby capacity rescinded the former policies. His statement may also apply solely to election mail.

The Postal Service has also not changed its overtime policy in response to public outcry over service; as Postmaster DeJoy reiterated on August 18, 2020, "overtime has, and will continue to be, approved as needed." *Id.* While this statement serves as additional evidence of the fact that a flat ban is not in place, it does not eliminate the possibility that the agency has instituted new work hours reductions targets and restrictions on overtime.

### 4. Changes in the Treatment of Election Mail Sent as Marketing Mail

The Postal Service has historically prioritized the processing of Election Mail, defined as "any mailpiece that an authorized election official creates for voters participating in the election process and includes ballots and voter registration materials." *Office of the Inspector General, Audit Report: Processing Readiness of Election and Political Mail During the 2020 General Elections* (Aug. 31, 2020) Ex. 19 at 1, ECF No. 18-5. Ballots returned by voters to election officials must be sent, at a minimum, as First-Class Mail. *Id.* Current Postal Service officials have reiterated this requirement. Glass Decl. ¶ 4, ECF No. 37-2.

The question in this case is whether the Postal Service is altering its treatment of Election Mail that is sent from election authorities to voters. States may send their election mail as either First-Class mail, which routinely takes 2-5 days to be delivered, or Marketing Mail, which takes 3-10 days to be delivered. *See Office of the Inspector General, Audit Report: Processing Readiness of Election and Political Mail During the 2020 General Elections (Aug. 31, 2020)* Ex. 19 at 1. At this stage, the record in this case does not suggest that the Postal Service intends to deviate from its customary procedures with respect to the processing of Election Mail sent as Marketing Mail.

The Service does not appear to have a formal policy of upgrading Election Mail sent as Marketing Mail to First-Class Mail. *See* Glass Decl. ¶ 18. This conclusion is supported by a 2016

letter sent to election officials which encourages Boards of Election to "use First-Class Mail postage rather than Standard or Non-Profit postage rates when paying for the delivery of outbound absentee or vote by mail ballots." Glass Decl. 55. The 2016 letter further emphasized that "[t]he Postal Service is committed to processing and delivering Official Election mail within our stated delivery standards. Most First-Class Mail deliveries are made within 2-5 days. Standard Mail deliveries are made within 3-10 days." *Id.* at 56.

Although Defendants do not have a formal policy of automatically upgrading this class of mail, the Postal Service custom of "advancing" means that Election Mail entered as Marketing Mail usually has a similar delivery speed to First-Class Mail. *See* Glass Decl. ¶ 21. "Advancing" means that when there is excess First-Class processing capacity at a plant, Election Mail entered as Marketing Mail will be processed before all other mail. *Id.*

The evidence regarding specific changes in the Postal Service's handling of election mail is inconclusive. What is not reasonably in dispute is that the delays that have occurred as a result of the initiatives described above clearly pose a threat to the delivery of Election Mail to and from the voters. As Robert Glass admitted in his deposition, "service performance of Election Mail decreased similar to the decreases we saw in other mail." Glass Dep. 65-66 Courtroom Ex. 55. And Judge Marrero of the Southern District of New York posed the question starkly to Mr. Cintron in the evidentiary hearing in *Jones v. United States Postal Service*: "Q: Is it possible that in the course of implementing this policy of loading trucks and having them go out on time, that some of the mail that does not get in the trucks and having them go out on time, that some of the mail that does not get in the truck and leave on time could include some election mail?  A: It's possible."  *See* Tr. Prelim. Inj. Teleconference at 67, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020).

5.  **Impacts of Changes**

As an initial matter, it is somewhat concerning that the Postal Service has been inconsistent even as to the standard for First-Class Mail.  The official website for the Service describes First-Class Mail as being delivered in "1-3 business days." *First-Class Mail*, https://www.usps.com/ship/first-class-mail.htm (last visited Sept. 27, 2020).  In letters sent to election officials, the Postal Service represented that most first-class mail "is delivered [in] 2-5 days." Letters to Plaintiff States from General Counsel Thomas Marshall Ex. I, ECF No. 1-1. Approximately one month later, a letter was sent to Mail Service Providers stating that "First-Class Mail is delivered in 3 to 5 days." Letter from Steven W. Monteith Acting Chief Customer and Marketing Officer and Executive Vice President, USPS, to Mail Service Providers (Aug. 26, 2020) Ex. 15 at 8, ECF No. 18-4. In an August 31, 2020 audit report, the USPS Office of Inspector General made clear that one-day delivery is not being accomplished, as First-Class Mail service currently takes 2-3 days within the continental United States. *See Office of the Inspector General, Audit Report: Processing Readiness of Election and Political Mail During the 2020 General Elections (Aug. 31, 2020)* Ex. 19 at 9 n. 13.

As conceded by Postmaster DeJoy,[15] the initiative, which included changes to trucking, overtime, and letter carrier schedules, caused a decline in service. During the week of July 4, 2020 to July 11, 2020, there was a five-point decline in service standards. *See* Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit Ex. 54-16. Mr. Cintron issued his preliminary guidance on July 11, 2020 and performance declined further, to 82.22 percent. *Id.* The lowest point occurred on August 8, 2929, at 81.47 percent. *Id.* Mr. Cintron

---

[15] On August 13, Postmaster DeJoy touted "substantial improvements" but acknowledged that "this transformative initiative has had unintended consequences that impacted our overall service levels." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G.

maintains that the dip in service could have been attributed to other factors like COVID-19 and "other initiatives that were going on at the same time," which included "other operating plan initiatives." Cintron Dep. 146, 149.  But at no other point during the pandemic has service fallen in the manner it did in July and August.

Furthermore, although Defendants have claimed that "service performance is rapidly returning to early July levels," Cintron Decl. ¶ 27, Congressional briefing materials indicate that meaningful delays were still present at the end of August. *See Congressional Briefing: Transportation and Service Performance Updates* (Aug. 31, 2020) Ex. 16, ECF No. 18-4. As of September 5, 2020, the latest data in the record, First-Class mail service was at 88.74 percent, which is still lower than pre-July levels. *See* Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit Ex. 54-16.

The affidavits of current and former Postal Service employees persuasively explain why heavy restrictions on late or extra trips would impact service. John Gibson, President of Local 303 of the National Postal Mail Handler's Union, details that "[r]gidly requiring trucks to leave at their scheduled time means that trucks leave without all of their mail, which exacerbates delays because a piece of mail that may have been an hour late because a day late or more." Gibson Decl. ¶ 15. Similarly, Chester Cassel, who worked for the Postal Service for 51 years, underscores that, in his experience as a transportation manager, "it was often necessary to hold trucks for a few minutes at the plant or at the station to make sure that all the day's mail was loaded on board." Cassel Decl. ¶ 26. These extra or late trips prevent the "cardinal sin" among Postal Service employees – leaving mail behind. *Id*. at ¶ 9. And the nationwide scope of the restrictions was conceded by the Postmaster in his testimony before the House of Representatives, in which he acknowledged that the changes were in place in "every state a truck

moves in." *See Protecting the Timely Delivery of Mail, Medicine, and Mail-In Ballots Before the H. Committee on Oversight and Reform*, 116th Cong. 228 (2020) (statement of Postmaster General and Chief Executive Office Louis DeJoy), ECF No. 37-4.

Admittedly, increased operating efficiencies at the Postal Service that result in cost savings are in the public interest. But, consistent with updated reporting from June 2020, testimony before the House of Representatives demonstrated that the Service will remain financially viable through August of 2021. *Id.* at 95. It is therefore curious, at a minimum, that a major initiative would be implemented, in the middle of a public health crisis, four months before a national election where mail-in voting is expected to increase dramatically. Depending on how one views the range of conclusions that can be drawn from the evidence, it might even be considered reckless. Regardless, for the reasons set forth below, it is unlawful.

Plaintiffs go further and argue that the changes are malign in their intent. They draw that inference based upon President Trump's continued public statements attacking the Postal Service and attacking mail-in voting, coupled with Postmaster DeJoy's substantial contributions both to the Republican Party and to President Trump. At this stage in the case and with minimal formal discovery, any such conclusion is premature. I do note, however, that I am troubled by, and draw negative inferences from, what appears to be a strategic effort by Defendants to limit the Court's understanding of the significant degree to which some top officials of the Postal Service were directly involved in the operational changes that went into effect in July. My concern on that score weighs strongly in favor of injunctive relief, to assure that the necessary steps are taken to cure these critical deficits.

## II.     The Controlling Procedural Standard

A plaintiff that seeks a preliminary injunction must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest*." Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The first two factors are the most critical; the Third Circuit has stated that plaintiffs "must meet the threshold for the first two most critical factors… and if the gateway factors are met, a court then considers the remaining two factors, possibility of harm to others and the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). The Supreme Court has further emphasized that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Benisek v. Lamone*, 138 S.Ct. 1942, 1945 (2018) (citing *University of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)).

## III.     Subject-Matter Jurisdiction

Congress enacted the PRA in 1970. In doing so, it created the modern Postal Service, and defined its susceptibility to private suit. It gave the Postal Service the power to "sue and be sued in its official name." 39 U.S.C. § 401. Congress also conferred upon federal district courts the power to hear cases by or against the Postal Service, saying "[e]xcept as provided in this section, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409(a). Separately, 28 U.S.C. § 1339 states that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service."

The PRA's overarching policy concern is to provide "basic and fundamental service . . . to the people." 39 U.S.C. § 101(a). Pursuant to that end, the Postal Service is obligated to "develop

24

and promote adequate and efficient postal services." 39 U.S.C. § 3661(a). When deciding to make "change[s] in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," the Postal Service must first "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b). Users of the mail then have an opportunity to participate in a public hearing subject to Administrative Procedure Act ("APA") rules before the PRC issues an advisory opinion. 39 U.S.C. § 3661(c).

The Commission has an additional role with respect to 39 U.S.C. § 3661. For example, the PRA invests the Commission with original jurisdiction over "*Rate and Service Complaints.*" Thus, while the PRA gave district courts broad jurisdiction over Postal Service matters, Congress did not give district courts exclusive jurisdiction over its disputes. 39 U.S.C. § 3662(a).

Section 3662(a), titled "*Rate and Service Complaints,*" provides:

> Any interested person (including an officer of the Postal Regulatory Commission representing the interests of the general public) who believes the Postal Service is not operating in conformance with the requirements of the provisions of sections 101(d), 401(2), 403(c), 404a, or 601, or this chapter (or regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission in such form and manner as the Commission may prescribe.

The question before me is whether this Court may exercise jurisdiction, under 28 U.S.C. § 1339 and the PRA's general statutory grant of § 409(a), over Plaintiffs' claim that the Defendants acted unlawfully when they failed to consult with the Commission and participate in a public hearing before making "change[s] in the nature of postal services which will generally affect service on a nationwide . . . basis." 39 U.S.C. § 3661(b).

The Postal Service argues the Commission's authority is exclusive and that this Court lacks authority to review its action. Its position is not without some irony. It is accused of bypassing the Commission and thereby acting beyond its authority, and, in turn, defends itself by stating that it

25

is the Plaintiffs who must resort to the Commission in order to obtain relief. *See* Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 25-30, ECF No. 37. These circumstances arise partially because of the dual roles of the Commission with regard to Chapter 36 of the PRA. First, it hears "Rate and Service Complaints" from "interested part[ies]" per section 3662(b). Second, *before* the Postal Service may make "change[s] in the nature of postal services which will generally affect service on a nationwide . . . basis," 39 U.S.C. § 3661(b), it holds public hearings and issues advisory opinions. 39 U.S.C. § 3661(c). The issue is nuanced and complex, but in the final analysis I am persuaded that this Court has jurisdiction.

By way of initial summary, before proceeding through the analysis, it bears repeating that 28 U.S.C. § 1339 provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service."[16] More importantly, section 409(a) of the PRA constitutes an additional jurisdictional grant that explicitly states non-reviewability is the exception—not the rule. With regard to section 409(a), the Third Circuit has stated that "we cannot imagine how Congress could grant jurisdiction more plainly." *Licata v. U.S. Postal Serv.*, 33 F.3d 259, 261 (3d Cir. 1994).

Moreover, the Court has not found, nor have the Defendants cited, any case in which a court denied jurisdiction over a claim that the Postal Services acted outside of its authority with regard to the process required under section 3661(b). In contrast, the Third Circuit has addressed claims that the Postal Service acted outside its authority when it bypassed the Commission, where the PRA explicitly calls for Commission input. It exercised jurisdiction, even though according to

---

[16] It should be noted that the Supreme Court attaches less significance to grants of general jurisdiction such as 28 U.S.C. § 1331 when the governing statute provides for judicial review in a particular court, *see e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012), but the combination of three statutory sources—28 U.S.C. § 1331, 28 U.S.C. § 1339, and 39 U.S.C. § 409(a) carries some weight.

Defendants' rationale here, Plaintiffs would have been obligated to bring those claims exclusively to the Commission. *See United Parcel Serv., Inc. v. U.S. Postal Serv.*, 604 F.2d 1370, 1381 (3d Cir. 1979) *cert. denied*, 446 U.S. 957 (1980).[17] Similarly, the Sixth Circuit has exercised jurisdiction per 28 U.S.C. § 1339 and section 409(a) over *ultra vires* claims against the Postal Service with regard to the promulgation of regulations. *See Combined Commc'ns Corp. v. U.S. Postal Serv.*, 891 F.2d 1221, 1227-28 (6th Cir. 1989). Moreover, when confronted with the precise legal issue this court is called upon to decide—a claim relating to the failure of the Postal Service to undertake the process mandated under section 3661(b) in making nationwide changes to service—both the Fifth Circuit and a district court have exercised jurisdiction under section 409(a). *See Buchanan v. U.S. Postal Serv.*, 375 F. Supp. 1014, 1017 (N.D. Ala. 1974), *aff'd in part, vacated in part*, 508 F.2d 259 (5th Cir. 1975) (affirming district court order enjoining changes in service); *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, No. CIV.A.06 726 CKK, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007). My ultimate conclusion is that jurisdiction exists for the reasons set forth more fully below.

## A. Standard of Review

In this inquiry I am guided by a trio of Supreme Court cases. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010); *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012). They provide the framework to determine

---

[17] The Plaintiffs in *United Parcel Serv., Inc.* argued that the Postal Services acted outside its authority in bypassing the Commission when engaging in a temporary ratemaking experiment *vis a vis* former section 3622, which required that any change in a rate of postage be recommended by the Postal Rate Commission. 39 U.S.C. § 3622 (1970), *amended by* 39 U.S.C. § 3622 (1998); *United Parcel Serv., Inc.*, 604 F.2d at 1374. The previous version of section 3662 allowed "[i]nterested parties who believe the Postal Service is charging rates which do not conform to the policies set out in this title . . . to lodge a complaint with the Postal Rate Commission in such form and in such manner as it may prescribe." 39 U.S.C. § 3662 (1970), *amended by* 39 U.S.C. § 3622 (2006). The Commission, in its discretion, would hold hearings on such complaint and issue a recommended decision. *Id.* Then, "[a] decision of the Governors to approve, allow under protest, or modify the recommended decision of the Postal Rate Commission" could be appealed to any court of appeals of the United States. *Id.*

when judicial review is appropriate if a statute also provides for administrative review and the right to appeal the administrative decision to a circuit court. In the most recent case, *Elgin*, the Supreme Court instructs that where the circuit court is capable of providing meaningful review, the "appropriate inquiry is . . . whether it is 'fairly discernible' from the [statute] . . . that Congress intended [litigants] . . . to proceed exclusively through the statutory review scheme." 567 U.S. at 9-10 (alteration in original) (internal citations omitted). "To determine whether it is 'fairly discernible' that Congress precluded district court jurisdiction over petitioners' claims, we examine the . . . [statute's] text, structure, and purpose." 567 U.S. at 10 (alteration in original) (internal citations omitted).

