**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br><br>    Plaintiff,<br><br>v.<br><br><br>UNITED STATES POSTAL SERVICE, *et al.*,<br><br>    Defendants. | No. 20-cv-2295(EGS) |

**MEMORANDUM OPINION**

I.   **Introduction**

Plaintiff, the National Association for the Advancement of Colored People ("NAACP") filed this lawsuit against Defendants the United States Postal Service ("USPS" or "Postal Service") and Louis DeJoy ("Mr. DeJoy"), in his official capacity as Postmaster General of the United States, alleging the following claims: (1) Non-statutory review of unlawful agency action for failure to follow the procedures required by 39 U.S.C. § 3661; (2) Non-statutory review of unlawful agency action that is arbitrary, capricious, and not in accordance with 39 U.S.C. § 101(e); (3) Mandamus to enforce 29 U.S.C. § 3991; and (4) Mandamus to enforce 39 U.S.C. § 101(e). Plaintiff seeks a preliminary injunction with regard to their first and second claims. Upon consideration of Plaintiff's motion, the response,

and reply thereto, the applicable law, and the entire record, the Court **GRANTS** Plaintiff's motion.

## II.  Background

### A.  Statutory and Regulatory Framework

In the Postal Reorganization Act ("PRA"), Public Law 91-375, 84 Stat. 719 (Aug. 12, 1970), Congress replaced the Post Office Department with the Postal Service as "an independent establishment of the executive branch of the Government of the United States, under the direction of a Board of Governors, with the Postmaster General as its chief executive officer." 39 C.F.R. § 1.1. The PRA establishes that the policy of the USPS includes the mandate to "provide prompt, reliable, and efficient services to patrons in all areas and . . . render postal services to all communities." 39 U.S.C. § 101. The PRA also created an independent oversight body for the USPS, the Postal Rate Commission. 39 U.S.C. § 501. Congress passed the PRA to "[i]nsulate" the management of the USPS "from partisan politics  . . . by having the Postmaster General responsible to the [Postal Rate] Commission, which represents the public interest only, for his conduct of the affairs of the Postal Service." H.R. Rep. No. 91-1104, 3660-61 (1970).

In the Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 et seq.), Congress replaced the Postal Rate

Commission with the Postal Regulatory Commission ("PRC" or "Commission") and "strengthened its role." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 340 (D.C. Cir. 2019).

The USPS is responsible for "develop[ing] and promot[ing] adequate and efficient postal services." 39 U.S.C. § 3661(a). "When the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* § 3661(b).

Following the submission of a proposal, "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." 39 U.S.C. § 3661(c).

**B.    Factual Background**

   **1.    The COVID-19 Pandemic and Its Impact on Voting in
           the 2020 Election.[1]**

On March 11, 2020, the World Health Organization ("WHO")

declared a global pandemic as a result of the spread of COVID-

19. *See* Dr. Tedros Adhanom, *WHO Director-General's Opening*

*Remarks at the Media Briefing on COVID-19* (Mar. 11, 2020),

https://www.who.int/dg/speeches/detail/who-director-general-s-

opening-remarks-at-the-media-briefing-on-covid-19---11-march-

2020. On March 13, 2020, President Donald J. Trump declared a

national emergency as a result of the outbreak. Proclamation No.

9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020).

   The virus that causes COVID-19 is highly contagious, is

believed to spread mostly from person-to-person when people are

in within six feet of each other, and may be spread by people

who are not showing symptoms of the virus. *See* Centers for

Disease Control, *Coronavirus Disease 2019 (COVID-19): How to*

*Protect Yourself and Others* (last updated Sep. 11, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-

---

[1] The Court takes judicial notice of documents and information on
official government websites. Fed. R. Evid. 201(b)(2); *see also*
*Western Watershed Project v. Bernhardt*, 2020 WL 3402379, * 3 n.4
(D.D.C. June 19, 2020). The Court takes judicial notice of
certain information at the World Health Organization website,
the Johns Hopkins University website, and the Mayo Clinic
website which is "not subject to reasonable dispute" because
they are "sources whose accuracy cannot be reasonably
questioned." Fed. R. Evid. 201(b)(2).

sick/prevention.html. Symptoms range from mild to severe. *See* Mayo Clinic, *Coronavirus Disease 2019 (COVID-19), Symptoms and Causes* (updated Sep. 11, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963. Older people and people with existing chronic medical conditions have a higher risk of serious illness from COVID-19. *Id.* Such chronic medical conditions include "serious heart disease . . . , cancer, chronic obstructive pulmonary disease, type 2 diabetes, severe obesity, chronic kidney disease, sickle cell disease, and weakened immune system from solid organ transplants." *Id.* COVID-19 can result in severe medical complications including "pneumonia and trouble breathing, organ failure in more than one organ, heart problems, acute respiratory distress syndrome, blood clots, acute kidney injury, and additional viral and bacterial infections." *Id.* A disproportionate number of black people have been infected and killed by the disease. The COVID Tracking Project, *The COVID Racial Data Tracker*, https://covidtracking.com/race.

As of October 10, 2020, just over one million people worldwide, and 214,004 Americans have died from COVID-19. *See* Johns Hopkins University, Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html. Also as of October 6, 2020, over 37 million people worldwide have been infected, with

the United States having more infections than any other country, with just over seven and a half million infections. *Id*.

