UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 20-cv-2295 (TSC) |
| UNITED STATES POSTAL SERVICE, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION TO ENFORCE AND MONITOR COMPLIANCE WITH PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED BRIEFING AND HEARING**

The above-captioned Plaintiff respectfully seeks relief from this Court to compel and monitor compliance with the Court's preliminary injunctions barring Defendants from continuing to enforce the policy changes that have caused a dramatic drop in the number of late and extra trips (the "July 2020 Policy Changes").[1] In light of Defendants' failure to clearly reverse those policy changes, Plaintiff seeks the prompt production of data to assess Defendants' compliance and a hearing on Tuesday, October 27—a week before Election Day—to address additional equitable relief that may be necessary. This motion is being filed concurrently in certain related cases pending before this Court.

---

[1] *See* Order, New York v. Trump, 20-cv-2340 (EGS) (hereinafter "*New York*"), (D.D.C. Sept. 27, 2020), ECF No. 51; Order, Vote Forward v. DeJoy, 20-cv-2405 (EGS) (hereinafter "*Vote Forward*") (D.D.C. Sept. 28, 2020), ECF No. 31; Order, Richardson v. Trump, 20-cv-2262 (EGS) (hereinafter "*Richardson*"), (D.D.C. Oct. 8, 2020), ECF No. 64; Order, NAACP v. USPS, 20-cv-2295 (EGS) (hereinafter "*NAACP*"), (D.D.C. Oct. 10, 2020), ECF No. 31 (collectively, the "Parallel Litigation").

1

For several weeks, Defendants failed to take *any* action in response to the Court's orders, the first of which was issued on September 27, because they believed "there wasn't anything to change." Defendants' data confirms their non-compliance. Through October 15, the most recent date for which Defendants have produced data, the number of late and extra trips has remain depressed, far *below* the levels that predated the July 2020 Policy. Likewise, as of the week of October 3, on-time service scores remain several points *below* the pre-July level. And although Defendants belatedly issued some additional communications to the field in the last few days—none of which unequivocally rescinds the July 2020 guidelines that curtailed the use of late and extra trips—they have rejected Plaintiff's request for daily data reporting on service scores and late and extra trips, which is critical to evaluating the effect of these recent communications. Defendants object on burden grounds, but the type of data Plaintiff seeks is consistent with what Defendants have shown the ability to generate. Moreover, given Defendants' foot-dragging and failure to clearly reverse the July 2020 Policy Changes, they cannot reasonably complain about the inconvenience of having to demonstrate their compliance. Furthermore, producing this data is consistent with Defendants' own stated interests—ensuring timely delivery of Election Mail

There are less than two weeks until Election Day. Every day until then, hundreds of thousands of voters will be seeking to obtain and return their election ballots. There is an urgent need for prompt action to remedy Defendants' failure to comply with the Court's injunction and to ensure that the unlawful July 2020 Policy Changes have not compromised the timely delivery of mail. Plaintiff therefore requests that the Court (1) schedule a hearing for **Tuesday, October 27**—one week before Election Day—and (2) require Defendants to produced updated, current data regarding mail delivery timelines no later than 12 hours before that hearing, so that Plaintiff and the Court can assess what further equitable relief is necessary to ensure compliance with the

Court's preliminary injunctions. Plaintiff further requests that the Court order Defendants to produce the same data on a daily basis, going forward.

Plaintiff asks that the Court expedite briefing of this motion, directing Defendants to submit their opposition brief by Friday, October 23 at 5:00 p.m.

