UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, et al.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 20-cv-2295 (EGS) |

**PLAINITFF NAACP'S REPLY MEMORANDUM IN SUPPORT OF
EMERGENCY MOTION TO ENFORCE AND MONITOR
COMPLIANCE WITH PRELIMINARY INJUNCTION**

      Defendants U.S. Postal Service and Postmaster General Louis DeJoy (hereafter, USPS) do not dispute that the substantial reduction in late and extra trips has persisted well into October. USPS likewise concedes that it has not rescinded the July 2020 policy change curtailing the use of late and extra trips, or otherwise advised USPS employees to revert to pre-July levels of such trips. Instead, USPS argues that the Court enjoined only a total ban on late and extra trips—a ban that, as the Court recognized in its rulings, did not exist.

      With the updated data that USPS filed on Friday—which shows a continuing drop in late and extra trips through October 22 and service scores through October 16—it is clear that the Court should order USPS to take the following actions to comply with the Court's injunctions: (1) clearly and unequivocally rescind the July 2020 policy changes curtailing the use of late and extra trips; (2) advise USPS employees to perform late and extra trips to the same degree and under the same standards as applied prior to July; (3) distribute to USPS employees a list of state-specific ballot receipt deadlines, to enable USPS managers and employees to implement USPS's recent Election

1

Mail guidance; and (4) file with the Court on a daily basis updated data on the rate of late and extra trips and on-time service scores, as well as metrics specific to Election Mail, to assess whether further relief is necessary.

I. **This Court's order enjoined USPS's July policy changes reducing the number of late and extra trips.**

USPS argues that the Court enjoined only a "prohibition of late and extra trips," Defs. Opp. at 1, 6, ECF 36, and that because USPS never instituted such a prohibition, the Court's order required nothing. The policy that the Court enjoined, however, was USPS's substantial *reduction* in late and extra trips. The Court explained the challenged policy changes as follows:

> The key changes that Plaintiff challenges are the prohibition on "late trips" and "extra trips" (collectively "Transportation Policy Changes") announced on July 10, 2020. **Defendants have since clarified that late or extra trips are not "banned"; however, they acknowledge that they continue "at a reduced level" that began in July 2020.** By August 13, 2020, the USPS had reduced the number of late trips by 71 percent. Mr. DeJoy acknowledged that the "transformative initiative has had unintended consequences that impacted our overall service levels."

Mem. Op. at 6–7, ECF 32 (emphasis added) (internal citations and footnotes omitted). If USPS were correct that the Court's order was limited to enjoining a complete ban, the Court would have stopped at this paragraph and denied the motion.

Subsequent passages in the Court's opinions confirm that the policy at issue was the reduction in late and extra trips. The Court repeatedly characterized the "Transportation Policy Changes" as the reduction, rather than an outright ban, on late and extra trips that USPS implemented in July:

- "However, Defendants' own evidence demonstrates that Mr. DeJoy has acknowledged that the **Transportation Policy Changes** caused mail delays. *See* Ex. 5, Tr. of Senate Homeland Security and Governmental Affairs Comm. Hr'g on USPS Operations During COVID-19 and the Elections, Aug. 21, 2020, ECF No. 21-1 at 104 (Mr. DeJoy stating that the **reduction in late trips** resulted in mail delays); *Id*. at 309." Mem. Op. at 14, ECF 32 (emphasis added).

- "The Court is persuaded that Plaintiff is likely to succeed on its claim that Defendants violated Section 3661(b) by failing to submit the **Transportation Policy Changes** to the PRC. First, it was a 'change' because it has had a 'meaningful impact on service.' *Buchanan*, 508 F.2d at 263. Plaintiff points to evidence showing that **the reduction in extra and late trips** has resulted in changes to service standards nationwide because it has resulted in nationwide delays. *See supra* at 6-7, 13-14; s*ee also* August 13, 2020 Email, ECF No. 25-1 at 4 ('We have also reduced extra trips by 71 percent – a tremendous achievement.')." Mem. Op. at 32, ECF 32 (emphasis added).

- "Second, **the changes were 'in the nature of postal services,'** 39 U.S.C. § 3661(b) because they qualitatively altered 'the manner in which postal services [are] available to the user,' *Buchanan*, 508 F.2d at 263. As stated above, Plaintiff points to evidence showing that **the reduction in extra and late trips** resulted in nationwide delays." Mem. Op. at 32–33, ECF 32 (emphasis added).

