IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES POSTAL SERVICE, *et al.*, <br><br> Defendants. | Civil Docket No. 20-cv-2295 (EGS) |

## NOTICE OF DATA IN RESPONSE TO THE COURT'S OCTOBER 27, 2020, OCTOBER 30, 2020, AND NOVEMBER 6, 2020 ORDERS

Pursuant to the Court's October 27, 2020, October 30, 2020, and November 6, 2020 orders, Defendants provide the Court with (1) data on the number of extra and late trips performed the preceding day, (2) data pertaining to the processing scores and number of "inbound ballots," organized by origin and destination district, and (3) data identifying those ballots that have received an initial processing scan but not a destination or finalization scan.

Defendants again caution that this data does not reflect accurate service performance reporting for the reasons stated in their opposition to Plaintiffs' motion to enforce and the accompanying Declaration of Arslan Saleem. As explained in Defendants' opposition, this data is not appropriate for evaluating the Postal Service's performance. Defendants maintain that the data possesses little to no analytical value and should not be considered a reliable indicator of performance. Bearing these limitations in mind, the Postal Service provides the following data.

1. **Extra and Late Trips**

    Exhibit 1 contains the most recent reasonably available nationwide data on the number of extra and late trips for all Divisions, Surface Transfer Centers, and International Service Centers.

2. **Processing Scores and Number of "Inbound" Ballots**

    Exhibit 2 contains data pertaining to the processing scores and number of mailpieces that bear service type ID (STID) codes that identify the mail as ballots from incoming voters (*i.e.*, "inbound" ballots). Exhibit 3 shows this data for ballots originating from a district, and Exhibit 4 shows the data for ballots destined for a district.

    The Postal Service again cautions that this data does not reflect accurate service performance reporting and is not appropriate for evaluating the Postal Service's performance with respect to Election Mail on any given day, including November 3, 2020. The Postal Service has long reported service performance data to the Postal Regulatory Commission in accordance with approved methodologies. Releasing daily reports, however, provides data that can be misleading. A thorough explanation of each day's data requires an in-depth understanding of Postal Service mail processing procedures and electronic monitoring systems.

    Defendants also reiterate that the substantial amount of work required to isolate this data and generate new reports on a daily basis diverts the Postal Service's data analysts from the important work of fulfilling the Postal Service's mission. The Postal Service has nevertheless endeavored to collect the information that Plaintiffs have requested, but cautions again that the data can be misleading. The inbound ballot processing scores in particular do not provide a representatively accurate measurement of inbound ballot Election Mail service performance for several reasons.

First, as the Postal Service has explained, only a subset of ballots is capable of being tracked (*i.e.*, those identified by the Intelligent Mail Barcode (IMB) feature with ballot STID codes). Tracking those ballots can also be inaccurate if the mailer reuses a barcode such that it is no longer unique, or if the mailer applies the barcode to non-ballot mail.[1]

Second, many ballots are not captured by the Postal Service's measurement system, even if they could be tracked. The system tracks the performance of ballots within the operational network—specifically the time between a mailpiece's first and last processing scan. As has been noted in testimony and Defendants' prior submissions, because of the extraordinary measures that the Postal Service has implemented, many delivery units have arranged for a "local turnaround" of ballots so that ballots are delivered locally, without ever entering the processing operation. And even for ballots that enter processing operations, many receive a special sort to expedite delivery, thereby bypassing expected standard mailflow. The processing score is therefore not useful for identifying whether ballots are moving through the network in a timely manner (*e.g.*, the lack of a scan is most likely indicative of extraordinary measures and not delayed mail). In short, the processing scores listed in the data are not representative because USPS' extraordinary measures, which expedite delivery, result in ballots not being captured by its service-performance data.

---

[1] The Court's November 6, 2020 Order directs Defendants to "include, in the daily report on Inbound Ballot processing scores, information sufficient to show the absolute number of Inbound Ballots covered by the processing score for a given District for ballots originating from the District and for ballots destined to the District." For the reasons explained above, it is not possible to identify the "absolute number" of inbound ballots originating from or destined to a district. Rather, the number of ballots identified in the data refers to those mailpieces with a ballot STID code that were measured for the purpose of ascertaining the reported processing score. As explained above, some of these mailpieces may not in fact represent inbound ballots. There may also be inbound ballots that were delivered but not included in the data because, for example, they did not contain a ballot STID code.

Third, for those pieces that do have a first and last processing scan, many may still be held out at the processing plant for ballots to be provided directly to a Board of Elections. But because of the method the Postal Service uses to calculates when a mailpiece is on-time in processing (*i.e.*, whether it has met published service standards), these ballots may be recorded in the system as being delivered the following day even when they were provided to a Board of Election on the same day. This discrepancy is the result of the specific cut-off time used by USPS (10:30 a.m.) to calculate whether a mailpiece was last processed on-time or not. This cut-off means that if a ballot was processed at 11:00 a.m. on Election Day, and held out to be delivered to the Board of Elections that day, the ballot would still show an anticipated delivery date of November 4, 2020 because of how the system reflects on-time performance. The chart below illustrates how this cut-off time plays a role in calculating service performance scores:

| Start-the-Clock | Service Standard | Expected Delivery Date | Last Processing Scan Date and Time | Last Scan After 10:30 AM? | Anticipated Delivery Date | On-Time |
|---|---|---|---|---|---|---|
| 11/2/2020 | 2 | 11/4/2020 | 11/4 @ 7 AM | No | 11/4/2020 | Yes |
| 11/2/2020 | 3 | 11/5/2020 | 11/5 @ 11 AM | Yes | 11/6/2020 | No |

