UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE,
    4805 Mount Hope Drive
    Baltimore, MD 21215,

    Plaintiff,

v.

UNITED STATES POSTAL SERVICE,
    475 L'Enfant Plaza SW
    Room 4012
    Washington, DC 20260-2200,
and

LOUIS DEJOY, in his official capacity
as Postmaster General of the United
States Postal Service,
    U.S. Postal Service Office
    475 L'Enfant Plaza SW
    Room 4012
    Washington, DC 20260-2200,

    Defendants.

Case No. 20-2295

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

## INTRODUCTION

1.    From the earliest days of the Republic, the United States Post Office, now known

as the United States Postal Service (USPS), has been essential to our constitutional democracy. In

the Pulitzer-winning words of Daniel Walker Howe, the early Post Office had a dual mission "as

a service to the public and to national unification."[1] It facilitated communication across our

---

[1] Daniel Walker Howe, *What Hath God Wrought: The Transformation of America, 1815-1848*
(2009).

sprawling and diverse nation and encouraged civic engagement by subsidizing the distribution of newspapers.

2.    Today, USPS is more important than ever to our democracy, as it is necessary for free and fair elections. Over three-quarters of Americans were potentially eligible to vote by mail in November 2020, and there was a surge in mail-in voting due to the COVID-19 pandemic. That pandemic has now cost 500,000 Americans their lives, with death rates particularly high for Black people due to disparities in access to health care and structural discrimination. Mail-in voting was essential to ensuring that Americans had an opportunity to vote without risking their safety in the November 2020 election, and mail-in voting requires prompt and reliable postal service. Prompt mail delivery is also especially important during the pandemic and the economic crisis it has caused, as Americans rely on the mail for medications, for benefits, to receive legal notices, and for many other important communications.

3.    The importance of timely and reliable delivery of ballots is not limited to elections that occur during a pandemic. Even before the pandemic, as USPS itself recognized in January 2020, one-quarter of the 120 million Americans who participated in the 2018 election voted by mail. A number of states conduct elections principally by mail. In many other states, mail-in voting allows voters to cast their ballots without facing burdensome in-person voting conditions, which can include hours-long lines (especially in communities of color), and polling sites that are inaccessible to disabled voters or that are geographically remote and require voters to travel long distances even if they lack transportation.

4.    At this moment in our history, when the prompt delivery of ballots and other mail matters more than ever, USPS has failed to take the measures required to ensure timely and reliable mail delivery. Instead, USPS: (a) made significant changes that resulting in unreliable service and

2

widespread delays, and (b) failed to implement procedures to ensure that ballots will be delivered in a reliable and timely manner.

5.     On May 6, 2020, Louis DeJoy was appointed as the new Postmaster General, and he assumed office on June 16. Then, on July 10, DeJoy announced changes to transportation policy, including a major operational "Pivot" that imposed significant new restrictions on the timing and nature of letter carrier routes. In so doing, he acknowledged that employees would "see mail left behind or on the workroom floor or docks" as a result. The changes to transportation policy, including the Pivot and Guidelines issued by USPS on July 14, 2020, caused substantial delays in mail service across the nation, with entire towns in rural areas not receiving their mail on certain days and people in some cities going days or weeks without receiving any mail at all. These delays have caused Americans to go without medicines and benefits, and they have prevented eligible Americans from voting by mail in their primary elections.

6.     With respect to election mail, USPS officials recognized the need to implement special measures to ensure that ballots—especially ballots mailed close to Election Day—were accounted for and delivered in a timely manner. Yet USPS implemented no written guidelines mandating such procedures during the 2020 primary election season, and in fact made changes to longstanding practices that delayed the delivery of election mail.

7.     On July 29, 2020, USPS's General Counsel sent letters to 46 states warning them of a mismatch between their deadlines related to mail-in voting and USPS's likely delivery times. In these letters, USPS indicated that ballots sent by marketing mail would not be accorded first-class mail treatment, and thus take longer to deliver, even though USPS had previously trained its employees to give first-class treatment to ballots and other election-related materials sent as marketing mail. In those letters, USPS also warned there was a significant risk that voters would

3

be disenfranchised if they mailed their ballots within one week of the State's deadline for receiving ballots, even if (for example) state election deadlines allowed voters to request mail-in ballots a week before the receipt deadline.

8.    USPS did not implement any written guidelines to prioritize and account for the delivery of ballots for the November 2020 election until after this lawsuit, and other suits across the country, were filed, and a federal judge in New York entered a preliminary injunction. Even then, the guidelines that USPS announced—culminating with an "Extraordinary Measures" memorandum on October 20, 2020—were primarily permissive rather than mandatory. USPS made mandatory key procedures to ensure that ballots were prioritized and accounted for in advance of the November 2020 Election only after Court orders entered on October 30, 2020, and November 1, 2020.

9.    Although USPS eventually applied "Extraordinary Measures" to the November 2020 Election, it has not announced or implemented written guidance to ensure prompt and reliable mail-in ballot delivery in future elections.

10.    Some states have elections scheduled in 2021, including as soon as the spring of 2021.

11.    The National Association for the Advancement of Colored People (NAACP), the nation's largest and oldest civil rights grassroots organization, brought this suit to require USPS to suspend the changes it implemented in its July "Pivot," to restore prompt and reliable mail delivery, and to ensure that mail-in ballots are accorded priority status, as they have been in past years, in the November 2020 election. Congress has mandated that, before implementing changes that have a nationwide impact on mail delivery, USPS must provide an opportunity for public comment and seek an opinion from the Postal Rate Commission. *See* 39 U.S.C. § 3661. USPS

4

failed to do so with respect to the reduction in late and extra trips or the change in treatment of ballots sent by marketing mail. Its changes were therefore unlawful. Congress has also mandated that: "In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e). USPS's reversal of its policy of according first-class service to ballots sent by marketing mail, and its failure to implement policies necessary to ensure the prompt and reliable delivery of ballots for future elections, are inconsistent with that statutory mandate.

12.     To preserve the integrity of the November 2020 election, and to ensure that every American has access to reliable mail service during the COVID-19 pandemic, the NAACP asked this Court to enjoin USPS's unauthorized changes and to declare that USPS acted arbitrarily, capriciously, and in violation of section 101(e) by failing to give highest consideration to the delivery of important letter mail, including ballots.

13.     This Court entered a preliminary injunction and a series of additional orders to enforce the injunction and to seek to ensure the prompt and reliable delivery of ballots close to the November 2020 general election and the run-off Georgia Special Elections for January 5, 2020.

14.     USPS is reportedly planning imminently to adopt changes to mail delivery policies that will have a substantial impact on delivery times for first-class and other mail.

15.     Judicial relief is needed to ensure that: (1) USPS does not implement policy changes that will have a substantial impact on mail delivery without first going through the process set forth in 39 U.S.C. § 3661; and (2) USPS implements procedures to ensure the prompt and reliable delivery of ballots in future elections, including accounting for and prioritizing ballot delivery close to Election Day, as required by USPS's obligation to "give the highest consideration to the

5

Deleted: either
Deleted: "Pivot"
Deleted: are
Deleted: The Postal Service's
Deleted:  is
Deleted: asks
Deleted: the Postal Service's
Deleted: the Postal Service has

requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

## JURISDICTION AND VENUE

16.     This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1361.

17.     Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(c)(2), (e)(1).

## PARTIES

18.     Plaintiff NAACP is the nation's largest and oldest civil rights grassroots organization. Since its founding in 1909, the mission of the NAACP has been to ensure the political, educational, social, and economic equality of all persons and to eliminate race-based discrimination. The NAACP has fought in the courts for decades to protect the constitutional guarantee of equal protection under law. To advance its mission, the NAACP has brought landmark civil rights cases over its 109-year history and continues to do so. The NAACP also has filed numerous amicus briefs in cases that significantly impact people of color.

