I, Earl D. Randel, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, state as follows:

1. I have been employed by the United States Postal Service for over 33 years and am currently serving as Acting Director, Logistics Surface Planning at Postal Service Headquarters. I base this declaration on information available to me in the course of my official duties and responsibilities at the United States Postal Service ("Postal Service"), including oversight of nationwide transportation schedules and logistics operations.

2. The Postal Service's surface transportation system includes "local surface transportation" and "network surface transportation," using vehicles generally referred to as "trucks." The surface transportation system also uses trains.

3. Local surface transportation refers to the transportation of mail and packages to and from Metro Area Customer Service Delivery Units and local Associated Post Offices (or other locations where mail is accepted, such as business mail entry units), Delivery and Distribution Centers (DDCs), Postal Handling Service (PHS) locations, and processing and distributions centers or facilities within a limited geographic area. More particularly, under the rubric of local surface transportation, in the afternoon, postal employees (or, sometimes, contractors) collect mail and packages from acceptance sites (inclusive of collection boxes or otherwise known as blue box mail) and transport them to processing facilities, where the items will be further sorted for delivery or transportation to a subsequent processing facility. In the morning, postal employees or contractors transport mail and packages, which were sorted at the processing facility overnight, to local delivery units. Local surface transportation can also include trips directly to or from larger customers and local contracted delivery routes.

4. "Network surface transportation" refers to transportation of mail between processing and distribution facilities, such as Sectional Center Facilities (SCFs), Area Distribution Facilities, Network Distribution Centers (NDCs), International Service Centers (ISCs), and processing and distribution centers (P&DCs or plants). Mail that does not both originate and destinate within the geographic area of an SCF must be further transported to downstream processing facilities for further sorting, transportation, and delivery. Network surface transportation also connects the movement of mail between those facilities and surface transportation centers (STCs).

5. The Postal Service effects local transportation of mail and packages through the services of both postal employees, i.e., the Postal Vehicle Service (PVS), and Highway Contract Route (HCR) suppliers. In general, the Postal Service employs PVS suppliers only for local surface transportation.

6. The Postal Service enters into negotiated agreements with HCR suppliers (which use large trucks, most often large tractor-trailers) to perform the vast majority of the work for network surface transportation. Certain HCR suppliers who primarily transport mail between processing facilities occasionally also transport mail to individual delivery units located along a processing-facility-to-processing-facility route. HCR suppliers operate under the terms of competitively awarded contracts; the negotiated contract terms require the awardee(s) to transport mail according to specific schedules and service levels and provide for the supplier's submission of charges for extra trips not contemplated by the schedule.

7. In mid to late April 2021, the Postal Service began initial implementation of a new process to centralize and manage HCR supplier selection for extra network transportation

service and to improve data collection regarding such transportation service. The process, which used a SharePoint website to input and track extra trip information, focused solely on requests for extra HCR supplier trips within network surface transportation and did not include monitoring of local service transportation or postal vehicle trips.

8. The new process had two major purposes:

    a. Supplier Selection: A primary goal of the process was to ensure selection of the supplier and trip that was the best alternative for meeting service at the lowest cost, a policy that the Postal Service has always expected managers arranging such trips to follow. To improve accountability and compliance, the new process employed a Tier 1 – Tier 2 Selection Tool, which prioritized use of the lower cost suppliers (Tier 1) over the costlier Tier 2 suppliers if Tier 1 suppliers were available and a Tier 2 supplier was not already on route.

    b. Data Collection to Improve Network Performance: In addition to improving supplier selection, the process was directed at improving existing data reporting. For many years, Postal Service network facilities have reported data regarding extra trips, supplying data regarding the applicable facility, route, supplier, and the reason for trip. This data is used to identify needs for any network adjustments that will allow the network to function more timely and efficiently. For example, logistics data analysts may determine that data on extra trips utilized demonstrates the need for additional trips to be added to regular schedules, for rerouting trips within the network, or for new routes to be added. Because data reporting has been inconsistent, and incomplete tracking has resulted in untimely processing of payments to suppliers and incomplete monitoring of supplier performance and

expenses, the new process centralizes that same reporting. Improved data tracking also provides the Postal Service with improved knowledge of contractor expenses, assists with timely processing of payments, and enhances the Postal Service's ability to monitor and make necessary adjustments to the performance of network surface transportation, through its Surface Visibility (SV) interface

9. A third element of the process evaluated whether an extra trip would be service responsive and where utilization of an extra trip would cause significant expense and delay the delivery of only a small volume of mail. The process permitted denial of an extra trip in these limited circumstances.

10. The process requested that field network facilities requiring extra trips submit a transportation request via an internal SharePoint drive to the Surface Planner Group, consisting of a team of Headquarters logistics personnel in various locations. A Group team member reviewed the information submitted, including the volume of mail requested to be moved, the origin and destination, and the reason why the trip was needed; checked data systems to identify available trips from the origin or vicinity; and made the appropriate decision as to the supplier selection based on service needs and costs. The requesting facility was to be notified of the selected supplier within two hours or less from the time the initial request was submitted. After selection of a supplier, the local site was notified of the selection and provided route and extra trip information to be entered into the Postal Service's Surface Visibility system.

