I, Earl D. Randel, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, state as follows:

1. On April 30, 2021, I submitted a declaration in support of Defendants' Notice of Extra Trips Process in the above-captioned matter. I am submitting this supplemental declaration in support of Defendants' Motion for Clarification or, in the Alternative, to Modify the Preliminary Injunction, to provide further detail and clarify the limited circumstances in which it is in the Postal Service's interests for the Surface Planner Group effecting the extra trip process to decline approval for network trips. This supplemental declaration is based on information available to me in the course of my duties at the Postal Service as Acting Director, Logistics Surface Planning at Postal Service Headquarters, including information provided by other Postal Service officials with whom I work.

2. The Postal Service manages a complicated surface transportation network, with many third-party suppliers and supplier brokers that provide, on average, more than 13,000 daily network trips. As referenced in my April 30, 2021 declaration (Dec.), network trips transport mail between processing and distribution facilities, or between those facilities and surface transportation centers (STCs). These trips are generally long distance. Dec. ¶¶ 2, 4. Highway Contract Route (HCR) suppliers, with whom the Postal Service has negotiated contracts, perform the vast majority of the work for network surface transportation, using large trucks, most often large tractor-trailers. Dec. ¶ 6.

3. In mid to late April, the Postal Service initially began implementing a new process that was directed at centralizing and managing HCR supplier selection for extra network transportation service and improving data collection regarding such transportation service and that focused solely on requests for extra HCR supplier truck trips within network

1

surface transportation. The new process did not include monitoring of local service transportation or postal vehicle trips.

4. The new process had two major goals—ensuring selection of the supplier and trip that was the best alternative for meeting service at the lowest cost and collecting data to improve network performance. Gathering data about network extra trips allows the Postal Service to make network adjustments to improve service performance and mitigate unnecessary expense. Dec. ¶¶ 7-8. Potential network adjustments include adjusting the times of schedules, adding new scheduled trips (rather than relying on frequent extras), and/or adding an additional regular scheduled stop that would be in the line of travel for timely transport of mail.

5. It is in the Postal Service's interests for the process to include another function: for the Surface Planner Group to evaluate the circumstances of an extra trip request and decline approval for network trips in two very limited circumstances: (1) where an extra trip would not be service responsive, and (2) where not utilizing an extra trip would delay the delivery of only a small volume of mail.

6. Since April 30, 2021, the Postal Service has clarified the general parameters of the two circumstances where it would decline approval of network trips if this Court were to confirm that denial of extra trips under those limited circumstances does not violate the existing preliminary injunction.

**Where an extra trip would not be service responsive.**

7. "Service responsive" is a phrase the Postal Service uses to describe trips that deliver mail within the published service standards approved by the Postal Regulatory Commission. Service standards reflect the target goal for the time a mailpiece or package is expected to

take from origin to its ultimate destination. The standard varies according to the mail product (e.g., First-Class Mail, Marketing Mail) and the distance traveled. For example, where the service standard is 3 days, a trip is deemed "service responsive" if it enables the mail to arrive at a destination processing center in time for it to be processed, transported to the delivery unit, and delivered by the letter carrier within 3 days.

8. To be service responsive, mail must arrive at the ultimate destination processing facility that will process the mail for delivery by "critical entry time." Critical entry time, or CET, is the time by which mail needs to be received by a facility to be included in that day's processing and then transported to delivery units (e.g., post offices) for delivery by letter carriers the next day. Whether the extra trip will proceed directly to the destination processing facility or to an STC, where the mail is transferred to another truck for transportation to the destination processing center, the mail must arrive at the destination processing facility by the critical entry time for that type of mail to be considered service responsive.

9. An extra trip is not service responsive when, even if the trip were run, the mail transported would not meet the service performance target for that mail. More specifically, an extra trip would be considered not service responsive when the trip would not arrive at the destination processing facility within a timeframe that will meet the CET in order to achieve service performance targets.

10. For example, the critical entry time for First-Class Mail is generally 8:00 a.m. First-Class Mail that arrives at a destination processing and distribution center by 8:00 a.m. is processed and transported that day to delivery units and delivered by letter carriers the next day. An extra trip that will not arrive at the destination processing center by 8:00

a.m. is not service responsive. Similarly, if the mail must be transferred at an STC to another truck for delivery to the destination processing center, it must arrive at the STC before the scheduled time for the truck to which the mail is to be transferred to depart. Otherwise, the STC will not be able to load the mail onto a truck in time for it to be transported to the destination processing center by the critical entry time.

11. In both situations, the same level of service can be achieved if the mail travels on an extra trip or is loaded onto the next regularly scheduled trip. There would be no benefit whatsoever to running the extra trip, and running it would create unnecessary costs for the Postal Service.

