**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,<br><br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, *et al.*,<br><br><br>Defendants. | Civil Docket No. 20-cv-2295 (EGS) |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR CLARIFICATION OR, IN
THE ALTERNATIVE, TO MODIFY THE PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

I.     THE PRELIMINARY INJUNCTION DOES NOT PROHIBIT DECLINING TO
       APPROVE EXTRA TRIPS IN THE TWO CIRCUMSTANCES AT ISSUE .................. 4

       A.     The Preliminary Injunction Does Not Prohibit the Postal Service From
              Declining Extra Trips That Would Not Be Service Responsive............................ 7

       B.     The Preliminary Injunction Does Not Prohibit the Postal Service From
              Declining to Approve Extra Trips Where Doing So Would Delay Only a
              Small Volume of Mail .......................................................................................... 10

II.    ALTHOUGH THE POSTAL SERVICE HAS COMPLIED WITH THE
       PRELIMINARY INJUNCTION, ITS COMPLIANCE IS NOT THE SUBJECT
       OF THE PRESENT MOTION ........................................................................................ 13

CONCLUSION.................................................................................................................. 16

## TABLE OF AUTHORITIES

**CASES**

*\*Buchanan v. U.S. Postal Serv.*,
   508 F.2d 259 (5th Cir. 1975)................................................................................ 12

*\*NAACP v. U.S. Postal Serv.*,
   496 F. Supp. 3d 1 (D.D.C. 2020) .................................................................*passim*

*Nat'l Urban League v. DeJoy*,
   Civ. A. No. GLR-20-2391, 2020 WL 6363959 (D. Md. Oct. 29, 2020)................................... 3

*New York v. Trump*,
   490 F. Supp. 3d 225 (D.D.C. 2020) .......................................................................... 9

*Wis. Gas. Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ........................................................................... 9, 10

**STATUTES**

39 U.S.C. § 3661 ................................................................................................. 4, 5

**OTHER AUTHORITIES**

American Postal Workers Union, PRC Docket No. C2013-10, Order No. 1892
   (Nov. 27, 2013), https://www.prc.gov/Docs/88/88438/Order_1892.pdf .................................... 5

**INTRODUCTION**

For decades, the United States Postal Service has relied on its transportation managers, working in consultation with postal headquarters, to determine in their professional judgment whether it is appropriate to run additional, unscheduled "extra" network trips to transport mail between postal facilities. While that decision is often fact-intensive, there are two circumstances in which the Postal Service has traditionally viewed extra trips as being particularly wasteful: (1) where such a trip would not be "service responsive"—*i.e.*, where the trip would not achieve on-time delivery, and (2) where such a trip would cause significant expense to transport only a small volume of mail. *See* First Randel Decl. ¶¶ 18, 20, ECF No. 153-1. As the Postal Service has explained, it simply "does not have sufficient resources to utilize extra trips in each and every circumstance in which a small volume of mail has not been loaded on the appropriately scheduled trip." *Id.* ¶ 20. Thus, for years, the Postal Service transportation managers have reasonably exercised their judgment to decline extra trips in those circumstances. *See id.*

By its terms, the Court's preliminary injunction in this case does not prevent transportation managers from exercising their discretion to decide, as part of their day-to-day operational duties, that an extra trip is inappropriate or unwarranted. Rather, the injunction prohibited the Postal Service from implementing a nationwide *ban* on all extra trips without first seeking an advisory opinion from the Postal Regulatory Commission (PRC). *NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1, 7 (D.D.C. 2020) (enjoining a "*prohibition* on 'late trips' and 'extra trips'" (emphasis added)). The Postal Service has complied with that order, making clear on numerous occasions both before and after the Court issued its injunction that extra trips are not banned, but rather are authorized and should be used if they will effectuate timely delivery of the mail. *See* ECF No. 36 at 1, 6–7 (collecting Postal Service guidance on this issue). And the Postal Service has likewise complied with the Court's later order to issue a notice to its

employees to perform extra trips "to the maximum extent necessary to increase on-time mail deliveries" and "to the same or greater degree than they were performed prior to July 2020 when doing so would increase on-time mail deliveries," issuing the required notice immediately after the Court instructed it to do so. *See* 10/27/2020 Minute Order; ECF No. 40 at 2 n.2.

