**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>
NATIONAL ASSOCIATION FOR THE<br>
ADVANCEMENT OF COLORED PEOPLE,<br><br>
    Plaintiff,<br><br>
v.<br><br><br>
UNITED STATES POSTAL SERVICE,<br>
<em>et al.</em>,<br><br>
    Defendants.
</td><td>
No. 20-cv-2295(EGS)
</td></tr>
</table>

<u>**MEMORANDUM OPINION**</u>

Pending before the Court is Plaintiff the National Association for the Advancement of Colored People's ("NAACP") Motion to Enforce Compliance with the Settlement Agreement and Court Order ("Mot."), ECF No. 171.[1] Upon careful consideration of NAACP's motion, the opposition, the reply, the applicable law, and for the reasons discussed below, the Court **GRANTS** NAACP's motion.

**I.   Background**

**A. Settlement Agreement**

NAACP filed this lawsuit on August 20, 2020 against Defendants the United States Postal Service and the then-

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF header page number, not the page number of the filed document.

Postmaster General of the United States[2] in his official capacity (collectively "USPS" or "Postal Service") challenging various changes the Postal Service made with respect to the delivery of Election Mail shortly before the 2020 national election and in the midst of the COVID-19 pandemic. Because the changes the Postal Service implemented lead to significant and nationwide mail delays, NAACP sued "to require the Postal Service to suspend these changes, to restore prompt and reliable mail delivery, and to ensure that mail-in ballots are accorded priority status, as they have been in past years." Compl., ECF No. 1 ¶ 5. On October 10, 2020, the Court granted NAACP's Motion for Preliminary Injunction, ruling that NAACP was likely to succeed on the merits of its claim that the Postal Service made the changes without following the procedures required by law. *See* Mem. Op., ECF No. 32 at 29-34.

In December 2021, the parties entered into a Settlement Agreement ("Agreement") regarding the Postal Service's practices for Election Mail, including those regarding mail-in ballots. *See* Stipulation of Settlement & Proposed Order ("Stipulation"), ECF No 170. The Court "retained jurisdiction to enforce paragraphs 2, 4, and 5 of the Settlement Agreement, subject to

---

[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the current Postmaster General David Steiner is substituted as Defendant for the former Postmaster General Louis DeJoy. *See* Fed. R. Civ. P. 25(d).

the relevant limitations set out in paragraphs 4.b, 5.b, 6.b, and 10." *See id*. ¶ 2; Minute Order (Dec. 20, 2021).

The parties stipulated that the Postal Service agreed "to prioritize monitoring and timely delivery of election mail." Stipulation, ECF No. 170 at 1. The Agreement requires the Postal Service to issue "National Guidance documents" for every national election cycle through 2028 that "reflect the Postal Service's formal nationwide Election Mail practices and policies for prioritizing the monitoring and timely delivery of Election Mail." Agreement, ECF No. 170 ¶¶ 1-2. Also under the Agreement, the Postal Service "retains discretion over the . . . substantive contents of" the National Guidance Documents, *id*. ¶ 2; but those documents "will reflect the Postal Service's good faith efforts to prioritize monitoring and timely delivery of Election Mail" consistent applicable statutory requirements, regulations, and Postal Regulatory Commission orders, *id.* ¶ 3(b).

## B. Executive Order 14399 and the Postal Service's Proposed Rule

On March 31, 2026, President Trump issued an Executive Order ("EO") designed to exert federal control over who in the United States may be sent a mail-in or absentee ballot in federal elections by the Postal Service. *See* Exec. Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026). Among

other things, the EO directed the Postal Service to initiate a rulemaking on mail-in and absentee ballots and directed that the proposed rulemaking include certain provisions set forth in the EO. *Id*. at 17126.[3] The EO directed that any final rule be issued no later than 120 days from the date of the order or August 3, 2026. *Id*. at 17127.

Pursuant to the EO, the Postal Service issued a Proposed Rule on June 2, 2026 that tracks the directives of the EO. *See* Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (proposed June 2, 2026) (to be codified at 39 C.F.R. pt. 111) ("Proposed Rule"). Among the changes proposed are new envelope design and review standards—specifically "the use of the official Election Mail logo, automation compatibility, placement of a uniquely serialized Intelligent Mail barcode (IMb) on each outbound and return ballot envelope, and a mailpiece design review." *Id*. at 32916. States would be required to "notify the Postal Service of the individuals to whom they will be mailing a mail-in or absentee ballot, along with the unique barcode applied to the