The Third Circuit has recently utilized *Elgin's* approach in determining the appropriateness of judicial review of agency action. *See E.O.H.C. v. Sec'y U. S. Dep't of Homeland Sec.*, 950 F.3d 177, 188 (3d Cir. 2020); *see also Guerra v. Consol. Rail Corp.*, 936 F.3d 124, 135 (3d Cir. 2019); *cf. Adorers of the Blood of Christ v. FERC*, 897 F.3d 187, 195 (3d Cir. 2018) (noting that it would utilize the approach outlined in *Thunder Basin* had it not already decided the jurisdictional question through the explicit language of the statutory text).

## B. Discussion

I begin with the analysis under the framework set forth in *Elgin*: where the circuit court is capable of providing meaningful review, the "appropriate inquiry is . . . whether it is 'fairly discernible' from the [statute] . . . that Congress intended [litigants] . . . to proceed exclusively through the statutory review scheme." 567 U.S. at 9-10 (alteration in original). Assuming the Plaintiffs' claims could at some later point ultimately be addressed by the D.C. Circuit under 39 U.S.C. § 3663[18] following administrative review by the Commission, I must determine whether

---

[18] 39 U.S.C. § 3663 provides: "A person, including the Postal Service, adversely affected or aggrieved by a final order or decision of the Postal Regulatory Commission may, within 30 days after such order or decision becomes

Congress' intent to preclude district court jurisdiction is "fairly discernible in the statutory scheme." *Id.* This requires an examination of the statute's text, structure, and purpose. *Id.*; *see E.O.H.C.*, 950 F.3d at 188; *see also Guerra*, 936 F.3d at 135.

If an intent to preclude judicial review is not discerned, the language of the statute authorizing review has force and effect. *See Buchanan v. U.S. Postal Serv.*, 375 F. Supp. 1014, 1017 (N.D. Ala. 1974), *aff'd in part, vacated in part*, 508 F.2d 259 (5th Cir. 1975) (affirming district court order enjoining changes in service); *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, No. CIV.A.06 726 CKK, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007) (exercising jurisdiction where USPS allegedly acted beyond its authority *vis a vis* section 3661(b)); *see also United Parcel Serv.*, 604 F.2d 1370, 1381 (3d Cir. 1979) (exercising jurisdiction where USPS allegedly acted beyond its authority in ratemaking context, despite the availability of resort to the Commission); *Commc'ns Corp.*, 891 F.2d 1221, 1228 (6th Cir. 1989) (exercising jurisdiction per section 409(a) over *ultra vires* claims against the Postal Service with regard to the promulgation of regulations.)

The most relevant sections for this analysis are sections 3661, 3662(a), and 409(a), along with 28 U.S.C. § 1339. Section 3661, titled "*Postal Services,*" provides:

(a)  The Postal Service shall develop and promote adequate and efficient postal services

(b) When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such

---

final, institute proceedings for review thereof by filing a petition in the United States Court of Appeals for the District of Columbia." However I note that the Third Circuit recently held in the context of the INA that "claims that cannot be effectively handled by the administrative review process," such as "where review and relief may come too late" deprive the claimant of meaningful review. *E.O.H.C.*, 950 F.3d at 186 (internal citations omitted); *see also Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996)("It follows that . . . [plaintiff] has alleged a sufficiently serious irreparable injury to lead us to conclude that the administrative review process is insufficient to afford him full relief.) (alteration in original).

proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.

(c) The Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under sections 556 and 557 of title 5 has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title.

Next, section 3662(a), titled "*Rate and Service Complaints*," provides:

Any interested person (including an officer of the Postal Regulatory Commission representing the interests of the general public) who believes the Postal Service is not operating in conformance with the requirements of the provisions of sections 101(d), 401(2), 403(c), 404a, or 601, or this chapter (or regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission in such form and manner as the Commission may prescribe.

28 U.S.C. § 1339 states:

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service.

Finally, section 409(a) provides:

Except as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service.

In analyzing the text, given the Third Circuit's statement in *Licata,* 33 F.3d at 261, I start from the premise that section 409(a) consists of a general grant of jurisdiction over all actions brought against the Postal Service. Yet section 409(a) counsels that exceptions to that rule exist, given its opening phrase, "[e]xcept as otherwise provided in this title . . . ." 39 U.S.C. § 409(a).

In order to determine whether section 3662, as it relates to section 3661(b), constitutes the exception, thus divesting district courts' jurisdiction over claims relating to section 3661(b), I examine the text of section 3662. Section 3662 is entitled "*Rate and Service Complaints.*" The explicit text of section 3662 provides that "any interested person . . . *may* lodge a complaint with

the Postal Regulatory Commission" (emphasis added) when that person believes the Postal Service is not operating in conformance with Chapter 36 and a number of other sections (which predominantly deal with rates and service).[19] Chapter 36 includes section 3661.

At the outset, the term "may" suggests that resort to the Commission is permissive. The principal case on which Defendants rely, *Lemay*, makes this very point: "[c]ertainly, as a general rule of statutory construction, 'may' is permissive, whereas 'shall' is mandatory. *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (citing *Anderson v. Yungkau,* 329 U.S. 482, 485 (1947)). In that regard, the Third Circuit has emphasized that courts should assume words mean what they appear to say: "[i]f the Act's meaning is plain from its text, our task is complete, unless the result falls into the narrow category of cases where the plain meaning of the statute is 'demonstrably at odds with the intentions of its drafters.'" *Air Courier Conference of Am./Int'l Comm. v. U.S. Postal Serv.*, 959 F.2d 1213, 1217–18 (3d Cir. 1992) (internal citations omitted). I note as well the Supreme Court's recent and forceful comment on extra-textual analysis: "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1737 (2020).

Yet, as numerous courts have observed, the legislative history of the PRA reveals a Congressional desire "to minimize external intrusions on the Postal Service's managerial independence." *LeMay*, 450 F.3d at 800 (citing *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262 (5th Cir.1975)). In crafting the PRA, "Congress intended to afford postal management the 'unfettered authority and freedom that has been denied for years to maintain and operate an

---

[19] These sections include: 39 U.S.C. § 101(d) (rates); 39 U.S.C. § 401(2) (rules and regulations) (services, rates, fees, and classifications); 39 U.S.C. § 404a (rules and regulations); 39 U.S.C.A. § 601(services).

efficient service.'" *Lemay*, 450 F.3d at 800 (citing Sen. Rep. No. 912, 91st Cong., 2d Sess. 2 (1970)).

Thus, despite the explicit presumption in favor of judicial review under both 28 U.S.C. § 1339 and section 409(a) of the PRA, as well as the general rule of statutory construction suggesting that "may" is permissive, some courts reviewing "claims regarding postal rates and services," *Lemay*, 450 F.3d at 799, have looked beyond the text and concluded that the legislative history reveals Congress intended to divest jurisdiction from the district courts.[20] Defendants point to a number of such cases. *Id.*; *see also Foster v. Pitney Bowes Corp.*, 549 F. App'x 982 (Fed. Cir. 2013); *Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir. 1995); *Pep-Wku, LLC v. USPS*, No. 20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky. Apr. 30, 2020); *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009), *aff'd sub nom. McDermott v. Donahue*, 408 F. App'x 51 (9th Cir. 2011); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018); *Striley v. United States Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017); *Murphy v. United States Postal Serv.*, No. C 14-02156 SI, 2014 WL 4437731, at *3 (N.D. Cal. Sept. 9, 2014); *Powell v. United States Postal Serv.*, No. CV 15-12913-FDS, 2016 WL 409672, at *1 –2 (D. Mass. Feb. 2, 2016).

But each of the cases cited by the Defendants involved run-of-the-mill allegations of unsatisfactory service or issues far afield from those contemplated in section 3661(b). *See, e.g.*, *Lemay*, 450 F.3d at 798 (complaint that Postal Service's heightened Priority Mail charges did not correspond with enhanced services); *Foster v. Pitney Bowes Corp.*, 549 F. App'x at 984 (complaint arising under PRA section 404(a) that the Postal Service stole plaintiff's ideas contained in patent application); *Bovard*, 47 F.3d at 1178 (complaint that USPS unreasonably discriminated against

---

[20] As discussed below, I find the legislative history discussed by *Lemay* and other courts as limited to garden variety claims about postal service.

Plaintiff by switching mail service from ordinary to afternoon delivery); *Pep-Wku, LLC*, 2020 WL 2090514, at *1 (W.D. Ky. Apr. 30, 2020) (complaint by owners of multi-unit apartment complexes that USPS failed to sort mail before delivering it to their apartment complexes, thereby forcing them to do the sorting themselves); *McDermott v. Potter*, 2009 WL 2971585, at *1 (W.D. Wash. Sept. 11, 2009), (complaint about closure of local postal facility); *Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *1 (W.D. Wash. July 30, 2018) (complaint about bad attitude of mail carrier); *Striley*, 2017 WL 513166, at *1 (N.D. Cal. Feb. 8, 2017) (complaint that USPS unlawfully increased the rates for Plaintiff's post office box, crammed Plaintiff's box full of advertising materials, and failed to deliver an article of mail), *Murphy*, 2014 WL 4437731, at *1 (N.D. Cal. Sept. 9, 2014) (complaint about denial of Plaintiff's postal services at a local United States post office); *Powell*, 2016 WL 409672, at *1 (D. Mass. Feb. 2, 2016) (complaint that local post office refused to deliver mail to the Plaintiff).[21]

Although these lawsuits were largely filed by *pro se* plaintiffs who were likely without the legal background to ground their claims in a specific statutory provision, the overwhelming majority of the claims at issue are precisely captured by section 3661(a), which requires the Postal Service to provide adequate and efficient service to the public. None involved a claim that the USPS circumvented the process required when making a "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). The nature of the dispute in *Lemay*—a "common dispute over . . . services"—controlled the Eighth Circuit's conclusion that the legislative history weighed against exercising jurisdiction.

---

[21] Other district court cases not cited by the parties are consistent. *Azzolina v. U.S. Postal Serv.,* 602 F. Supp. 859 (D.N.J.1985) (complaint challenged USPS selection of post office site in his township); *Tedesco v. U.S. Postal Serv.,* 553 F. Supp. 1387 (W.D.Pa.1983) (Plaintiffs sought to have post office established in their township and brought action against Postal Service based on allegations of breach of duty to provide prompt, reliable, and efficient service.) They fit the same mold.

450 F.3d at 801. Its opinion makes that clear in the following summary of its holding: "After correctly perceiving the matter was a common dispute over rates and services, the district court rightly determined Congress had placed authority over such matters in the Postal Rate Commission, at which point the district court was divested of its jurisdiction." *Id.*

Unlike the claims in the cases cited by Defendants, which dealt with the adequacy and efficiency of service under section 3661(a), Plaintiffs' core challenge is that the Postal Service acted outside of its authority in making changes without consulting first with the Commission in violation of section 3661(b), a wholly separate provision. *See* Pls. Reply Supp. Mot. Prelim. Inj. 7, ECF No. 47. They argue that while it may not be unreasonable to infer that Congress intended to foreclose judicial review of claims arising under section 3661(a), which can most properly be characterized as localized service-related disputes, *id.* at 7, Congress certainly did not have the same intention *vis a vis* claims relating to section 3661(b). That section focuses on the *process* to which the Postal Service must adhere before making a "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). Likewise, the Commission has emphasized that "the twin hallmarks of section 3661(b) are advance public disclosure of Postal Service plans that will affect service on a nationwide basis, in the form of a request for an advisory opinion from the Commission, and an opportunity for public comment on those plans." Commission Report Concerning Complaint on First-Class Mail Standards Service, Docket No. N2001-3, at 2 (April 17, 2006).

So I return again to the text, structure, and legislative history of the PRA with regard to section 3662 and its relation to section 3661(b) — the specific provisions that are before this court — bearing in mind that reviewability is embedded in the relevant statutes. 28 U.S.C. § 1339; 39 U.S.C. § 409(a). In reviewing the relevant text of sections 3662 and 3661, I note once more that

Congress elected to use the term "may" when it described the right of "any interested user" to file a complaint with the Commission. 39 U.S.C. § 3662(a). At the outset, this plain text suggests that resort to the Commission is permissive. *LeMay*, 450 F.3d at 799 (citing *Anderson,* 329 U.S. at 485 (1947)). To interpret it otherwise requires countervailing evidence from the overall structure and legislative history of the PRA. *Id*.; *see Bostock*, 140 S. Ct. at 1737.

Turning to the structure of the PRA and its legislative history, certainly Congress intended to reduce outside interference with several facets of Postal Service operations. As discussed above, other courts have not unreasonably concluded that "common disputes over . . . services" were meant exclusively for the Commission. *Lemay,* 450 F.3d at 801. But section 3661(b)—the provision Plaintiffs claim that Defendants have violated—clearly falls outside the scope of such common disputes. Indeed, Congress instituted section 3661(b) because it expected that these changes were uncommon and would require stakeholder input. *See Buchanan*, 508 F.2d at 262 (5th Cir. 1975) ("The language of the statute, the legislative history, and the existence of alternative remedies indicate that Congress intended 3661 to apply to only a specified class of decisions. Postal management was left with broad decision-making power, subject to 3661 requirements for specified decisions"). That section requires not only that the Postal Service consult with the Commission before making changes that fall within its purview, 39 U.S.C. § 3661(b), but also that a public hearing be held in accordance with APA procedures. 39 U.S.C. § 3661(c). I find this provision significant, as the Postal Service, for the most part, is not otherwise subject to APA review. 39 U.S.C. § 410; *Nat'l Easter Seal Soc. for Crippled Children & Adults v. U.S. Postal Serv.*, 656 F.2d 754, 767 (D.C. Cir. 1981) ("Congress provided that the procedural requirements of the APA apply in certain, limited circumstances for example, when major changes with a nationwide impact are contemplated . . .").

Moreover, the only court presented with section 3661(b) claims as they relate to section 3662 has emphasized the distinction between "common disputes over . . . services" on the one hand, *LeMay*, 450 F.3d at 801, and claims about nationwide changes relating to section 3661(b) on the other. *Buchanan,* 508 F.2d 259, 262 (5th Cir.1975) (exercising jurisdiction where the Postal Service allegedly acted beyond its authority *vis a vis* 3661(b)). In *Buchanan*, the Fifth Circuit found that the PRA offered a "harmonious scheme," whereby those seeking to challenge whether the Postal Service improperly bypassed the Commission could do so in federal district court, whereas those with service-related complaints akin to section 3661(a) could file complaints with the Commission. 508 F.2d at 264. In reaching this conclusion, the court found that "[t]here is much in the legislative history of the Act to indicate that Congress intended to increase the ability of the Postal Service management to make the decisions necessary to the efficient and effective operation of the postal system," but also evident is the "goal of providing to the American people a public service which is sensitive and responsive to their needs."[22] 508 F.2d at 262; *see Am. Postal Workers Union, AFL-CIO*, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007).