In light of the COVID-19 pandemic, the Centers for Disease Control and Prevention ("CDC") has provided guidance to voters and election polling locations to prevent the spread of the disease, including recommending "a wide variety of voting options . . . such as alternative voting options that minimize contact." *See* CDC, *Coronavirus Disease 2019 (COVID-19): Considerations for Election Polling Locations and Voters, Interim Guidance to Prevent Spread of Coronavirus Disease 2019 (COVID-19)* (last updated June 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html. Consistent with this guidance, states have enacted temporary changes for the 2020 election including expanding the ability to vote by mail. Nat'l Conference of State Legislatures, COVID-19 and Elections, (last updated Oct. 2, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-mail-voting-policies-in-effect-for-the-2020-election.aspx.

## 2. USPS Implements Changes that Lead to Nationwide Mail Delays

The key changes that Plaintiff challenges are the prohibition on "late trips" and "extra trips" (collectively

"Transportation Policy Changes")[2] announced on July 10, 2020.[3] Reply, ECF No. 25 at 9.[4] Defendants have since clarified that late or extra trips are not "banned"; however, they acknowledge that they continue "at a reduced level" that began in July 2020. Suppl. Cintron Decl., ECF No. 24-3 ¶ 4. By August 13, 2020, the USPS had reduced the number of late trips by 71 percent. Email from Mr. DeJoy to All Employees ("August 13, 2020 Email"), Aug. 13, 2020, ECF No. 25-1. Mr. DeJoy acknowledged that the "transformative initiative has had unintended consequences that impacted our overall service levels." *Id.* at 2. On September 21, 2020, USPS issued "Operational Instructions" providing that "transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments." Ex. 1 to Notice Suppl. Material, ECF No. 29-1 at 4.

---

[2] "Late trips" and "extra trips" have been employed by the USPS to "complete timely mail delivery." Ex. 1 to Notice Suppl. Material, ECF No. 29-1 at 4.

[3] Plaintiff originally challenged changes in addition to the Transportation Policy Changes, *see* Mem. in Supp. of Mot. for Prelim. Inj. ("Mot."), ECF No. 8-1 at 22-23; but clarified that they challenge the Transportation Policy Changes, *see* Reply, ECF No. 25 at 9.

[4] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

It is undisputed that the USPS did not seek an advisory opinion pursuant to 39 U.S.C. § 3661(b) from the PRC prior to implementing these changes.

### C.   Procedural Background

Plaintiff filed this lawsuit on August 20, 2020. On September 1, 2020, Plaintiff filed a motion for a preliminary injunction, which requests that the Court enjoin Defendants from enforcing certain USPS policies and practices. *See* Mem. in Supp. of Mot. for Prelim. Inj. ("Mot."), ECF No. 8-1. Defendants filed their opposition on September 11, 2020. *See* Defs.' Opp'n Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 21. Plaintiff filed its reply brief on September 16, 2020. *See* Pls.' Reply ("Reply"), ECF No. 25. The motion is ripe for the Court's consideration.

## III. Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A

preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council,* 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC,* 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley,* 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.") (quotation marks omitted). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the

less rigorous sliding-scale analysis." *ConverDyn v. Moniz,* 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

## IV. Analysis

Plaintiff argues that it is likely to succeed on the merits of its Section 3661(b) claim because "Congress has mandated that before implementing changes that have a nationwide impact on mail delivery, the Postal Service must provide an opportunity for public comment and seek an advisory opinion from the [PRC]." Mot., ECF No. 8-1 at 13. Plaintiff further argues that in rushing to make the Transportation Policy Changes, "Defendants failed to consider key statutory objectives about reliable mail service and the need to give the highest consideration to delivery [of] important mail, including ballots and checks . . . and failed to consider the adverse impact on timely delivery of medications" which they contend is inconsistent with the mandate set forth in Section 101. *Id.*

Defendants respond that Plaintiff lacks Article III standing, that district courts lack subject matter jurisdiction over Section 3661 claims, that the *ultra vires* doctrine does not provide for judicial review here, and that Plaintiff's claim that defendants' failure to comply with Section 101(e) was arbitrary and capricious cannot be brought. Defs.' Opp'n, ECF No. 21 at 33-38, 39-43, 43-49, 49-51.

A. **Plaintiff Is Likely To Succeed On The Merits Of Its 39 U.S.C. § 3661(b) Claim**

1. **Plaintiff Likely Has Standing to Bring this Challenge**

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "These requirements apply whether an organization asserts standing to sue, either on its own behalf, or on behalf of its members." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). "Standing to seek . . . forward-looking injunctive relief requires [Plaintiff] to show [that it] is suffering an ongoing injury or faces immediate injury. For a future injury, that means submitting evidence showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (internal quotation marks, citations, and alterations in original omitted).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561

11

(citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id*.