## BACKGROUND

### A. The Court Enjoined Defendants' July 2020 Policy Changes Regarding Late and Extra Trips.

Beginning on September 27, 2020, this Court issued a series of preliminary injunctions in four related cases, including this one, challenging certain policy changes implemented by the Defendants in July 2020.[2] The Court found that Defendants' July 2020 Policy Changes aimed at reducing the number of late and extra trips would impose undue burdens on plaintiffs in the four cases, and that absent injunctive relief, plaintiffs faced irreparable harm. *See* Memorandum Opinion, *New York*, 2020 WL 5763775 (D.D.C. Sept. 27, 2020); Memorandum Opinion, *Vote Forward*, 2020 WL 5763869 (D.D.C. Sept. 28, 2020); Memorandum Opinion, *Richardson*, 2020 WL 5969270 (D.D.C. Oct. 8, 2020); Memorandum Opinion, *NAACP*, 2020 WL 5995032 (D.D.C. Oct. 10, 2020). In this case, the Court unequivocally "ORDERED that pursuant to the Order, Defendants are HEREBY ENJOINED from enforcing the Transportation Policy Changes . . ." ECF No. 31 at 1.[3]

In opposing plaintiffs' motions, Defendants insisted that they had not "banned" late and extra trips. *Vote Forward*, ECF No. 21, at 19 n.6; *New York*, ECF. No. 30, at 25; *Richardson*, ECF No. 55, at 19 n.6; *NAACP*, ECF No. 21, at 18 n.6. But they acknowledged that upon discussing the matter with newly-appointed Postmaster General DeJoy, senior executives drafted

---

[2] *See supra* n.1.

[3] This Court entered similar orders in Parallel Litigation. *See supra* n. 1.

3

and distributed a set of "guidelines" regarding the use of late and extra trips. *Vote Forward*, ECF No. 21, at 18–19; *New York*, ECF. No. 30, at 18; *Richardson*, ECF No. 55, at 18; *NAACP*, ECF No. 21, at 18; *see also* Ex. A, *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 156, 183, Rev (Aug. 24, 2020) (DeJoy declared that he made only "one change" in early July: he "asked the team to run the trucks, transportation on time and mitigate extra trips."). And they did not dispute the sharp decline in on-time service scores and late and extra trips that followed the communication of these new guidelines. *See Vote Forward*, ECF No. 21, at 19–20; *New York*, ECF. No. 30, at 19; *Richardson*, ECF No. 55, at 19; *NAACP*, ECF No. 21, at 18–19.

The Court's decision acknowledged Defendants' position that "late or extra trips are not 'banned,'" but "continue 'at a reduced level.'" *Vote Forward*, 2020 WL 5763869, at *2 (quoting Suppl. Cintron Decl., ECF No. 21-3, at ¶ 4); *New York*, 2020 WL 5763775, at *2 (same); *Richardson*, 2020 WL 5969270, at *2 (same); *NAACP*, 2020 WL 5995032, at *3 (same). The Court also considered additional operational instructions and guidelines that Defendants adopted on September 21, 24, and 25 and submitted for the Court's consideration. *See e.g.*, *Vote Forward*, 2020 WL 5763869, at *2 (quoting Notice Suppl. Material, ECF No. 30-1 at 4 (September 21 guidelines)); *New York*, 2020 WL 5763775, at *2 (same); *Richardson*, 2020 WL 5969270, at *2 (same); *NAACP*, 2020 WL 5995032, at *3 (same); *see also e.g.*, *Vote Forward*, Defs.' Notice of Suppl. Materials, ECF No. 30.[4] Those materials confirmed to the field that late and extra trips were not banned but did not advise the field that the July 2020 guidelines were

---

[4] Defendants attached the September 21, 24, and 25 USPS guidelines as Exhibits A, B, and C, respectively. *See* ECF Nos. 30-1, 30-2, 30-3.

otherwise inoperative. By granting plaintiffs' motions, the Court made clear that these attempts at clarification were inadequate.

> **B.     Defendants Fail To Comply with the Court's Order, as Evidenced by Their Own Data.**

For over two weeks after the Court's initial order enjoining Defendants' July 2020 Policy Changes, Defendants made no efforts to comply because, they contend, they "did not ban [late trips and extra trips]" and thus "there wasn't anything to change." Ex. B, Dep. Tr. of Robert Cintron (Oct. 15, 2020) (herein after "Cintron Dep. Tr."), at 158:24-159:15. Indeed, Mr. Cintron, USPS's 30(b)(6) representative, who had authored and released the July 2020 guidelines, stated at his deposition late last week that "we have not rescinded the guidelines" issued in July regarding late and extra trips—effectively flouting the Court's rulings. *Id.* at 91:16-93:9; *see also id*. at 76:23-77:2 ("Q. So it's fair to say that the Cintron Guidelines remain in effect at the Postal Service? A. They do.").