- "Third, **the changes affected service** 'on a nationwide or substantially nationwide basis,' 39 U.S.C. § 3661(b) because '[a] broad geographical area [was] involved,' *Buchanan*, 508 F.2d at 263. Defendants' own evidence demonstrates that service was affected on a nation-wide basis. *See* Defs.' Ex. 14, ECF No. 21-1 at 452-53 (Mr. DeJoy stating that **the reduction in late and extra trips** occurred in '[e]very state a truck moves in')." Mem. Op. at 33, ECF 32 (emphasis added).

The Court's opinion thus makes clear that it understood USPS's July policy changes as being the substantial reduction in late and extra trips, and that it was enjoining those policy changes because they were implemented without undergoing the § 3661 process required for service changes with substantial nationwide effect.

Likewise, in the *Vote Forward* case, the Court recognized that USPS had not instituted an outright ban on late and extra trips. *Vote Forward v. DeJoy*, 2020 WL 5763869 (D.D.C., Sept. 28, 2020), at *2, ECF No. 32 at 5 ("Defendants have clarified that late or extra trips are not 'banned'; however they acknowledge that they continue 'at a reduced level'"); *see Richardson v. Trump*, 2020 WL 5969270, at *2, Mem. Op., 20-cv-2262 (EGS), ECF No. 65, at 3–8 (D.D.C. Oct. 8, 2020) (same). The Court further noted the September 21, 2020, guidance that USPS touts in its opposition to this motion, *Vote Forward*, 2020 WL 5763869, at *2: but nonetheless found that USPS's policy reducing late and extra trips imposed a substantial burden on the plaintiffs' right to vote, and that the plaintiffs were therefore likely to succeed on the merits of their claims:

3

> Defendants contend that the USPS policy changes do not impose a "severe" burden on voters because "USPS has not instituted a ban on late trips or extra trips," only a call for a "renewed focus on schedules." … However, **even if Defendants did not institute a full "ban" on late or extra trips,** Defendants have not rebutted the statistics that Plaintiffs have put forward indicating that **the nearly 75% drop in the number of late and extra trips has resulted in "a material cut in USPS's capacity to timely deliver mail."**

*Id*. at *9 (emphasis added). In addition, the Court found that "Defendants' policy . . . will continue to cause inconsistency and delays in the delivery of mail across the United States," *id.* at *8, ECF No. 32 at 27, and that the plaintiffs' harms could be remedied through injunctive relief, *see id.* at *5, ECF No. 32 at 15. These conclusions would not make sense if the Court were addressing a ban on late and extra trips that it had stated did not exist.

USPS does not dispute these points, but it urges the Court to ignore "language that is not in the text of an order." Defs. Opp. at 3. Yet USPS itself relies on the Court's accompanying opinion to describe the policies enjoined. *See id*. at 6 (citing Mem. Op. at 6–7, ECF 32, to explain meaning of enjoined "Transportation Policy Changes"); *id.* (citing *Richardson*, Mem. Op, at 4, ECF 65, for meaning of enjoined "Late/Extra Trips Policy"); *id.* (citing *Vote Forward*, Mem. Op., at 3, ECF 32, re same). And the cases cited by USPS, Defs. Opp. at 9–10, fully support the point that the Court's preliminary injunction orders must be read in the context of the accompanying opinions. *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) (holding that the specificity of the Court's orders must be "read in the context of [its] legal conclusions" and "findings of fact"); *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (holding that a preliminary injunction order banning certain meetings "similar in nature to" the challenged meeting failed Rule 65(d) when "the memorandum opinion accompanying the order" did not "clarify its meaning"). The Supreme Court has likewise made clear that the scope of a preliminary injunction is properly understood by reference to the opinion that accompanies it. *See Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 378 n.10 (1997) (referring to

the district court's "opinion accompanying the issuance of the preliminary injunction," as showing how the court "interpreted the injunction"). Here, this Court's opinions clearly addressed policy changes that caused a reduction in late and extra trips, and not only an outright ban.

## II. USPS has not complied with the Court's orders enjoining the reduction of late and extra trips.

USPS does not dispute two fundamental facts demonstrating its non-compliance: (1) the level of extra and late trips has remains far below the level that existed before the July 2020 policy change, and (2) it has failed to unequivocally revoke the instructions to USPS employees that reduced the use of late and extra trips.