Fourth, processing scores are calculated and measured when the last processing event is seen on the equipment rather than the date on which the mail was entered. As mail in the system tapers off and late pieces from prior higher volume days arrive at their destination, the processing scores are impacted, often negatively. Put another way, processing scores as a measurement for a particular mailing with volume that spikes and declines (as is typical for outbound and inbound ballots) is not representative of processing performance due to what the Postal Service refers to as the "tail of the mail." The score is measured when the mailpiece receives the last processing scan, so that as time moves on, the scores will decline towards zero as the only pieces remaining

4

in the system are the failures. A more representative assessment of the processing score for ballots by district would consider all ballots measured for the duration of the election season.

Fifth, the volume of ballots measured on any particular day is often too small to be statistically significant. For example, if there are five ballots that fail to meet their service standard, but 100 ballots total, the processing score will be significantly different than if there are five ballots that fail to meet their standard, but only ten ballots in total. As the denominator decreases, the processing scores will continue to go down.

### 3. Inbound Ballots Without Destination Scans

Exhibit 5 contains data identifying those ballots that have received an initial processing scan within the Postal Service's processing network, but have not received a destination or finalization scan. To be clear, the lack of a finalization scan <u>does not</u> mean that the ballots were not delivered. There are many reasons why a ballot may not have received a finalization scan. For example, as noted, as part of the Postal Service's extraordinary efforts, mailpieces identified as ballots can be pulled from processing to be delivered directly to a Board of Election. Such ballots would not receive a finalization scan.

Additionally, as a normal part of mail processing, mailpieces sometimes will be rejected through automation. Mailpieces may land in a "reject" bin on a machine during processing, meaning that the machine was unable to sort it. For example, two mailpieces may stick together, resulting in the machine being unable to independently read their addresses. There are also circumstances where a barcode will be unreadable because of a smudge. These mailpieces can be manually sorted and would not necessarily receive a finalization scan.

As the Court is aware, the Postal Service uses a process referred to as daily "all clears" to ensure that all Election Mail is accounted for within the system. In the all clear process, in-plant

support personnel in processing or delivery units use a checklist to confirm that mail scheduled or "committed" to go out that day has gone out, and anything committed for the next day is at the front of the line. Personnel conducting all clears consult Election Mail logs and also check all locations within the facility to ensure that all pieces of Election Mail in the facility's possession are in the right location.

All Clear reports help the Postal Service identify facilities that require additional follow-up to enforce their compliance with the daily "all clear" policy. Each Postal Service processing plant, delivery unit, and reporting retail unit is required to certify, through an online system, its all-clear performance every day. If a facility submits no "all clear" response on a given day, Postal Service Headquarters alerts the relevant District Manager or Division Director to follow up. If a particular facility exhibits a pattern of non-responses, USPS may take corrective action. In addition to the "all clears," the United States Postal Inspection Service conducts onsite observations of Election Mail processing. Inspectors have observed conditions of mail within the operations at all letters and flats processing centers to identify delayed volumes, if any. They report their findings to the local management team and to Postal Service Headquarters.

Additionally, the United States Postal Service Office of Inspector General (OIG) has been on site at 27 processing centers validating conditions as well. Similar to the Inspection Service process, OIG auditors check operations for delays and processes for compliance. They also report findings to the local team and Postal Service Headquarters.

*   *   *

The Postal Service considers all of the data filed today to be commercially sensitive and not subject to public disclosure under 39 U.S.C. § 410(c). Because data is incomplete, subject to change, not representatively accurate, and potentially misleading or confusing, it would not be

released under good business practices. With respect to daily service performance data generally, the Postal Service considers this to be commercially sensitive in that it is not consistent with its approved service performance rules and inconsistent with the methodology used in developing the data that the Postal Service discloses publicly. With respect to Election Mail service performance data specifically, because the Postal Service is only able to measure a subset of Election Mail, the service performance scores are not representatively accurate measurements of the service performance of all Election Mail handled by the Postal Service. The data is also a subset of First-Class Mail and Marketing Mail data that is more disaggregated than is otherwise publicly shared. Nor does the Postal Service otherwise report on a combination of a subset of First-Class Mail and Marketing Mail in this manner in other contexts. As such, this information is commercially sensitive in nature and would not be disclosed under good business practices. USPS is providing the information pursuant to the Court's Order, but reserves the right to assert the confidential nature of this information in other contexts.

Dated:  December 2, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Director, Federal Programs Branch

/s/ John Robinson
JOSEPH E. BORSON
KUNTAL CHOLERA
ALEXIS ECHOLS
DENA M. ROTH
JOHN ROBINSON (D.C. Bar No. 1044072)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 616-8489
john.j.robinson@usdoj.gov

*Attorneys for Defendants*