19.     The NAACP is organized into state or state area and local units, known as conferences, chapters and branches, all of which are part of the NAACP. Every member of a state or local unit is also a member of the NAACP. The NAACP has state and local conferences or chapters in 48 states, and it has over 200,000 members nationwide.

20.     The NAACP and its members rely on mail service by USPS for a variety of important purposes. Delays in mail delivery are of significant concern to the NAACP and to NAACP members, and NAACP members have been adversely impacted by delays in mail delivery that began last summer. For example, Earl Graham, a 62-year-old disabled veteran and NAACP

**Deleted:** the United States Postal Service

**Deleted:** recent delays in mail delivery. For example, in Houston, TX, NAACP National Board Member and veteran Mr. Howard Jefferson's mail-order medications recently took twice as long as expected to arrive due to mail delays. Similarly, over the past month, NAACP member

member in South Carolina, experienced delays in connection with the delivery of his prescription drugs last summer, which resulted in his enduring substantial pain.

21.     The NAACP engages in educational initiatives targeted at its members. A significant aspect of this educational work involves informing members of accurate information about voting, including voting by mail.

22.     The NAACP has also established a civic engagement program, which is designed to encourage citizens to be fully engaged in the democratic process, and to raise awareness for political, educational, social, and economic equality for communities of color in the electoral and legislative process. Drawing upon the resources of its branches across the country, the program seeks to increase turnout among Black voters in federal, state, and local elections.

23.     The NAACP's civic engagement program is already planning to engage in election protection, voter registration and voter turnout activities in elections at the state and local level in multiple states for 2021, including elections that will occur this spring. The NAACP intends to continue its civic engagement program for elections in future years, including the 2022 and 2024 federal elections, as well as additional state and local elections.

24.     Concerns about the reliability and timeliness of mail delivery caused the NAACP to divert civic engagement program resources in connection with the 2020 elections. For example, because of numerous reports documenting concerns about the reliability and timeliness of mail delivery, the Florida State Conference of the NAACP and volunteers it recruited as part of the civic engagement program disseminated information and organized transportation for voters to drop off their absentee ballots at local supervisors of elections in advance of Florida's August 18, 2020 primary election, including after church services. Absent these concerns about the reliability and timeliness of mail delivery, the Florida State Conference of the NAACP and volunteers it

7

**Moved down [1]:** Ms.

**Deleted:** Gwendolyn Forbes Towns has received her medications three or four days late, if at all, which her prescription provider has told her is because of delays in postal service. The NAACP also has many members who intend to vote by mail in the November 2020 election.

recruited could have devoted these resources to the regular activities of the civic engagement program, including voter registration, contacting voters to ensure they have accurate information and encouraging them to vote, and conducting poll monitoring and other election activities.

25.     If delays in postal service persist, or if USPS fails to implement clear procedures to prioritize—and ensure reliability of—the delivery of mail-in ballots close to Election Day, the NAACP will likely be required to divert resources that it would have otherwise expended on other aspects of its civic engagement program. For example, if concerns about the reliability and timeliness of mail-in ballot delivery persist close to election days, the NAACP (including state and local units) and volunteers it recruits will likely disseminate information encouraging voters to drop off absentee ballots at local election boards or drop boxes, or organize transportation to ensure that voters can do so. The NAACP will likely have to divert staff and/or volunteer time to these activities. Absent concerns about the reliability and timeliness of ballot delivery, the NAACP (including state and local units) would likely devote these resources—including staff and volunteer time—close to election days, to the regular activities of the civic engagement program, such as registering voters (when registration is still open), contacting registered voters to ensure they have accurate voting information and encouraging them to vote, organizing events to get out the vote, and conducting poll monitoring and other voter protection activities during early voting. NAACP staff or volunteers are also likely to be required to divert resources throughout the pre-election period, and on election day itself, to questions from voters about delayed delivery of mail-in ballots and how they can vote if their mail-in ballot was delayed or not delivered.

26.     The timeliness and reliability for mail-in ballot delivery are also likely to impact the decisions and conduct of NAACP members. If delays persist in mail delivery, and absent clear procedures to identify and prioritize the delivery of ballots close to an election to ensure the

8

reliability of mail-in voting, NAACP members are likely to choose other methods to cast their ballots, especially close to an election. These other measures may require NAACP members to have to wait in long lines, or travel significant distances, rather than cast their ballots by mail. Alternatively, NAACP members may have to cast their ballots sooner than they would like to, reducing the time they have to consider different candidates for different elections, in order to have confidence that their ballots will be delivered in time to be counted.

27.     Defendant USPS is an independent agency of the executive branch of the United States.

> **Deleted:** United States Postal Service

28.     Defendant Louis DeJoy is the Postmaster General, the chief executive officer of USPS. He is sued in his official capacity.

> **Deleted:** the Postal Service.

## BACKGROUND

**Statutory and Regulatory Background**

29.     "The U.S. Postal Service is established under the provisions of the Postal Reorganization Act (the Reorganization Act) of 1970, Public Law 91-375, 84 Stat. 719, as amended by the Postal Accountability and Enhancement Act of 2006 (PAEA), Public Law 109-435, 120 Stat. 3198, as an independent establishment of the executive branch of the Government of the United States, under the direction of a Board of Governors, with the Postmaster General as its chief executive officer." 39 C.F.R. § 1.1.

30.     By statute, USPS is required to "operate[] as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). It has "as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable,

> **Deleted:** the Postal Service

and efficient services to patrons in all areas and shall render postal services to all communities."
*Id.*

31.     Congress has directed that, "[i]n determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." *Id.* § 101(e).

32.     The PAEA in 2006 established the Postal Regulatory Commission as "an independent establishment of the executive branch." *Id.* § 501. "The Postal Regulatory Commission is composed of 5 Commissioners, appointed by the President, by and with the advice and consent of the Senate. The Commissioners shall be chosen solely on the basis of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration, and may be removed by the President only for cause. Each individual appointed to the Commission shall have the qualifications and expertise necessary to carry out the enhanced responsibilities accorded Commissioners under the Postal Accountability and Enhancement Act." *Id.* § 502(a). "No Commissioner shall be financially interested in any enterprise in the private sector of the economy engaged in the delivery of mail matter." *Id.* § 502(b).

**Process for Changes to the Provision of Postal Services**

33.     USPS is tasked with "develop[ing] and promot[ing] adequate and efficient postal services." *Id.* § 3661(a).

34.     "When the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* § 3661(b).

10

**Deleted:** The Postal Service

35.    Before issuing its opinion, the Commission must provide "an opportunity for hearing on the record under sections 556 and 557 of [the Administrative Procedure Act] . . . to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." *Id.* § 3661(c).

36.    The Commission's Rules of Practice and Procedure require USPS to file its request "not less than 90 days before the proposed effective date of the change in the nature of postal services involved." 39 C.F.R. § 3020.112.

**Deleted:** the Postal Service

37.    The Commission's rules permit two forms of voluntary participation in Commission proceedings: (1) A person may file a notice of intervention pursuant to 39 C.F.R. § 3010.142(a) and, as a party, participate in discovery and motions practice, file testimony, and submit briefs, among other rights and responsibilities. (2) A person may participate by submitting comments in proceedings before the Commission except those involving an appeal of a Postal Service determination to close or consolidate a post office, pursuant to 39 C.F.R. § 3010.140.

38.    Through section 3661, Congress provided the public a right to comment and an opportunity to provide input on any proposals to make meaningful changes in the delivery of the post nationwide. Consistent with the requirements of section 3661, USPS has, in the past, submitted proposed changes regarding the nature of postal services to the Commission within a reasonable time prior to the effective date of the proposal and requested an advisory opinion from the Commission.