11. The Postal Service began initial implementation of the process from April 14 to April 23, 2021. During that period, data on approximately 736 extra trips were tracked. The 736

extra trips requested through the new process made up a small portion of the extra network trips that operated during that period.

12. On April 23, 2021, the Postal Service made the decision to pause the initial implementation of the process and transmitted notice of this decision to the field. During the following week, the internal SharePoint website created for the new process was shut down so that the site could not be accessed by the field to input information.

13. Initial implementation of the SharePoint request process was paused because of concerns that, in addition to supplier selection and data collection, the SharePoint request process also permitted for the denial of requests for extra trips, which could be interpreted to implicate the Court's injunctions directing that the Postal Service not ban extra (or late) trips. Banning or limiting extra trips was not the purpose of the process. As explained above, the new process was aimed to ensure the selection of the supplier and extra trip that was the best alternative for meeting service at the lowest cost, and data collection to improve network surface transportation performance.

14. From April 14 to April 23, 2021, 12 of the 736 trips entered into the system did not occur as requested.

15. The reasons that the 12 requested extra trips did not occur as requested varied. The fact that they did not proceed as requested had no meaningful effect on overall service performance. The following list sets forth the reasons the new process did not track those requested trips as completed:

 (1), (2): Two of the twelve requests were for local trips, which were not appropriate for the network surface transportation process. The Surface Planner

Group promptly advised the local facilities that the process did not apply to local trips and the local facilities should proceed to schedule the trip themselves.

(3): The requesting facility determined that it did not need the trip and canceled its request.

(4), (5): Two extra trips requested would not have been service responsive, i.e., even if the extra trip operated, it would not result in more timely service of the mail than if the mail were transported via the next scheduled trip.

(6): No supplier was available to perform the trip.

(7): The facility, on a Friday, requested the extra trip for service on Sunday, but was unable to identify the volume of mail expected to be transported. The Surface Planner Group advised the facility to contact it on that Sunday if an extra trip was needed. The facility did not use the process to request an extra trip on Sunday, but did run an extra trip.

(8) – (11): The specific trips requested did not proceed because the Surface Planner Group found other alternatives for transporting the mail that were still service responsive, , i.e., that would allow the mail to achieve the service standards, such as a regularly scheduled trip that would deliver the mail in a timely manner.

(12): A facility requested an extra trip to transport nine containers of mail containing approximately 1,530 packages (based upon average conversion rates of pieces per container) that missed the regularly scheduled trip that traveled a distance of over 900 miles. The trucks generally hold 48 containers of mail, so a truck carrying this volume would utilize less than 20 percent of its capacity. The

>Surface Planner Group advised the facility to place the containers on the next available regularly-scheduled trip arriving the next day because any delay of such a small volume of mail did not justify the costs of the trip of over 900 miles in distance.

16. Therefore, during the initial implementation of the process, only one extra trip that did not operate (trip number (12)) could have impacted service adversely. The Surface Planner Group reasonably considered that the significant costs for running an underutilized trip (at only 20 percent capacity) at such a distance outweighed the minimal benefit of one day's delay in delivery of the small amount of mail.

17. The Postal Service intends to resume the process in part, on May 17, 2021, after Logistics Operations clarifies that the Surface Planner Group will not deny the use of extra trips and that the process will be employed only for supplier and trip selection and for general data gathering purposes. Furthermore, Transportation Managers, Supervisors, and the Surface Planner Group will be directed that the extra trip request process is designed to improve source selection of network surface transportation suppliers, and that the process does not discourage the use of extra trips, and that no extra trips will be denied.

18. We believe, however, that it is in the Postal Service's interests for the process to ultimately include the third element: for the Surface Planner Group to evaluate and decline approval for network trips in two very limited circumstances: (1) where an extra trip would not be service responsive, and (2) where utilization of an extra trip would cause significant expenses and delay the delivery of only a small volume of mail.

19. An extra trip is not service responsive when, even if the trip were run, the mail transported would not meet the service performance target for that mail. For example,

even if the extra trip had been made from a P&DC to an STC, it still would not arrive in time to make its connection and would have to wait at the STC for the next connection. Because the same level of service can be achieved if the mail is loaded onto the next regularly scheduled trip, there would be no benefit whatsoever to running the extra trip, and running it would create unnecessary costs for the Postal Service.

20. For many years, most Postal Service transportation managers considering whether to schedule extra trips have taken into account the volume of mail to be transported and the costs of extra trips that generally run under capacity (i.e., only filling a small portion of the truck). The Postal Service does not have sufficient resources to utilize extra trips in each and every circumstance in which a small volume of mail has not been loaded on the appropriately scheduled trip. Therefore, occasionally, the Postal Service has reasonably decided not to order an extra trip where the volume of mail to be transported is very small and the cost of the extra trip is extraordinarily high in relation to usual costs of transportations for trucks that are fully loaded or loaded with a substantial volume of mail. Given the small volume of mail, any delay would have a virtually immeasurable effect on overall compliance with service performance goals, while the cumulative costs of proceeding with each and every possible extra trip would be financially irresponsible.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Washington, D.C. on the 30 day of April, 2021

EARL D. RANDEL