**Only a small volume of mail would be delayed.**

12. The Postal Service has refined the second category of potential trip denials that we anticipated as of the time of my prior Declaration. My original Declaration referred to this category as "where utilization of an extra trip would cause significant expenses and delay the delivery of only a small volume of mail." Dec. ¶ 18. Rephrased more accurately, the second category is "where utilization of an extra trip would cause significant expenses and only a small volume of mail would be delayed if an extra trip is not used."

13. The Postal Service does not have sufficient resources to utilize extra trips in each and every circumstance in which a small volume of mail has not been loaded on the appropriately scheduled trip. Moreover, there is a limited supply of transportation providers and using a truck and driver for a trip with little to no volume could mean that a provider is not available for a trip with more significant volume. Therefore, the Postal Service has reasonably decided not to order an extra trip where the volume of mail to be

4

transported is very small and the cost of the extra trip is extraordinarily high in relation to usual costs of transportations for trucks that are fully loaded or loaded with a substantial volume of mail. Given the small volume of mail, any delay would have a virtually immeasurable effect on overall ability to achieve service performance goals, while the cumulative costs of proceeding with each and every possible extra trip would be financially irresponsible.

14. After further evaluation, we have determined that, for purposes of applying a uniform standard, the Surface Planner Group would be authorized to decline approval of an extra trip where only a small volume of mail would be delayed and to further define "small volume" in terms of the load capacity of the truck transporting the mail, i.e., where the volume of mail for which an extra trip is requested is less than 15% of the truck's full capacity.

15. The Postal Service believes that where the volume of mail for which an extra trip is requested is less than 15%, there would be minimal, if any, effect on timeliness of overall service performance and that the efficiency and costs savings achieved by not running the trip outweighs that minimal effect.

16. Where the mail volume is less than 15%, the Surface Planner Group would attempt to identify alternative trips that have capacity to transport the mail. In most circumstances, alternative means of transporting the mail, such as putting it into bags that can be loaded into remaining space on a truck that is otherwise fully loaded or moving that mail volume to a nearby route that will arrive at the designation facility prior to CET are available.

17. During the April 2021 initial implementation of the new process, only one of the over 700 extra trip requests—less than 0.2 percent of requests—was denied on the grounds of low

volume of mail. *See* Dec. ¶¶ 15-16. The Postal Service anticipates that if the new process were authorized to deny extra trips in the limited circumstances identified, only a similarly small percentage of requests would be denied due to truck capacity utilization of less than 15%.

18. The one instance of a trip denial on grounds of low capacity during the initial implementation involved the Surface Planner Group's decision that the costs of the trip would be excessive and would have little, if any, effect on overall service performance, given the low volume of mail, which was less than 20% of the truck's capacity (but more than 15%). Although the process was not intended to operate to deny extra trips (and the Postal Service has reiterated that extra trips are not to be denied), as discussed above, in an effort to minimize the number of extra trip requests that may be denied due to low volume, the Postal Service would set the percentage at 15% moving forward.

19. The Surface Planner Group staff consists of professional logistics employees who have solid experience in monitoring and evaluating Postal Service transportation logistics, using the Service Visibility interface and other electronic tools. When addressing an extra trip request, the staff is equipped to identify all means of achieving delivery of the volume of mail to be transported so that the Group can make a well-informed decision as to whether an extra trip will be service responsive and will transport volumes of mail that exceed 15% of the truck's capacity.

20. The Postal Service believes that using the new process to approve the vast majority of extra trips requested, and denying trips only where the extra trip is not service responsive and where the mail volume to be transported amounts to less than 15% of the mail, are appropriate and will promote the efficiency of mail service and reduce costs, while still

maintaining the practice of utilizing a large number of extra trips on a daily basis where necessary. Of course, as in the past, it is possible that a request for an extra trip may not be approved solely because no truck is available.

21. Given the complexity of the surface network transportation system and size of Postal Service nationwide operations, it is possible that unforeseen circumstances could arise that lead to the Surface Planner Group having to exercise reasonable business judgment in application of these parameters for evaluating and approving extra trips. For example, if an extra trip is requested to move a volume of a particular mail product that would constitute less than 15% of a truck's capacity but the requester suggests filling the truck with other items or products that are subject to a longer service standard, such as Marketing Mail, the Surface Planner Group may decline approval of an extra trip because other alternatives that will timely deliver the mail product are located or there is capacity on the next scheduled trip.

22. We anticipate that application of these two defined categories will generally be straightforward and will result in a more uniform approval of extra trips nationwide.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Washington, D.C. on the 11 day of May, 2021

_____
EARL D. RANDEL

7