Plaintiff opposes Defendants' motion and the circumstances described therein in which Defendants seek to decline only those extra trips that are run by contractors as part of network transportation, which make up about 19% of the Postal Service's overall trips. *See* Ex. 1, Third Declaration of Earl Randel ("Third Randel Decl.) ¶ 2. But the basis for that opposition is less clear. It appears Plaintiff takes the position that this Court's injunction effectively enjoins the Postal Service from declining to approve a request for an extra trip for *any* reason. Under that view, a Postal Service employee could not decline a request to run an extra trip to transport a single piece of mail from New York to Los Angeles, regardless of the cost of that trip. That absolutist position is not what Plaintiff sought in its motion for a preliminary injunction (as it would have had no connection to the irreparable harm that was the basis for the motion), and it is not what the Court's preliminary injunction requires. And Plaintiff offers no reason why it would make any commercial or practical sense for the Postal Service to approve extra trips in the circumstances described in the motion, let alone why the Postal Service should be legally required to do so.

Instead, relying primarily on this Court's October 27, 2020 instruction to the Postal Service to inform its employees that "late and extra trips should be performed to the same or greater degree than they were performed prior to July 2020 when doing so would increase on-time mail deliveries," Plaintiff complains that the Postal Service has not undertaken as many extra trips as it had prior to July 2020. In other words, relying on data that it has had in its

possession for months (having been provided by the Postal Service on a daily or weekly basis since October), Plaintiff now appears to maintain that the Postal Service has been in violation of the preliminary injunction for reasons entirely unrelated to the present motion. And Plaintiff makes this allegation based solely on data, rather than any identified policy of the Postal Service. To Plaintiff, noncompliance is a matter of simple math, despite the fact that the Postal Service's usage of late and extra trips (like its service performance levels) reflects "the result of a combination of a host of factors, some internal to and controllable to USPS, and some external and outside of USPS's control." *Nat'l Urban League v. DeJoy*, Civ. A. No. GLR-20-2391, 2020 WL 6363959, at *9 (D. Md. Oct. 29, 2020). And just as the Court "could no sooner order [the Postal Service] to restore on-time performance to [a certain percentage] than it could order a baseball player to achieve a .300 batting average over his next several games," *id.*, the Court could not have intended to enter an injunction where compliance would be contingent on factors outside of the Postal Service's control.

Plaintiff's position also ignores the fact that this Court's October 27, 2020 instruction did not require the Postal Service to inform its employees to approve every extra trip, no matter how wasteful, but only "when doing so would increase on time mail deliveries." This Court could not have intended by this instruction to expand its injunction to the point where compliance would be contingent on factors outside of the Postal Service's control, or where the injunction has little to no connection to the allegations of irreparable harm upon which it is based. But if Plaintiff seeks to allege noncompliance on the part of the Postal Service, then that would be the subject of a different motion, in which the Postal Service would have the opportunity to submit evidence and declarations to demonstrate the seriousness with which it takes compliance with this Court's

orders. But that is not the subject of the Postal Service's pending motion, which seeks only to clarify the scope of the Court's injunction.

## ARGUMENT

### I.    THE PRELIMINARY INJUNCTION DOES NOT PROHIBIT DECLINING TO APPROVE EXTRA TRIPS IN THE TWO CIRCUMSTANCES AT ISSUE

The Court's preliminary injunction order "enjoin[s] [the Postal Service] from enforcing the Transportation Policy Changes," Order at 1, ECF No. 31, which it defined as a nationwide "prohibition on 'late trips' and 'extra trips.'" *NAACP*, 496 F. Supp. 3d at 7. In concluding that the Postal Service was likely required to seek an advisory opinion from the PRC before implementing those changes, the Court noted that Plaintiff had provided evidence that the alleged ban on late and extra trips "ha[d] resulted in nationwide delays" and that "service was affected on a nationwide basis." *Id.* at 17–18. Because of the "broad scope" of the alleged ban, the Court held that Plaintiff would likely succeed on its claim that the Postal Service must seek an advisory opinion from the PRC before implementing such a policy "change." *Id.* at 18.

The Court's decision, however, does not address the issue of Postal Service employees' traditional discretion to approve or deny extra trips more generally, as part of their day-to-day operational duties, outside of the context of an outright national ban on late and extra trips. An injunction that prohibited Postal Service employees from *ever* declining to approve an extra trip would have been inconsistent with the limited nature of Plaintiff's claims and the Court's basis for entering an injunction, namely, that the alleged ban was so significant in scope that it constituted a "change in the nature of postal services" within the meaning of 39 U.S.C. § 3661(b).