---

[3] On June 24, 2026, the provision in the EO directing the Postal Service to initiate the rulemaking was declared "legally void" as ultra vires and an unconstitutional violation of the separation of powers, among other things. *See California v. Trump*, No. 1:26-cv-11581-IT, 2026 WL 1826490, at *16 (D. Mass. June 25, 2026). Accordingly, that Court enjoined the Defendants in the case—other than the President—from implementing the provision as to the November 3, 2026 or any earlier federal election in the Plaintiff states. *See id*.

outbound and return ballot mail envelope for [the] individual"
to enable the Postal Service to create a "Mail-In and Absentee
Participation List" for each state—the "State-Specific Mail-In
and Absentee Participation List" or "State-Specific
Participation Lists" which the Postal Service would then
"provide to each state's chef election official." *Id.* States
would be able to "add to or modify the list of enrollees until
the last day that ballots may be mailed out to individuals under
state law." *Id.* The Postal Service would only mail ballots to
individuals who are on the State-Specific Participation Lists.
*Id.* This would be accomplished through a Postal Service
verification procedure: the Postal Service would only accept
ballots for mailing to voters if the Postal Service "confirm[s]
that a state submitted a list consistent with the conditions
laid out in the proposed rule, and that the outbound ballot
mail, and thus the blank ballot that could be returned by mail,
is destined to individuals on the list, by checking the
barcodes." *Id.* Mailings that do not comply with the standards
would be returned to the ballot mailer, who can address the
error and then resubmit. *Id.* at 32918.

Under the Proposed Rule, "states would retain full control
over who would (or would not) be able to vote by mail in federal
elections in each state" and states would provide this
information to the Postal Service "via the Federal Ballot Mail

Portal." *Id*. at 32916. Users of the portal would be required to "certify to the Postal Service that any mail-in or absentee ballots their state's authorized ballot mailers provide to the Postal Service for mailing meet the standards." *Id*. at 32918. If a state does not make this certification, mailings from that state would not be accepted and will be returned. *Id*. The Proposed Rule does not apply to federal primary elections or voting under the Uniformed and Overseas Citizens Absentee Voting Act. *Id.*

The only way for an individual to be enrolled in the Postal Service's Mail-In and Absentee Participation List is to be included on the list provided to the Postal Service through these processes. *Id.* at 32916–18. The Postal Service would then use the information to verify outbound federal ballot mail—that is, ballots sent from election officials to voters—before accepting them for mailing. *Id.* at 32918. Specifically, the Postal Service would review whether the mailing complies with new envelope standards and whether it matches the state-submitted Mail-In and Absentee Participation List and associated barcodes. *Id.* Noncompliant mailings would not be accepted and transmitted; instead, they would be returned to state or local election officials or vendors for correction before resubmission. *Id.* If a state declines to certify a Mail-In and Absentee Participation List, the Postal Service would not

6

transmit any outbound federal ballot mail to that state's voters.

## II. Analysis

### A. The Proposed Rule Would Violate Paragraph 2 of the Settlement Agreement

NAACP argues that the Proposed Rule would violate Paragraph 2 of the Agreement because the Postal Service "would refuse to transmit mail-in ballots in states that did not use specific envelopes with specific codes, and would refuse to deliver ballots for voters not included on a state-specific Mail-In and Absentee Participation List." Mot., ECF No. 171 at 9 (citing Proposed Rule, 91 Fed. Reg. at 32918). Furthermore, the Postal Service would "not deliver[] Election Mail altogether for states that do not use USPS's preferred envelopes and barcodes." *Id.* (citing Proposed Rule, 91 Fed. Reg. at 32918). NAACP argues that "there is a grave risk that USPS will fail to timely deliver Election Mail for voters who, through no fault of their own, may not be on the USPS's new Mail-In and Absentee Participation Lists because their state has not certified its List" *Id.* at 9-10 (citing Proposed Rule, 91 Fed. Reg. at 32918). NAACP also points out that the List will contain inaccuracies, resulting in voters failing to receive Election Mail. *Id.* at 10 (citing Ex. B, Prelim. Inj. Hr'g Tr. at 78:1-2, *DSCC v. Trump*, No. 1:26-cv-

7

1114-CJN (D.D.C. May 14, 2026) (government defendants conceding that no list is "perfect")).