Nothing in the legislative history of subsequent amendments suggests an intention to legislatively overrule *Buchanan*. *See, e.g.*, S. Rep. No. 108-318, at 48 (2004); H.R. Rep. No. 109-66, at 52 (2005).  In describing section 3662, the House and Senate Committee reports are nearly identical. They focus almost entirely on the Commission's expanded enforcement powers to address rate and service issues promptly and effectively. The House Committee Report states that the changes to section 3662 "strengthen the authority of the Postal Regulatory Commission to act

---

[22] This reading is consistent with the opening section of Title 39 entitled "*Postal Policies*," which begins with the following provision: "The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people." 39 U.S.C. § 101(a).

on complaints," H.R. Rep. 109-66, at 52, and explains that it will be required to address complaints within 90 days of receipt. *Id.* It notes that the Commission can now levy fines against the Postal Service for certain violations. *Id.* Clearly the thrust of the report is on enforcement powers and not the scope of the Commission's authority or its preclusive impact on judicial remedies. Indeed, the House Committee cites only one way that the changes would enlarge the scope of the authority of the Commission. *Id.* With the revisions in place, the Commission could now order the Postal Service to adjust rates or suspend product rates or classification. *Id.*

Similarly, the Senate Committee Report in a section entitled "Rate and Service Complaints," summarily states that the new changes provide the Regulatory Commission with enhanced authority to respond to complaints of pricing, service, or other actions by the Postal Service in violation of law." S. Rep. No. 108-318 at 48. The Committee Report then notes a number of ways in which the Commission's enforcement powers had expanded under the revised language. First, the changes required prompt attention by the Committee within 90 days of receiving complaints. *Id.* Second, the Commission could now levy fines against the Postal Service. *Id.* Again, the Senate Report discusses one area in which the actual scope of the Commission's authority would be enlarged: under the new changes, the Commission could order the Postal Service to adjust rates if they are set below attributed costs, which was authority that the Rate Commission had lacked under the original version of the PRA. *Id.* Thus, although explaining changes in enforcement powers and the scope of the Commission's authority, neither the House nor the Senate Reports mentioned changes with regard to claims relating to section 3661(b), nor any intention to displace judicial review.[23]

---

[23] Neither party has brought anything to the court's attention to contradict this reading of the legislative history.

The Act's legislative history simply does not convince me that Congress intended courts to diverge from the plain meaning of the text. And, I must be mindful of the Third Circuit's admonition in *Air Courier*, which was analyzing PRA provisions regarding ratemaking, not "to use ambiguous legislative history to contradict a clear statute's text." *Air Courier Conference of Am./Int'l Comm.*, 959 F.2d at 1223. *See also Bostock*, 140 S. Ct. at 1737.

In fact, shortly after the current version of section 3662 was enacted, a district court explicitly *rejected* the argument that it lacked jurisdiction over a complaint regarding the USPS's alleged non-compliance with section 3661(b). *Am. Postal Workers Union, AFL-CIO*, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007). As the court explained, "[p]laintiff's Complaint seeks a declaration that it is unlawful for USPS to proceed with modification to its mail processing operations . . . because USPS failed to submit [the proposed modifications] to the PRC for an advisory opinion within a reasonable time prior to the implementation of . . . [the modifications]." *Id.* "Plaintiff's Complaint appears to be properly brought before this Court pursuant to 39 U.S.C. § 409, which provides that 'the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against [USPS]'." *Id.* Additionally with regard to section 3662, the D.C. Circuit has noted that the PRA's "scheme . . . is inherently claim-dependent, and the relevant statutory language even suggests an aim on the part of Congress to allow complainants a role in framing their claims (and choosing their forum)." *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 220 F. Supp. 3d 27, 34 (D.D.C. 2016).

Likewise, the Third Circuit has exercised jurisdiction in ratemaking cases involving allegations that the Postal Service improperly bypassed the Commission, where resort to the Commission was also available under section 3662. *United Parcel Serv.*, 604 F.2d at 1381 (holding that Postal Service acted outside its authority in bypassing the PRC before engaging in a temporary

ratemaking experiment). These rulings are not inconsistent with the reasoning of *Lemay*, which found that section 3662 constitutes "a *specific* grant of authority over a *defined* category of postal rate/postal service concerns." 450 F.3d at 800 (emphasis added). That the Third Circuit has exercised jurisdiction over claims otherwise susceptible of administrative review by the Commission per section 3662 supports a conclusion that section 3662 *does not* divest district courts of jurisdiction under 28 U.S.C. § 1339 and section 409(a), where plaintiffs claim that the Postal Service acted outside of its authority in bypassing the Commission. *United Parcel Serv., Inc.*, 604 F.2d at 1381.

In light of the text, structure, and legislative history, and informed by decisions from the Third and Fifth Circuits, I do not find it "fairly discernible" that Congress intended to preclude district courts from hearing claims related to section 3661(b), which contemplates changes of national significance, simply because resort to the Commission is available.[24] I echo the Third Circuit in noting that, "as a policy matter, 'it would be passing strange for an ultra vires agency action to be . . . insulated from judicial review.'" *Advanced Disposal Servs. E., Inc. v. N.L.R.B.*, 820 F.3d 592, 600 (3d Cir. 2016) (quoting *Teamsters Local Union No. 455 v. N.L.R.B.*, 765 F.3d 1198, 1201 (10th Cir. 2014)).[25] Otherwise, as Plaintiffs suggest, "the Postal Service could, for example, choose to stop delivering mail received from select zip codes the week before an election . . . and the States could do nothing about it." *Pl. Resp.* at 16, ECF No. 47.

---

[24] If Congress had indeed intended to preclude review over such claims, it could have changed the language of section 3661(b) from the permissive "may" to "must" or "shall" when it adopted the PAEA in December 2006. Indeed, when the PAEA was adopted, Congress used the term "shall" in the very same section. 39 U.S.C. § 3661(c). This coupling further suggests that "may" in section 3662(a) means what it says.

[25] It should be further borne in mind that "[t]he law is settled that if a federal officer does or attempts to do acts which are in excess of his authority or under authority not validly conferred, equity has jurisdiction to restrain him." *Zirin v. McGinnes*, 282 F.2d 113, 115 (3d Cir. 1960) *citing State of Colorado v. Toll*, 268 U.S. 228 (1925); *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902); *and Harper v. Jones*, 195 F.2d 705 (10th Cir. 1952), *cert. denied,* 344 U.S. 821 (1952).

To further illustrate why judicial review is warranted here, it is useful to return to *Thunder Basin*. 510 U.S. 200. There, the Supreme Court considered the question of jurisdiction in the context of the Mine Act, wherein Congress did not provide explicit guidance on whether judicial review was precluded by the statute's administrative scheme, and a plaintiff was seeking injunctive relief in the court. *Id*. at 202-06. The nature of the mine operator's claim against the Mine Safety and Health Administration (MSHA) was that certain regulations the MSHA had promulgated violated its rights under the National Labor Relations Act. *Id.* at 205. The mine operator sought to enjoin penalties to which it was subject for failure to comply with those regulations, prior to enforcement by Secretary of the Department of Labor.[26] *Id.* It had filed the motion for a preliminary injunction in federal district court, despite the fact that the statutory scheme allowed mining operators thirty days to challenge citations via the Federal Mine Safety and Health Review Commission (MSHRC), whose determinations were reviewable by courts of appeals. *Id.* at 208.

To ascertain whether it was "fairly discernible" that Congress intended to preclude judicial review of such claims, the Court reviewed the text, structure, and legislative history of the Mine Act. *Id.* at 206-12. Ultimately it concluded that "the Mine Act's comprehensive enforcement structure, combined with the legislative history's clear concern with channeling and streamlining the enforcement process, establishes a 'fairly discernible' intent to preclude district court review . . . ." *Id.* at 216 (internal citations omitted). It thus held that the MSHRC had exclusive jurisdiction over such claims. *Id.*

---

[26] Section 814 of the Mining Act provides that the Secretary may issue a citation if he "believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter." 30 U.S.C. § 814.

The Court found it persuasive that the structure of the Mine Act expressly authorized district court jurisdiction in only two provisions, both of which empowered the Secretary of the Department of Labor to enjoin violations, and neither of which afforded mine operators a corresponding right. *Id.* at 209. Moreover "[t]he Act's comprehensive review process" did "not distinguish between preenforcement and postenforcement challenges . . . ." *Id.* at 208-09. And the Court stressed the "detailed structure for reviewing violations of 'any mandatory health or safety standard, rule, order, or regulation promulgated' under the Act." *Id.* at 207 (internal citations omitted).

The Court also found that the legislative history of the statute weighed against exercising jurisdiction over the claims of mine operators. *Id.* at 209-10. At the time of the Mining Act's passage, worker accidents were common, and Congress expressed concern that mine operators would be able to re-litigate civil-penalty assessments in federal district court once the administrative review process was complete, thereby "seriously hamper[ing] the collection of civil penalties." *Id.* at 210. Thus, Congress expressly eliminated mine operators' rights to challenge a final penalty assessment *de novo* in district court. *Id.*

The case before us differs meaningfully from *Thunder Basin* in several key respects. First and foremost, unlike the limited jurisdictional grants in the Mine Act, both 28 U.S.C. § 1339 and section 409(a) of the PRA explicitly grant jurisdiction in cases involving the Postal Service, with section 409(a) explicitly granting jurisdiction in cases *against* the Postal Service. *Licata*, 33 F.3d at 261-62. That explicit grant is subject only to exceptions within the statute.[27] 39 U.S.C. § 409(a). In contrast, the Mine Act *did not* include a grant of general jurisdiction to district courts in suits

---

[27] I reiterate that the combination of three statutory sources—28 U.S.C. § 1331, 28 U.S.C. § 1339, and 39 U.S.C. § 409(a) carries some weight.

against the MSHA or the Secretary of Labor. *Thunder Basin*, 510 U.S. at 209. To the contrary,  the Mine Act authorized jurisdiction in only two distinct areas, both of which empowered the Secretary of Labor to utilize district courts to augment its enforcement powers against regulated entities. *Id*.

Second, the Mine Act's review process did not discuss pre-enforcement challenges; it told mine operators exactly when they had a right to weigh in on the process, and that was *after* the Secretary of Labor issued citations. *Id.* at 208-09. Here, the distinction in the PRA between pre-implementation and post-implementation of certain Postal Service actions is fundamental. Indeed, Plaintiffs' claims relate precisely to that distinction. Per sections 3661(b) and 3661(c), the PRA reserves for both the Commission and the public the right to provide input *before* the Postal Service makes nationwide changes affecting the nature of the postal services, a right which Plaintiffs allege was denied when USPS skirted the statutorily mandated process.[28]

Finally, an interpretation allowing judicial review in *Thunder Basin* would have thwarted the goals of the statute. *Id*. at 209-10. Congress's purpose in passing the Mine Act was to empower the Secretary of Labor to penalize mine operators violating health and safety standards accordingly, without being hampered at the collection stage. *Id.* at 210. *De novo* resort to a district court by mine operators would have complicated collection efforts, thus undermining the legislation's purpose. But the instant matter is different. Allowing the public to resort to federal district court when the Postal Service violates the *public's statutorily mandated right* to a hearing before nationwide changes are made under section 3661 only supports the PRA's overarching

---

[28] Again, the Commission has pointed out that "[t]he twin hallmarks of section 3661(b) are advance public disclosure of Postal Service plans that will affect service on a nationwide basis, in the form of a request for an advisory opinion from the Commission, and an opportunity for public comment on those plans." Commission Report Docket No. N2001-3, at 2.

policy, which is to provide a "basic and fundamental service . . . to the people." 39 U.S.C. § 101. The availability of judicial review in such limited instances only serves to support that policy.

Thus, applying the Supreme Court's test in the context of the PRA, it is entirely sensible to conclude that section 3662 precludes review of "common disputes over . . . services," *id.*, given that these complaints comprise the core language of, and guiding principle behind, section 3662. But as to claims relating to section 3661(b), the controlling test supports the availability of judicial review. *See Buchanan,* 508 F.2d at 262 (5th Cir. 1975); *United Parcel Serv.*, 604 F.2d at 1381 (holding that Postal Service acted outside its authority in bypassing the PRC before engaging in a temporary ratemaking experiment); *Am. Postal Workers Union, AFL-CIO*, 2007 WL 2007578, at *7 (D.D.C. July 6, 2007) (explicitly *rejecting* the argument that it lacked jurisdiction under 409(a) regarding a complaint *vis a vis* USPS's alleged non-compliance with section 3661(b)); *see also Anatol Zukerman*, 220 F. Supp. 3d at 34 (the PRA's "scheme . . . is inherently claim-dependent, and the relevant statutory language even suggests an aim on the part of Congress to allow complainants a role in framing their claims (and choosing their forum)").

In summary, Congressional intent to preclude district courts from hearing claims relating to section 3661(b) is not fairly discernible from the text, structure, and legislative history of the PRA.[29] The Defendants have not overcome the statutory language authorizing judicial review per

---

[29] If I had been unpersuaded by Plaintiffs' argument that Congressional intent to preclude review is not fairly discernible in the text, structure, and legislative history of the PRA, I could also have considered "'three additional factors'" to override the presumption of the unavailability of judicial review. *Elgin*, 567 U.S. at 15 (citing *Free Enter. Fund*, 561 U.S. at 489). Under these additional exceptions, which are not applied according to any "strict mathematical formula," *Arch Coal v. Acosta*, 888 F3d 493, 500 (D.C. Cir. 2019), courts may find that Congress did not intend to limit jurisdiction where: 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.' *Elgin*, 567 U.S. at 15 (internal citations omitted).

Nevertheless, having been persuaded that Congressional intent to preclude review is not fairly discernible, I need not consider those factors under *Elgin*, which instructs that where the circuit court is capable of providing meaningful review, the "appropriate inquiry is . . . whether it is 'fairly discernible' from the [statute] . . . that Congress intended [litigants] . . . to proceed exclusively through the statutory review scheme." 567 U.S. at 9-10 (alteration in original) (internal citations omitted).

28 U.S.C. § 1339 and 39 U.S.C. § 409(a). I will exercise therefore exercise jurisdiction over Plaintiffs' Count I claims.

At argument, Defendants made clear that they were not arguing that the Plaintiffs had failed to exhaust administrative remedies, but rather that the availability of judicial review later in the process deprives this Court of jurisdiction. But some of the controlling principles of exhaustion have relevance here if only by way of analogy. If a nonjudicial remedy is "clearly shown to be inadequate to prevent irreparable injury" in extraordinary circumstances, the court may grant an exception under administrative exhaustion doctrine. *Republic Indus., Inc. v. Cent. Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 293–94 (3d Cir. 1982); *see Harrow v. Prudential Ins. Co. of Am.,* 279 F.3d 244, 249 (3d Cir. 2002) ("[a] plaintiff is excused from exhausting administrative procedures under ERISA if it would be futile to do so.").