Defendants argue that Plaintiff fails to demonstrate injury to its members or to itself as an organization. "First, the fact that one of the Plaintiff's members [Mr. Earl Graham, a disabled veteran] allegedly has been harmed by delayed mail in the past does not entitle Plaintiff to standing now, at least when it is seeking forward-looking injunctive relief" because Defendants have provided "evidence that mail delays have been mitigated" and so "there is no basis to conclude that this purported injury is likely to recur." Defs.' Opp'n, ECF No. 21 at 34-35 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 107-108, 1983). However, Mr. Graham has described persisting mail delays. Decl. of Earl Graham,[5] ECF No. 8-3 ¶ 6 ("Before this summer, my mail-order medications would arrive generally a few days after my doctor approved any prescription. Since mid-July, however, my medications have taken much longer to arrive, including sometimes arriving one week or longer after my doctor has

---

[5] Earl Graham is a member of the NAACP.

approved prescriptions."); Second Decl. of Earl Graham, ECF No. 25-2 ¶ 2 ("The delays I discussed have continued since I submitted by August 28, 2020 declaration.); ¶ 3 ("A week [after an August 25, 2020 teleconference appointment with a Veterans Affairs doctor] the medicine approved by my doctor during my August 25, 2020, teleconference appointment still had not arrived. Without the medication, I began experiencing serious pain."); ¶¶ 5-6 (explaining that he was eligible to be sent medication through express mail due to the seriousness of the pain he was experiencing and that he received the medication sent via express mail within two days); ¶ 6 ("By the time the delayed medication arrived, it had been almost two weeks since my August 25, 2020 teleconference appointment."). As Plaintiff has provided evidence of continuing mail delays, Defendants' reliance on *City of L.A.* for the proposition that the alleged injury is unlikely to recur is misplaced. In that case, the Supreme Court observed that "five months had elapsed between [the traffic stop resulting in a chokehold] and the filing of the complaint, yet there was no allegation of further unfortunate encounters between [Mr.] Lyons and the police." *City of Los Angeles*, 461 U.S. at 108. Here, Plaintiff has provided evidence demonstrating that mail delays persist.

As part of this argument, Defendants contend that the Complaint does not allege what exactly caused the mail delays.

Defs.' Opp'n, ECF No. 21 at 34-35. However, Defendants' own
evidence demonstrates that Mr. DeJoy has acknowledged that the
Transportation Policy Changes caused mail delays. *See* Ex. 5, Tr.
of Senate Homeland Security and Governmental Affairs Comm. Hr'g
on USPS Operations During COVID-19 and the Elections, Aug. 21,
2020, ECF No. 21-1 at 104 (Mr. DeJoy stating that the reduction
in late trips resulted in mail delays); *Id*. at 309, (Mr. DeJoy
stating that "[w]e are very concerned with the deterioration and
service and are working very diligently."); *Id*. at 323 (Mr.
DeJoy stating that "[o]ur recovery process is taking too long.
This should have been resolved in a couple of—in a few days and
it's-it's not."); *Id*. at 350 (Mr. DeJoy stating that "I think
there is a lot of different issues going on within the country
that are—impact mail delay, including the actions that we took
with regard to transportation."); August 13, 2020 Email, ECF No.
25-1 at 4 ("Unfortunately, this transformative initiative has
had unintended consequences that impacted our overall service
levels.")

Second, Defendants argue that Plaintiff's members' concerns
about future mail delays impacting their ability to vote fails
to establish standing because future injury must be "certainly
impending." Defs.' Opp'n, ECF No. 21 at 35 (quoting *Clapper v.
Amnesty Int'l USA*, 568 U.S. 398, 409 (2010)). Defendants contend
that "the Postal Service has numerous policies and practices

14

designed to ensure that ballots will be timely delivered before the election," that it is within Plaintiff's members' control to timely mail their ballots, and so their injury is speculative. *Id*. However, Defendants are incorrect to assert that standing to obtain injunctive relief requires the injury to be "certainly impending." Rather, "[s]tanding to seek . . . forward-looking injunctive relief requires [Plaintiff] to show [that it] is suffering an ongoing injury or faces immediate injury. For a future injury, that means submitting evidence showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Pres. Office*, 949 F.3d at 13 (internal quotation marks, citations, and alterations in original omitted). Accordingly, as explained above, Plaintiff has demonstrated that its members face a "substantial risk that the harm will recur" and has demonstrated injury to its members.

Third, Defendants contend that Plaintiff alleges issue advocacy harm, which is insufficient to establish organizational standing. Defs.' Opp'n, ECF No. 21 at 35-37. Plaintiff responds that it has provided evidence demonstrating that because of the impact of the mail delays, it is "diverting resources away from its ordinary voter registration activities, voter protection activities, and education activities designed to promote voter turnout" which pursuant to *League of Women Voters v. Newby*, 838

F.3d 1 (D.C. Cir. 2016), constitutes irreparable injury. Reply, ECF No. 25 at 30.

The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") recently articulated the test for determining whether an organization satisfies the "irreparable harm" prong:

> An organization is harmed if the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (explaining that the initial question is whether "a defendant's conduct has made the organization's *activities* more difficult"). If so, the organization must then also show that the defendant's actions "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430. The second step is required to ensure that organizations cannot engage in activities simply to create an injury. *Id.*

*League of Women Voters*, 838 F.3d at 8. "Irreparable harm" is a higher burden than that necessary to establish Article III standing. *Nat. Res. Def. Council, Inc. v. EPA*, 383 F. Supp. 3d 1, 11 (D.D.C. 2019) ("'an identifiable trifle is enough for standing'") (quoting *United States v. Students Challenging Reg'y Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)).