The relevant data confirm Defendants' failure to comply with the Court's injunctions. As the Court noted in its Opinion, "the August 29, 2020 service score [88.04%] was 3.56 percentage points lower than the pre-policy average" of 91.6% from January 4, 2020 to July 4, 2020. *Vote Forward*, 2020 WL 5763869, at *2 (citing Supp. Grimmer Decl. ¶ 5, *Vote Forward*, ECF No. 24-2 (included as Ex. K)). Since then, USPS's weekly **on-time service scores have dropped even lower**—to 84.23% on September 19, 85.97% on September 26, and 86.15% on October 3, the most recent week for which data is available. Ex. C, National Service Scores at 1; *see also* Ex. B, Cintron Dep. Tr., at 132:10-23. More granular, district-level service scores show the same picture: 92.5% of the USPS districts had *lower* service scores than the six-month average from before the July 2020 Policy Changes. *See* Ex. D, Suppl. Grimmer Decl. ¶¶ 6, 12, *New York*, ECF No. 59-23.

5

Furthermore, the number of extra and late trips taken each day continue to fall far short of pre-policy levels. By USPS's own admission, there were *far fewer extra trips* between October 1 and 10 (around 500-700 per day) than the period preceding the policy changes in July (ranging from 1,900-2,400 trips per day). *See* Ex. E (March 1 through October 11 Extra Trips Data); Ex. B, Cintron Dep. Tr., at 126:9-127:13. Similarly, there were *far fewer late trips* from October 1 to October 11 (approximately 2,000 trips per day) compared to the number of late trips from June 1 to July 10 (3,000-5,000 trips per day). Ex. F (March 1 through October 11 Late Trips Data); *see also* Ex. B, Cintron Dep. Tr., at 121:16-123:6. In fact, as of mid-October, the number of late and extra trips per day has merely recovered to the numbers from immediately *after* the July 2020 Policy Changes. *See* Ex. B, Cintron Dep. Tr., at 123:11-23 (late trips), 127:5-24 (extra trips). More recent data up until October 15 confirms this continuing drop in the number of extra and late trips. *See* Ex. G at 1.[5]

### C. Defendants' Belated Efforts to Comply Fall Short of this Court's Orders.

From October 13 to 20—more than two weeks after the Court granted the first preliminary injunction in these cases—Defendants issued a series of additional memos and stand-up talks to the field.

On Friday, October 16, Mr. Cintron emailed regional vice presidents and managers, along with a two-part "Stand-Up Talk" to be posted on each facility. *See* Ex. H, Colin Decl. ¶ 17, *PA v. Dejoy*, 20-cv-4096 (October 16, 2020), ECF No. 76-5; *see also id.* at 16-20 (Mandatory Stand-

---

[5] Mr. Cintron, USPS's 30(b)(6) representative, explained that the Columbus Day holiday accounted for the increase in extra trips on October 11 and 12. *See* Ex. B, Cintron Dep. Tr., at 125:9-126:5 ("Usually around holidays we got a big push. We certainly did this holiday in terms of getting prepared and cleaned up, heading into one of the busiest weeks for us. So we would have authorized a lot of extras. There was a lot of extra planning."). This momentary increase is not indicative of the overall trend. Indeed, the number of extra trips decreased to the 700s by October 14 and 15. *See* Ex. G at 1. Recent data confirms approximately 2,000 late trips per day from October 1 to October 15.

6

Up Talk, Part I and II). Mr. Cintron's email "reinforce[d] what [he] believe[s] recent communications from HQ have already made clear: The guidelines provided to field operations in July regarding late and extra trips set no hard limitations on these trips, as made clear by a recently circulated Stand-Up Talk (attached)." *See* Ex. H at ¶ 17. The email went on to note that the July 2020 "guidelines may provide an effective tool for addressing any questions managers may have concerning when to run lates and extras," while noting that "they **should not** be read in a manner that conflicts with the attached Stand-Up Talk." *Id.* (emphasis in original). The attached Stand-Up Talk, in turn, stated that "[t]ransportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets," and that "[t]he Postal Service shall use extra trips to meet service commitments, except when not feasible." Ex. H at 18.