*First*, the updated data on daily late and extra trips that USPS attached to its opposition memorandum confirms that, through last Thursday, October 22, the number of late and extra trips continued to lag far behind the pre-July numbers. For the week of October 16–22, late and extra trips averaged about **half** of their pre-July average.[1] This continued drop in late and extra trips correlates with a continued drop in on-time service scores. Data produced by USPS on Friday in a separate lawsuit shows that the service score for the week of October 10–16, 2020, the on-time service score was 85.58%—roughly five percentage points below the average service score for the first six months of the year. *Compare Vote Forward*, ECF 37-1 (*Pennsylvania v. DeJoy*, 20-cv-4096 (GAM) (E.D. Pa.), ECF 82-3, at 7 (service score for October 10–16)), *with* Ex. K to Pls.' Mot. to Enforce, Supp. Grimmer Decl. ¶ 5, ECF 35-14 (average score was 91.6% from January 4 to July 4). Indeed, scores have **declined** since the August 29 service score that the Court considered

---

[1] The exhibit shows 1,524 to 2,605 late trips per day from October 16–22, compared to around 3,000–5,000 per day pre-policy. *Compare* Defs. Ex. F at 28, ECF 36-1 (October data), *with* Pls. Memo. in Support at 6, ECF 35-1, at 6 (summarizing pre-policy data). There were 664 to 839 extra trips per day in October 16–22, compared to around 1,900 to 2,400 per day pre-policy. *Compare* Defs. Ex. F at 28, ECF 36-1 (October data) *with* Pls. Memo. in Support at 6, ECF 35-1 at 6 (summarizing pre-policy data).

when it issued its preliminary injunctions. *See VoteForward*, ECF 37-1 at 7 (showing that service score for October 10 (85.58%) is lower than for August 29 (88.04%)).

*Second*, USPS admits that it has not revoked the policy document that caused this steep (and continuing) drop in late and extra trips and corresponding decline in service scores. *See* Defs. Opp. at 9. Prior to July, USPS had not issued any formal instructions to constrain managers' discretion to approve late and extra trips. *See Vote Forward*, ECF 37-2 (Depo. Tr. of Robert Cintron (Oct. 15, 2020) ("Cintron Oct. Depo. Tr.") at 151:2–152:10). But on July 14, 2020, USPS's Vice President of Logistics, Robert Cintron, issued a set of guidelines ("Cintron Guidelines") identifying several circumstances in which late and extra trips are *"not acceptable"* and narrowly circumscribing the situations in which they are "acceptable." *See also Vote Forward*, ECF 37-3 (Depo. Tr. of Robert Cintron (Sept. 22, 2020) ("Cintron Sept. Depo. Tr.") at 52:6–53:6 (testifying that the Cintron guidelines provided direction on when extra and late trips "are permitted")). Mr. Cintron distributed the Cintron Guidelines under a cover email stating that USPS's "focus is to *eliminate* unplanned extra transportation." *Vote Forward*, ECF 37-4 (emphasis added). The cover email also announced that "[t]rips **must depart on time**," *id*. (emphasis added)—a requirement that, even under USPS's interpretation of the Court's order, was enjoined by the Court. *See* Defs. Opp. at 6 (asserting that the Court enjoined the requirement that "[a]ll trips will depart on time") (alteration in original). Unsurprisingly, the Cintron Guidelines led to the steep drop in late and extra trips that persists to this day. *See also* Mem. Op. at 20, ECF 32 (holding that NAACP had established causation where USPS admitted that "the only specific change that was actually implemented was additional guidance on complying with long-established transportation schedules by departing on time and thus mitigating extra trips." (internal citations omitted)).

6

Importantly, Mr. Cintron testified on October 15 that USPS has *"*not rescinded the guidelines.*" Vote Forward*, ECF 37-2 (Cintron Oct. Depo. Tr. at 91:16–93:9); *see also id*. at 158:24–159:15 (testifying that "there wasn't anything to change" after preliminary injunction orders). USPS does not disagree, instead repeating its theme that it has "repeatedly reiterated to its employees that there is no **ban** on late and extra trips," Defs. Opp. at 6 (emphasis added)—although, again, the Court expressly stated that there was no ban before granting the motions for preliminary injunction.

To the extent that USPS's communications to its employees have touched on the Cintron Guidelines, they have been ambiguous at best, doing as much to reinforce the Cintron Guidelines as to repudiate them. For example, the September 21 memo that USPS points to in its opposition (and which the Court cited in its opinion, Mem. Op. 7, ECF 32), stated "when operationally required, late and extra trips are permitted." *See* Defs. Opp., Ex. A at 3, ECF 36-1 at 5. When asked "what … operationally required mean[s]," Mr. Cintron circled back to "[t]he guidelines" as "clarif[ying] … all the reasons they are going to run, all operationally required." *Vote Forward*, ECF 37-2 (Cintron Oct. Depo. Tr. at 80:11–81:18); *see also id.* at 89:5–90:4 (confirming that the Cintron Guidelines "continue to tell supervisors and instructors when late and extra trips are operationally required").