**Deleted:** the Postal Service

39.    For example, in 2014, USPS sought an advisory opinion on a proposal to change the manner by which it processes and dispatches mail that qualifies for a discounted price. For

**Deleted:** the Postal Service

certain mail entered on Fridays or Saturdays, USPS proposed to change the delivery expectation or delivery service standard from 3 days to 4 days. The Commission's advisory opinion recommended that the proposal required more study. After receiving comments and briefs from intervenors, the Commission found, among other things, that USPS's proposal was based on limited test information and sometimes anecdotal accounts, and it noted concern that the proposal did not have sufficient "support within the mailing community."[2]

40.     Similarly, in 2012, USPS sought an advisory opinion under section 3661 on a proposal to reduce the hours of operation at more than 13,000 post offices nationwide by 6, 4, or 2 hours per weekday, and to increase hours at approximately 73 locations. USPS stated that its proposed plan was intended "to achieve cost savings with limited reductions in access and service," and included provisions for soliciting community input with respect to the changes in hourly operations at specific offices. After soliciting public comment, the Commission made recommendations concerning access, community input, revenue, and staffing.[3]

**USPS'S FAILURE TO GIVE HIGHEST CONSIDERATION TO THE COLLECTION, TRANSPORTATION, AND DELIVERY OF BALLOTS**

41.     Mail-in voting has existed for decades in the United States. All fifty States allow voters to use some sort of mail-in voting, and millions of voters vote by mail each year. Members of the United States military stationed on bases away from home in other states and outside the country rely on mail-in voting to participate in elections. Disabled voters, those who are hospitalized and voters in nursing homes also often vote by mail. In November 2000, Oregon

---

[2] PRC, Advisory Op. on Service Changes Associated with Standard Mail Load Levels, N2014-1 at 1, Mar. 26, 2014, https://www.prc.gov/docs/89/89493/docket%20no.%20n2014-1_advisory %20opinion.pdf; *id.* at 5 (noting comments).

[3] PRC, Advisory Op. on Post Office Structure, N2012-2, at 1–2, Aug. 23, 2012, https://www.prc. gov/docs/85/85013/n2012-2_adv_op_082312.pdf.

became an all vote-by-mail state.[4] Even before the pandemic, as USPS itself recognized in a January 2020 publication, one-quarter of the 120 million Americans who participated in the 2018 election voted by mail.[5] In 2020, 46% of the more than Americans who participated in the November election voted by mail.[6]

42.     In "giv[ing] the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail," 39 U.S.C. § 101(e), USPS must implement policies that prioritize the delivery of ballots near election times, and that ensure ballots are not left behind in processing facilities or elsewhere in the delivery process. If USPS does not implement such policies, large numbers of Americans will be disenfranchised because their ballots will not arrive in time to be counted.

43.     USPS recognizes the need to implement special procedures to prioritize the delivery of ballots close to elections, including by taking steps such as using the express mail network; creating special procedures for the local delivery of ballots that bypass traditional processing networks; contacting local boards of elections to coordinate deliveries; and conducting sweeps of processing facilities to ensure that ballots are not left behind.

**The 2020 Election**

44.     In response to *Jones v. USPS*, 2020 WL 5627002, ___ F. Supp. 3d ___ (S.D.N.Y. Sept. 21, 2020), which found USPS's treatment of election mail to be inadequate, USPS issued memoranda on September 21 and September 25 providing further information about the handling of election mail. Although USPS's September 25, 2020, memorandum acknowledged that extra

Deleted:

---

[4] Oregon Sec. of State, Oregon Vote-By-Mail, https://sos.oregon.gov/elections/Documents/statistics/vote-by-mail-timeline.pdf.

[5] https://about.usps.com/kits/kit600.pdf, at 3.

[6] http://electionlab.mit.edu/sites/default/files/2020-12/How-we-voted-in-2020-v01.pdf.

steps would be required to ensure the timely delivery of ballots, both memoranda provided only general guidance.

45.     USPS issued specific written policies describing the extra steps necessary to prioritize and account for the delivery of ballots in the November 2020 election only after required to do so by a court order. It disseminated a "Supplemental Guidance Memorandum" on October 13, 2020, and then an "Extraordinary Measures Memorandum" on October 20, 2020, that underscored the need to take special measures in advance of the election. The "Extraordinary Measures Memorandum" stated: "we must work together to put a relentless focus on Election Mail" over the next two weeks. It then described a number of measures that were "authorized to be used" beginning October 26, such as establishing a drive through ballot postmark/drop option; establishing a "hub-and-spoke" process for running ballots on November 2 and November 3 that were mailed in close proximity to a local Board of Election, bypassing the normal mail flow process; and, beginning October 30, using the Express Mail network. The October 20, 2020 memorandum also either authorized or required additional trips by mail carriers; coordination between USPS employees and local election officials; and, for many offices, running regular mail collections on Sunday, November 1.

46.     Most of the measures set forth in the October 2020 memoranda were not required.

47.     High-ranking USPS officials repeatedly acknowledged in testimony that the measures described in the October 2020 memoranda were necessary to ensure the prompt and reliable delivery of mail-in ballots for the November 2020 election, even though USPS had not made those measures mandatory in the October 2020 memoranda.

48.     For example, Kristen Seaver, Chief Retail and Delivery Officer for USPS who was one of two signatories to the September and October memoranda, testified on October 30, 2020

14

that expanded service is necessary the weekend before a Tuesday election day "because we know we can't turn those ballots [that have been mailed] in time for that Tuesday election depending on the service standard." Tr. 15:15-17. Ms. Seaver further testified that, to ensure that ballots in the mail network the weekend before a Tuesday election are delivered in a timely manner, "specific measures" are required, including: a dedicated person picking up collections from blue collections boxes the Sunday before the election; extra transportation between post offices and processing plants; and plants processing outgoing mail on Sunday. *Id.* at 12:10-13:13. Absent the implementation of these special measures the weekend before an election "we know we can't turn these ballots around in time for that Tuesday election depending on the service standard." *Id.* at 15:14-15.

49. Similarly, Michael Barber, Vice President of Processing and Maintenance Operation, testified on October 31, 2020, that, under USPS's normal service standard, ballots entered into the system near in an election "would be at risk of not making it to their destination timely" if they were "left to go through the regular and normal process that we have." Oct. 31, 2020 Tr. 3 at 10:15. As a result, Mr. Berber testified that, in preparation for the November 2020 election, USPS had to put in place measures to "isolate ballots in different ways," implement "additional transportation," identify additional resources with the logistics team including standby resources, including by "maximizing the full use of any overtime usage." *Id.* at 3:17, 4:18-20, 7:14-15; *see also id.* at 13:23-14:10 (testifying that because ballots collected the day before an election for local delivery would not necessarily be delivered in time if they went "through . . . regular sortation," USPS had to implement extraordinary measures for the November 2020 election).

50. Dane Coleman, the Regional Vice President of Processing Operations, testified on October 31, 2020, that "We need all available resources" to deliver election mail in a timely

15

manner, which including "utiliz[ing] as much overtime as necessary to get the job done." *Id*. 24:15-19. He further stated: "We all recognize how important it is to deliver our brand to the American public. So it's all hands on deck. All resources available needed." *Id*. at 25:1-3. Mr. Coleman testified that the extraordinary measures that USPS implemented for the November 2020 election were "necessary for us to finish strong." *Id*. at 25:12-13.