Specifically, Section 3661(b) of the Postal Reorganization Act requires the Postal Service to seek an advisory opinion from the PRC only when the Postal Service determines that a plan

4

represents "a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." The PRC has interpreted this provision to require the Postal Service to seek an advisory opinion only if the Postal Service (1) "has already, or plans to implement, new service standards" or (2) "is knowingly and/or intentionally de[grading] service."[1] Thus, the Postal Service has sought advisory opinions from the PRC before formally changing the service standards for certain classes of mail, changing the hours of operations at tens of thousands of post offices, or eliminating an entire day of mail delivery. *See* ECF No. 21 at 38–40 (collecting PRC decisions).

The issue of when a Postal Service employee may exercise his or her discretion to decline to authorize an extra trip, however, has never been the subject of a proceeding before the PRC. And for good reason. A PRC proceeding is an on-the-record, trial-type proceeding that involves the presentation of evidence, testimony of witnesses, and full posttrial briefing. *See* 39 C.F.R. § 3020.116–123. PRC regulations require the Postal Service to request an advisory opinion at least 90 days before making the proposed change. *Id.* § 3020.112. And, as explained above, the requirement to seek an advisory opinion from the PRC applies only to *changes* in the nature of postal services. 39 U.S.C. § 3661(b). Here, by contrast, the Postal Service simply seeks clarification that its employees may *continue* to decline to authorize extra trips for the same reasons that they have always declined to authorize such trips. Such a request to maintain the *status quo* cannot possibly implicate Section 3661(b).[2]

---

[1] American Postal Workers Union, PRC Docket No. C2013-10, Order No. 1892, at 13 (Nov. 27, 2013), https://www.prc.gov/Docs/88/88438/Order_1892.pdf.

[2] On March 29, 2021, the PRC, as part of its Fiscal Year 2020 Annual Compliance Determination, requested that the Postal Service "file with the Commission a service performance impact analysis for initiatives that are planned for implementation on or before . . . March 29, 2022 . . . and are reasonably foreseeable to impact service performance results." *See* Response of U.S. Postal Service to Commission Request for Additional Information at 1 (June 4,

5

This Court's recent decision in *New York v. Biden* is instructive. *See* Order, No. 20-cv-2340 (D.D.C. April 3, 2021), ECF No. 88 ("*New York* Order"). There, Defendants moved for clarification that the Court's order enjoining "the removal of high-speed sorting machines nationwide" did not prohibit the Postal Service from moving a limited number of mail-processing machines in certain circumstances. *Id.* at 1–2. The Court granted Defendants' motion for clarification, holding that their request was "not part of a nationwide plan to systematically reduce the number of processing machines" but rather "involve[d] the Postal Service's decision to move a small number of individual mail-processing machines [that were] . . . operationally necessary." *Id.* at 6–7. Because Defendants' request "implicate[d] the day-to-day activities and decisions of the Postal Service," it "d[id] not fall under the Court's preliminary injunction." *Id.*

The same is true here. Defendants' requested clarification is not part of a nationwide plan to systematically ban late and extra trips. Rather, the request implicates a small number of extra trip requests where approving the requests would impose significant costs for little to no benefit. *See* Second Randel Decl. ¶ 17, ECF No. 154-2. And, like the request at issue in *New York*, Defendants' request here implicates day-to-day activities and decisions of the Postal Service that have been left to the discretion of managers. The request thus "does not fall under the Court's preliminary injunction." *New York* Order at 7.

Plaintiff does not seriously contend otherwise. As explained below, Plaintiff offers no reason why the Court's preliminary injunction should be construed to prohibit the Postal Service

---

2021), https://www.prc.gov/docs/118/118333/USPS%20Resp%20to%20ACD%20Request%206-4-21.pdf. On June 4, 2021, in an abundance of caution, the Postal Service notified the PRC of the two new processes at issue in this motion for clarification, even though the Postal Service "do[es] not anticipate any measurable impact on overall service performance as a result of the new process[es]." *Id.* Thus, although the new processes do not implicate Section 3661(b) and the Postal Service has not requested an advisory opinion from the PRC, the PRC is aware of the processes and the pending motion for clarification in this case. *Id.* at 4 n.3.

from declining to approve extra network trips in either of the two circumstances at issue here: (1) where the trip would not be "service responsive" and (2) where not using the extra trip would result in delay of only a small volume of mail, specifically, less than 15% of the truck's capacity.