The Postal Service responds that Paragraph 2 is merely "an informational obligation for USPS to publicly post practices and policies" and that the Court's ability to enforce Paragraph 2 is "limited to requiring USPS to continue to post on its website the handbooks, regulations, and/or memoranda pertaining to Election Mail". Opp'n, ECF No. 175 at 12.[4] The Postal Service also argues that the Paragraph 2 provision stating that "[t]he Postal Service retains discretion over the specific manner and method of posting, as well as the substantive contents of any such documents posted, as further clarified in paragraphs 3 and 10 of this Agreement" supports its position. *Id.* Finally, the Postal Service argues that the Paragraph 6(b) provision stating that "[t]he Stipulation will specify that nothing in this Agreement requires the Postal Service to undertake any specific

---

[4] The Court does not address the Postal Service's argument that NAACP is trying to enforce Paragraph 3 of the Agreement, *see* Opp'n, ECF No. 175 at 13-14; since NAACP seeks to enforce Paragraph 2, *see* Reply, ECF No. 177 at 8-9. The Court also does not address the Postal Service's arguments about the benefits of the Proposed Rule's envelopes and barcodes, *see* Opp'n, ECF No. 175 at 15-16; since they are not being challenged in the motion. And the Court agrees with NAACP that the Postal Service's assurance that it will continue to use Extraordinary Measures for "completed ballots," *id.* at 16; does not address the issue since the Proposed Rule would allow the Postal Service to reject non-compliant ballots and so they would not be mailed in the first place.

measure to prioritize monitoring and timely delivery of Election Mail, or any specific measure with respect to the treatment of Election Mail" similarly supports its position. *Id*. at 14.

The Postal Service's arguments are without merit. First, Paragraph 2 is not merely "an informational obligation." Rather, Paragraph 2 requires that "the Postal Service will post publicly on its website copies of officially issued National Guidance Documents related to Election Mail." Agreement, ECF No. 170 ¶ 2. The Agreement defines National Guidance Documents as "official materials issued by Postal Service Headquarters that will reflect the Postal Service's formal nationwide Election Mail practices and policies for prioritizing the monitoring and timely delivery of Election Mail for the national election cycle taking place every two years."[5] *Id*. ¶ 1. The Postal Service acknowledges that under the Proposed Rule, if a voter is not enrolled on the "State-Specific Mail-In and Absentee Participation List," the voter will "not receive . . . mail-in or absentee ballots." Opp'n, ECF No. 175 at 21. That is because the Postal Service would refuse to accept "noncompliant mailings"—that is, mailings where the individual does not appear

---

[5] The Agreement defines Election Mail as "any item mailed to or from authorized election officials that enables citizens to participate in the voting process—including ballots, voter registration cards, absentee voting applications, and polling place notifications." Agreement, ECF No. 170 ¶ 1.

on the Mail-In and Absentee Participation List. Opp'n, ECF No. 175 at 10. The Proposed Rule provides that where a state declines or fails to certify a list the Postal Service requests, it "will not transmit any outbound federal ballot mail to that state's voters." Proposed Rule, 91 Fed. Reg. at 32918. The Proposed Rule violates paragraph 2 of the Agreement because the Postal Service cannot post documents reflecting "practices and policies for prioritizing the monitoring and timely delivery of Election Mail" if its policies provide that it will not accept "noncompliant mailings" and therefore will not deliver mail-in or absentee ballots to some voters, and if it will not mail ballots to *any* voters in a state where the state "declines or fails to certify a list."

Second, the Paragraph 2 provision stating that "[t]he Postal Service retains discretion over the specific manner and method of posting, as well as the substantive contents of any such documents posted, as further clarified in paragraphs 3 and 10 of this Agreement" does not give the Postal Service discretion to disseminate "substantive contents" that are inconsistent with the Agreement as a whole. "The cases are legion establishing that where a contract affords discretion to the government, 'exercise of that discretion must be fair and reasonable. . . .'" *Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 637 (Fed. Cl. 2020) (quoting *Everett Plywood Corp.*

10

*v. United States,* 512 F.2d 1082, 1090 (Ct. Cl. 1975)).

Accordingly, the "substantive contents" of the postings must be consistent with its "practices and policies for prioritizing the monitoring and timely delivery of Election Mail."

Third, the Paragraph 6(b) provision stating that "[t]he Stipulation will specify that nothing in this Agreement requires the Postal Service to undertake any specific measure to prioritize monitoring and timely delivery of Election Mail, or any specific measure with respect to the treatment of Election Mail" does not allow the Postal Service to put in place a policy of refusing to accept and deliver certain ballots.

For all these reasons, the Court concludes that the Proposed Rule would violate Paragraph 2 of the Settlement Agreement.

### B. NAACP's Motion is Ripe

The Postal Service advances several arguments in support of its position that NAACP's challenge to the Proposed Rule is not ripe. For the reasons explained below, the Postal Service's arguments are without merit.