As will be discussed below, the Plaintiffs have demonstrated irreparable harm. Moreover, they have shown that—with regard to the demonstrable harms related to their status as users of the mail *vis a vis* the upcoming election—resort to the Commission even within days of the changes USPS made on or around July 10, 2020 would have been futile, given that the Commission has 90 days simply to respond as to whether it will hear a complaint. 39 U.S.C. § 3662(b)(1). If the Commission had decided to dismiss the case, it could have waited until mid-October to do so. *Id.* Defendants would have been left to appeal to the D.C. Circuit just days before the election. Similarly under section 3662(b)(1) the Commission could have simply waited until mid-October to decide to hear the case, at which time it would have been too late. There is no doubt the Plaintiffs have acted reasonably and in due diligence in seeking immediate judicial review.

44

As to Count II, subject matter jurisdiction exists under 28 U.S.C. § 1339 and 39 U.S.C. § 409(a), which provides that: "[e]xcept as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." The Third Circuit has held that section 409(a) provides an independent basis for subject matter jurisdiction. *See Licata*, 33 F.3d at 262; *see also Anselma Crossing, L.P. v. U.S. Postal Serv.,* 637 F.3d 238, 241 (3d Cir. 2011).[30]

As to Count III, subject matter jurisdiction exists under 28 U.S.C. § 1331 and Article III, Section 2 of the United States Constitution.

## IV.     Standing

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." The law of Article III standing, in turn, "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013). At its core, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "Standing has constitutional and prudential components, both of which must be satisfied before a litigant may seek redress in the federal courts." *UPS Worldwide Forwarding, Inc. v. U.S. Postal Serv.,* 66 F.3d 621, 625 (3d Cir. 1995).[31]

Constitutional standing to seek injunctive relief requires a plaintiff to show (1) "that he is under threat of suffering 'injury in fact' that is concrete and particularized; (2) the threat must be actual and imminent, not conjectural or hypothetical; (3) it must be fairly traceable to the

---

[30] Plaintiffs have not formally moved for preliminary relief under Count II. It should be noted, however, that none of the exceptions that Defendants assert deprive this Court of jurisdiction apply to the claims asserted under Count II. And as discussed below, the same evidence that provides a basis for relief under Count I would apply with equal force to the core elements of Count II.

[31] Because Defendants do not challenge Plaintiffs' prudential standing, I do not address it here.

challenged action of the defendant; and (4) it must be likely that a favorable judicial decision will prevent or redress the injury." *Free Speech Coalition, Inc. vs. Att'y Gen. of the U. S.*, 825 F.3d 149,165 (3d Cir. 2016) (internal punctuation omitted) (citing *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009)). Plaintiffs seeking injunctive relief must also demonstrate a likelihood of future harm. *See McNair v. Synapse Grp. Inc.,* 672 F.3d 213, 225 (3d Cir. 2012). Moreover, a plaintiff must also "demonstrate standing for each claim he seeks to press." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015).

Plaintiffs must make a "clear showing" that they have standing. Because standing requirements "are not pleading requirements, but are necessary elements of a plaintiff's case, mere allegations will not support standing at the preliminary injunction stage." *Doe v. National Bd. of Medical Examiners*, 199 F.3d 146, 152 (3d Cir. 1999). Moreover, as a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," these Plaintiffs must make a "clear showing" that they have standing. *See Winter*, 555 U.S. at 22; *see also Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (applying a "clear showing" standard in evaluating Article III standing at the preliminary injunction stage).

Moreover, as a general rule, in an injunctive case, courts need not address the standing of each plaintiff if it concludes that one plaintiff has standing. *See Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 481 n.14 (3d Cir. 2016) (citing *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 826 n.1 (2002)).

## A. Pennsylvania Has Standing to Challenge Procedural Violations of the PRA

Plaintiffs allege that, in early July, "the Postal Service abruptly instituted a 'transformative initiative' that changed how mail was processed, transported, and delivered." Mem. Law. Supp. Pls. Mot. Prelim. Inj. 33. These changes included restrictions on overtime, requirements that

carriers adhere rigidly to start and stop times regardless of whether all mail for their route has arrived or been delivered, and limits on late or extra trips by postal workers. *Id.* The Postal Service, Plaintiffs claim, was required to request an advisory opinion from the Postal Regulatory Commission prior to instituting the July changes. *Id.*

Plaintiffs further claim that the Postal Service has acted without the requisite procedural safeguards (the submission of the proposed changes to the Postal Regulatory Commission) and are suing to enforce their procedural rights. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 (1992) (describing the "procedural" requirements for a hearing prior to a license denial or the issuance of an environmental impact statement before the construction of a new government facility). To the extent that the Defendants believe that the Postal Service  was not required to submit its proposed changes to the Commission, this is an issue of the merits rather than of standing.

Where plaintiffs seek to enforce procedural rights, they must first establish that the procedures "are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n.8; *Earth Island Inst.,* 555 U.S. at 496–497 (noting that an injury may arise when individuals are denied their right to comment due to "unlawful abridged procedures," so long as their concrete interests are threatened). Once a plaintiff establishes that his concrete interest is particularly threatened by the procedural violation, the "plaintiffs must 'demonstrate a causal relationship between the final agency action and the alleged injuries,'" which permits the court to "assume[ ] the causal relationship between the procedural defect and the final agency action." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see also Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 247 n.4 (3d Cir. 2011) (noting that plaintiffs had

standing where the agency implemented a policy, in violation of plaintiffs' notice and comment rights, that could delay issuance of notices to proceed to plaintiffs).

### 1. Defendants' Alleged Procedural Violations Threaten Pennsylvania's Concrete Interests

Pennsylvania has experienced a particularized, concrete harm to its interest in timely service as a user of the mail.[32] "A concrete injury must be *de facto;* that is, it must actually exist." *Spokeo, Inc.* v. *Robins*, 136 S.Ct. 1540, 1548 (2016) (internal punctuation omitted). Plaintiffs must set forth facts that show a risk of harm particular to them. *See Kamal v. J. Crew Group, Inc.*, 918 F.3d 102, 116 (3d Cir. 2019). The Commonwealth's Department of General Services has provided a list of instances where delays have interrupted the processing of incoming revenue, travel reimbursements, and other agency priorities. *See* Beverly Hudson Decl. Ex. 28 3–4, ECF No. 18-4. The Office of the General Counsel in the Pennsylvania Criminal Unit has also experienced mail delays that have made it more difficult to carry out their duty to issue warrants. *See* Carissa M. Mager Decl. Ex. 34 ¶¶ 8, 9, ECF No. 18-4. Recent USPS delays have also hindered the Department of Labor's efforts to schedule hearings and adjudicate benefits. *See* Robert V. O'Brien Decl. Ex. 39 ¶ 19–29, ECF No. 18-4.

This evidence underscores that Pennsylvania is not asserting a procedural right "*in vacuo.*" *Earth Island Inst.*, 555 U.S. at 496. Had the Commonwealth been able to participate in the commenting process prescribed under section 3661, it would have the opportunity to assert its

---

[32] Because only one plaintiff must have standing in equitable relief cases, I do not address the standing of the other state Plaintiffs in detail, although California, Delaware, and North Carolina have also offered evidence of harms to their state agencies. Mail delays have also impaired the ability of the California Department of Consumer Affairs to process licenses, which has forced the agency to deploy additional staff resources. *See* Kimberly Kirchmeyer Decl. Ex. 32 ¶ 16-20, ECF No. 18-4. In addition, Delaware has listed instances, beginning in July, where state residents did not receive essential items provided by the Delaware Department of Health and Social Services, on account of mail delays. *See* Gabriela Kejner Decl. Ex. 31 ¶ 14, ECF No. 18-4. And finally, North Carolina's Division of Motor Vehicles has received hundreds of complaints about mail delays around driver's license suspensions and hearing deadlines. D. Jordan Whichard IV Decl. Ex. 45 ¶ 8, ECF No. 18-4.

agencies' need for timely service. Pennsylvania, accordingly, has a concrete and particularized

interest in the resolution of this controversy.[33]

### 2. The Delays Harming Pennsylvania Are Traceable to Defendants' Alleged Violations

Plaintiffs must also demonstrate that the injuries to their interests are "fairly traceable" to

the agency action that was instituted with insufficient procedures. This requirement preserves

concreteness and particularity in procedural standing cases; as the D.C. Circuit has persuasively

explained, it ensures that courts do not "foster a procedural right in the air or a right that is distinct

from any concrete injury." *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996)

(internal citations omitted). In this matter, Pennsylvania has made a clear showing that the mail

delays are "fairly traceable" to the Postal Service's transportation and overtime changes.

On August 13, Postmaster DeJoy touted improvements in the on-time dispatch schedule,

which resulted on-time rates of "97.3 percent, up from 89.9 percent." Internal Memorandum from

Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G. At the same time, DeJoy also noted that

the Postal Service had "reduced extra trips by 71 percent — a tremendous achievement." *Id.* But

DeJoy conceded that "this transformative initiative has had unintended consequences that

impacted our overall service levels." *Id.* DeJoy's conclusion that the transportation changes

impacted service is also supported by statistical evidence and employee testimony. Service

precipitously declined in July, when the changes were implemented, *see* USPS Serv. Performance

Measurement Ex. 11, ECF No. 18-3, and delays impacted services in the Eastern Area (which

includes Pennsylvania), *see* Eastern Area AIM Meeting – Service Update Ex. 6, ECF No. 18-3,

and the Pacific Area (which includes California). *See* Pacific Area AIM Meeting Presentation Ex.

---

[33] The fact that the delays are "widely shared" does not minimize Pennsylvania's interest in the litigation. *See Massachusetts v. EPA*, 549 U.S. 497, 522 (2007).

12, ECF No. 18-3. Post office employees in the Pacific and Eastern areas have also alleged that the change to transportation mail has delayed processing in their respective regions. *See* Cogan Decl. Ex. 48 ¶ 13 (Oregon); Kelly Dickey Decl. Ex. 50 ¶ 25 (Pittsburgh); John Gibson Decl. Ex. 26 ¶ 15 (Philadelphia).

The delays in Pennsylvania are also linked to the changes in overtime policy. As described previously, the record strongly suggests that USPS leadership has undertaken a national policy to alter overtime policies. *See* PowerPoint – AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13 (describing a national "Work Hour Reduction Target, Do It Now" initiative). Pennsylvania has not been spared the impact of this decision. Union officials have testified that "overtime was significantly restricted at certain facilities" in Philadelphia that are represented by Local 308 of the National Postal Mail Handler's Union. Gibson Decl. ¶ 14. Although overtime allowances have increased in Philadelphia since the dramatic reductions in late July and early August, restrictions remain in place. *Id.* at ¶ 16. One Philadelphia branch manager further reported that the overtime restrictions came from the Postmaster General. *Id.* And in Pittsburgh, management instituted a one-week ban on overtime. Dickey Decl. ¶ 22. Management has since lifted its ban but overtime continues to be limited at the facilities represented by Local 322 of the National Postal Mail Handlers Union. *Id.* at ¶ 23.

Defendants have argued that the Plaintiffs must also show that that the prior delays were "primarily caused by the USPS policy changes, rather than COVID-related circumstances (e.g., staffing shortages)." Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 32. But this view misstates the law on causation.[34] In *Massachusetts v. EPA*, the agency maintained that its alleged procedural

---

[34] Even if Defendants were correct, Plaintiffs could still make a strong showing that the delays were primarily caused by USPS policy changes. In a September 16, 2020 hearing, Robert Cintron observed that the COVID-related impacts started to occur in February/March. *See* Tr. Prelim. Inj. Teleconference at 59, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020). However, as of the week of August 29th, first-class mail service was at 88%, which was

violation – a refusal to undertake rulemaking to address greenhouse gas emissions – contributed so "insignificantly to petitioners' injuries that the Agency cannot be haled into federal court to answer for them." 549 U.S. 497, 523 (2007). The Court disagreed; Massachusetts had standing because the agency's refusal to regulate such omissions *contributed* to the state's injury, even though the actions of third parties also had a large impact. *Id.* at 523-24. As in *Massachusetts*, halting the Defendants' policies would meaningfully contribute to addressing Pennsylvania's injuries.

### 3. Pennsylvania Will Experience Ongoing Injuries

The Commonwealth of Pennsylvania has also met its burden with respect to the "actual and imminent" standard. In equitable relief cases, the Third Circuit has required plaintiffs to show that they are "likely to suffer future injury" from the defendant's conduct." *McNair*, 672 F.3d at 223. Defendants argue that Plaintiffs cannot make such a demonstration, as "service performance is rapidly returning to early July levels."[35] Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 32. This statement was contradicted by Robert Cintron's testimony during the September 16, 2020 *Jones v. USPS* hearing. Robert Cintron first admitted, on cross-examination, that service performance of First-Class mail had improved by only .28 percent in the most recent data. *See* Tr. Prelim. Inj. Teleconference at 62, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020). Cintron also agreed that "[c]urrently, first-class mail products are somewhere between five and six percent below

---

the lowest performance yet within the COVID-19 pandemic. *Id.* at 59-60. The Postal Service has stated that the lowest rates of availability due to COVID-19 and vacation absences occurred in mid-July. *See* Prokity Decl.¶ 5. The ongoing nature of the delays strongly suggests that another causal factor besides COVID-19 is at work.

[35] This factor is less critical in our standing analysis because Pennsylvania is asserting a procedural injury. As the Supreme Court made clear in *Lujan v. Defenders of Wildlife*, "the normal standards for redressability and immediacy" are lessened in cases where the plaintiff has been "accorded a procedural right to protect his concrete interests." 504 U.S. at 572 n.7. Pennsylvania's interest against mail disruption will remain concrete throughout; *compare Earth Island Inst.,* 555 U.S. at 497 (Plaintiffs asserted a procedural right *in vacuo* with respect to a building project that was already the subject of litigation and settlement).

established service standards." *Id.* at 53. At 88.74% for First-Class Mail, *see* Q4 To-Date Service

Performance For Market Dominant Products, Courtroom Exhibit Ex. 54-16, service has not yet

rebounded to the lowest point in the COVID-19 era. *Id.*

Pennsylvania's claim that they are likely to suffer future injury is further bolstered by

evidence that the contested policies have persisted and will continue delays across the state. The

August 18, 2020 DeJoy statement notably did not mention a suspension of changes to the

transportation policy and stated only that overtime would be "approved as needed." Statement of

Postmaster General Louis DeJoy (August 18, 2020) Ex. H, ECF No. 1-1. But among the

Pennsylvania facilities represented by Local 322, overtime was terminated for one week and

continues to be limited. *See* Dickey Decl. ¶¶ 22, 23. Management at these facilities continues to

order that trucks adhere to a strict transportation standard, even if it means that some mail will be

left behind. *Id.* at ¶ 24. Representatives of Pennsylvania-based Local 303 have also claimed that

the rigid transportation requirements and overtime restrictions have persisted, although overtime

usage has increased. *See* Gibson Decl. ¶¶ 15, 16. The record strongly shows that the injuries

sustained by Pennsylvania will persist into the future, as the state will continue to be denied their

right to comment on the policy changes that threaten their concrete interests as users of the mail.