Plaintiff has provided evidence demonstrating that it "has established a civic engagement program, which is designed to encourage citizens to be fully engaged in the democratic

16

process, and to raise awareness for political, educational, social and economic equality for communities of color in the electoral and legislative process. . . [T]he program seeks to increase turnout among Black voters in federal, state, and local elections." Decl. of Carmen Watkins,[6] ECF No. 8-2 ¶¶ 2, 6. Plaintiff has also demonstrated that Defendants' actions have "made the organization's activities more difficult," *League of Women Voters*, 838 F.3d at 8 (citation omitted); because Plaintiff has explained that needing to address the impact of the mail delays is causing it to "divert[] resources from the regular activities of the NAACP's civil engagement program," which includes "registering voters, contacting registered voters to ensure that they have accurate voting information and encouraging them to vote, organizing events to get out the vote, and conducting voter protection activities during early voting." *Id*. ¶ 11.

Next, Plaintiff must show that "the defendant's actions 'directly conflict with the organization's mission'" in order "to ensure that organizations cannot engage in activities simply to create an injury." *League of Women Voters*, 838 F.3d at 8. Plaintiff's civic engagement program is clearly part of its mission "to ensure the political, educational, social, and

---

[6]  Carmen Watkins is the Interim Vice President of Field Operations for the NAACP.

economic equality of all persons and to eliminate race-based discrimination." Watkins Decl., ECF No. 8-2 ¶ 2. And as stated above, the civic engagement program includes "registering voters, contacting registered voters to ensure that they have accurate voting information and encouraging them to vote, organizing events to get out the vote, and conducting voter protection activities during early voting." *Id.* ¶ 11. Accordingly, Plaintiff has provided evidence demonstrating that to Defendants' actions "directly conflict with [its] mission" because it has needed to divert resources from the civic engagement program to instead "organize transportation for voters to drop off their absentee ballots" in various states. *Id.* ¶¶ 8, 9, 10, 12.

Defendants fail to distinguish *League of Women Voters* in their opposition brief and the authorities they point to support Plaintiff's ability to satisfy "irreparable harm," a higher burden than that necessary to establish Article III standing. Plaintiff has provided evidence that due to mail delays caused by Defendants' action, they have needed in the past and will need in the future to divert resources from their civic engagement program to organize transportation to ensure that votes are counted. This constitutes a "drain on the organization's resources"; not simply a "setback to the organization's abstract social interests." *Nat'l Ass'n of Home*

*Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). Similarly, Plaintiff's provision of services through its civic engagement program demonstrates that it does not engage solely in "pure issue-advocacy." *Ctr. for Law & Educ v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005). Rather, Plaintiff's activities are more akin to those of Housing Opportunities Made Equal ("HOME"), which the Supreme Court held had standing in *Havens Realty Corp. v. Coleman*. In so holding, the Supreme Court stated:

> If, as broadly alleged, petitioner's steering practices have perceptibly impaired HOME's ability to providing counseling and referral services for low-and moderate-income home seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities–with the consequent drain on the organization's resources— constitutes far more than simply a setback to the organization's abstract social interests.

455 U.S. at 379. Similarly, here Plaintiff has provided evidence demonstrating how mail delays are causing it to divert resources from its usual civic engagement activities, which is distinguishable from the situation in *Int'l Acad. Of Oral Medicine & Toxicology v. FDA*, 195 F. Supp. 3d 243 (D.D.C. 2016), where the Plaintiff failed to explain how the agency action "forced it to divert or modify its activities in any meaningful way from its standard programmatic efforts." *Id*. at 259.

For all of these reasons, Plaintiff has provided evidence "showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Pres. Office*, 949 F.3d at 13.

Finally, Defendants argue that "Plaintiff cannot establish causation or redressability because it seeks to enjoin changes that have not occurred." Defs.' Opp'n, ECF No. 38. Specifically, Defendants argue that "the only specific change that was actually implemented was additional guidance on complying with long-established transportation schedules by departing on time and thus mitigating extra trips." *Id.* This, however, is precisely what Plaintiff challenges. Reply, ECF No. 25 at 9, 19-21.

For all of these reasons, Plaintiff has demonstrated that it likely has standing to bring its claims on behalf of its members and itself as an organization.

### 2.   This Court Likely Has Subject Matter Jurisdiction Over The Section 3661 Claim

Defendants contend that this court lacks subject matter jurisdiction over "complaints regarding" Section 3661 because such complaints must first be made to the PRC and then to the D.C. Circuit. Defs.' Opp'n, ECF No. 21 at 39. The statutory scheme provides as follows. 39 U.S.C. § 409(a) provides that "[e]xcept as otherwise provided in this title, the United States

district courts shall have original but not exclusive
jurisdiction over all actions brought by or against the Postal
Service." One of the exceptions to this original jurisdiction is
set forth in 39 U.S.C. § 3662, which provides that "[a]ny
interested person . . . who believe[s] the Postal Service is not
operating in conformance with the requirements of a provision of
. . . this chapter (or regulations promulgated under any of
these provisions) may lodge a complaint with the [PRC] . . ."
Section 3662(b) requires the PRC to respond to the complaint
within 90 days and provides that if a complaint is not timely
responded to, a petition for review may be filed with the D.C.
Circuit, which also has jurisdiction to review final orders or
decisions of the PRC.