USPS also issued two memoranda specific to Election Mail, on October 13 and October 20—more than two and three weeks, respectively, after the first preliminary injunction issued by this Court. The October 13 memorandum again "reiterate[d]" that "late and extra trips are not banned." Ex. H at 12. And, as with Defendants' other communications, it failed to state that the July 2020 guidelines were rescinded, revoked, or suspended. It did, however, state that "late and extra trips that would facilitate the on-time delivery of Election Mail are authorized and encouraged." *Id.*[6] The October 20 memorandum detailed specific plans to support the handling of Election Mail that are "expected to be executed by local management between October 26 and November 24 . . ." Ex. I at 2.

---

[6] *See also* Ex. H at 19 (Oct. 16, 2020 Mandatory Stand-Up Talk stating that "[l]ate and extra trips and overtime should be used when they would facilitate the expeditious delivery of Election Mail").

7

**ARGUMENT**

The Court has "inherent power to enforce its judgments," pursuant to which it may order limited discovery. *Damus v. Nielsen*, 328 F.R.D. 1, 3–4 (D.D.C. 2018) (*quoting Cal. Dep't of Social Servs. v. Leavitt*, 523 F.3d 1025, 1033–34 (9th Cir. 2008)). This is appropriate when "significant questions regarding noncompliance [with a court order] have been raised.'" *Id.*; *see also Abdi v. McAleenan*, No. 1:17-CV-00721 EAW, 2019 WL 1915306, at *3 (W.D.N.Y. Apr. 30, 2019); *Heredia Mons v. Wolf,* No. CV 19-1593 (JEB), 2020 WL 4201596, at *2 (D.D.C. July 22, 2020).

**I.     There Is, At a Minimum, a "Significant Question" Regarding Defendants' Noncompliance with the Court's Preliminary Injunctions.**

Here, the evidence before the Court is, at a minimum, sufficient to raise the question of whether Defendants have complied with the Court's Orders. Defendants readily conceded that they did not believe this Court's preliminary injunctions required them to do anything. They admit, at least as of October 15, that they had not rescinded the very policy changes instituted in July 2020 that dramatically curtailed the use of late and extra trips. And their own data shows that at least as of October 3, the most recent available data, they remained far below pre-July levels in terms of on-time mail delivery and the use of late and extra trips. Indeed, their on-time service scores are now 2 percent *lower* than the late August levels that the Court considered in issuing its injunctions, and nearly 10 percent below USPS's performance goals. *See* Ex. C at 1 (most recent scores 86.15% for week of Oct. 3); Ex. K, Supp. Grimmer Decl. ¶ 3, *Vote Forward*, ECF No. 24-2 ("The September 10th USPS press release asserts that, for the week of August 29th, the Service Score for first-class mail is 88.04%. The postal service described this Service Score as an 'uptick in service performance.'").

8

It remains, at best, uncertain whether Defendants' belated communications to the field over the past week will actually reverse this fall-off that was precipitated by the July 2020 Policy Changes.  *First*, none of the additional guidance has communicated that the Late/Extra Trip Policy is no longer operative.  Rather, Defendants' additional guidance documents each "reiterate" the communications that were sent prior to this Court's order.  Ex. H at 10 (Oct. 13 memorandum); *see also id.* at 18 (Oct. 16 Stand-Up Talks); Ex. I at 1 (Oct. 20 memorandum). *Second*, though USPS offers some concrete plans for Election Mail, many of these guidelines and plans are not "expected to be executed by local management" until October 26, a mere week before the election.  *See* Ex. I at 2.

## II. Defendants Must Immediately Provide Updated, Current Data to Allow Plaintiff and the Court to Assess the Need for Further Equitable Relief Before Election Day.