Similarly, Mr. Cintron emailed USPS employees on October 16 that the Cintron Guidelines "may provide **an effective tool** for addressing any questions managers may have concerning when to run lates and extras." *See* Motion to Enforce, Ex. H at ¶17, ECF No. 35-11 (emphasis added). He added that the guidelines "should **not** be read in a manner that conflicts with the attached Stand-Up Talk," *id.* (emphasis added), which in turn states that late and extra trips shall be used when "reasonably necessary to meet service standards" and further advises that extra trips should not be

7

used "when not feasible." *See id*. at 18. Neither the October 16 email nor the attached Stand-Up Talk, however, explains what is "reasonably necessary." The data confirms that this mixed messaging has failed to reverse the reduction in late and extra trips.

Some communications to USPS employees are specific to Election Mail and do not address the use of late and extra trips generally. Thus, the data strongly indicates a continuing reduction in late and extra trips with a broad impact on mail delivery—whether of ballots, checks, medications, or other important mail. Further, in the absence of any data showing that Election Mail is somehow exempt from the broader trends concerning late and extra trips, as well as on-time service scores, there is no way to know if the USPS communications are mitigating the effect of USPS's non-compliance on the timely delivery even of Election Mail. And although USPS's communications authorize "[e]xtra delivery and collection trips … to ensure completed ballots reach the appropriate election official by the state's designated deadline," *id*. at 2, 17, it does not appear that USPS has distributed direction to USPS employees on what those "designated deadline[s]" are, Defs. Opp., Ex. D at 2, ECF 36-1 at 17—thus undermining any effort to ensure that completed ballots are delivered in time to ensure that the voter's ballot is counted.

### III. The Court should order USPS to take steps to ensure compliance with the Court's orders.

In light of the data produced by USPS on Friday and the impending election, the Court should promptly compel USPS to take certain actions to comply with the Court's prior orders. The Court should order USPS to:

1. Rescind the Cintron Guidelines clearly and unequivocally;

2. Advise the field to perform late and extra trips to the same degree and under the same standards that were applied prior to July;

3. Distribute to the field a list of state-specific ballot receipt deadlines, so that USPS managers and employees can implement the Election Mail guidance that USPS recently issued; and

4. File with the Court on a daily basis updated data on the rate of late and extra trips and on-time service scores, as well as metrics specific to Election Mail, to assess whether further relief is necessary.

Importantly, USPS does not dispute the feasibility of providing daily reports on late and extra trips. In fact, it attached to its opposition memorandum on October 23 a daily report on late and extra trips for the preceding day, October 22. *See* Defs. Opp., Ex. F, ECF 36-1.

As for on-time service scores, USPS does not suggest that it is infeasible to provide this data, but only that it is subject to daily variations and is burdensome to collect. *See* Defs. Opp. at 15–16.[2] The NAACP is open to receiving service score data every other day, so long as the data is timely, regular, and sufficient to monitor compliance.

Ultimately, there is no dispute that USPS has not rescinded the Cintron Guidelines, that late and extra trips continue to be conducted at a substantially reduced level, and that on-time service scores remain depressed as compared to before July. And there can be no dispute that the Court and the plaintiffs in these related cases have a right to enforce the preliminary injunctions. With now only a week before Election Day, NAACP is entitled to further relief to enforce and monitor USPS's compliance.

**CONCLUSION**

For the reasons stated herein and in its memorandum in support of its motion, the Court should grant Plaintiff NAACP's Emergency Motion to Enforce and Monitor Compliance with Preliminary Injunction.

---

[2] Defendants are wrong to contend that weekly data it has produced in *Pennsylvania v. Dejoy*, 20 Civ 4096 (GAM) (E.D. Pa), provides a sufficient window to monitor service scores. *See* Defs. Opp. at 14. As of the time of the opposition brief (3:00 pm, Oct. 23), the latest data released covered scores for the week of October 3 through October 6. *See VoteForward*, ECF 37-5 (*Pennsylvania*, ECF No. 76-3, at 8). This data was stale by two to three weeks. As of the time of this filing (12:00 pm, Oct. 26), the latest data covers scores for the week of October 10 through October 16. *See VoteForward*, ECF 37-1 at 7. According to USPS's reporting schedule, service scores for this past weekend would not be shared until November 6, three days after Election Day.

Dated: October 26, 2020

Samuel Spital (D.D.C. Bar No. SS4839)
Rachel Kleinman (NY Bar No. 4417903)
Monique Lin-Luse (NY Bar No. 5671920)
J. Zachery Morris (NY Bar No. 5392196)
John S. Cusick (NY Bar No. 5585245)
NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Respectfully submitted,

/s/ Allison M. Zieve
Allison M. Zieve (DC Bar No. 424786)
Matthew A. Seligman (DC Bar No. 1018889)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Counsel for Plaintiff NAACP