51.     Another USPS employee, Kevin Bray, testified on November 4, 2020, that his "real job is manager of In Plant Support," but just four weeks earlier he had been given the job of being the executive in charge of mail processing for the 2020 election. Nov. 4 Tr. 33:15-34:6. Mr. Bray testified that, although he had not been made aware of any injunctions that courts had by then issued against the USPS, he "heard that that document [the October 20, 2020 Extraordinary Measures Memorandum] was being done because we were under some heat from the courts." *Id*. at 111:19-21. Mr. Bray further testified that he heard this information from Justin Glass, the appointed manager in charge of election and political mail for the 2020 Election, and that Mr. Bray was further "told we're going to have to do everything, move heaven and earth to deliver ballot mail. We don't want the courts to come back and say we didn't do everything we could. Make this detailed and make it right so we can deliver the mail. That was my overarching reason for being put in the position." *Id*. at 112:2-7.

52.     Mr. Bray further explained that sweeps, and certifications of sweeps, of mail processing facilities are important to ensuring that ballots are delivered in a timely manner because, for example, ballots can be found in unexpected locations such as manual operations and because mis-sorts and mis-sends happen at processing facilities. *Id*. at 66:3-68:2. The sweep and certification process allows such ballots to be identified and then expedited to ensure timely delivery if possible. *See id.*; *see also id*. at 78:6-9 (sweeps may identify "ballots that aren't where

16

they are supposed to be"). Mr. Bray further acknowledged "being asked to investigate why election mail wasn't being delivered on time at a very high percentage" in certain facilities. *Id*. at 72:7-18.

53.     Mr. Bray also testified that each plant was supposed to have a plan in place for a final sweep on Election Day in November 2020 in time to make the ballot receipt deadline, but he admitted that there was no written documentation instructing plants to have such plans and that he did not have anything to verify that such plans existed. *Id*. at 82:1-14.

54.     Mr. Bray further acknowledged that, even with the extraordinary measures in place, USPS's own data reflected that, in just one district, approximately 1,400 ballots delivered on Election Day in Central Pennsylvania were not delivered with USPS's service standard for on-time delivery, which he agreed was "not something that should have happened based on the extraordinary measures that were put in place." *Id*. at 93:20-21; *id*. at 94:6-7 ("I don't know why and there's no excuse. It should never have happened."); *see also id*. at 90:17-18 (acknowledging, based on representations from plaintiff's counsel in a related case about outbound ballots delivered to voters in Western Pennsylvania based on USPS's own data, "[h]aving mail that late is bothersome."). Mr. Glass also recognized that USPS was "by no means, perfect," in the November 2020 election: some "ballots that were mailed on time did not make it." Dec. 5 Tr. at 128:8-10.

55.     On October 30, 2020, and November 1, 2020, this Court entered orders that required USPS employees in many districts to implement measures set forth in the October 20, 2020 memorandum (unless doing so would slow down mail delivery) and to take additional measures to prioritize and account for the delivery of ballots in advance of the November 2020 election. *See* Oct. 30, 2020, Minute Entry; ECF 62.

56.     In sum, USPS officials repeatedly testified that special measures, including those set forth in the October 2020 memoranda, were necessary to ensure the prompt and reliable delivery of ballots.

**Lack of USPS Election-Mail Policies**

57.     USPS has no written policies or guidance in place to ensure the prompt and reliable delivery of ballots with respect to election mail generally. USPS would not have issued the October 13, 2020, memorandum absent a court order. Dec 5 Tr. at 42:8-15.

58.     The measures set forth in the October 2020 memoranda were limited to the November 2020 election.

59.     At the October 30 hearing, Ms. Seaver testified that USPS had put in place policies to prioritize the delivery of election mail in prior elections as well. However, when asked by the Court: "So this is traditional. Is that right? Every election year, you do this. The Postal Service does this?," Ms. Seaver responded: "We do this to some extent." Oct. 30 Tr. 15:20-23.

60.     USPS has not been consistent in its (unwritten) approach to election mail in prior elections. In September 2020, a federal court in New York found that "[t]he Postal Service's approach to handling election mail" also "experienced changes in" 2020. *Jones v. USPS*, 2020 WL 5627002, at *7. Those changes included abandoning the prior practice of treating election mail as first-class mail even if it was sent at marketing mail rates. *See id.*[7]

61.     On July 29, 2020, USPS sent letters to election officials in 46 states and the District of Columbia announcing a change to its treatment of election mail, including mailed ballots. In

---

[7] *See also* USPS Office of the Inspector General, Audit Report, a Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections at 7 (Nov. 4, 2019), https://www.uspsoig.gov/sites/default/files/document-library-files/2019/19XG010NO000.pdf OIG 2019 Report).

**Deleted:** the

**Deleted:** "treat

those letters, USPS warned that "there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted."[8]

62.     To account for that risk, the USPS letters "recommend[ed] that election officials use First-Class Mail to transmit blank ballots and allow 1 week for delivery to voters." It warned that "[u]sing Marketing Mail will result in slower delivery times and will increase the risk that voters will not receive their ballots in time to return them by mail."

63.     The letters stated that "the Postal Service cannot adjust its delivery standards to accommodate the requirements of state election law." The letters did not acknowledge USPS's longstanding policy of according first-class treatment to ballots materials sent by Marketing Mail, or the change in policy reflected in the letters.

64.     The letters also did not acknowledge USPS's statutory obligation to provide highest consideration for the delivery of important letter mail, *see* 39 U.S.C. § 101(e), or its statutory duty to seek an advisory opinion from the Postal Regulatory Commission before making any changes "that will generally affect service on a nationwide or substantially nationwide basis," *see id.* § 3661(a).

65.     The slower delivery of ballots under the USPS policy announced in the letters would have compressed the time voters had to return their completed ballot for the November 2020 election. As USPS recognized in the July 29 letters, "the ballot needs to be in the hands of the voter so that he or she has adequate time to complete it and put it back in the mail stream so that it can be processed and delivered by the applicable deadline." The delay in the delivery of

---

[8] Letters from Thomas Marshall, Gen. Counsel, U.S. Postal Service, to Forty-Seven Secretary of States (July 29, 2020), https://www.washingtonpost.com/context/u-s-postal-service-letters-to-states/b50799f2-25ad-40ed-ba1e-9d648b1814ad/?itid=lk_interstitial_manual_6.

Deleted: Election and Political Mail as

Moved (insertion) [6]

Deleted: ," regardless of whether the election authority paid for

mailed ballots that no longer receive first-class treatment risked causing significant numbers of completed ballots not to be counted because they would be delivered after states' deadlines.

66.    Although this change in the nature of postal services would have a nationwide effect, USPS failed to submit a proposal for the change to the Postal Regulatory Commission.

67.    In *Jones*, the court issued an injunction that, among other things, required USPS to treat all Election Mail as First-Class Mail or Priority Mail Express to the extent excess capacity was available. *See* 2020 WL 5627002, at *28-*29.

68.    Earlier in 2020, USPS managers directed employees to no longer prioritize ballots in the sorting process. The *Jones* court credited testimony that this change led to approximately 600 ballots being left on the mail room floor in a San Antonio processing facility during the March 2020 primary. *Jones v. USPS*, 2020 WL 5627002, at *7. Further, although USPS stated that it had in place "all clears" to ensure that Election Mail was accounted for, an August 31, 2020 report from the USPS's Office of the Inspector General found that, of seven facilities audited, none used the USPS's all-clear checklist. In addition, at that time, most of the measures that USPS contemplated with respect to election mail were "considered 'practices' not 'policies,' meaning … that they are not required and are instead 'typically left to local managers' to implement." *Id.*

69.    The October 2020 memoranda, *see supra* ¶ 45, were the first time that USPS had created something "more codified" with respect to the delivery of election mail; those memoranda do not apply to future elections. Glass Dep., 12/5/20 at 138:1-15.