A.      **The Preliminary Injunction Does Not Prohibit the Postal Service From Declining Extra Trips That Would Not Be Service Responsive**

Plaintiff appears to concede that the preliminary injunction does not restrict the ability of Postal Service employees to deny requests for extra trips that would not be service responsive. *See* Pl.'s Opp. 3 & n.1, ECF No. 156. This is clear from the Court's preliminary injunction itself, which enjoins the Postal Service only from implementing a nationwide prohibition on late and extra trips, not from declining to authorize extra trips in all circumstances. *NAACP*, 496 F. Supp. 3d at 7.

The Court's October 27, 2020 Minute Order does not change this conclusion. The Minute Order directs the Postal Service only to "issue a . . . notice" stating that Postal Service personnel "are instructed to perform late and extra trips *to the maximum extent necessary to increase on-time mail deliveries*, particularly for Election Mail" and that "late and extra trips should be performed to the same or greater degree than they were performed prior to July 2020 *when doing so would increase on-time mail deliveries*." 10/27/2020 Minute Order (emphasis added). The Postal Service issued the required notice and has since run hundreds of thousands of extra trips. Nothing in the Minute Order requires the Postal Service to schedule trips *solely for the purpose of increasing the number of trips*, even when such trips would not be service responsive. That is because the Minute Order addresses performing extra trips only when doing so "would increase

on-time mail deliveries." *Id.* And extra trips that are not service responsive do not, by definition, "increase on-time mail deliveries."

Plaintiff does not appear to dispute any of this. In the section of its opposition arguing that Defendants are seeking to "modify" the preliminary injunction, Plaintiff addresses only the second circumstance as to which Defendants request clarification—*i.e.*, when not using the extra trip would result in delay of only a small volume of mail. In a footnote, Plaintiff observes that it "can matter greatly to a customer whether a piece of mail is one day late or two or more days late," Opp. 3 n.1, but declining to authorize an extra trip that would not be service responsive would not result in mail arriving at its final destination any later than it would have if the extra trip had been authorized. *See* Third Randel Decl. ¶ 7. If a Postal Service employee declined to approve an extra trip that would not be service responsive, the Postal Service would put the mail at issue on the next regularly scheduled trip. *Id.* The mail would not arrive at its final destination any later than if the Postal Service had run an extra trip. *Id.* If there is insufficient capacity on the next regularly scheduled trip, and no reasonable means of delivering the mail only one day later, then the Postal Service would run the extra trip, regardless of capacity. *Id.* "In other words, declining to authorize an extra trip that would not be service responsive *would not result* in mail arriving at its final destination any later than it would if the Postal Service had run an extra trip." *Id.* ¶ 6 (emphasis added).

In any event, Plaintiff does not appear to actually contend that the preliminary injunction requires the Postal Service to authorize extra trips that are not service responsive. Such an order would impose an extraordinary burden on the Postal Service, requiring it to run an extra trip even for just a single letter even when doing so would not help the letter arrive on time. *See* First Randel Decl. ¶¶ 19–20; Second Randel Decl. ¶¶ 7–11. Nothing in the Court's preliminary

injunction suggests that the Court (or Plaintiff) intended to impose such a burdensome requirement on the Postal Service.

Alternatively, even if this circumstance fell within the scope of the Court's preliminary injunction, Defendants have shown why the preliminary injunction should be modified. *See* Defs.' Mot. for Clarification ("Mot.") 14, ECF No. 154-1. Plaintiff acknowledges that the Court has discretion to modify a preliminary injunction in light of changed factual or legal circumstances that make continued enforcement of the preliminary injunction inequitable. *See id.* at 10–11; Opp. 3–4. Here, both the facts and the law have changed. The Court entered the preliminary injunction in the lead-up to the November 2020 presidential election in the context of the Postal Service adopting a number of allegedly new policies in the midst of a global pandemic. *See NAACP*, 496 F. Supp. 3d at 7; *see also New York v. Trump*, 490 F. Supp. 3d 225, 233 (D.D.C. 2020) (discussing other alleged "Postal Policy Changes"). But the election has come and gone, and the Postal Service delivered 97.9% of ballots on time.[3] Because the November 2020 election has passed, there is no longer any prospect that the limited extra trip practices described in Defendants' motion would jeopardize the timely delivery of Election Mail for that election.