The Postal Service argues that NAACP's challenge to the Proposed Rule is not ripe because the Proposed Rule is without legal effect, citing cases that stand for the undisputed proposition that proposed rules are not final agency action subject to judicial review under the Administrative Procedure

11

Act ("APA"). *See* Opp'n, ECF No. 175 at 15-16. But NAACP is not seeking judicial review of agency action under the APA; it is seeking to enforce Paragraph 2 of the Agreement and asks the Court to declare that the standards and procedures set forth in the Postal Service's Proposed Rule would violate the Agreement and to enjoin the Postal Service from implementing those standards and procedures. *See* Proposed Order, ECF No. 171-7 at 1.

The Postal Service argues that the issue before the Court is not ripe because the Court's "intervention at this time would merely result in an advisory opinion as to whether the Proposed Rule is in keeping with the Agreement in violation of Article III's requirement that federal courts resolve only "'cases'" and "'controversies.'" Opp'n, ECF No. 175 at 15 (quoting U.S. Const. art. III, § 2). But the Postal Service has not argued that NAACP lacks standing to bring its motion. *See generally* Opp'n, ECF No. 175.

Prudential ripeness "is best seen in a twofold aspect, requiring [the Court] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). *But see Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 167 (2014) (questioning the "continuing vitality of the prudential ripeness doctrine," which appears to be in

"tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging" (citation modified)). The Court concludes that both factors weigh in favor of considering the merits of NAACP's motion.

As to fitness, the motion and opposition present legal questions involving the interpretation of the Agreement and whether the Proposed Rule would violate it. *See, e.g., Sweeney v. USPS*, 159 F.3d 1342, 1343 (Fed. Cir. 1987) ("Interpretation of a settlement agreement is a question of law . . . ."). That the Proposed Rule is not final does not affect the Court's interpretation of the Agreement. Rather, the declaratory relief NAACP seeks from the Court is appropriate in this situation. *See IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 70 (Fed. Cl. 2022) (noting that "[t]he archetypal situation calling for declaratory relief is a dispute over contract interpretation") (citation omitted)).

As to hardship, NAACP has plausibly suggested—and the Postal Service has not disputed—that the Proposed Rule is already having a "real impact on present day affairs." *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council,* 857 F.2d 55, 64 (2d Cir. 1988) (citation omitted). Among other things, the Postal Service issued its 2026-2027 Official Election Mail Guide in February 2026, *see* Reply, ECF No. 177 at 16; and the changes

13

mandated in the Proposed Rule are "already causing confusion and apprehension," *id*. (citing evidence in *California v. Trump*, No. 1:26-cv-11581-IT (D. Mass. Apr. 23, 2026), Dkt. No. 105 where stakeholders have attested to the harm to their interests being caused by the Proposed Rule).

The Postal Service points to *NAACP v. Trump* to explain that NAACP's "ripeness problem" is based on a series of contingencies: "any final rule that may (or may not) be implemented has yet to be issued (if at all), and the guidance documents that would have to be revised to reflect that rule (if it is issued) need not be promulgated for nearly four months." Opp'n, ECF No. 175 at 15-16 (citing *NAACP v. Trump*, No. 26-CV-01114 (CJN), 2026 WL 1487833 at *10 (D.D.C. May 28, 2026)). But the Postal Service has not explained—nor provided authority for— why the Court cannot declare that the standards and procedures set forth in the Proposed Rule would violate the Agreement and enjoin the Postal Service from implementing the standards and procedures. As explained above, declaratory relief is appropriate in this situation. *See IAP Worldwide Servs., Inc.*, 160 Fed. Cl. at 70.

For all these reasons, NAACP's challenge to the Proposed Rule is ripe.

14

### C. NAACP Satisfied the Meet and Confer Requirement in Paragraph 10 of the Agreement

Paragraph 10 of the Agreement provides that prior to filing a motion for relief of a violation of paragraphs 2, 4, or 5 of the Agreement, NAACP must "specify in writing to the Postal Service the alleged violation" and must give "the Postal Service at least five days' notice to investigate the allegations." Agreement, ECF No. 170 ¶ 10. The Postal Service argues that the Court is without jurisdiction to consider the motion because NAACP did not comply with this requirement when it did not wait at least five days after the Proposed Rule was published in the Federal Register on June 2, 2026 before filing the instant motion. *See* Opp'n, ECF No. 175 at 16-17.