### 4. Pennsylvania's Injuries Can Be Redressed by Injunctive Relief

Plaintiffs are also able to meet the light burden of redressability that arises in procedural

rights standing cases. The Supreme Court has maintained that "person who has been accorded a

procedural right to protect his concrete interests can assert that right without meeting all the normal

standards for redressability and immediacy." *Earth Island Inst.,* 555 U.S. at 496 (noting that

procedural rights claims "can loosen the strictures of the redressability prong of our standing

inquiry"). Here, a favorable judicial ruling would resolve plaintiffs' procedural injury, as the

plaintiffs would be able to comment on the proposed changes prior to their implementation. Plaintiffs do not need to show that a resolution in the procedural injury would ultimately result in USPS adopting a different policy. *See Defenders of Wildlife*, 504 U.S. at 572 n. 7.

## B.  California Has Standing to Challenge USPS' Alleged Constitutional Violations

Standing involves an examination of whether a "particular plaintiff is entitled to an adjudication of the particular claim*s* asserted." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

In *Oregon v. Mitchell*, the Supreme Court reiterated that states retain power to "regulate elections" under the Elections Clause in the absence of a Congressional enactment or Constitutional limit. 400 U.S. 112, 121 (1970). There, the Court entertained an action by the State of Oregon to enforce its interests under the Elections Clause against Congressional aggrandizement. The Court ultimately held that Congress had "invaded an area preserved to the states" when it attempted to lower the voting age in state and local elections. *Id.* at 130.[36] Similarly, in *South Carolina v. Katzenbach*, the Court permitted South Carolina and the states to pursue claims that the Voting Rights Act "encroach[ed] on an area reserved to the States by the Constitution." 383 U.S. 301, 323 (1966).

Plaintiffs in this action similarly seek to halt federal encroachment on their constitutional power to determine the "Times, Places, and Manner" of federal elections and appoint electors. *See* U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II § 1, cl. 2. The states allege that USPS interference,

---

[36] The Court also noted that "no question has been raised concerning the standing of the parties or the jurisdiction of this Court." *Oregon v. Mitchell*, 400 U.S. 112, 117 n. 1 (1970).

in the form of delays and incorrect mailers to voters, have "jeopardize[d] the manner in which the

States have chosen to let voters vote" under the Elections Clause. Mem. Law. Supp. Pls. Mot.

Prelim. Inj. 47.

California[37] has offered sufficient evidence to show that its claimed injury – the Postal

Service's  interference with the state's constitutional power to conduct elections and set rules for

mail-in ballots – is concrete, particularized, and fairly tracible to Defendants. The agency's

intrusions have taken two forms: delays[38] that call into the efficacy of California's mail voting

system into question and incorrect mailers to California voters.

USPS data from the Pacific region (the latest available in the record) establishes that

services for First-Class mail declined precipitously in July and remained below usual standards at

the start of August. *See* Pacific Area AIM Meeting Presentation Ex. 12. Declines have persisted

nationally and have impacted Election Mail. *See* Tr. Prelim. Inj. Teleconference at 53, *Jones v.*

*USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020) ("[c]urrently, first-class mail products are

somewhere between five and six percent below established service standards."); Robert Glass Dep.

65, Courtroom Exhibit 55 (observing that delays have already occurred with respect to Election

Mail). Declarations from California officials have established that service delays have occurred in

California and are persistent. *See, e.g.*, Kirchmeyer Decl. ¶ 18. And California's Secretary of State

has testified that USPS sent out incorrect mailers about how voters can vote by mail in California's

elections. *See* Alex Padilla Supp. Decl. Ex. 53 ¶ 6, ECF No. 47-1. As a result of USPS delays and

policy changes, California's Secretary of State experienced a "drastic spike in inquiries" that

---

[37] Again, I analyze standing for California because only one plaintiff is required to have standing in equitable relief cases. Declarations from officials in Maine and Washington, D.C. also describe financial expenditures by the states to protect their residents' ability to vote by mail, in light of persistent USPS delays. *See* Matthew Dunlap Decl. Ex. 23 ¶ 19, ECF No. 18-4 (ME); Alice P. Miller Decl. Ex. 37 ¶ 13, ECF No. 18-4 (D.C.).

[38] Because I have established that the delays are tracible to USPS policy changes, I do not repeat this analysis here.

required them to divert resources. Alex Padilla Dec. Ex. 40 ¶¶ 27, 28, ECF No. 18-4. California also received a surge of questions regarding the incorrect mailers. *See* Alex Padilla Supp. Decl. ¶ 4.

Taken together, this evidence establishes that USPS' actions have shaken voters' confidence in California's mail-in voting system and continue to pose a credible threat to the state's ability to administer its election. Whether the harm is cognizable under the Electors Clause or the Elections Clause is a different inquiry.

California can also meet standards for redressability. As established previously, an injunction would remedy the delays that are the result of the July 2020 policies. Moreover, this Court is empowered to enjoin USPS from mailing false postcards. These remedies would resolve California's constitutional injury.

## V.    Likelihood of Success on the Merits

With respect to this requirement, a movant for a preliminary injunction "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not"). *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018), *cert. denied,* 139 S. Ct. 440, 202 L. Ed. 2d 319 (2018) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017); *see also Singer Management Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (stating that a "likelihood" of success "does not mean more likely than not").

The Plaintiffs allege that the Postal Service was required by 39 U.S.C. § 3661(b) to ask the Postal Commission for an advisory opinion regarding their changes to policies for late and extra trips ("Transportation Policy") and for overtime work ("Overtime Policy"). Compl. ¶ 224-226. Section 3661(b) of the Postal Reorganization Act (PRA) states:

> When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially

nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.

39 U.S.C. § 3661(b).

Plaintiffs further claim that by not submitting a proposal to the Commission before the changes in the Transportation Policy and Overtime Policy took effect, Defendants acted beyond their statutory authority and the changes are *ultra vires*. Compl. ¶ 227. Defendants argue that they were not required to seek an advisory opinion under section 3661(b) because the changes implemented do not constitute changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis. Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 32.

Both Defendants and Plaintiffs agree that the question of whether the Postal Service needs to go to the Commission for an advisory opinion is properly addressed under the framework of *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1974). In *Buchanan*, a proposed class of postal users sought to enjoin changes being implemented by the Postal Service, alleging that the Service was required to go through the section 3661 process beforehand. *Buchanan*, 508 F.2d at 261. The court enjoined implementation of two of the three changes involved and ordered the Postal Service to seek an advisory opinion from the Commission. *Id.* at 267. The PRA had been enacted just four years prior, and the circuit court (as had the district court below) thoroughly examined the legislative history and purposes of § 3661. *Id.* at 263-64; *Buchanan v. U.S. Postal Serv.*, 375 F. Supp. 1014, 1017-18 (N.D. Ala. 1974).

The court wrote that there are "two basic policies" at the core of the PRA that "pull in different directions": "the goal of vesting in management the freedom to make decisions without external constrains" and "the goal of providing to the American people a public service which is

sensitive and responsive to their needs." *Buchanan*, 508 F.2d at 262. The court found that these policies could be harmonized by reading section 3661 such that "management is given the freedom to manage without unnecessary limitations and the public is given an opportunity to present their views on decisions of the Postal Service which affect them." *Id.* at 262; *see also Buchanan*, 375 F. Supp. at 1017-18 (noting that although "it is clear that Congress intended generally to give the Postal Service broad powers and wide discretion in its operations" it is "equally as clear . . . Congress intended to retain for the public a right to be heard so that the Postal Service would be responsive to the public and the public would have assurance that any major changes in postal service. . . would conform to the basic policies established in the [PRA].)"[39] When the Postal Service implements "change[s] in the nature of postal service which will generally affect service on a nationwide or substantially nationwide basis" without going through the procedures prescribed by section 3661, the general public is "denied a very fundamental right -- the opportunity for a hearing on the proposed change." *Buchanan*, 375 F. Supp. at 1019.

Under *Buchanan*, there are three factors that must exist before a proposed change is required to go through the Commission in compliance with section 3661:

> First, there must be a "change." This implies that a quantitative determination is necessary. There must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within § 3661. Second, the change must be "in the nature of postal services." This involves a qualitative examination of the manner in which postal services available to the user will be altered. Third, the change must affect service "on a nationwide or substantially nationwide basis." A broad geographical area must be involved.

*Buchanan*, 508 F.2d at 262-63.

As discussed in Section III, I have found that subject matter jurisdiction exists under 39 U.S.C. § 409, as buttressed by 28 U.S.C. § 1339 and 28 U.S.C. § 1331 to consider this claim.

---

[39] The text of section 3661(b) examined in *Buchanan* remains unchanged today. See *Buchanan*, 375 F. Supp. at 1018; 39 U.S.C. § 3661(b).

Because the Administrative Procedure Act does not apply to the Postal Service for claims like this one, *see Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014), I analyze this claim under a theory of nonstatutory review.

"Nonstatutory review" enables a federal court to use its equity powers to enjoin violations of law by governmental officials. This form of review is primarily used if a plaintiff "is unable to bring his case predicated on either a specific or a general statutory review provision." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *see also Zirin v. McGinnes*, 282 F.2d 113, 115 (3d Cir. 1960); *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 600 (3d Cir. 2016) (ruling that party did not forfeit claim of ultra vires agency action because such claims should not be insulated from judicial review); *Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 916 (3d Cir. 1981). Where nonstatutory review is available, it is quite narrow. *Mittleman*, 757 F.3d at 25. It is available only to determine whether the agency has acted "*ultra vires*"—that is, whether it has "exceeded its statutory authority." *Id.*

*Ultra vires* review has been utilized by various courts to analyze actions of the Postal Service. In *Aid Ass'n for Lutherans*, the D.C. Circuit reviewed a District Court decision, holding that the Postal Service had acted *ultra vires* in promulgating certain regulations. 321 F.3d 1166, 1174 (D.C. Cir. 2004). The court found that the agency acted *ultra vires* because it "lacked authority under the statute effectively to regulate out of the market nonprofits' use of the reduced postage rates for insurance-related purpose." *Id*. at 1178; *see also id.* at 1172 ("Judicial review is favored when an agency is charged with acting beyond its authority.") Similarly, in *Combined Commc'ns Corp.*, the Sixth Circuit upheld a district court's decision that the Postal Service had acted *ultra vires* in promulgating certain regulations, after finding jurisdiction under 28 U.S.C. § 1339 and 39 U.S.C. § 409. 891 F.2d at 1227-28. The Third Circuit has likewise analyzed ultra vires claims against the

Postal Service where plaintiffs alleged that the Service exceeded its authority by implementing certain policies without following the procedure prescribed by the PRA. *See Air Courier Conf. of America/ Int'l Comm.*, 959 F.2d at 1215; *United Parcel Serv., Inc.*, 604 F.2d at 1372.[40]

## A. Scope of Review

Before analyzing the *Buchanan* factors, I am mindful of the deference owed to agency interpretations of its governing statute.

At the outset, I must identify exactly what the interpretation is that was offered by the agency, as that will guide the analysis as to the deference owed that interpretation. *See United States v. Mead Corp*, 533 U.S. 218, 227-28 (2001). I may only consider the interpretation offered at the time of the agency action, and not *post hoc* justification offered during litigation. *See Dep't of Homeland Security v. Regents of the Univ. of Calif*, 140 S. Ct. 1891, 1909 (2020) (holding that courts must rely only on "contemporaneous explanations for agency action" and that "[p]ermitting agencies to invoke belated justifications, on the other hand, can upset 'the orderly functioning of the process of review.'") (quoting *SEC v. Chenery Corp*., 318 U. S. 80, 94 (1943)); *see also Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 151 (3d Cir. 2004) ("[W]e may affirm the agency's decision only on grounds on which the agency actually relied, and not on the basis of alternative rationales or justifications put forward by counsel on appeal.") (quoting *Chenery*).

As discussed in Section I.B, there were changes to the Postal Service's transportation policies in July 2020. Mr. Cintron states that he has been leading an "initiative" regarding extra

---

[40] Defendants have suggested that this Court's nonstatutory review must proceed under *Leedom v. Kyne*, 358 U.S. 184 (1958). In interpreting *Leedom*, the D.C. Circuit has looked to whether the agency's error is "patently a misconstruction of the Act," or "when the agency has disregarded a specific and unambiguous statutory directive," or "when the agency has violated some specific command of the statute." *Griffith v. Federal Labor Relations Authority*, 842 F.2d 487, 497 (D.C. Cir. 1988). However, I do not rely on the more restrictive language of *Leedom* because I do not find that Congress has generally precluded review on this class of claims where jurisdiction already exists within the statute itself. *See Air Courier*, 959 F.2d 1213, 1215 (3d Cir. 1992); *United Parcel Serv., Inc.*, 604 F.2d 1370, 1372 (3d Cir. 1979); *see also Combined*, 891 F.2d at 1227-28.

and late truck trips, which began in name two years ago, but received "renewed focus" this July. Changes in overtime policy also began in July 2020.

The Postal Service has not presented documents issued at the beginning of Mr. Cintron's "initiative" from two years ago. And as to documents published contemporaneously with the changes in July of this year, the Postal Service disputes that either the Stand-Up Talk or the PMG Expectations PowerPoint represent agency policy. That question is not dispositive for this analysis, however, since neither document references section 3661. The policy guidelines issued by Mr. Cintron in July 2020 likewise do not reference section 3661 and do not discuss why the new policy would or would not be covered by the procedural safeguards of that section. The only contemporaneous document in the record seems to be the letter from the Postal Service's General Counsel, Thomas Marshall, to members of Congress on July 22, 2020. *See* Marshall Letter, Ex C at 13-15, ECF No. 1-1. In this letter, Mr. Marshall writes that "we are aware of our legal obligations to request an advisory opinion before implementing 'a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis' under 39 U.S.C. § 3661(b)" but that "[n]one of the operational efforts discussed here constitute such a change." *Id.* at 15.

### 1. The Marshall Letter Is Not Owed *Chevron* Deference.

I now turn to the level of deference owed to Mr. Marshall's determination that the operational changes do not constitute a change within the ambit of section 3661(b). As I must at the beginning of any deference inquiry, I begin by asking whether Congress "has directly spoken to the precise question at issue" through unambiguous statutory language. *See Hagans v. Commissioner of Social Sec.,* 694 F.3d 287, 294 (3d Cir. 2012) (citing *Chevron U.S.A., Inc. v.*

*Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). If so, then no further inquiry is needed. *Id.*

Here, the statute mandates procedure through the Commission when a change affects "the nature of postal services" and that change "will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). These terms are ambiguous and are susceptible to multiple interpretations, as the Commission itself has acknowledged. *See, e.g.* Order No. 1307, Order Partially Denying Motion of [USPS] to Dismiss Complaint and Notice of Formal Proceedings, Docket No. C2001-1, at 13 n. 12 (Mar. 20, 2001) ("There is no bright line for determining when a reduction in collection and mail processing service is a change in the nature of a postal service."). I therefore proceed to step two of *Chevron. See Chevron*, 467 U.S. at 843.