Plaintiff's complaint alleges a procedural violation—that
the USPS failed to comply with the requirement that "[w]hen the
Postal Service determines that there should be a change in the
nature of postal services which will generally affect service on
a nationwide or substantially nationwide basis, it shall submit
a proposal, within a reasonable time prior to the effective date
of such proposal, to the Postal Regulatory commission requesting
an advisory opinion on the change." 39 U.S.C. § 3661.

Defendants contend that "[c]ourts have repeatedly held that
39 U.S.C. §§ 3662 and 3663 constitute the exclusive
jurisdictional remedy for complaints about postal services that

fall within the statutory provisions specifically identified in [S]ection 3662." Defs.' Opp'n, ECF No. 21 at 40. However, defendants have provided no mandatory authority to support their assertion that Sections 3662 and 3663 constitute the exclusive jurisdictional remedy for a claim that the USPS has failed to comply with the procedural requirements set forth in Section 3661. Indeed, Plaintiff points out that none of the cases cited by defendants "concerns a failure to follow the procedural requirements of [S]ection 3661" but rather "considered a complaint about Postal Service prices and the manner in which the Postal Service provides delivery services." Reply, ECF No. 25 at 12.

"Whether a statute is intended to preclude initial judicial review is determined by the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 307 (1994) (internal citation omitted). The language of the statute is broad:  "[a]ny interested person . . . who believe[s] the Postal Service is not operating in conformance with the requirements of a provision of  . . . this chapter (or regulations promulgated under any of these provisions) may lodge a complaint with the Postal Regulatory Commission . . ." 39 U.S.C. § 3662. This could certainly be read to mean that the failure of the USPS to comply with the

procedural requirement set forth in Section 3661 would be encompassed by Section 3662. Plaintiff argues that the use of the permissive "may" in Section 3662 coupled with the mandatory phrasing "shall" in Section 3662(c) shows Congress did not intend to limit jurisdiction over Section 3661 claims. *See* Reply, ECF No. 25 at 10. The statute consistently uses the word "may" when setting forth the procedure for filing complaints and for seeking appellate review of the PRC's determination (or failure to make a determination): any interested person "may" lodge a complaint with the PRC, and if the interested person is unsatisfied with the response or does not receive a timely response, they "may" file a petition with the D.C. Circuit. 39 U.S.C. §§ 3662(a), 3663. The use of the permissive "may" coupled with the use of the mandatory "shall" suggests that Sections 3662(a) and 3663 were not intended to be the exclusive avenue for bringing a procedural challenge to the USPS's failure to comply with Section 3661. *See Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1828 (D.C. Cir. 1973) ("[T]he permissive interpretation is conclusively proven to be correct  [together with the particular legislative history] by the fact that when in the same statute Congress intended a mandatory direction it used the auxiliary 'shall' not 'may'-a contrast which is generally significant . . . ."). This interpretation is strengthened because the statute expressly provides that this

Court has original jurisdiction "over all actions brought by or against the Postal Service" unless "otherwise provided in [title 39]." 39 U.S.C. § 409(a).

The availability of judicial review for the USPS's failure to comply with Section 3661 is consistent with the legislative history of the PRA. In the discussion of the section of the PRA that established the "procedures for changes in postal service," the House Committee Report states that "[t]he postal service is—first, last, and always—a public service" and that the PRA "require[s] [Postal Services management] to seek out the needs and desires of its present and potential customers—the American public." H.R. Rep. No. 91-1104 at 3668. The Committee Report describes provisions in the act that "contain[] specific provisions requiring justification and review of changes in service." *Id.*; *see Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 263 n.6 (5th Cir. 1975) ("[T]he procedures mandated by 3661 are sufficiently elaborate to amount to a significant impediment in the path of the decision-making process of the Postal Service.").

The Court must also consider whether the claim may be reviewed because there is no other meaningful or adequate avenue for judicial review. *See Thunder Basin Coal Co.*, 510 U.S. at 307. District court jurisdiction may not be implicitly precluded based on consideration of the following factors: (1) if "'a

finding of preclusion could foreclose all meaningful judicial review'"; (2) if the claim is "'wholly collateral to a statute's review provisions'"; and (3) if the claims are "'outside the agency's expertise'" to discern "whether the particular claims at issue fall outside an overarching congressional design."[7] *Jaresky v. SEC*, 803 F.3d 9, 17 (D.D.C. 2015) (quoting *Free Enter. Fund v. Pub. Company Acct. Oversight Board*, 561 U.S. 477, 489-90 (2010). Mindful of the fact that there is a 90-day window for the PRC to respond to a complaint brought pursuant to Section 3661, Defendants contend that it does not matter that the PRC cannot provide immediate relief because eventual relief is sufficient as a matter of law. Defs.' Opp'n, ECF No. 21 at 43 n.11. However, the authority upon which Defendants rely is inapposite. In *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.D.C. 2019), the court held that meaningful judicial review was not foreclosed because Plaintiffs were unable to obtain "pre-implementation review of executive orders or immediate relief barring all agencies from implementing the executive orders," *Id.* at 755 (internal quotation marks omitted); because there the parties agreed to consolidate their preliminary injunction requests with the

---

[7] Defendants' assertion that the three factors must be met is incorrect. *See Jaresky v. SEC*, 803 F.3d 9, 17 (D.D.C. 2015).

merits, *see* Scheduling Order, Civil Action No. 18-1261, ECF No. 16 at 1.