Moreover, the only way for Plaintiff and the Court to assess whether the recent communications are having any effect on mail delivery timelines is to obtain current data on service scores, late and extra trips, and other mail delivery metrics.  Defendants' systems automatically collect information on extra and late trips on a daily basis.  *See* Ex. B, Cintron Dep. Tr., at 24:16-25:21.  Indeed, last Friday, Defendants produced the late and extra trip information for every day the of the prior week up to the day before the production—they just have declined to produce that daily information each day.  *See* Ex. G.  Defendants have the ability to track service scores over three-day intervals.  Ex. C at 1 (reporting service score data in 3-4 day intervals for June 27, July 1, and July 4).  And Defendants track various data and information specifically related to Election Mail.  *See, e.g.*, Ex. J, Dep. Tr. of Robert Justin Glass (Oct. 16, 2020), at 166:21-167:7 ("we monitor through the data that we are seeing, but we marry that up against the actual feedback from the ballot monitors that we have. . . and we provide daily feedback on that to our plant managers and division directors"); *id*. at 114:20-117:2

9

(explaining that USPS will track and receive reports regarding "extraordinary measures"—such as upgrading Election Mail to priority mail express, "delivering ballots on Sunday," and conducting "special deliveries"—during October 26 to November 4).

It is therefore critical that Defendants provide immediate and, going forward, daily data updates for extra and late trip deliveries, and daily (or, at minimum, every three days) updates for on time delivery scores, so that the Plaintiff and the Court can evaluate the extent to which additional equitable relief is necessary to ensure that Defendants have fully rescinded their July 2020 Policy Changes and to avoid the irreparable harm that led to the Court's preliminary injunctions in the first place. Plaintiffs in the related cases have made multiple attempts in the past week to obtain this data from Defendants. Defendants have refused to produce it on the grounds that it would be burdensome to provide, but the type of data plaintiffs seek is consistent with what Defendants have shown the ability to generate, as noted above. Moreover, given Defendants' foot-dragging and their clear failure to reverse the policy changes that this Court enjoined, they are in no position to complain about the inconvenience caused by having to produce this data.

Given that there are less than two weeks before Election Day, Plaintiff requests that the Court (1) schedule a hearing for Tuesday, October 27—one week before Election Day—and (2) require Defendants to produced updated, current data regarding mail delivery timelines no later than 12 hours before that hearing, so that Plaintiff and the Court can assess what further equitable relief is necessary to ensure compliance with the Court's preliminary injunctions. Plaintiff further requests that the Court order Defendants to produce the same data on a daily basis, going forward.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion to Enforce Preliminary Injunction and enter the attached proposed order.

Dated: October 22, 2020  Respectfully submitted,

/s/ Samuel Spital

| | |
|---|---|
| Samuel Spital (D.D.C. Bar No. SS4839) | Allison M. Zieve (DC Bar No. 424786) |
| Rachel Kleinman (NY Bar No. 4417903) | Matthew A. Seligman (DC Bar No. 1018889) |
| Monique Lin-Luse (NY Bar No. 5671920) | PUBLIC CITIZEN LITIGATION GROUP |
| J. Zachery Morris (NY Bar No. 5392196) | 1600 20th Street NW |
| John S. Cusick (NY Bar No. 5585245) | Washington, DC 20009 |
| NAACP LEGAL DEFENSE & | (202) 588-1000 |
|    EDUCATIONAL FUND, INC. | |
| 40 Rector Street, 5th Floor | |
| New York, NY 10006 | |
| (212) 965-2200 | |

Counsel for Plaintiff NAACP

## CERTIFICATE OF SERVICE

      I certify that, on October 22, 2020, I electronically transmitted the foregoing memorandum of law, attached motion and accompanying exhibits using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants for this case.

Date:  October 22, 2020                      /s/ Samuel Spital
                                                   Samuel Spital
                                                   NAACP LEGAL DEFENSE &
                                                   EDUCATIONAL FUND, INC.
                                                   40 Rector Street, 5th Floor
                                                   New York, NY 10006
                                                   (212) 965-2200