70.    USPS received a total of between 30,000 and 40,000 calls from employees to its help desk related to election procedures, and the majority of those calls were questions about the memoranda that USPS issued in September and October of 2020 concerning the delivery of election mail. 12/5/20 Glass Dep. 150:4-16.

---

**Deleted:** service or the less expensive Nonprofit Marketing service.[9]

**Deleted:** <#>The Postal Service Office of the Inspector General "concluded that this was how [election mail] was generally handled." *Id.*¶
To facilitate this First-Class treatment and to "provide greater visibility to Election Mail as it is processed, the Postal Service encourages election officials to use" a specialized tag identifying it as Election Mail. OIR 2019 Report, Appendix B (letter from USPS Acting Vice President, Processing and Maintenance to OIG). In addition, some Postal Service facilities "had personnel identify and separate Election and Political from other mail at the facility to improve processing in accordance with standard operating procedures." OIG 2019 Report, at 6.¶
First Class mail has a delivery standard of 1–3 days. By contrast, Nonprofit Marketing Mail has a delivery standard of 3–10 days.

### THE COVID-19 PANDEMIC

71.     On March 11, 2020, the World Health Organization declared a global pandemic resulting from the spread of COVID-19.[10] Two days later, then-President Trump announced that the outbreak of COVID-19 in the United States constituted a national emergency.[11]

72.     By April 2020, the United States became the epicenter of the COVID-19 pandemic with the highest number of confirmed COVID-19 cases in the world.[12] As of August 2020, there were over 5,400,000 COVID-19 cases reported in the United States, including nearly 170,000 deaths.[13] Given a combination of shortages in testing, false negatives, and asymptomatic carriers, the actual number of cases and deaths is likely higher than officially reported.[14] As of February 2020, more than 500,000 Americans have died from COVID-19.

73.     COVID-19 is a respiratory infection caused by the novel coronavirus SARS-CoV-2. It spreads via respiratory droplets, particularly through close in-person contacts.[16] The virus can

---

[10] Dr. Tedros Adhanom, WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[11] Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020), https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak.

[12] David Smith, *US Surpasses China for Highest Number of Confirmed COVID-19 Cases in the World*, The Guardian (Mar. 27, 2020), https://www.theguardian.com/world/2020/mar/26/coronavirus-outbreak-us-latest-trump.

[13] CDC, *Coronavirus Disease 2019* (COVID-19): Cases in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Aug. 18, 2020).

[14] Apoorva Mandavilli, *Coronavirus Infections Much Higher Than Reported Cases in Parts of the U.S., Study Shows*, NY Times (July 21, 2020), https://www.nytimes.com/2020/07/21/health/coronavirus-infections-us.html; Andrew Joseph, *Actual Covid-19 Case Count Could be 6 to 24 Times Higher than Official Estimates, CDC Study Shows*, STAT (July 21, 2020), https://www.statnews.com/2020/07/21/cdc-study-actual-covid-19-cases/.

[16] CDC, *Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last updated July 31, 2020).

21

---

**Moved up [4]:** *Id.*

**Deleted:** at 4.¶
In accord with this Postal Service policy for the treatment of Election and Political Mail, the Office of the Inspector General found that 96 percent of Election and Political Mail met the 1–3-day delivery standard for First Class mail for the 2018 mid-term and special elections.

**Moved up [5]:** *Id.*

**Deleted:** at 5. ¶
**The Rise in Mail-In Voting Due to the**

**Deleted: Pandemic**

**Deleted:** ¶
**The COVID-19 Pandemic**

**Formatted:** Font: Not Bold

**Deleted:** have been

**Deleted:** Globally, there

**Deleted:** been over 21,700,000 confirmed cases of

**Deleted:** , with over 770,000 deaths.[15]

be spread by asymptomatic, pre-symptomatic, and symptomatic individuals.[17] Understanding of the full range of effects of COVID-19 infection continues to develop. Symptoms may be severe, including fever, difficulty breathing, and loss of taste or smell.[18] Individuals hospitalized with COVID-19 may continue to experience persistent symptoms for months.[19] Lethal at its worst, COVID-19 infection can lead to long-term damage to the lungs, heart, brain, kidneys, or liver.[20] It is uncertain whether people who recover from COVID-19 can subsequently be re-infected.[21]

74.     People of all ages have contracted and died from COVID-19.[23] Several preexisting medical conditions can increase the risk of serious complications from COVID-19, regardless of

**Deleted:** The CDC and the World Health Organization have estimated that approximately one out of five people infected with COVID-19 will require hospitalization.[22]

---

[17] Nathan W. Furukawa, et al., *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, 26 CDC Emerging Infectious Diseases (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article.

[18] CDC, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 13, 2020).

[19] Victoria Foster, *80% Of People Hospitalized With Coronavirus Still Had Symptoms Two Months Later, Says New Study*, Forbes (July 11, 2020), https://www.forbes.com/sites/victoriaforster/2020/07/11/80-of-people-hospitalized-with-coronavirus-still-had-symptoms-two-months-later-says-new-study/#37aedd2b1e93.

[20] Jacqueline Howard, *COVID-19's Impact on the Heart: Two New Studies Suggest 'the Plot Thickening'*, CNN (July 28, 2020), https://www.cnn.com/2020/07/28/health/covid-heart-damage-two-studies/index.html; CDC, *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last updated June 30, 2020); Zoe Cormier, *How Covid-19 can damage the brain*, BBC (June 22, 2020), https://www.bbc.com/future/article/20200622-the-long-term-effects-of-covid-19-infection.

[21] CDC, *Coronavirus Disease 2019 (COVID-19): Duration of Isolation & Precautions for Adults* (last updated Aug. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html.

[23] CDC, *COVID-19 Guidance for Older Adults*, https://www.cdc.gov/aging/covid19-guidance.html (last updated Aug. 17, 2020). *See also* CDC, *Hospitalization Rates and Characteristics of Children Aged <18 Years Hospitalized with Laboratory-Confirmed COVID-19* (Aug. 14, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6932e3.htm ("Children are at risk for severe COVID-19. Public health authorities and clinicians should continue to track pediatric SARS-CoV-2 infections.").

age, including kidney disease, heart disease, asthma, hypertension, and diabetes.[24] The pandemic has had a particularly devastating impact on Black people in the United States. As a result of disparities in access to health care and structural discrimination that leads to higher rates of co-morbidities, Black people comprise a disproportionate number of both cases of infection and deaths caused by the virus.[25]

### USPS IMPLEMENTS CHANGES IN NATIONWIDE POSTAL SERVICE IN THE MIDST OF THE COVID-19 PANDEMIC

**A "Pivot" Affecting Nationwide Service**

75.     On May 6, 2020, Louis DeJoy was appointed Postmaster General of the United States, assuming office on June 16, 2020.

76.     Just weeks later, Postmaster General DeJoy directed USPS to implement significant operational changes on a nationwide basis. Internal USPS documents acknowledged that those changes would impact USPS's provision of postal services to the public, including by resulting in delays in mail delivery.

77.     Specifically, on or about July 10, 2020, local USPS managers circulated a document entitled "PMGs expectations and plan," which outlined their understanding of significant nationwide changes Postmaster General DeJoy was implementing. That document stated that overtime would be eliminated, that letter carriers would have to make changes limiting the timeframe and affecting the scope of their delivery routes, and that certain customer service

---

[24] CDC, *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk of Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated Aug. 14, 2020).

[25] *See* Richard A. Oppel, Jr., et al., *The Fullest Look Yet at the Racial Inequity of Coronavirus*, NY Times, July 5, 2020, https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html; *see also* The COVID Tracking Project, *The COVID Racial Data Tracker*, https://covidtracking.com/race (last visited Aug. 18, 2020).