The legal considerations underlying the Court's preliminary injunction have also changed. In concluding that Plaintiff had established irreparable harm, the Court acknowledged that Plaintiff needed to demonstrate that it faced an injury that is "both certain and great" and "of such imminence that there is clear and present need for equitable relief to prevent irreparable harm." *NAACP*, 496 F. Supp. 3d at 18 (quoting *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C.

---

[3] U.S. Postal Serv., 2020 Post-Election Analysis: Delivering the Nation's Election Mail in an Extraordinary Year, https://about.usps.com/newsroom/national-releases/2021/ usps_postelectionanalysis_1-12-21_georgia.pdf.

Cir. 1985)). Even assuming that Plaintiff met that high standard in October 2020 on the eve of a national presidential election in which millions of voters would be casting their ballots by mail for the first time during a global pandemic, it cannot satisfy that standard now. Indeed, Plaintiff does not even attempt to show that enjoining the approval of extra trips in the two circumstances at issue here is necessary to prevent any irreparable harm.

> **B.  The Preliminary Injunction Does Not Prohibit the Postal Service From Declining to Approve Extra Trips Where Doing So Would Delay Only a Small Volume of Mail**

Nor does the preliminary injunction prohibit the Postal Service from declining to approve an extra trip where doing so would delay only a small volume of mail (defined as no greater than 15% of the truck's total capacity). *See* Mot. 8–9. Postal Service transportation managers can easily determine a truck's load capacity based on the number and size of the containers holding the mail scheduled to be transported. Third Randel Decl. ¶ 9. The Postal Service selected a threshold of 15% because within HCR network transportation, tractor-trailer capacity is not often less than about 20%, and local managers have exercised their discretion not to run an extra trip in such circumstances. *Id.* ¶ 10. The Postal Service set the threshold percentage even lower—at 15%—to further minimize the number of extra trips that could be denied on this basis. *Id.*

The Postal Service anticipates that only a very small percentage of extra trip requests would be denied due to this threshold; in the April 2021 initial implementation, less than 0.2 percent of requested trips were denied due to low volume. Second Randel Decl. ¶¶ 17–18. And during the initial week of formal implementation of the process, May 17–21, 2021, only one of the 365 extra trip requests reported (all of which were run) had a capacity of less than 15%, indicating that less than 0.3 percent of requests would have been affected if that request had been declined. Third Randel Decl. ¶ 12. Thus, "any delay would have a virtually immeasurable effect on overall compliance with service performance goals." First Randel Decl. ¶ 20. But allowing

the Postal Service to decline to approve such trips would save "significant expenses" given that the cost of such trips is "extraordinarily high in relation to [the] usual costs of transportation for trucks that are fully loaded or loaded with a substantial volume of mail." Second Randel Decl. ¶ 13. Late and extra trips cost the Postal Service at least $280 million in fiscal year 2019 alone. *See* USPS OIG Audit Report, U.S. Postal Service's Processing Network Optimization and Service Impacts (June 16, 2020)) at 1, ECF No. 21-1. In fiscal year 2020, late and extra trips cost the Postal Service over $415 million. Third Randel Decl. ¶ 15.

Plaintiff identifies nothing in the Court's preliminary injunction order that requires the Postal Service to approve an extra trip in such circumstances. Instead, Plaintiff argues that declining to approve trips in these circumstances would be "inconsistent" with the injunction because it could "reduce the use of late and extra trips." Opp. 3. But, as explained above, the Court's injunction did not prohibit the Postal Service from taking any measures that might have the effect of "reduc[ing]" the use of extra trips. Rather, the injunction enjoined the Postal Service from implementing an alleged nationwide policy *banning* the use of late and extra trips. *NAACP*, 496 F. Supp. 3d at 7. An injunction prohibiting measures that merely "reduce" the use of late and extra trips would be significantly broader than the injunction that the Court issued, prohibiting the Postal Service from, for example, improving the efficiency of its transportation network if doing so resulted in a "reduction" in the use of extra trips. Plaintiff did not request, and the Court did not enter, an injunction that imposes such a mandatory obligation on the Postal Service to run extra trips simply for the sake of running extra trips.