On April 2, 2026, the first business day after the EO was issued and sixty-two days before filing the motion, NAACP wrote to the Postal Service to inform it that the rulemaking directed by the EO would cause it to violate the Agreement. Reply, Exhibit A, ECF No. 177—1 at 7-8. The Postal Service acknowledged receipt on the same day and not having received a response, NAACP sent a follow up on April 8, 2026. *Id*. at 6-7. The Postal Service responded on April 14, 2026, stating that paragraph 10 was not implicated because "[i]t is . . . premature to know what final rule will emerge from the notice-and-comment process, including how any such rule would implicate existing legal

15

authorities." *Id.* at 5. NAACP responded on April 16, 2026, stating that "[a]s we understand it, the EO directs USPS to initiate a rulemaking that would violate [its] commitments . . . required under the Settlement Agreement. Under these circumstances, we do not think the concerns set forth in our April 2 email are premature." *Id.* at 4. The Postal Service acknowledged receipt the same day. *Id.* at 3. On June 2, 2026, NAACP informed the Postal Service that it intended to file the instant motion and asked the Postal Service to confirm its opposition, which it did the same day. *Id.* at 2.

The Postal Service asserts that NAACP "cannot bootstrap conferral about one issue (the Executive Order) into an adequate conferral about the issue it actually challenges here, the NPRM." Opp'n, ECF No. 175 at 17. The Postal Service's argument is without merit. Sixty-two days before filing the motion, NAACP wrote to the Postal Service to inform it that the rulemaking directed by the EO would cause the Postal Service to violate the Agreement and the Postal Service declined to substantively engage with NAACP on the issue. The Proposed Rule was issued pursuant to the EO and incorporates the requirements set forth in the EO. *Compare* Proposed Rule, 91 Fed. Reg. 32915 (June 2, 2026) *with* Exec. Order, 91 Fed. Reg. 17125 (Mar. 31, 2026). For all these reasons, NAACP complied with the meet and confer requirement in the Agreement.

16

## D. The Postal Service's Claim-Splitting Argument Is Without Merit

Finally, the Postal Service relies on *Zerilli v. Evening News Association* to argue that NAACP "is engaging in impermissible claim splitting" because it should have brought its motion as part of *NAACP v. Trump*, No. 26-1151. Opp'n, ECF 175 at 17-18. In *Zerilli*, the Court of Appeals for the District of Columbia Circuit held that a plaintiff has "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." 628 F.2d 217, 222 (D.C. Cir. 1980) (citation omitted). The Postal Service claims that NAACP meets the *Zerilli* criteria for claim splitting because: (1) it is challenging the EO that prompted the Proposed Rule in *NAACP v. Trump* and in the instant motion; (2) both that case and the instant motion challenge Section 3(b) of the EO; (3) both cases are in the same court; and (4) both cases are against the same defendant. Opp'n, ECF No. 175 at 18.

The Postal Service's argument is without merit. "[C]laim-splitting prohibits duplicative litigation filed before judgment." *Steele v. United States*, 144 F.4th 316, 324 (D.C. Cir. 2025). There is nothing duplicative about the instant case and *NAACP v. Trump.* This case was filed on August 20, 2020, alleging claims for (1) Non-statutory review of unlawful agency

action for failure to follow the procedures required by 39 U.S.C. § 3661, (2) Non-statutory review of unlawful agency action that is arbitrary, capricious, and not in accordance with 39 U.S.C. § 101(e), (3) Mandamus to enforce 29 U.S.C. § 3991, and (4) Mandamus to enforce 39 U.S.C. § 101(e). *See* Am. Compl., ECF No. 149. It was resolved with the Agreement and closed in 2021. The instant motion seeks relief based on the Proposed Rule issued pursuant to the EO. By contrast, *NAACP v. Trump* was filed nearly six years later on April 3, 2026, alleging claims for (1) Ultra Vires Presidential Action, (2) Violation of Separation of Powers—Unlawful Intrusion on Congressional Authority and Violation of Federalism, (3) Violation of Separation of Powers—Unlawful Intrusion on State Authority, (4) Constitutional Right to Vote, (5) Violation of the Postal Service's Statutory Authority, and (6) Agency Action Contrary to the Privacy Act arising out of the EO. That both involve the EO in some way does not turn the claims into the same "subject matter."

Furthermore, NAACP could not seek the relief requested in the instant motion in a separate action: the enforcement of the terms of the Agreement that resolved *this* case can only be enforced through a motion filed in *this* case. *See Garcia Ramirez v. U.S. Immigr. & Customs Enf't*, 812 F. Supp. 3d 86, 97 (D.D.C. 2025) ("District courts have the authority to enforce the terms of their mandates.") (citation omitted).

18

For all these reasons, NAACP is not engaging in impermissible claim splitting.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** NAACP's Motion to Enforce Compliance with the Settlement Agreement and Court Order, ECF No. 171. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**July 1, 2026**