*Chevron* review of an agency's interpretation of ambiguous statutory language is appropriate where "Congress delegated authority to the agency generally to make rules carrying the force of law and the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead Corp.*, 553 U.S. at 226-27. Congress has delegated authority to the Postal Service to make rules carrying the force of law. *See* 39 U.S.C. § 401(2) (authorizing the Postal Service  "to adopt, amend, and repeal . . . rules and regulations . . . as may be necessary in the execution of its functions…") Interpretations by the Postal Service promulgated in the exercise of this rulemaking authority can thus be entitled to *Chevron* deference. *See, e.g., Aid Ass'n for Lutherans,* 321 F.3d at 1174 (holding that *Chevron* review was appropriate where USPS had promulgated regulations pursuant to notice and comment rulemaking). In *Air Courier*, the Third Circuit granted *Chevron* deference to the Postal Service's international rate-setting. *Air Courier,* 959 F.2d at 1215. The PRA delegated to the Postal Service the authority to set rates carrying the force of law, and the rate-setting in this context was an exercise of that authority. *Id.* at 1225.

The internal policies addressed by Mr. Cintron's initiative (or its "renewed focus"), and the concurrent interpretation of section 3661 provided by Mr. Marshall were not exercises of the Postal Service's delegation and do not carry the force of law. The summary explanation provided in the letter is not owed *Chevron* deference. The Third Circuit has consistently held that "interpretations such as those in opinion letters— like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law- do not warrant *Chevron*-style deference." *Packard v. Pittsburgh Transp. Co.*, 418 F.3d 246, 252 (3d Cir. 2005) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)); *see also Hayes v. Harvey*, 903 F.3d 32, 45-46 (3rd Cir. 2018) (en banc) (noting in dicta that HUD guidance documents do not warrant deference under *Chevron* because they lack the force of law); *Mercy Catholic Medical Center v. Thompson*, 380 F. 3d 142, 145-55 (3rd Circ. 2004) (holding that agency interpretive guidelines are not entitled to *Chevron* deference and noting that "[t]o grant Chevron deference to informal agency interpretations would unduly validate the results of an informal process.") (quoting *Madison v. Res. For Human Dev., Inc.*, 233 F.3d 175, 186 (3d Cir. 2000)).

Where agency interpretations are cursory and lack detailed explanation, as is the case here, the Third Circuit has also held that these interpretations are not entitled to *Chevron* deference. *See Packard*, 418 F.3d at 251-52 (holding that "the informal and cursory" reasoning of the agency derived from one paragraph in an interagency letter was not entitled to *Chevron* deference); *Hagans*, 694 F.3d at 302 (noting that "[t]he SSA devotes only one paragraph to its interpretation of the statute and does not explain how or why it reached its interpretation, a factor which weighs against deference.").[41]

---

[41] Although many Third Circuit decisions focus on whether an agency interpretation has the "force of law," *see, e.g. Hayes*, 903 F.3d at 45-46, some agency interpretations that do not have the force of law may at times still be entitled to *Chevron* deference. *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (holding that the agency's longstanding interpretation is not "automatically deprive[d]. . . of the judicial deference otherwise its due" solely because the "the

### 2. The Marshall Letter should be examined under the *Skidmore* framework

Instead, the agency's interpretation of the PRA should be reviewed pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Hagans*, 694 F.3d at 294-95. Under *Skidmore* review, a court considers an agency judgment "based on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" 323 U.S. at 140.

The Third Circuit has "adopted *Mead*'s conceptualization of the *Skidmore* framework as a 'sliding-scale' test in which the level of weight afforded to an interpretation varies depending on [the] analysis of the enumerated factors." *Sec'y U.S. Dep't of Labor v. American Future Systems Inc.,* 873 F.3d 420, 428 (3d Cir. 2017) (citing *Hagans*, 694 F. Supp. at 304, citing *Mead*, 553 U.S. at 228). Those factors include whether the interpretation was: "(1) [i]ssued contemporaneously with the statute; (2) [c]onsistent with other agency pronouncements; (3) [r]easonable given the language and purposes of the statute; (4) [w]ithin the expertise of the relevant agency; (5) [p]art of a longstanding and unchanging policy." *Id.* "[M]any of the same circumstances. . . relevant for determining whether to apply *Chevron* deference are also useful for deciding the level of deference due under *Skidmore*." *Hagans*, 694 F.3d at 304-05.

---

Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking.") (citing *Chevron*, 467 U.S. at 843). Rather, depending on "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time," *Chevron* may still "provide[] the appropriate lens through which to view the legality of the Agency interpretation." *Id.* at 222. Nevertheless, like the informal ruling at issue in *Hagans*, the two sentences of the Marshall letter still would not be entitled to *Chevron* deference even without an exclusive focus on whether the letter had the force of law. *See Hagans*, 694 F.3d at 303 ("It is not entirely clear form the Supreme Court's precedent whether the lack of the 'force of law' is always fatal to the application of *Chevron*, but in any event, the lack of legal effect of this ruling, combined with the absence of formal notice-and-comment rulemaking and the failure of the [agency] to describe its reasoning, cannot be counterbalanced by the [agency]'s institutional desire for uniformity and ease of administration.")

Applying these factors, I find that a relatively low level of deference is warranted. Under the first factor, Mr. Marshall's interpretation was not issued contemporaneously with the statute. Under the second factor, Mr. Marshall's interpretation is not consistent with other contemporaneous agency pronouncements. Postmaster DeJoy referred to the policies instituted in July as "significant changes," and as a "transformative initiative." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G. And with respect to late and extra trips, Mr. DeJoy further stated that the Postal Service had "reduced extra trips by 71 percent" and that the change had affected on-time rates by eight percent. *Id.* Postmaster DeJoy also noted that "this transformative initiative has had unintended consequences that impacted our overall service levels." *Id.* Postal Service briefing documents provided to Congress likewise refer to the transportation policy as an "initiative." *Congressional Briefing: Transportation and Service Performance Updates* (Aug. 31, 2020) Ex. 16. Overall, Mr. Marshall's interpretation is not consistent with other agency pronouncements.

The third factor is whether Mr. Marshall's interpretation is reasonable given the language of the statute. To trigger the Commission process under section 3661(b), there must be a "change in the nature of postal services." 39 U.S.C. § 3661(b). The PRA defines "postal services" to be "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 101(5). Postal service standards must "preserve regular and effective access to postal services in all communities, including those in rural areas or where post offices are not self-sustaining" and must "reasonably assure Postal Service customers [of] delivery reliability, speed and frequency consistent with reasonable rates and best business practices." 39 U.S.C. § 3691(b)(1)(B), (C); *see also* Goldway

Decl. Ex. 52 ¶ 12, ECF No. 47-1 (describing "service standards" as "the official timeliness goal for delivering mail after receiving it from the customer.")

Defendants urge me to give broad deference to the past interpretations of section 3661(b) offered by the Commission, and I do so. *See* Section V.B.3, *infra*. The Commission's description of the language of the statute is thus useful in analyzing this third factor. In one of the first advisory opinions issued by the Postal Regulatory Commission (then called the Postal Rate Commission), the PRC details the history of section 3661(b), and the competing interests of allowing the USPS managerial freedom while still trying to ensure public accountability. *See* Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, Docket No. N75-1, at 15-17 (Apr. 22, 1976). The Commission wrote that "[t]he procedural requirements of § 3661 obviously impinge upon the managerial decision-making processes of the Postal Service" but that "the imperative that adequate and efficient postal services to be provided to the public dictates a significant and viable scope of operation for § 3661." *Id.* at 16. Ultimately, the Commission held that section 3661 encompasses changes in the "type, quality, terms, or conditions" of service, and that a change falls within the ambit of section 3661 if "it has as a reasonably foreseeable consequence a significant change in the availability of basic postal services to the representative postal consumer." *Id.* at 9*; see also id.* at 21 ("It is the experience of the individual postal consumer, the recipient of the complex of services provided by the Postal Service and the intended beneficiary of the policies incorporated by § 3661, that must be assayed in determining whether an action or program involves a change in the nature of postal services.").

Here, Plaintiffs have put forward substantial evidence to show that postal customers experienced significant changes in the availability of basic postal services. *See* Section IV.A.2, *supra*; Section V.B, *infra*. They have also proffered evidence showing that these service impacts

65

were a reasonably foreseeable consequence of the changes. *See* Stand-Up Talk (stating that "we may see mail left behind" as a result of the changes); Gibson Decl. ¶ 15 (" Rigidly requiring trucks to leave at their scheduled time means that trucks leave without all of their mail, which exacerbates delays because a piece of mail that may have been an hour late becomes a day late or more."); Cogan Decl. ¶ 13 (testifying that as a result of the changes, "mail that was nearly done being processed may miss the truck entirely and could sit at the facility for at least another day."); Coradi Decl. ¶ 8 (testifying that as a result of the transportation policy, employees "are prohibited from making late trips and extra trips even if waiting just a few minutes would ensure timely delivery to entire communities.").

Plaintiffs also submitted a declaration from Ruth Goldway, who served on the Commission for seventeen years and was Chairwoman for six years. Goldway Decl. ¶ 1-2. Ms. Goldway represents that "[i]t is my opinion, based on my two decades of experience reviewing Postal Service operations, that eliminating local flexibility and requiring rigid adherence to transportation schedules would negatively impact service performance." *Id.* at ¶ 31. She further represents that "[e]ven if the Postal Service did not know that its changes were likely to impact service standards, it should still have reported to the Commission once it became clear that the changes were preventing the Postal Service from meeting its existing service standards." *Id.* at ¶ 36. Given the language of the statute, as interpreted by the Commission, it is unreasonable to argue that the policy changes contemplated and implemented could not have significant changes as a reasonably foreseeable consequence.

The fourth factor is whether the interpretation is within the expertise of the relevant agency. The Postal Service clearly does have some expertise in evaluating programs under § 3661. But this expertise is shared with the Postal Commission. *See, e.g., Air Courier*, 959 F.2d at 1223 ("Our

holding. . . in favor of the Postal Service is strengthened by the long-standing interpretation both the Postal Service and the Commission have given the statute. ") The Postal Service has previously sought out the expertise of the Commission as to exactly this question—whether a proposed change affects the nature of postal service on a substantially nationwide basis and triggers the procedures of the subsection. *See* Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1, at 1 (Mar. 24 2011) ("[T]he public proceeding that supports the Commission's conclusions is an example of how the Postal Service and the Commission can cooperatively use their complementary authority to develop policy and improve the process in an open and transparent manner."); s*ee also* Advisory Opinion on Service Changes Associated with Standard Mail Load Leveling, Docket No. N2014-1 (Mar. 26, 2014) at 8 (noting that "[w]ith an advisory opinion, the Commission. . . provides an opinion based on its expertise."); Goldway Decl. ¶ 23 ("The Commission also provides the Postal Service with valuable analysis and guidance on how to best accomplish its goals of increased efficiency and cost-savings without impeding mail service and public access").

Because interpretations of section 3661(b) are shared between the Postal Service and the Commission, and because these interpretations often conflict, *see* section V.A.3, *infra*, this factor likewise does not warrant deference to the Postal Service's interpretation alone in this instance. *Compare National Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 825-26 (1983) (deferring to the Commission's interpretation of a statute instead of the Postal Service's interpretation), *with Air Courier*, 959 F.2d at 1224 (noting that "the Commission agrees with the Postal Service" as to the interpretation in question and deferring to that interpretation).

Finally, under the fifth factor, this interpretation is not part of a long and unchanging policy. *See, e.g.,* Gibson Decl. ¶ 14 (testifying to implementation of changes in July 2020 that differed

67

from previous policy and practice); Cogan Decl. ¶ 7 (same); Coradi Decl. ¶¶ 5-9 (same); Dickey Decl. ¶¶ 19-26 (same). Under Third Circuit precedent, the agency's summary interpretation, devoid of reasoning, is owed very low deference under *Skidmore*. *See Packard*, 418 F.3d at 253 (holding in the context of an "informal and cursory" letter that "*Skidmore* deference is available only based on an agency interpretation's power to persuade . . . [t]he materials at issue here simply provide no reasoning or analysis that a court could properly find persuasive.") After analyzing the five factors above, I conclude that the agency's interpretation through the Marshall letter is owed a low level of deference. *Mead*, 553 U.S. at 228.

### 3. Past Practice of the Commission

The Defendants also argue that past practice of the Commission and the Postal Service "should be given the deference ordinarily accorded any interpretation of a statute by the agency." Defs. Resp. in Opp'n to Pls. Mot. Prelim. Inj. 33 (citing *United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102,107 n.11 (D.D.C. 2002)). According to Defendants, the Commission's past practice makes clear that the changes in this case do not rise to the level of changes affecting the nature of postal service on a substantially nationwide basis. *Id.* at 33-34.

I agree that the past practice of the Commission and the Postal Service is critical, and that statutory interpretations of the Commission are owed the highest degree of deference. *Cf. U.S. Postal Serv. v. Postal Regul. Comm'n,* 640 F.3d 1263, 1266 (D.C. Cir. 2011) (holding that the Commission's interpretation of 39 U.S.C. § 3622 is entitled to *Chevron* deference); *U.S. Postal Serv. v. Postal Regul. Comm'n*, 599 F.3d 705, 710 (D.C. Cir. 2010) (deferring to Commission's interpretation of 39 U.S.C. § 404(e)(3)).

The past practice of the Commission, however, does not accord with Defendants' description of how the Commission has interpreted section 3661(b). To the contrary, the

Commission's interpretation of section 3661(b) and the types of changes it has held to fall within that section's ambit would seem to reach the changes contemplated by this action.

True, some advisory opinions concern "general changes to postal facility hours or service standards for mail delivery." Advisory Opinion Docket No. N2014-1 at 1, 10 (involving a proposal to change the service standard from 3 days to 4 days); Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1, at 1 (Sept. 28, 2012) (involving changes to service standard that "would ultimately eliminate all overnight delivery service for single-piece First-Class Mail, and delay much of current First-Class Mail 2-day delivery to 3-day delivery.").

But the Commission has also issued advisory opinions on smaller matters and has interpreted section 3661(b) to encompass a larger variety of changes than Defendants imply. In 2006, for example, the Commission issued an opinion on the Postal Service's proposal "to enhance efficiency in the postal system's network of mail processing facilities through the use of modern computerized simulation and optimization models." Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, Docket No. N2006-1, at 15 (Dec. 12, 2006). Notably, the Commission found that the proposal triggered section 3661(b) because "implementation of [the] proposal is likely to cause at least a small degradation in the current level of service provided to First-Class Mail on a nationwide basis." *Id.* at 9. In that same case, the Postal Service estimated that "[i]n terms of volume, the net reduction in overnight [First Class Single-Piece Letters] would be 1.55 percent." *Id.* at 74. The Commission found that the proposed change qualified as a "change to the nature of postal services" under section 3661(b). *Id.* at 9. The Commission issued an opinion under section 3661, even though the proposed change's "overall effects on the postal service [could not] be known in advance" and even though the Postal Service "explicitly disclaim[ed] any

intention to change currently-established service standards as part of its proposal." *Id.* at 13; 15. In one of its first advisory opinions, the Commission likewise wrote that "[T]he effect of a contemplated program, rather than the Service's specific intent in adopting it, controls in establishing whether that program accomplishes a change in the nature of postal services." Advisory Opinion Docket No. N75-1, at 20.