With regard to the first consideration—whether Plaintiff would be denied meaningful review—it is clear that it would. There is no dispute that the USPS did not comply with Section 3661 in implementing the Transportation Policy Changes, and Plaintiff has provided evidence demonstrating that the changes have resulted in mail delays which cause Plaintiff's members and Plaintiff as an organization harm. *See supra* IV.A.1. Accordingly, even if there was a "fairly discernible" intent in the statutory scheme to preclude district court jurisdiction, requiring Plaintiff to go through the PRC process would deny it meaningful review. *See Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th Cir. 2018) (noting that "plaintiffs are denied meaningful review when they are subject to some additional and irremediable harm beyond the burdens associated with the dispute resolution process" (internal quotation marks and citations omitted)); *Krescholleck v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996) (noting that the plaintiff had "alleged a sufficiently serious irreparable injury to lead us to conclude that the administrative review process is insufficient to afford him full relief"). And persuasive authority holds that this factor is the "most important." *Berkley*, 896 F.3d at 630. Accordingly, this first factor weighs in favor of finding

Congress intended district courts to have jurisdiction over claims such as the one brought by Plaintiff. The second consideration–whether the claim is wholly collateral to the statutory scheme—is "'related' to whether 'meaningful judicial review' is available, and the two considerations are analyzed together." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 758 (D.C. Cir. 2019) (quoting *Jarskey*, 803 F.3d at 22.) The question to ask is "whether the plaintiffs 'aimed to obtain the same relief they could seek in the agency proceeding.'" *Id.* at 758-60 (quoting *Jarskey*, 803 F.3d at 23). Here, the relief Plaintiff seeks cannot be meaningfully redressed through filing a Section 3662 complaint.

The third consideration is whether the claim is "beyond the expertise" of the PRC. Plaintiff's claim is that the USPS failed to comply with the procedural requirement set forth in Section 3661. This procedural claim does not require the "agency expertise" the statutory procedures contemplate. *Berkley*, 896 F.3d at 630. Accordingly, precluding district court jurisdiction here would completely deny Plaintiff meaningful review given the timing of the implementation of the Transportation Policy Changes.

For all these reasons, the Court likely has subject matter jurisdiction over Plaintiff's Section 3661(b) claim. *See Commonwealth of Pennsylvania v. DeJoy,* Civil Action No. 20-4096,

2020 WL 5763553, *22 (E.D. Pa. Sept. 29, 2020) (stating that "Congressional intent to preclude district courts from hearing claims relating to [S]ection 3661(b) is not fairly discernible from the text, structure, and legislative history of the PRA.").

### 3. Plaintiff's Section 3661(b) Claim Is Likely Reviewable Pursuant To The *Ultra Vires* Doctrine

While as a general matter "the Postal Service is exempt from review under the Administrative Procedure Act, . . . its actions are reviewable to determine whether it has acted in excess of its statutory authority." *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012). "The scope of Non-APA review is narrow . . . [and] is available only to determine whether the agency has acted *ultra vires*—that is whether it has exceeded its statutory authority." *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016) (quotation marks and citations omitted).

Defendants contend that *ultra vires* review is unavailable because: (1) Plaintiff cannot show that USPS acted "in excess of its delegated powers and contrary to a specific prohibition" because they cannot show that USPS violated Section 3661(b); and (2) Plaintiff has a "meaningful and adequate means of vindicating [their] statutory rights" because they can file a complaint with the PRC pursuant to Section 3662. Defs.' Opp'n, ECF No. 21 at 44 (citing *Nat'l Air Traffic Controllers Ass'n*

*AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1258 (D.C. Cir. 2006) (internal quotation marks and citations omitted)).

The Court is persuaded that Plaintiff's claim is reviewable:

> "Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction." *Griffith v. FLRA,* 842 F.2d 487, 492 (D.C. Cir. 1988) (citing the leading case, *Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 183-84, 3 L. Ed. 2d 210 (1958) (finding judicial review proper despite statutory preclusion of judicial review, where the NLRB acted "in excess of its delegated powers and contrary to a specific prohibition" in the NLRA)).

*Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d 116, 1172-73 (D.C. Cir. 2003). Plaintiff's claim here is that the USPS failed to comply with the requirement Congress set forth in Section 3661. Accordingly, Plaintiff's claim "clearly admit[s] of judicial review." *Id.* at 1173.

### 4.   USPS Likely Failed to Comply with Section 3661(b)

The scope of non-APA review includes, among other things, "a straightforward question of statutory interpretation." *Nat'l Ass'n of Postal Sup'rs v. U.S. Postal Serv.*, 602 F.2d 420, 432 (D.C. Cir. 1979). In conducting this review, "[t]he judicial role is to determine the extent of the agency's delegated authority and then determine whether the agency has acted within

that authority. In this as in other settings, courts owe a measure of deference to the agency's own construction of its organic statute, but the ultimate responsibility for determining the bounds of administrative discretion is judicial." *Id*. at 432-33 (internal citations omitted).