---

**Moved up [2]:** <#>¶
Mail-in voting has existed for decades in the United States. All fifty States allow voters to use some sort of mail-in voting, and millions of voters vote by mail each year. Members of the United States military stationed on bases away from home in other states and outside the country rely on mail-in voting to participate in elections. Disabled voters, those who are hospitalized and voters in nursing homes also often vote by mail.

**Moved up [3]:** <#>In November 2000, Oregon became an all vote-by-mail state.[32]

**Deleted:** <#>There is no approved medication to cure COVID-19,[26] and there is currently no vaccine to prevent it.[27] There is consensus among medical experts and government agencies that a COVID-19 vaccine will not be available to the public in 2020.[28] ¶
Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases and White House coronavirus advisor, has stated that U.S. health officials cannot see "an end in sight" to the pandemic.[29] According to the CDC, as of August 2020, COVID-19 is the third leading cause of death in the United States, and the rate of deaths from COVID-19 remains significantly higher in the United States than in other countries.[30]¶
In the interim, experts have identified techniques that are effective in decreasing transmission of COVID-19, including practicing social distancing by avoiding close in-person contacts, avoiding large gatherings, wearing masks in public, and practicing frequent and thorough handwashing.[31]¶
**The Anticipated Surge in Mail-in Voting Resulting from the Pandemic**

**Deleted:** <#>¶
The CDC has provided guidance regarding safe voting practices during the COVID-19 pandemic, encouraging states to adopt voting procedures that allow voters to maintain social distancing and thereby decrease the spread of the virus. Specifically, the CDC has warned of the significant possibility of person-to-person COVID-19 transmission at polling sites and has urged the use of "voting methods that minimize direct contact and reduce crowd size at polling locations," such as mail-in voting.[33] ¶                      …

**Deleted:** <#>¶

**Deleted:** <#>Services, Including with Respect to the Treatment of Election Mail

**Deleted:** Two months

**Deleted:** the Postal Service

**Deleted:** Postal Service

**Deleted:** the Postal Service's

**Deleted:** the Postal Service

**Deleted:** to employees

**Deleted:** the

**Deleted:** In that

**Deleted:** , Postmaster DeJoy announced

windows would be closed during lunchtime.[49] It also stated that employees should leave mail

behind at distribution centers if it delayed letter carriers from their routes. These represented

significant departures from prior practices, as postal workers had been trained not to leave letters

behind and to make multiple trips to ensure timely distribution of letters and parcels.

78.    USPS also circulated a document on July 10, 2020, entitled "Mandatory Stand-Up

Talk: All Employees," with a subtitle "Pivoting For Our Future" (herein "Pivot Instructions"). The

Pivot Instructions described significant changes that USPS was immediately implementing on a

nationwide basis and acknowledged that these changes would impact the delivery of mail.[50]

79.    The Pivot Instructions state that USPS "must make immediate, lasting, and

impactful changes in our operations and in our culture," and stress that "[e]very single employee

will receive this information" because every employee was "integral" to the success of those

changes.

80.    The Pivot Instructions further state that the "initial step in our pivot is targeted on

transportation" which will involve "challenging" changes "as we seek to change our culture and

move away from past practices previously used." The Pivot Instructions then provide numerous

specific examples of "transportation changes being implemented immediately (today)," including

limiting the timeframe when employees are permitted to make mail delivery trips. The Pivot

Instructions acknowledge that, as a result of these changes, employees "may see mail left behind

or on the workroom floor or docks," which is "not typical" and "may be difficult for employees."

---

[49] *See, e.g.*, Jacob Bogage, *Postal Service Memos Detail 'Difficult' Changes, Including Slower Mailer Delivery*, Wash Post (Aug. 14, 2020) https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/.

[50]  *Available at* https://federalnewsnetwork.com/wp-content/uploads/2020/07/071020-stand-up-talk.pdf.

81.    The Pivot Instructions appear to contemplate that "delayed mail volumes" would result from the first phase of this pivot; the Instructions state that the transportation pivot is part of an "ongoing pivot" that would include additional phases, and that "operations will begin to run more efficiently and that delayed mail volumes will soon shrink significantly." The Pivot Instructions do not, however, explain what those additional phases will be, when they will be implemented, or how they will reduce delayed mail volume.

82.    Neither the "PMGs expectations and plan" nor the Pivot Instructions discuss prioritizing the delivery of ballots, election-related mail, or other important letter mail.

83.    Despite the significant changes in the postal service operations, and their impact on the public, USPS did not follow the procedures set forth in 39 U.S.C. § 3661 before implementing them. Specifically, USPS did not submit a proposal to the Postal Regulatory Commission requesting an advisory opinion on those changes prior to implementing them.

**The "Pivot" Leads to Delays in Postal Service**

84.    In the wake of USPS's "Pivot," there were widespread reports of mail piling up in regional distribution centers and post offices around the country, and of customers experiencing substantial delays and disruptions in mail service.[51]

85.    For example, in Philadelphia, Pennsylvania, residents reportedly experienced delays of up to three weeks in receiving mail, leading to missed worker's compensation checks and paychecks.[52] Baltimore County, Maryland, residents who had not

---

[51] Luke Broadwater, *Crisis Ripples Across Nation as Election Looms*, NY Times (Aug. 18, 2020), https://www.nytimes.com/2020/08/15/us/post-office-vote-by-mail.html.

[52] Ellie Rushing, *Mail Delays are Frustrating Philly Residents, and A Short-Staffed Postal Service is Struggling to Keep Up*, Philadelphia Inquirer (Aug. 2, 2020), https://www.inquirer.com/news/philadelphia/usps-tracking-in-transit-late-mail-delivery-philadelphia-packages-postal-service-20200802.html.

---

**Deleted:** There is no discussion of

**Deleted:** in either the "PMGs expectations and plan," or in the Pivot Instructions.

**Deleted:** the Postal Service

**Deleted:** the Postal Service

**Deleted:** the Postal Service's

**Deleted:** have been

received mail in two weeks waited in line for hours at the post office to try and collect their mail. Those residents reported that they were still unable to pick up their most important mail, including checks and an unemployment benefit debit card needed to pay their bills.[53] Similarly, in Southeast Washington, DC, hundreds of residents went two weeks without receiving any mail.[54]

86.     Mail has been arriving late across Western New York: the president of a local chapter of the American Postal Workers Union reported that, as a result of the changes in service, "we've had entire towns that didn't get their mail that day," including "some of the bigger ones— East Aurora, Lancaster."[55] Similar delays have occurred across central Alabama.[56] In Maine, postal workers reported leaving 80,000 letters behind because they were not permitted to wait 10 minutes for them to be processed.[57]

87.     Similar delays in mail service were reported throughout the country, including in California, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, Missouri, Nevada,

> **Deleted:** There have been similar reports of

---

[53] Kim Dacey, *People Who Haven't Received Mail in Weeks Line Up at Post Office*, WBALTV (Aug. 6, 2020), https://www.wbaltv.com/article/baltimore-mail-delays-continue-no-mail-in-weeks/33535355.

[54] Kolbie Satterfield, *Southwest DC Residents Go Weeks Without Mail Being Delivered*, WUSA9 (Aug. 13, 2020), https://www.wusa9.com/article/news/local/dc/two-weeks-no-mail-in-southeast-dc-neighborhood/65-31535798-3c83-45f8-b0e4-775ce6d6e8f8.

[55] *See* Jerry Zremski, *Mail Delays, Days With No Delivery Prompt Rising Concern in NY*, Buffalo Times (Aug. 13, 2020), https://buffalonews.com/news/national/govt-and-politics/mail-delays-days-with-no-delivery-prompt-rising-concern-in-wny/article_d9944036-dd92-11ea-8f15-778f24 015679.html.