There would likewise be no basis for prohibiting extra trips in these circumstances under Section 3661(b), as the Postal Service managers have traditionally exercised their judgment to decline to approve extra trips when they deem appropriate, such as when doing so would only

delay a small volume of mail. *See* First Randel Decl. ¶ 20 (explaining that transportation managers have taken into account "the volume of mail to be transported and the costs of extra trips" "[f]or many years"). Section 3661(b) does not apply to such "[m]inor alterations which have a minimal effect on the general class of postal users." *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262 (5th Cir. 1975).

Nor does the Court's October 27, 2020 Minute Order require the Postal Service to approve extra trips in these circumstances. *See* Opp. 3. Again, that order required only that the Postal Service issue a notice rescinding the Postal Service's prior guidance and making clear that "late and extra trips should be performed to the same or greater degree than they were performed prior to July 2020 when doing so would increase on-time mail deliveries." 10/27/2020 Minute Order. The clarification that Defendants request is entirely consistent with the order. As noted, it was the Postal Service's regular practice, "prior to July 2020," that managers could decline to authorize extra trips where only a small volume of mail was at issue. First Randel Decl. ¶ 20. The Postal Service seeks only clarification that it may continue to adhere to that past practice and decline to approve extra network trips where only a small amount (less than 15% of the truck's capacity) of mail would be affected.

Finally, even if the preliminary injunction could be construed to cover declining to approve extra trips in these circumstances, Defendants have satisfied the requirements for modifying the injunction for all of the same reasons identified above. The nation is no longer in the midst of a presidential election in which voting by mail is necessary to prevent the spread of an uncontrolled pandemic. While timely delivery of all mail continues to be of paramount importance to the Postal Service, there is no legal basis for requiring the Postal Service to approve extra trips when doing so would result in significant cost for only a marginal, if any,

benefit. Rather, decisions about whether to authorize an extra trip in such circumstances should, consistent with past practice, be left to the expert judgment of Postal Service employees who deal with these issues on a daily basis.

## II.   ALTHOUGH THE POSTAL SERVICE HAS COMPLIED WITH THE PRELIMINARY INJUNCTION, ITS COMPLIANCE IS NOT THE SUBJECT OF THE PRESENT MOTION

In lieu of explaining why the Court's preliminary injunction prohibits Postal Service employees from declining to approve extra trips in the circumstances described above, Plaintiff devotes a substantial portion of its opposition to criticizing the Postal Service's current level of late and extra trips. *See* Opp. 3–7. Plaintiff contends that this "reduced number of extra trips" suggests "a consistent failure to comply with the preliminary injunction." *Id.* at 5. And Plaintiff proposes that if the Court does not deny Defendants' motion, it should alternatively "hold a hearing at which USPS would be required to address its persistent failure to return to pre-July 10, 2020, levels of late and extra trips." *Id.* at 7.

But none of this has anything to do with Defendants' motion for clarification. The number of extra trips that the Postal Service is *currently* using simply has no bearing on the legal question of what the Court's preliminary injunction requires. Moreover, Plaintiff has ignored the fact that the motion for clarification concerns only the "highway contract route" network trips. Those trips make up only about 19% of the total trips that the Postal Service runs. Third Randel Decl. ¶ 2. And Plaintiff's attempt to raise this issue now is particularly inappropriate given that, since October, Defendants have been producing to Plaintiff on a regular basis data reflecting the number of extra and late trips performed each day. *See, e.g.*, 01/15/2021 Minute Order. So Plaintiff has known exactly how many late and extra trips the Postal Service has been using for months, but it is only now—in the context of Defendants' motion for clarification—that Plaintiff argues that this data suggests a "failure to comply with the preliminary injunction." Opp. 5. If

13

Plaintiff has genuine questions about this data, nothing prevents it from seeking answers to those questions in the normal course of discovery. But there is simply no basis for Plaintiff to raise this issue as a reason to oppose Defendants' motion for clarification, or for the Court to hold a hearing on this issue when it is irrelevant to the present motion.