The Commission has also issued advisory opinions under section 3661(b) even where the Postal Service has not made the "threshold" determination that a proposed change affects the nature of postal service, and where the Postal Service has thus contested the Commission's jurisdiction. *See* Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1, at 11 (3/10/10) (rejecting the Postal Service's jurisdictional challenge, analyzing the proposed changes under the *Buchanan* framework, and finding that "the Postal Service's Initiative falls under the ambit of 39 U.S.C. § 3661."). The Commission has described section 3661(b) in expansive terms, noting the importance of its safeguards for protecting the public and in ensuring that the Postal Service fulfills its statutory obligations.  The Commission has noted that section 3661(b) is a "statutory tool provided by Congress for gathering. . . public input" and that:

> Obtaining the views of Postal Service customers is vitally important where the Postal Service's monopoly First-Class Mail product is concerned. The privilege of a governmentally established monopoly status includes the responsibility to hear and consider the needs of the constituency that must function under the constraints of that monopoly. Actions that are, or are perceived to be unilateral in nature may disenfranchise users to the ultimate detriment of the monopoly product.

Commission Report: Complaint on Sunday and Holiday Collections, Docket No. C2001-1 at 2 (Nov 5, 2002).

It is precisely because the Postal Service cannot always properly independently make the threshold determination of section 3661(b) that the Commission has maintained it is important for the Postal Service to seek out the expertise of the Commission. *See, e.g.,* Goldway Decl. ¶ 21 (describing how in reviewing a certain proposal, the Commission found "that the cost savings [stated by the Postal Service] were overstated by more than $1 billion, would cause up to $0.6 billion in net revenue losses, and would cause almost 25 percent of all First-Class and Priority mail to be delayed for two days" and that "the Postal Service had failed to assess the impact its proposal would have on people living and working in rural or remote locations.").

In sum, the past practice of the Commission, which is owed a high degree of deference, shows that the Commission interprets section 3661(b) more expansively than suggested by the Defendants. And, as set forth below, this ultimately  weighs strongly against Defendants in an assessment of the merits.

### B.  Analysis of *Buchanan* Requirements

I now return to the *Buchanan* requirements, giving a low level of deference to Mr. Marshall's statement in the July 22 letter, and a very high degree of deference to the Commission's past practice in interpreting section 3661 and these factors. In order for changes to fall within the ambit of section 3661(b), three requirements must be met. *Buchanan*, 508 F.2d at 262-63. Importantly, in the context of a preliminary injunction, "it is not necessary [for a court] to decide that the challenged changes are in fact embraced in Section 3661." *Buchanan*, 375 F. Supp. at 1022. Rather, a court must find "that most likely they are and therefore that there is substantial likelihood that plaintiffs will prevail on the merits." *Id.*

The first requirement under *Buchanan* is that "there must be a 'change.' This implies that a quantitative determination is necessary. There must be some meaningful impact on service.

Minor alterations which have a minimal effect on the general class of postal users do not fall within § 3661." *Buchanan,* 508 F.2d at 262. Defendants argue that the July operational changes are not changes within the ambit of section 3661 because they do not represent new policy, but rather a "renewed focus" to comply with existing policies. Plaintiffs counter that the evidence thus far, including declarations from Mr. Cintron and public statements from Postmaster DeJoy and Chief Operating Officer David Williams, show evidence of a change and a meaningful impact on service.

The agency's description of its own change is not determinative; rather, courts may look at facts in the record to determine whether there has been a "meaningful impact on service." *See id.* at 265 (noting that "the Postal Service says[] there is no change in the nature of postal services since [the program] changes nothing and only provides information" but that "[t]estimony indicating the existence of two programs supports plaintiffs' position."). The Commission has likewise held that "the effect of a contemplated program, rather than the Service's specific intent in adopting it, controls" as to whether there has been a "change." Advisory Opinion Docket No. N75-1, at 20. "Therefore, the Service's claim that [a program] is designed to maintain existing overall levels of postal service, and will produce no aggregate change in the service it provided, is not controlling." *Id.* And even proposals described by the Postal Service as a "renewed focus" of "longstanding policy" have previously merited review by the Commission under section 3661. *See* Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1, at 8 (Mar. 10, 2010) (noting that the Postal Service sought an advisory opinion before implementing changes "that may result from a focused, systemwide application of its longstanding discontinuance review process.").

As discussed above, Defendants' attempt to characterize the initiative as a simple continuance of existing policies, rather than a change, is belied by the agency's own pronouncements and substantial evidence in the record. Postmaster DeJoy stated that the Postal Service "must make a number of significant changes," and that he "began those efforts right away." Internal Memorandum from Postmaster General Louis DeJoy (Aug. 13, 2020) Ex. G. The Stand-Up Talk referred to "transportation changes being implemented immediately (today)." *See* Stand-Up Talk Ex A. A banner put up recently in Oregon read "Do not hold the truck. No more holding trucks" and "All HCR and PBS trips will depart on time, no exception." *See* Tr. Prelim. Inj. Teleconference at 66, Jones v. USPS, No. 20-6516 (S.D.N.Y. Sept. 16, 2020). Guidance by Mr. Cintron effectively sets national transportation policy and narrows the criteria for approving late or extra trips. *See* Email from Robert Cintron to Area Vice Presidents re: Extra Guidance (July 14, 2020) Courtroom Ex. 54-11 (stating that "our focus is to eliminate unplanned extra transportation" and that "trips must depart on time."). The Cintron Guidance was distributed to area executives. *Id.*; Cintron Decl. ¶245. Ruth Goldway, the former Chairwoman of the Commission, noted that, in her opinion, the changes in transportation and overtime policies should have been submitted to the Commission. Goldway Decl. ¶ 35. Ms. Goldway also wrote that "[e]ven if the Postal Service did not know that its changes were likely to impact service standards, it should still have reported to the Commission once it became clear that the changes were preventing the Postal Service from meeting its existing service standards." *Id.* ¶ 36.

The "quantitative determination" demanded by *Buchanan* is also evidenced in the agency's own documents. Mr. DeJoy stated that the Postal Service now had an "ontime dispatch schedule" of "97.3 percent, up from 89.8 percent" and had "reduced extra trips by 71 percent." Internal Memorandum (Aug. 13, 2020) Ex. G. Mr. DeJoy also stated that "[u]nfortunately, this

transformative initiative has had unintended consequences that impacted our overall service levels." *Id.* Evidence shows sharp decreases in mail service across the country beginning in mid-July, after the issuance of the Stand Up Talk and Mr. Cintron's policy guidance. *See* Eastern Area AIM Meeting- Service Update (Aug. 4, 2020) Ex. 6; Service Performance Measurement, PMG Briefing Ex. 11; Pacific Area Performance Briefing; Congressional Briefing (Aug. 31, 2020) Ex. 12; Q4 To-Date Service Performance For Market Dominant Products, Courtroom Exhibit 54-17.

The second *Buchanan* requirement is that "the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered." 508 F.2d at 262-63. Defendants argue that if the new initiatives qualify as a change, then any managerial initiative would have to go through the process. Plaintiffs respond that not all managerial decisions would be implicated by their reading of section 3661(b), but only those that affect the nature of postal services.

The Commission has stated  that in determining whether an initiative involves a change in the nature of postal services "[i]t is the *experience of the individual postal consumer*, the recipient of the complex of services provided by the Postal Service and *the intended beneficiary of the policies* incorporated by § 3661, that must be assayed." Advisory Opinion Docket No. N75-1, at 21. (Emphasis added).

Plaintiffs have shown that individual postal customers have experienced an alteration in the availability of postal services as a result of the changes. *See, e.g.,* Jeffrey Erlbaum Decl. Ex. 24, ECF No. 18-4 (testifying to impact of delays on his business); Clayton Haas Decl. Ex. 27, ECF No. 18-4 (describing how delays have harmed the California Department of Conservation); Beverly Hudson Decl. Ex. 28 (testifying to problems caused by delays for the Pennsylvania Department of General Service and providing a chart of these delays); Linda Jara Decl. Ex. 29,

ECF No. 18-4 (describing how delays have impacted her access to medication); Jennifer Jones Decl. Ex. 30, ECF No. 18-4 (describing how USPS delays killed the chickens she ordered through the mail); Gabriella Kejner Decl. Ex. 31 (detailing instances where Delaware residents did not receive essential items provided by the Delaware Department of Health and Social Services in a timely fashion due to postal delays); Kimberly Kirchmeyer Decl. Ex 32 (describing how mail delays have impaired the California Department of Consumer Affair's ability to carry out its mission and have impaired the ability of the agency to process licenses); Steward Knox Decl. Ex. 33, ECF No. 18-4 (describing how delays have impacted receipt of notices that the California Labor and Workforce Development Agency has sent); Clarissa Mager Decl. Ex 34 (describing the public safety risks caused by mailing delays related to the Pennsylvania Criminal Unit of the Office of the General Counsel); Naomi Mayer Decl. Ex. 36, ECF No. 18-4 (testifying that she has been personally impacted by Postal Service delays); Christina Ann Naccarato-OToole Decl. Ex 38 (testifying that she and her family have been harmed by USPS delays); Robert O'Brien Decl. Ex. 39 (describing how recent USPS delays have impaired the ability of the Pennsylvania Department of Labor to timely adjudicate and pay benefits, schedule and hold hearings, and respond to matters in litigation); Jean Pallares Decl. Ex. 41, ECF No. 18-4 (describing how patients who receive prescriptions through the mailing program from the Los Angeles County Department of Health Services have been impacted by delays); Melinda Utal Decl. Ex. 43, ECF  No. 18-4 (describing how her business has been impacted by delays); Jill Weber Decl. Ex 44, ECF No. 18-4 (describing changes in her mail delivery); *see also* Sections IV.A.2 and IV.A.3, *supra*.

The third requirement to invoke section 3661(b) is that "the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved." *Buchanan*, 508 F.2d at 263.

In analyzing this requirement, the Commission previously upheld a decision by an ALJ that the change had a nationwide impact "because the breadth of its impact" was "evidenced by its hierarchical dissemination from Postal Service headquarters and its implementation at multiple locations in different areas throughout the country." Advisory Opinion Docket No. N75-1, at 26. The Commission further noted that "[i]f a significant number of postal customers experience the requisite change in service in their local areas, and these local areas cover a 'broad geographical area" then the change is substantially nationwide "regardless of whether the local changes produce an aggregate change in the level of postal services provided by the Postal service." *Id.* at 29. The Commission cautioned that this reasoning "should not be read to imply that this Commission will assert jurisdiction over 'scattered local changes' in postal services which are not the products of an identifiable decision or program of the Postal Service." *Id.* Rather, jurisdiction under section 3661(b) "is predicated upon the assumption that change in the nature of postal services, however widespread or significant, must be the results of a 'determination' of the Postal Services in the form of a discrete managerial decision or program." *Id.* at 29-30.

Where courts have denied relief, it has been on the basis that the postal service changes challenged were limited in geographical area and thus not covered by section 3661(b). *See, e.g., Bradley v. U.S. Postal Serv.*, 554 F.2d 186, 187-88 (5th Cir. 1977) (per curiam) (holding that a change did not "invoke the safeguards of section 3661" because it only affected residents of one county and thus was not "a nationwide change."); *Ludewig v. Wolff*, 492 F. Supp. 1048, 1059 (S.D. Tx. 1980) (holding that "the renumbering of mailboxes in one rural route in Three Rivers, Texas" did not invoke the section 3661 procedures under the "nationwide impact" requirement of the subsection); *Wilson v. U.S. Postal Serv.*, 441 F. Supp. 803, 808 (C.D. Cal. 1977) ("In this instance, the transfer of mail processing functions merely affects the western region of Los Angeles County.

76

That is a far cry from affecting postal services on even a substantially nationwide basis."); *NAACP v. U.S. Postal Serv.*, 398 F. Supp. 562, 564 (N.D. Ga. 1975) (holding that the relocation of the main branch of the Atlanta Postal Service "does not involve a broad geographic region.")

Defendants seem to concede that these changes are occurring at a nationwide level; indeed, they could not plausibly argue otherwise. The changes in this case come from headquarters. *See* Cintron Decl ¶ 245; PowerPoint – AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13; PowerPoint – AVP Meeting (July 7, 2020), Courtroom Ex. 54-14; PowerPoint – AVP Telepresence (July 10, 2020) Courtroom Ex. 54-9; Cintron Dep. 66. The changes have been implemented at postal offices around the country, as shown by declarations from union leaders, *see* Gibson Decl. Ex. 26; Dickey Decl. Ex. 50; Coradi Decl. Ex. 49; Cogan Decl. Ex. 48, led to a Stand Up Talk being distributed around the country from the Southern Area, to a banner being hung in Oregon, and to a PowerPoint apparently being crafted in Northern Ohio and widely distributed. The effects of the centralized changes have been felt by customers in, at least six states and the District of Columbia, as described above and in Section IV, *supra*.

In order to grant a preliminary injunction, the Plaintiffs must show a "reasonable probability" of success on the merits that Defendants were required to seek an advisory opinion from the Commission under section 3661(b) and acted ultra vires by failing to do so. *Reilly*, 858 F.3d at 176; *see also Buchanan*, 375 F. Supp. at 1022 (holding that a court need only find that "most likely" the changes in question are embraced by section 3661(b)). Under any standard of deference, I conclude that the Plaintiffs have made this showing.[42]

---

[42] See Section VIII, *infra*, for a brief discussion on the merits of Count III.

### VI.    Irreparable Harm

To show irreparable harm, "a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Ramsay v. National Board of Medical Examiners*, 968 F.3d 251, 262 (3d Cir. 2020) (citing *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)). Economic loss does not constitute irreparable harm. *Acierno*, 40 F.3d at 653. Moreover, "the injury created by a failure to issue the requested injunction must 'be of a peculiar nature, so that compensation in money cannot atone for it.'" *Id.* Irreparable harm is evaluated according to a "more likely than not" standard. *Reilly*, 858 F.3d at 180.

Here, Plaintiffs have shown previous and ongoing harm being suffered by agencies and individuals as a result of these allegedly illegal changes. *See* Sections IV.A.2 and IV.A.3, *supra*. The harms highlighted are more than economic, and are "of a peculiar nature, so that compensation in money cannot atone" for them. For example, the Deputy Secretary for Administration at the Department of General Services in Pennsylvania attested that the agency has received a number of complaints from suppliers concerning payments that have been mailed and were never received. *See* Hudson Decl. Ex. 28 at 4-5. The Postal Service's delays have inflicted a reputational injury, a fact that operates in favor of a preliminary injunction. *See Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 211 (3d Cir. 2014), *holding modified* by *Reilly*, 858 F.3d at 173 ("Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.") (citing to *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990)); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 378 (3d Cir.1992) (noting that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.").