Section 3661(b) provides that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."

Persuasive authority has construed Section 3661(b) as follows:

> The language of the statute . . . indicates that three factors must coexist before 3661 applies. First, there must be a 'change.' This implies that a quantitative determination is necessary. There must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661. Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered. Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved. These three factors combine to demonstrate that Congress intended the safeguards of 3661 to apply only when changes of significance were contemplated.

*Buchanan v. U.S. Postal Service*, 508 F.2d 259, 263 (5th Cir. 1975).

There is no dispute that the USPS did not comply with Section 3661(b) prior to implementing the Transportation Policy Changes. Defendants argue that the Transportation Policy Changes do not implicate Section 3661(b) because: (1) there has been no "meaningful impact on service;" (2) postal services available to the user have not been altered; and (3) the changes have not affected service in a broad geographical area. Defs.' Opp'n, ECF No. 21 at 46 (quoting and citing *Buchanan* 508 F.2d at 263). In support, Defendants argue that "[t]he only notable change USPS has made has been to renew its emphasis on adhering to its published schedule, including developing written guidance clarifying the circumstances under which extra truck trips were acceptable, in order to mitigate the number of unplanned and unnecessary trips" which is not a "change" that is contemplated in Section 3661. *Id*. at 46-47. Defendants contend that this "is not a new policy but rather has a renewed focus on ensuring the Postal Service complies with its *existing policies*, and that it operates as efficiently as possible." *Id*. Defendants conclude that this is "precisely the type of management direction to which [S]ection 3661 does not apply." *Id*. at 47.

The Court is persuaded that Plaintiff is likely to succeed on its claim that Defendants violated Section 3661(b) by failing to submit the Transportation Policy Changes to the PRC. First, it was a "change" because it has had a "meaningful impact on service." *Buchanan*, 508 F.2d at 263. Plaintiff points to evidence showing that the reduction in extra and late trips has resulted in changes to service standards nationwide because it has resulted in nationwide delays. *See supra* at 6-7, 13-14; *see also* August 13, 2020 Email, ECF No. 25-1 at 4 ("We have also reduced extra trips by 71 percent – a tremendous achievement.") Furthermore, Plaintiff has demonstrated that Defendants' position that the Transportation Policy Changes do not constitute a "change" is not supported by the USPS's own statements. *See id.* at 3-4 ("In order to transform . . . we must make a significant number of changes that will not be easy . . . ); *Id.* at 4 ("Unfortunately, this transformative initiative has had unintended consequences that impacted out overall service levels. However, recent changes are not the only contributing factors."); *Id.* ("I ask that you bear with me while we work through these changes to transform for the better . . .").

Second, the changes were "in the nature of postal services," 39 U.S.C. § 3661(b) because they qualitatively altered "the manner in which postal services [are] available to the user," *Buchanan*, 508 F.2d at 263. As stated above, Plaintiff

points to evidence showing that the reduction in extra and late trips resulted in nationwide delays.

Third, the changes affected service "on a nationwide or substantially nationwide basis," 39 U.S.C. § 3661(b) because "[a] broad geographical area [was] involved," *Buchanan*, 508 F.2d at 263. Defendants' own evidence demonstrates that service was affected on a nation-wide basis. *See* Defs.' Ex. 14, ECF No. 21-1 at 452-53 (Mr. DeJoy stating that the reduction in late and extra trips occurred in "[e]very state a truck moves in").

Defendants contend that pursuant to past practice, the types of "nationwide changes that trigger 3661's review are general changes to postal facility hours or service standards for mail delivery"; and not the type of operational change at issue here. *Id*. at 47-49. However, based on the analysis above, the significant reduction in late and extra trips has resulted in a change to service standards.

While it is clear that Congress did not intend for the courts to micromanage the operations of the USPS, requiring the USPS to comply with the statutory requirement that it obtain an advisory opinion from the PRC and provide for notice and comment prior to implementing "a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" is not micro-managing; it is requiring the USPS to act within its statutory authority.

Furthermore, Congress clearly intended Section 3661 to require an opportunity for public participation and for independent review before the USPS implements service changes that will have a broad effect. The broad scope of the Transportation Policy Changes demonstrates on its face that it is precisely the kind of change that is to be the subject of the public-participation and independent review safeguards provided by Section 3661.

Finally, Defendants argue that because Plaintiff has a "meaningful and adequate means of vindicating their statutory rights" by filing a complaint with the PRC and then seek judicial review in the D.C. Circuit if unsatisfied, they cannot establish *ultra vires* jurisdiction. Defs.' Opp'n, ECF No. 21 at 44. Plaintiff responds—and the Court agrees—that the PRC complaint process, even if it is available for their procedural challenge, would not redress its injury due to the timeframes involved. Reply, ECF No. 25 at 18. Because the Court finds that Plaintiff has shown it will likely succeed on its claim that Defendants' Transportation Policy Changes likely violated 39 U.S.C. § 3661(b), the Court need not evaluate Plaintiff's claim that Defendants acted arbitrarily, capriciously, and contrary to the mandate of Section 101(e) at this time.