[56] *See* Lauren Walsh, *Central Alabama Experiences Some Mail, Package Delays as USPS, UPS Feel COVID-19 Impact*, ABC33/40 News (Aug. 12, 2020), https://abc3340.com/news/local/central-alabama-experiences-some-mail-package-delays-as-usps-ups-feel-covid-19-impact.

[57] *See* Alison Durkee, *Postmaster General Acknowledges 'Unintended Consequences' of USPS Changes Causing Mail Delays*, Forbes (Aug. 14, 2020), https://www.forbes.com/sites/alisondurkee/2020/08/14/postmaster-general-louis-dejoy-acknowledges-unintended-consequ ences-of-usps-postal-service-changes-mail-delays/#764bfdf46052.

New Mexico, Ohio, Oregon, Rhode Island, South Carolina, Texas, Utah, Vermont, Washington, Wisconsin, and Virginia.[58]

88.     These disruptions and delays in postal service have caused Americans to go without their life sustaining medication and medical supplies, including medications to treat diabetes, asthma, hypertension, among other serious chronic conditions.[59] Veterans, who overwhelmingly receive their medications through the mail, have reported delays of weeks to receive medication.[60] Veterans have also reported that delayed bills and payments have caused them to incur late fees.[61]

89.     Delays in mail delivery affected elections. For example, in St. Louis, Missouri, mail delays contributed to ballots arriving too late to be completed or mailed back in time to be counted in the state's August 4, 2020 primary election.[62]

---

[58] *See, e.g., State of Washington v. Trump*, No. 1:20-cv-03127 (E.D. Wash.), *available at* https://agportal-s3bucket.s3.amazonaws.com/001_ComplaintUSPS.pdf; Andrew Brown & Andrew Miller, *Some SC Businesses Say They are Experiencing Delays Because of US Postal Service Changes*, The Post and Courier, (Aug. 14, 2020), https://www.postandcourier.com/business/some-sc-businesses-say-they-are-experiencing-delays-because-of-us-postal-service-changes/article_e8716d38-dd6d-11ea-9c9e-a79f1c82a446.html; Ron Trevino, *USPS Delivery Delays Leave 82-year-old Texas Man Without Heart Medication for a Week*, WBNS (Aug. 17, 2020), https://www.10tv.com/article/news/nation-world/usps-delays-leave-humble-man-without-heart-medication/285-49815193-bf3d-4b45-a1a5-b0afe16236f7; David Manoucheri, *People Wait Weeks, Months for Packages to be Delivered*, KCRA, (Aug. 15, 2020), https://www.kcra.com/article/people-wait-weeks-months-for-packages-to-be-delivered/33606613; Ginna Roe, *Utah Diabetic Waiting for More Than a Week For Supplies By Mail*, KUTV, (Aug. 17, 2020); https://kutv.com/news/local/utah-diabetic-waiting-more-than-a-week-for-supplies-by-mail.

[59] Rosalind Adams, et al., *USPS Delays Are Causing People to Get their Prescriptions Late*, Buzzfeed News (Aug. 17, 2020) https://www.buzzfeednews.com/article/rosalindadams/post-office-delay-prescription-medicine.

[60] *See* Letter from 31 Senators to Louis DeJoy (Aug. 13, 2020), https://bit.ly/345AaDj; James Clark, *How the battle over the US Postal Service is costing veterans dearly*, Task & Purpose (Aug. 18, 2020), https://taskandpurpose.com/news/postal-service-veteran-medication-delays.

[61] Letter from Senator Gary Peters to Hal. J. Roesch II (Aug. 13, 2020), https://bit.ly/311tQe5.

[62] Robert Patrick, *Postal Delays, Greater Demand for Ballots Leading to Spike in Complaints, Groups Say*, St. Louis Post-Dispatch, (Aug. 1, 2020), https://www.stltoday.com/lifestyles/health-med-fit/coronavirus/postal-delays-greater-demand-for-ballots-leading-to-spike-in-complaints-

Deleted: have already

90.    In a memo circulated to USPS employees the week of August 10, Postmaster General DeJoy acknowledged that the Pivot, "impacted our overall service levels."

91.    Following widespread complaint and media reports regarding the delays, the House of Representatives sent a notice requesting Mr. DeJoy appear for a hearing on August 21, 2020.

92.    On August 18, 2020, Postmaster General DeJoy disseminated a public statement that he was suspending certain changes that had been implemented pursuant to "longstanding operational initiatives" that "predate my arrival at the Postal Service."[63] That statement did not, however, purport to suspend key changes announced in the July 10 Pivot directing reductions in service. It also did not address the changes discussed in the "PMGs expectations and plan" document, other than to say that "overtime has, and will continue to be, approved as needed."

### PERSISTING DELAYS AND PROPOSED CHANGES

93.    Even after this Court entered a series of preliminary injunctions beginning September 27, 2020, requiring USPS to suspend its new policy limiting late and extra trips, USPS made no effort to comply because in the words of a USPS official testifying on October 15, 2020, "there wasn't anything to change." Late and extra trips remained well below their pre-July 10 levels, and service scores remained depressed.

94.    Although late and extra trips increased temporarily beginning in late November during the holiday season, they declined again sharply in early January, and today late and extra trips today remain well below their levels prior to the July 10, 2020, transportation policy changes.

---

groups-say/article_4b65cb38-7cac-51dd-9c46-62c46ef5d7b8.html; Erin Richey, *Delays at the Post Office Could Force Missouri Absentee Voters to the Polls*, KSDK (Aug. 3, 2020), https://www.ksdk.com/article/news/politics/elections/absentee-ballot-delays-force-voters-polls-in-person/63-cbfd42b1-4df3-49f8-8845-68305c778074.

[63] *See*, Phil Mattingly (@Phil_Mattingly), TWITTER, https://twitter.com/Phil_Mattingly/status/1295776474751012867/photo/1 (Aug. 18, 2020).

Between February 1 and 24, for example, late trips generally averaged around 1,000 per day, with only two days in the 1,500-1,600 range. By contrast, in a the 24 days prior to July 10, 2020, there were generally over 2,000 late trips per day. Similarly, with respect to extra trips, between February 1 and 24, the daily number ranged from approximately 1,100 to 3,800, whereas in the period leading up to July 10, they were 4,500 or above on most days, and above 3,800 on 18 out of the 24 prior days.

95.     Service scores also remain depressed. Indeed, service scores plummeted in December, with only 71% of local first-class mail being delivered on time and only 38% of non-local first-class mail being delivered on time, compared to on-time delivery scores of approximately 90% and 80% respectively before Mr. DeJoy became postmaster general.[65]

96.     In congressional testimony delivered on February 24, 2021, Postmaster General DeJoy characterized persisting delays as "unacceptable."[66] He acknowledged that "during this peak season, we fell far short of meeting our service targets," and "[t]oo many Americans were left waiting for weeks for important deliveries of mail and packages."[67]

97.     Postmaster General DeJoy also testified that he is contemplating significant changes in an upcoming strategic plan, including lengthening the service standard for first-class mail.[68] In addition to leading to slower mail delivery generally, lengthening the service standard would increase the likelihood of ballots being delivered late in future elections.

---

[65] https://www.washingtonpost.com/graphics/2021/business/usps-performance-whats-next-biden/.

[66] https://about.usps.com/newsroom/testimony-speeches/pdf/022421.pdfl.

[67] *Id.*

[68] *See* https://thehill.com/homenews/house/540285-postmaster-general-apologizes-for-mail-delays.

29

**FIRST CAUSE OF ACTION**
(Non-statutory review of unlawful agency action
for failure to follow statutorily required procedures)

98. Plaintiff has a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires and unlawful.

99. Through the changes to transportation policy and to the treatment of election mail, USPS has implemented changes in the nature of postal services that will generally affect service on a nationwide or substantially nationwide basis, without following the procedures required by 39 U.S.C. § 3661.