Even if the Postal Service's current usage of extra trips were relevant, however, the data in no way suggests a "failure to comply with the preliminary injunction," as Plaintiff contends. Opp. 5. As explained, the preliminary injunction enjoined the Postal Service from enforcing a nationwide ban on late and extra trips. Pursuant to the injunction, the Postal Service made clear to its managers and employees on no fewer than five separate occasions that such trips are *not* banned, but rather are authorized and should be used if they will effectuate timely delivery of the mail. *See* ECF No. 36 at 1, 6–7 (summarizing guidance on this issue). And pursuant to the Court's October 27, 2020 Minute Order, the Postal Service issued a notice reiterating that its prior guidance regarding the use of late and extra trips was "rescinded," that Postal Service personnel were "instructed to perform late and extra trips to the maximum extent necessary to increase on-time mail deliveries," and that "late and extra trips should be performed to the same or greater degree than they were performed prior to July 2020 when doing so would increase on-time mail deliveries." ECF No. 40 at 2 n.2.

Consistent with these instructions, Postal Service employees have approved hundreds of thousands of late and extra trips since the Court entered the preliminary injunction. *See, e.g.*, ECF No. 154-3. There is thus no basis for Plaintiff's contention that the Postal Service has "fail[ed] to comply with the preliminary injunction." Opp. 5. At times, the Postal Service's level of late and extra trips has in fact significantly exceeded the "pre-July" levels referenced by Plaintiffs. For example, Plaintiff notes that "[t]he data generally show between 1,500 and 3,000

extra trips every day between April 1, 2020 and July 10, 2020." *Id.* at 4. But during the month of December, the Postal Service never ran fewer than 1,883 extra trips, and ran over 2,000 extra trips on 27 of the month's 31 days. ECF No. 154-3 at 3. To be sure, the Postal Service has not used as many late and extra trips in recent months, but that is because the Postal Service has not *needed* to use late and extra trips. Third Randel Decl. ¶ 18. As the declaration of Earl Randel explains, the Postal Service's transportation management team has been actively adjusting truck schedules to improve the timeliness and efficiency of the transportation network. *Id.* In late 2020 and early 2021, the team added additional trips to *scheduled*-trip contracts, reducing the Postal Service's need to rely on "extra" trips. *Id.* The need for late or extra trips also fluctuates with changes in mail volume, which the Postal Service has experienced during the pandemic. *Id.* ¶ 19. Local managers have also been able to find alternative means to transport mail in a service-responsive manner without running what would have been an unnecessary extra trip. *Id.* ¶ 18.

As a result of the Postal Service's efforts, on-time delivery rates have improved significantly in recent months. *See* U.S. Postal Service, Delivery of Mail Sees Across-the-Board Improvements as Recovery from Pandemic Continues.[4] In the month of May, the Postal Service delivered 87.6 percent of first-class mail on time, a 9.5 percent improvement compared against the second quarter that ended March 31. *Id.* There is no reason to think that requiring the Postal Service to run an arbitrary number of additional late or extra trips would improve on-time delivery rates. Indeed, the data available to the Postal Service does not suggest any correlation between the use of late or extra trips and on-time delivery rates. *See* Third Randel Decl. ¶ 20.

---

[4] https://about.usps.com/newsroom/national-releases/2021/0603-usps-delivery-of-mail-sees-across-the-board-improvements.htm

Had Plaintiff timely sought to question the Postal Service's compliance with the injunction based on this data, the Postal Service would have been prepared to respond to that allegation with evidence as to the seriousness with which it treats this Court's orders. But Plaintiff did not do so, and none of these aspersions are relevant to the present motion, which seeks only clarification as to whether the preliminary injunction prohibits Postal Service employees from declining to authorize extra trips in two very limited circumstances. For the reasons explained above, it does not. Accordingly, the Court should grant Defendants' motion for clarification.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion for clarification, or, alternatively, modify the preliminary injunction, and enter Defendants' proposed order. *See* ECF No. 154-4.

Dated:  June 9, 2021                    Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Acting Assistant Attorney General

                                        ERIC R. WOMACK
                                        Assistant Director, Federal Programs Branch

                                        /s/ John Robinson
                                        JOSEPH E. BORSON
                                        KUNTAL CHOLERA
                                        ALEXIS ECHOLS
                                        JOHN ROBINSON (D.C. Bar No. 1044072)
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L. Street, NW
                                        Washington D.C. 20005
                                        (202) 616-8489
                                        john.j.robinson@usdoj.gov

                                        *Attorneys for Defendants*