Plaintiffs must show that it is likely that they will suffer irreparable harm. *See Winter,* 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."). Plaintiffs have made that showing. Multiple agencies have shown that postal delays interfered with their basic ability to administer their programs. *See, e.g.*, Haas Decl. Ex. 27 (testifying to how delays in equipment delivery and delays in hearing notices have harmed the California Department of Conservation); Kejner Decl. Ex. 31 (testifying to how the delays in mail have prevented proper administration of programs by multiple agencies within the Delaware Department of Health and Social Services); Kirchmeyer Decl., Ex. 32 (testifying to how mail delays have harmed the basic functioning and processing of the California Department of Consumer Affairs); Knox Decl. Ex. 33 (testifying to how delays have affected the ability to issue decisions and delays in hearings for agencies within the California Labor and Workforce Development Agency); Mager Decl. Ex. 34 (testifying to public safety risks caused by delays in mailings to and from the Office of the General Counsel in Pennsylvania); O'Brien Decl. Ex. 39 (testifying to how mailing delays for hearing notices and decisions have harmed the Pennsylvania Department of Labor and Industry); Pallares Decl. Ex. 41 (testifying to how the Los Angeles County Department of Health Services has been harmed in its ability administer its prescription mailing program due to mailing delays); Whichard Decl. Ex. 45 (testifying to how mailing delays have harmed the ability of the Office of the Governor for North Carolina to administer various programs).

Given the ongoing reductions in service standards, even after Postmaster DeJoy announced a halt of various changes, *see* Courtroom Exhibit 54-16, Plaintiffs have shown it is more likely than not that they will continue to suffer these harms without a preliminary injunction. *See also* Section IV.A.3, *supra*. This resonates with particular concern as to Election

Mail, because the defendants have testified that Election Mail was delayed during primaries in

July and August could be impacted in the future by the operational changes. *See* Glass Dep. 50-

51, 65-66, Courtroom Ex 55 (stating that "[t]here was a reduction in our service level. It did take

longer for pieces to go from sender to receiver" that included election mail in primary elections

conducted in July and August 2020); *see* Tr. Prelim. Inj. Teleconference at 66, *Jones v. USPS*,

No. 20-6516 (S.D.N.Y. Sept. 16, 2020) (conceding that election mail could be left behind as a

result of changes in the transportation policy).

**VII.      Balance of Equities and Public Interest.**

Having established likelihood of success on the merits and irreparable harm, which the

Third Circuit has stated are the most critical, I now turn to the Balance of Equities and the Public

Interest. *See Reilly*, 858 F.3d at 179 (describing the first two factors as "critical" and as "gateway

factors.") Plaintiffs must show that "the balance of the equities tips in [their] favor, and an

injunction is in the public interest." *Winter,* 555 U.S. at 20. Where the Government is a party, the

last two factors in the preliminary injunction analysis merge. *See Nken v. Holder*, 556 U.S. 418,

435 (2009).

When assessing the balance of equities, the Third Circuit will consider how the district

court "balanc[ed] the parties' relative harms; that is, the potential injury to the plaintiff[ ] without

this injunction versus the potential injury to the defendant with it in place." *Ramsay v. National

Board of Medical Examiners*, 968 F.3d 251, 263 (3d Cir. 2020). In this matter, the balance of the

equities tilts in Plaintiffs' favor. Although the USPS has an interest in efficiency, as discussed

above, this interest does not outweigh its responsibility to adhere to the PRA and its responsibilities

to the public. The agency has already pledged to halt a number of different policy initiatives until

the election, effectively conceding that the public interest requires such action. *See* Statement of

Postmaster General Louis DeJoy (August 18, 2020) Ex. H. Moreover, the purpose of a preliminary injunction is to preserve the relative positions of the parties. *Benisek*, 128 S. Ct. at 1945. Enjoining the enforcement of the July 2020 policies puts the Postal Service in the same posture that it has been in for its recent history. I find that enjoining the imposition of USPS policies would halt disruption in the mail service and preserves the status quo that existed before the policies were implemented. I find that the interest of the public and particularly the risk of irreparable harm tilts the equities in the plaintiffs' favor in this instance. Finally, to the extent that Defendants contend that they are already taking steps to remedy the admitted deficits in the timely delivery of mail, they can hardly be burdened by a court order requiring them to address those deficits.

For the foregoing reasons, I find that Plaintiffs have met their burden and that a preliminary injunction should be entered as to Count I.[43]

## VIII.   Disposition of Count III

Because Plaintiffs' motion for a preliminary injunction with respect to their procedural claims under the PRA will be granted, there is no need to reach Plaintiffs' claims under the Elections Clause and the Electors Clause. I decline to do so under the reasoning articulated by Justice Brandeis in his famed *Ashwander* concurrence:

> The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.

---

[43] Plaintiffs have not moved for relief under Count II, which alleges that the changes implemented by the Postal Service violate sections 101(e), 403(a) and 403(b) of the PRA.  Pl. Compl. at ¶ 228-236.  As noted in note 29 *supra*, there is a separate jurisdictional basis for these claims.  Section 101(e) of the PRA requires that in determining all policies for postal services, the Postal Service "shall give the highest consideration to the requirement for the most expeditious. . . delivery of important letter mail." 39 U.S.C. § 101(e). Section 403(a)  requires  the Postal Service to "develop, plan, promote, and provide adequate and efficient postal services." 39 U.S.C. § 403(a). Section 403(b) requires  the Postal Service to  "maintain an efficient system of collection, sorting, and delivery of the mail nationwide." 39 U.S.C. § 403(b). Much of the same evidence advanced in support of Count I would appear to establish a probability of success on the merits as to Count II.

*Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). *See also Harmon v. Brucker,* 355 U.S. 579, 581 (1958).

Justice Brandeis' principle has been endorsed by the Third Circuit. *See Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 249 n.13 (3d Cir. 2005); *New Jersey Payphone Ass'n, Inc. v. Town of West New York*, 299 F.3d 235, 249 (3d Cir. 2002) (Alito, J., concurring).

Plaintiffs bring claims under the Elections Clause and the Electors Clause seeking to halt what they view as unprecedented executive interference in their election administration. The states fear that the persistent declines in USPS service under Postmaster DeJoy will delay Election Mail, thereby impairing voters' ability to safely participate in a critical election contest. I share Plaintiffs' concern, as USPS service has not rebounded to pre-July levels. But, as Plaintiffs admit, their constitutional arguments are novel and would require me to craft a new constitutional standard in deciding the merits of their claims.

Because equitable relief under Count I also addresses the delays that threaten states' mail-in voting systems, under the prevailing guidance from the Court of Appeals, I will dispose of Plaintiffs' motion for a preliminary injunction on the narrowest possible ground – the procedural violation of the PRA.

## IX. Remedy

The nature of this action necessarily requires a nationwide injunction, for which there is well-settled authority. *See Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932) (holding district court's order "binding upon the respondent, not simply within the District of Massachusetts, but throughout the United States"); *McLendon v. Cont'l Can Co.*, 908 F.2d 1171, 1182 (3d Cir. 1990) (holding "[f]ull relief required a nationwide injunction"). Thus, ordinarily, when a court finds agency regulations to be unlawful under the APA, it vacates those

rules entirely—the scope of the remedy fits the violation. *See, e.g.*, *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 834 (E.D. Pa. 2019), *aff'd sub nom. Pennsylvania v. President United States*, 930 F.3d 543 (3d Cir. 2019), *as amended* (July 18, 2019), *cert. granted sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 918, (2020), and *cert. granted sub nom. Trump v. Pennsylvania*, 140 S. Ct. 918 (2020), and *rev'd and remanded sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).[44]

Yet "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). In that exercise, courts must give appropriate consideration to the imperative "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Therefore, in certain circumstances—even in cases involving APA procedures with nationwide effect—it is possible to craft an injunction more limited in scope. *See Baeder v. Heckler*, 768 F.2d 547, 553 (3d Cir. 1985) (holding regulation invalid, but determining district court did not have "the authority to issue an injunction aimed at controlling [Agency's] behavior in every . . . case in the country").

Although the APA is not at issue here, for the purposes of providing complete relief to the Plaintiffs, I find the instant case highly analogous to that in which a federal agency violates procedures mandated by the APA in issuing regulations.  As discussed *supra*, the Plaintiffs have suffered a procedural injury by nature of the deprivation of the right to a public hearing per section

---

[44] Although the holding of *Pennsylvania v. Trump* was ultimately reversed on the merits, the district court's decision to issue a nationwide injunction was both affirmed by the Third Circuit in *Pennsylvania v. President United States*, 930 F.3d 543, 575-76 (3d Cir. 2019), and approved in dicta by the Supreme Court in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2412 n.5 (2020).  Thus I find it illustrative for this purpose.

3661 of the PRA. This has resulted in numerous concrete harms to the States themselves, including but not limited to the impaired functioning of critical state agencies. There are any number of examples of how continued mail delays outside of Plaintiff states would continue to subject Plaintiff states to those same harms.

Plaintiffs have demonstrated that mail delays both disrupt their ability to administer programs that impact the health and safety of their citizens, and subject them to reputational harms involving contractual partners. For example, Pennsylvania state agencies involved in ongoing business relationships have sent checks to suppliers that are late or never received; meanwhile incoming checks have arrived weeks late.[45] Hudson Decl. at 2, 4. Where contractual partners are out of state, it is difficult to imagine that the proper functioning of state agencies, which rely heavily on the effectiveness of the Postal Service, could be fully restored without nationwide relief. It is similarly challenging to conceive of a way to address ongoing reputational harms that result from out-of-state contractual partners receiving checks late without affording the Plaintiffs nationwide relief.

Plaintiffs' administrative agencies have been disrupted in other meaningful ways, including their ability to ensure the safety of their citizens.[46] An Administrative Officer in the Office of General Counsel in the Criminal Unit in Pennsylvania ("OCG Criminal Unit"), who receives and processes extradition requests from other states, reports mail delays and notes the related safety concerns. Mager Decl. Ex. 34, at ¶ 4-9, ECF 18. She explains that "[i]n most states

[45] Beverly Hudson, Deputy Secretary for Administration at Department of General Services ("DGS") explains how delays regarding incoming and outgoing mail are impacting her office, which oversees "processing of in-bound and outgoing mail on behalf of the Commonwealth." Hudson Decl. at ¶ 4.

[46] See, e.g., Penn. Const., art. I, § 2 titled "Political Powers": "All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness."

there is a 90-day deadline for a Governor's Warrant to be issued in an asylum state . . . If the Governor's Warrant is not issued by the 90-day deadline a fugitive can be released from jail regardless of the crimes with which they have been charged."[47] *Id.* at ¶ 6. Thus, if I issue an injunction with regard only to Plaintiff states, the Commonwealth remains exposed to high-level risks because of mail delays beyond its borders.

Moreover, Plaintiffs' administration of the upcoming election has been and will continue to be frustrated as a result of mail delays. For example, Maine's Secretary of State, which is responsible for administering state and federal elections, has had to respond to reports of delays in a host of ways: "encouraging voters to return absentee ballots as soon as possible after they are received," answering "from voters who say that they do not trust the USPS to deliver their mail in absentee ballots on time," working with "municipal officials to secure funding to partially offset the cost of the installation of secure drop boxes," and activating an on-line website "where voters will be able to track their absentee ballot." Dunlop Decl. at ¶¶ 2, 17-20.

By Defendants' own admission, it is reasonable to conclude that Plaintiff states will have to continue to devote time and resources to addressing these problems even if mail delays in their own states are corrected. According to Robert Justin Glass, Director of the Postal Service's Election Mail Operations:

> [T]he Postal Service has to also be aware that we reach a general national audience, especially one where you're gonna have voters that are currently receiving mail in a state that is not the state in which they're gonna be voting. So you have to take into account that somebody could be living or currently be receiving mail in Pennsylvania, but voting for an election, you know, based in the State of Florida, and there could be completely different sets of laws.

---

[47] See Pa.C.S.A. § 9136; 42 Pa. C.S.A. § 9138; *Com. ex re. Knowles v. Lester*, 321 A.2d 637 (Pa. 1974) (affirming grant of writ of habeas corpus on ground that petitioner had been detained for more than 90 days following his arrest without being presented before court as required by Pennsylvania's Uniform Criminal Extradition Act). The Court explained that the 90-day timeline was meant to allow the governor of the state demanding the fugitive's presence to "forward a requisition to the asylum state." *Lester*, 321 A.2d at 639.

Glass Dep. 118:18-24, 119:1-5.

Ultimately it would be highly impractical to craft a remedy specific to the Plaintiff states based on the Postal Service's operating structure. First, the Postal Service's retail and delivery operations are separated into four geographical areas (Atlantic, Southern, Central, and Western Pacific); mail processing operations are divided into two additional areas (Eastern and Western). Powerpoint AVP Telepresence (June 26, 2020), Courtroom Ex. 54-13.[48] That the Postal Service, by its own admission, cannot account for the way communications around late and extra trips have been interpreted in the field and around the country supports the conclusion that the Postal Service's internal operating structure would be a barrier to ensuring that anything but a nationwide injunction could be effectively implemented. Tr. Prelim. Inj. Teleconference at 64-77, *Jones v. USPS*, No. 20-6516 (S.D.N.Y. Sept. 16, 2020)*..*

Three other district courts have issued national injunctions within the past ten days. *Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557 (E.D. Wa. Sep. 17, 2020); *Jones v. U. S. Postal Serv*., No. 20 Civ. 6516 (VM), 2020 WL 5627002 (S.D.N.Y. Sep. 21, 2020); *State of New York v. Trump* (ECF 20-cv-2340) (D.D.C. Sep. 27, 2020). It is therefore particularly important "to ensure that nationwide relief . . . would not improperly interfere with the litigation of similar issues in other judicial districts." *Califano*, 442 U.S. at 702 (1979). Under the comity doctrine, I have attempted to ensure that the remedy here does not directly conflict. Indeed, this preliminary injunction explicitly incorporates the Order entered by agreement of the parties in *Jones. See California v. U.S. Dep't Health & Human Serv.*, 941 F.3d 410, 421 (9th Cir. 2019) ("to our knowledge, no court has adopted the view that an injunction imposed by one district court against a defendant deprives every other federal court of subject matter jurisdiction over a dispute

---

[48] This document was labeled as "confidential."

86

in which a plaintiff seeks similar equitable relief against the same defendant."). Although the issue of election mail was not presented here as fully as it was in *Jones v. U. S. Postal Serv*, a case brought largely by voters, I am fully incorporating Judge Marrero's Order because the problems created by Defendants' changes in operating procedures affect election mail at every stage of the process, both mailings to voters by states and ballots returned to states. It is necessary to include those aspects of Judge Marrero's Order in order to afford complete relief here.

Again, when "agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n*, 145 F.3d at 1409. In considering the alternatives, it is clear that the "ordinary result" must apply under these circumstances. *Id.*; *see Pennsylvania v. President United States*, 930 F.3d at 575 (affirming district court's decision to apply nationwide injunction). In order to afford the Plaintiffs "complete relief," *Califano*, 442 U.S. at 702, a nationwide injunction is needed.

An appropriate Order follows.

   /s/ Gerald Austin McHugh
United States District Judge