C.    **Plaintiff Faces Irreparable Harm**

"In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted). Furthermore, an organization faces irreparable harm where (1) the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs," *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quoting *Fair Emp't Council of Greater Wash.*, 28 F.3d at 1276), and (2) "the defendant's actions 'directly conflict with the organization's mission," *id.* (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

With regard to the irreparable harm to its members, Plaintiff argues and submits evidence demonstrating that the "changes that USPS implemented without following the required [S]ection 3661 process have caused delays that harm, and will continue to harm, NAACP members." Mot., ECF No. 8-1 at 38. Defendants counter first, that there is no procedural injury

because "Plaintiff cannot state a claim under [S]ection 3661 and thus cannot have suffered any procedural injury as a result of any violation of that statute." Defs.' Opp'n, ECF No. 21 at 52. However, the Court has determined that Defendants likely violated Section 3661(b). *See supra* Section IV.A.4. And a failure to comply with Section 3661(b) is sufficient to show irreparable harm. *See Buchanan*, 375 F. Supp. 1014, 1022 (N.D. Ga. 1974) ("The denial of . . . a [Section 3661] hearing, should one be required, is sufficient irreparable injury to support interlocutory injunctive relief, for it is clear that no hearing will be conducted and that the changes will continue unless enjoined.") *aff'd in relevant part*, 508 F.2d at 266 (stating that the district court "was correct in its determinations that plaintiffs had properly established that there was a substantial threat of irreparable injury"). Second, Defendants counter that "Plaintiff has not identified that its members are likely to suffer any injuries in terms of the potential future delay of their ballots" in light of the USPS's service improvements, noting that all Mr. Graham has to do is "mail[] his ballot a reasonable time before the election (which is approximately two months away)." Defs.' Opp'n, ECF No. 21 at 52. However, Mr. Graham's ability to return his ballot on time is not wholly within his control as the mailing of ballots is a matter of state law. *See supra* Section II.B.1 Furthermore, Plaintiff has

demonstrated that mail delays have persisted. *See generally* Second Decl. of Earl Graham, ECF No. 25-2.

With regard to irreparable harm to Plaintiff as an organization, Plaintiff argues and submits evidence demonstrating that "the delays caused by the Postal Service's changes have harmed, and continue to harm, the NAACP itself by frustrating its mission and requiring it to divert resources to counteract the effect of USPS's action." Mot., ECF No. 8-1 at 39-40. Defendants counter that Plaintiff's claimed injury to its resources fails because "Plaintiff has not established that mail delays were necessarily the result of the challenged policies, or that future delays, if there are any, would be the result of these Postal Service operational changes," Defs.' Opp'n, ECF No. 21; and that in view of the steps USPS has taken to improve service performance, Plaintiff cannot show that "future harm is imminent or likely to recur," *id.* at 53. However, the Court has already determined that Plaintiff as an organization has demonstrated irreparable harm. *See* supra at 15-20.

Accordingly, both Plaintiff's members and Plaintiff as an organization face irreparable harm absent a preliminary injunction.

### D.   The Balance Of Equities And Public Interest Favor An Injunction

The balance-of-equities factor directs the Court to "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'" *ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.*; *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast, the balance of equities may favor a preliminary injunction that serves only "'to preserve the relative positions of the parties until a trial on the merits can be held.'" 64 F. Supp. 3d 195, 205 (D.D.C. 2014) (quoting *Camenisch*, 451 U.S. at 395). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest,' *Winter*, 555 U.S. at 26." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).

Plaintiff argues that, as it explained in its argument that it has standing to bring its claims, without an injunction, "the NAACP and its members will suffer serious and immediate harms that could not be sufficiently remedied later . . . [and that] the Postal Service would not be harmed by an order requiring it to follow the law, and the public interest is served when administrative agencies comply with their statutory obligations," noting that "[t]his point applies fully to procedural obligations imposed by statute." Mot., ECF No. 8-1 at 41-42. Plaintiff also notes that "the public would not be harmed (to the contrary) by the restoration of reliable postal service, providing the timely delivery of medicines and checks and other important mail." *Id.* at 42.

Defendants fail to respond to Plaintiff's arguments, responding only that they are "undertaking extensive efforts to facilitate the timely delivery of Election Mail" and that "Plaintiff's member voters have an opportunity to avoid any harm by mailing in their ballots without delay." Defs.' Opp'n, ECF No. 21 at 54. Defendants also contend that ensuring "full compliance could [inappropriately] require the Court to act as an overseer of the agency's day-to-day activities." *Id*.

The balance of the equities and the public interest favor an injunction. First, Defendants identify no harms to themselves whereas Plaintiff has demonstrated serious, immediate, and

recurring harms to its members and to itself as an organization. Defendants' suggestion that an injunction could require the Court to oversee the USPS's "day-to-day activities" is without merit given that the Court will issue a targeted preliminary injunction enjoining the USPS from implementing the Transportation Policy Changes. Second, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994).

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion for a preliminary injunction. Any request to stay this decision pending appeal will be denied for substantially the same reasons as those articulated in this Opinion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**            United States District Judge**
**            October 10, 2020**