100. USPS's failure to follow required procedures has deprived Plaintiff NAACP and its members of the opportunity to comment on the changes in postal service, has impacted the timely delivery of mail to its members, and will impact the timely receipt of mail-in ballots by its members.

101. Plaintiff and its members will suffer irreparable injury if the changes are not declared unlawful, and Plaintiff and its members have no adequate remedy at law.

102. The public interest favors entry of a declaration that the changes are unlawful and invalid because they were issued and adopted without observance of the mandatory procedures required by 39 U.S.C. § 3661.

**SECOND CAUSE OF ACTION**
(Non-statutory review of unlawful agency action
that is arbitrary, capricious, and not in accordance with statutory requirements)

103. Plaintiff NAACP has a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires and unlawful.

**Moved up [6]:** <#>It warned that "[u]sing Marketing Mail will result in slower delivery times and will increase the risk that voters will not receive their ballots in time to return them by mail."

**Deleted:** <#> *Id.*¶
The letters state that "the Postal Service cannot adjust its delivery standards to accommodate the requirements of state election law." The letters do not acknowledge the Postal Service's longstanding policy of according first-class treatment to ballots or other election-related materials sent by Marketing Mail, or the change in policy reflected in the letters. ¶
The letters also do not acknowledge the Postal Service's statutory obligation to provide highest consideration for the delivery of important letter mail, *see* 39 U.S.C. § 101(e), or the Postal Service's statutory duty to seek an advisory opinion from the Postal Regulatory Commission before making any changes that have a nationwide impact on postal services, *see id.* § 3661(a).¶
This change in how the Postal Service treats election mail will impose financial burdens on state election authorities which, to ensure timely delivery, will have to pay 55 cents per piece for First-Class service rather than the 20 cents per piece they previously could pay. This increase in per-piece cost, combined with an anticipated 10-fold increase in vote-by-mail volume, will compound states' unprecedented financial strain in the midst of a global pandemic.¶
The slower delivery of election mail, including ballots, under the new Postal Service policy compresses the time voters have to return their completed ballot. As the Postal Service recognized in the July 29 letters, "the ballot needs to be in the hands of the voter so that he or she has adequate time to complete it and put it back in the mail stream so that it can be processed and delivered by the applicable deadline." The delay in the delivery of election mail, including ballots, that no longer receive First-Class treatment may thereby cause significant numbers of completed ballots not to be counted because they are delivered after states' deadlines.¶
The Postal Service implemented this change in the treatment of election mail on a nationwide basis, expressly warning 46 states of the new policy's potential harmful effects.¶
Although this change in the nature of postal services will have a nationwide effect, the Postal Service failed to submit a proposal for the change to the Postal Regulatory Commission, as required by federal law. 39 U.S.C. § 3661(b).¶

**Deleted:** announced in the "Pivot" Instructions

**Deleted:** changes

**Deleted:** the Postal Service

**Deleted:** The Postal Service's

104.   Through the changes to transportation policy and to the treatment of election mail, USPS has failed to give the "highest consideration" to the "delivery of important letter mail," including ballots as required by 39 U.S.C. § 101(e).

105.   Similarly, by failing to implement policies mandating procedures that USPS itself recognizes are necessary to ensure the prompt and reliable delivery of ballots in election, USPS has violated 39 U.S.C. § 101(e), which mandates: "In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

106.   In light of the mandate of section 101(e), the coronavirus pandemic, and the significant increase in voting by mail, the changes to transportation policy and to the treatment of election mail are unreasonable, arbitrary, capricious, or in violation of law.

107.   In light of the mandate of section 101(e) and USPS's recognition that it must implement special procedures to prioritize and account for the delivery of ballots close to elections, USPS's failure to implement such policies is unreasonable, arbitrary, capricious, or in violation of law.

**THIRD CAUSE OF ACTION**
(Mandamus to enforce 39 U.S.C. § 3661)

108.   Plaintiff NAACP has a statutory right under 39 U.S.C. § 3661 to notice and an opportunity to comment on changes in the nature of postal services that will generally affect service on a nationwide or substantially nationwide basis.

109.   Defendants have a nondiscretionary duty under 39 U.S.C. § 3661 to seek an advisory opinion from the Postal Regulatory Commission, in order that members of the public, such as plaintiff NAACP, will have notice and an opportunity to comment on changes in the nature

31

of postal services that will generally affect service on a nationwide or substantially nationwide basis.

110.    Defendants' failure to follow the procedures required by 39 U.S.C. § 3661 warrants relief in the nature of mandamus pursuant to 28 U.S.C. § 1361 if no other adequate remedy is available to Plaintiff NAACP to enjoin Defendants' unlawful action and compel action required of defendants by law.

111.    Plaintiff NAACP has been and will continue to be harmed by Defendants' unlawful actions because delays to mail to its members as a result of these actions are ongoing.

### FOURTH CAUSE OF ACTION
(Mandamus to enforce 39 U.S.C. § 101(e))

112.    Plaintiff NAACP and its members have a statutory right under 39 U.S.C. § 101(e) to have USPS provide "highest consideration" to the "requirement for the most expeditious collection, transportation, and delivery of" their "important letter mail."

113.    Defendants have a nondiscretionary duty under 39 U.S.C. § 101(e) to provide "highest consideration" to the delivery of "important letter mail" to the members of the public, including Plaintiffs.

114.    Defendants' failure to follow the procedures required by 39 U.S.C. § 101(e) warrants relief in the nature of mandamus pursuant to 28 U.S.C. § 1361 if no other adequate remedy is available to plaintiff NAACP to enjoin Defendants' unlawful action and compel action required of Defendants by law.

115.    Plaintiff NAACP has been and will continue to be harmed by Defendants' unlawful actions because delays to mail to its members as a result of these actions are ongoing.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff NAACP prays that this Court:

32

| Deleted: |
| Deleted: the Postal Service |

(A)     Declare the changes announced in July 2020 to transportation policy, and to the treatment of election mail described in the July 29, 2020, letters to states, invalid for failure to follow required procedures;

(B)     Declare the July 2020 changes to transportation policy and the changes to the treatment of election mail described in the July 29, 2020 letters to states invalid as unreasonable, arbitrary, capricious, or in violation of law;

(C)     Enjoin Defendants from continuing to implement the July 2020 changes to postal service;

(D)     Enjoin Defendants to continue USPS's prior policy of treating election mail sent as Marketing Mail as First-Class mail;

(E)     Establish policies to ensure the prompt and reliable delivery of ballots for future elections; and

(D)     Grant such other relief as this Court may deem just and proper.

Dated: March 5, 2021                    Respectfully submitted,

                                         /s/ Allison M. Zieve          .
Sam Spital                               Allison M. Zieve
(D.D.C. Bar No. SS4839)                  (DC Bar No. 424786)
NAACP LEGAL DEFENSE &                    PUBLIC CITIZEN LITIGATION
EDUCATIONAL FUND, INC.                   GROUP
40 Rector Street, 5th Floor              1600 20th Street NW
New York, NY 10006                       Washington, DC 20009
(212) 965-2200                           (202) 588-1000

                    Counsel for Plaintiff NAACP

33

---

**Deleted:** the Pivot Instructions

**Deleted:** the changes

**Deleted:** announced in the Pivot Instructions

**Deleted:**  announced on July 10

**Deleted:** the Postal Service's

**Deleted:** , until such time as the Postal Service has sought an advisory opinion from the Commission on these proposed changes

**Deleted:** the public has been provided a reasonable opportunity

**Deleted:** comment

**Deleted:** August 20, 2020